Juli Farris (Bar No. 141716)
jfarris@kellerrohrback.com
Matthew J. Preusch (Bar No. 298144)
mpreusch@kellerrohrback.com
KELLER ROHRBACK L.L.P.
1129 State Street, Suite 8
Santa Barbara, CA 93101
(805) 456-1496, Fax (805) 456-1497

Robert Lawrence Lieff (No. 037568)
rlieff@lchb.com
Robert Nelson (No. 132797)
rnelson@lchb.com
Elizabeth J. Cabraser (No. 83151)
ecabraser@lchb.com
Lieff Cabraser Heimann & Bernstein, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111
(415) 956-1000, Fax (415) 956-1000

***Attorneys for Plaintiff***
***(Additional Counsel on Signature Page)***

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| STACE CHEVEREZ, individually and on behalf of others similarly situated,<br><br>         Plaintiff,<br><br>   vs.<br><br>PLAINS ALL AMERICAN PIPELINE, LP, a Delaware limited partnership,<br><br>        Defendant. | Case No.<br><br>**COMPLAINT – CLASS ACTION**<br><br>**DEMAND FOR JURY TRIAL** |

## I.   INTRODUCTION

Plaintiff Stace Cheverez ("Plaintiff"), individually and on behalf of all others similarly situated, alleges the following against Plains All American Pipeline, LP ("Defendant" or "Plains"), based where applicable on personal knowledge, information and belief, and the investigation and research of counsel.

## II.   NATURE OF THE ACTION

1.     On the morning of May 19, 2015, a 24-inch oil pipeline in Santa Barbara, California known as Line 901 and owned by Defendant Plains All American Pipeline, LP ruptured. For Defendant, a Texas-based company, ruptured pipelines are nothing new; since 2006, federal agencies have cited it for at least 175 safety and maintenance violations. What made this failure different, however, was that this pipeline runs along the edge of the Pacific Ocean, and the rupture sent thousands of gallons of toxic crude oil flowing over some of the most beautiful beaches and pristine waters in California.

2.     Before Defendant managed to shut off Line 901, it had discharged over 100,000 gallons of crude oil. Oil coated the shoreline, clinging to rocks, sand, and the animals it touched. Oil floated out to sea, creating a slick that stretched for miles, contaminating several State Marine Conservation Areas along the way, and forcing the closure of beaches, fishing grounds, and shellfish operations.

3.     These waters are home to hundreds of sensitive animal species, and serve as the backbone of the local economy. Tourists come to these beaches to enjoy the unspoiled sand and water. People support themselves and their families by harvesting fish and shellfish from these waters. All that has been damaged by this spill, and that damage will likely last for decades.

4.     This depressingly familiar story could have been averted had Defendant installed an automatic shut-off valve on the pipeline. Such systems are not new or novel; they are ubiquitous on pipelines across the country. In fact, Line

901 is the only pipeline of its kind in Santa Barbara County without this key safety feature.

5.     The absence of an automatic shut-off system is no accident. When Defendant, through its predecessor in interest, built the pipeline in 1987, Santa Barbara County demanded that it install such a shut-off system and allow the County to inspect the welds on the pipeline. Rather than doing the responsible thing and installing safety systems and protocols, as all the other pipeline owners in the area had done, Defendant sued, arguing that the County lacked the authority to force it to install an automatic shut-off system or inspect its pipeline. As a result, Line 901 has no automatic shut-off system, and now more than 100,000 gallons of crude oil pollutes the waters and beaches on which the people and wildlife of this region depend.

6.     The Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23 on his own behalf and as a representative of others similarly situated to recover significant economic losses they have incurred and will continue to incur because of Defendant's oil spill.

### III.   PARTIES

7.     Plaintiff Cheverez is a resident of Santa Barbara County, California.

8.     Defendant Plains All American, L.P. is a Delaware limited partnership with its principal place of business in Houston, Texas. Defendant operates through or on behalf of PAA GP LLC, a Delaware limited liability company; Plains AAP, L.P. ("AAP"), a Delaware limited partnership that is the sole member of PAA GP LLC; Plains All American GP LLC ("GP LLC"), a Delaware limited liability company; Plains GP Holdings, L.P. ("PAGP"), a Delaware limited partnership that is the sole member of GP LLC; and PAA GP Holdings LLC, the general partner of PAGP.

9.      Defendant owns and operates the All American pipeline system, a common carrier crude oil pipeline system that transports crude oil produced from two outer continental shelf fields off the California coast via connecting pipelines to refinery markets in California. The system receives crude oil from ExxonMobil's Santa Ynez field at Las Flores and receives crude oil from the Freeport-McMoRan-operated Point Arguello field at Gaviota.

## IV.    JURISDICTION AND VENUE

10.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because the amount in controversy exceeds $5 million, exclusive of interest and costs, and members of the proposed class are citizens of different states than Defendant SPE. This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under the laws of the United States.

11.      This Court has personal jurisdiction over Defendant because it is registered to conduct business in California, and has sufficient minimum contacts with California.

12.      Venue is proper in this district under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district.

## V.     FACTS

**A.     The Gaviota Coast**

13.      The Gaviota Coast north of Santa Barbara is a special place. Its blue waters and beautiful coastline are home to an abundance of life, including critical populations of endangered Snowy Plovers, seals, migrating whales, and myriad fish. For those reasons, the area is often called North America's Galapagos.

14.      Because of this natural bounty and beauty, as long as people have lived in North America, they have lived on the Gaviota Coast. Today, the economic life in this region revolves around its waters and beaches. Thousands of

people in Santa Barbara County depend on the ocean and beaches for their jobs – fishing, tourism, and recreation in the region rely on them.

15.     For example, a 2009 report by the California Department of Fish and Game found annual ex-vessel revenues for fishing vessels in Santa Barbara County of $6.5 million. That includes important near shore fisheries like crab, lobster, and sea urchin.

16.     Now contamination by Defendant's oil spill has undermined the health of the environment on which that economy depends.

17.     Threats to the Gaviota Coast and Santa Barbara's environment and economy from oil development are not new. In 1969, a blowout at Union Oil's off-shore drill rig sent millions of gallons of oil into the waters and onto the beaches of Santa Barbara County. The blowout killed thousands of birds, dolphins, fish, and other marine life.

18.     Despite that disaster, the oil industry has only continued to grow in and around Santa Barbara County. Today, however, governments and some companies have taken significant steps to make the production and transportation of crude safer and more reliable. Defendant, on the other hand, is notable for its track record of doing otherwise.

**B.     The Failure of Plains All American Pipeline**

19.     Line 901, a 10-mile long, 24-inch wide pipeline owned and operated by Defendant, runs along the edge of the Pacific Ocean, transporting up to 6,300,000 gallons of oil a day between Gaviota and Las Flores. The route takes the pipeline past several state parks and beaches, including Refugio State Beach, carrying crude from offshore platforms inland, and from there to refineries.

20.     On the morning of May 19, 2015, Line 901 ruptured near Refugio State Beach, spilling toxic oil onto the beach and into the Ocean.

21.     As oil poured out of the ruptured pipe, neighbors and beachgoers began to be overwhelmed by the smell of oil. At approximately 11:30 a.m. the Santa Barbara County Fire Department responded to reports of the odors, and arrived to find oil flowing from the pipeline, through a storm drain under Highway 101, across the beach, and into the Pacific Ocean. Oil continued to leak from the pipeline until approximately 3 p.m.

22.     Initially, the oil covered the beach and rocks just below the failed pipe. But once it reached the water, the oil spread quickly, travelling for miles out to sea. The oil fouled beaches for miles in each direction.  As of May 28, the spill had impacted up to 28 miles of coastline.

23.     While the precise timeline of events is still not known, it appears that Defendant did not promptly act to respond to signs of the pipeline failure or notify relevant government agencies. As California's two United States senators stated in a letter to Defendant, "we are concerned that Plains Pipeline may not have detected this spill or reported it to federal officials as quickly as possible, and that these delays could have exacerbated the extent of the damage to the environment." The senators called Defendant's response "insufficient."

24.     Indeed, many witnesses who visited Refugio State Beach the night of the spill reported little or no response. Even the next day, as professional clean-up crews began to respond to Refugio State Beach, the response at other nearby beaches was left to volunteers with little or no training or protective equipment, using nothing but shovels and five-gallon buckets to try to remove thousands of gallons of crude from the sand and sea.

25.     Despite the efforts of those volunteers and professional responders, the scope of the spill continues to expand. It has already impacted numerous Marine Protected Areas that provide vital breeding and feeding grounds for marine species, as shown in this map prepared by the GreenInfo Network:



26.     As the oils spreads, so do its terrible consequences. Numerous, fish, birds, and marine mammals have died after being covered in oil or exposed to the oil's toxic compounds. Tar balls are washing up on beaches far to the south and east of Refugio. Frisbee-sized "oil pancakes" are drifting toward Channel Islands National Park. An oil-covered duck recently appeared at Alice Keck Park in downtown Santa Barbara, trying to clean itself in a decorative pond.

27.     Those are the visible harms, relatively easy to see and tally. Beneath the ocean's surface, however, a largely unseen catastrophe is unfolding. There, as the oil sinks and swirls in the tides and currents, it is likely suffocating sea grass, clinging to kelp beds, smothering reefs, and otherwise seeping into the aquatic food chain through shellfish and plankton. Dead bass, lobsters, crabs, octopi and other species that live beneath the surface offshore have already begun washing up on area beaches.

28.     In Santa Barbara, those environmental impacts translate to profound economic impacts.  In the short term, the oil from Defendant's ruptured pipeline has closed fishing grounds and shellfish areas, and caused canceled reservations

from tourists who otherwise would be spending their money on hotels, restaurants, kayaking or surf trips, and fishing charters

29.    For example, state officials have closed these key coastal fishing areas from Canada de Alegeria to Coal Oil Point, including the shoreline and offshore areas between those points to 6 miles offshore. Even after that closure is lifted—and that could be months away—the spill's impacts on those fisheries will continue far into the future. Also, the negative publicity from the spill has and will deter seafood buyers from seeking out Santa Barbara seafood.

30.    The spill has also discouraged tourists from visiting businesses in Santa Barbara County, where tourism (along with agriculture and wine) accounts for roughly 15 percent of the workforce, or over 36,000 jobs. For example, one local kayaking company reported 25 cancellations following the spill, resulting in a loss of approximately $3,000. Two popular state beaches—Refugio and El Capitan—were closed during one of the busiest holiday weekends of the year, and are expected to remain closed until at least June 18.

31.    Finally, the oil spill presents a serious risk to human life. The Santa Barbara County Health Department has recommended that residents avoid all areas affected by the spill, but a major highway runs through and adjacent to the spill area. Refugio Beach is considered a "Hazmat area," the County said. The County also warned that direct contact with oil, inhalation of fumes, or ingestion of contaminated fish or shellfish can cause skin irritation, nausea, vomiting, and other illnesses.

32.    Long term, the impacts may be as-yet-unknown, but they are no less certain. Even with the best spill response, toxic oil will remain in the environment for a long time, continuing to harm water, wildlife, and beaches. Recently, five years after the Deepwater Horizon oil spill in the Gulf of Mexico, officials assessing the damage to that ecosystem said "the environmental effects of this spill

is likely to last for generations." So too with this spill, which will cause similarly long-lasting environmental and economic impacts.

## C. Plains All American Pipeline Has a Long History of Recklessly Avoiding Installing Safety Equipment

33.     While this spill is a disaster, it is not an accident. Defendant wantonly disregarded the health and safety of the people and environment by operating a pipeline it knew did not have proper safety systems in place.

34.     In 1987, when Defendant constructed Line 901, Santa Barbara County's Energy Division sought to ensure the pipeline was constructed properly by, among other thing, inspecting the welds on the pipeline using x-rays. The Division routinely inspected welds on new pipelines, as a way to ensure they had been done correctly to reduce the risk of failure. The Division also ordered Defendant to install an automatic shut-off valve system on the pipeline to ensure the pipeline would shut down swiftly, and without having to wait for human action, at the first sign of a problem in the pipeline.

35.     Rather than agreeing to these commonplace and common-sense safety protocols, Defendant instead fought the County, suing it in U.S. District Court in 1987 and arguing it lacked jurisdiction to regulate its pipeline design and installation.

36.     As a result, today Line 901 in the only pipeline in Santa Barbara County "whereby the county is preempted from monitoring and safety inspections," said Kevin Drude, Director of the County's Energy Division. Drude has publicly said that Defendant's employees rarely, if ever, attend monthly meetings that he holds to discuss safety concerns with all the pipeline operators under his jurisdiction.

37.     Also as a result of its lawsuit against the County, today Defendant operates the only pipeline of its type in the County without an automatic shut-off valve system. For those reasons, it is the only pipeline that is capable of failing and discharging more than 100,000 of gallons of oil.

38.     While Santa Barbara, its citizens, and environment bore the risk, and now reality, of a catastrophic pipeline failure, Defendant has reaped rising profits, estimated at roughly $389 million on over $2 billion in earnings. By avoiding the cost of safety equipment and systems, Defendant boosted its profits by transferring the cost of failure to people who live and work in Santa Barbara County.

39.     The lax safety standards at Line 901 were not isolated incidents for Defendant. Since 2006 it has been cited for more than 175 violations of safety requirements, which have caused nearly $24 million in property damage. Eleven of those incidents were in California. Defendant is one of the top four most-cited pipeline operators in the country.

40.     Even more alarming is that, according to federal statistics analyzed by the website The Smart Pig Blog, the "number of incidents on crude oil pipelines operated by [Defendant] . . . is increasing faster than the national average," as shown in this chart:



41.     Last year, for example, a pipeline owned and operated by Defendant ruptured in a Los Angeles neighborhood, covering the streets, cars, houses, and businesses in oil. The cause: a poorly maintained pipeline. A few years ago, another poorly maintained Plains pipeline ruptured and sent oil into a drinking water reservoir for Los Angeles.

42.     In 2010, pursuant to a Consent Decree filed by the U.S. EPA following numerous alleged violations of the Clean Water Act by Defendant in several states, Defendant represented that it would update its procedures such that the "first required action where there is an indication of an increase in flow-rate outside the steady-state range [would be] "If there is an unexplained increase in delivery flow-rate with corresponding decrease in pressure – SHUTDOWN the affected line segment."

43.     As part of that settlement, Defendant paid a $3.25 million penalty for 10 spills between June 2004 and September 2007 that discharged a total of roughly 273,420 gallons of crude oil into navigable waters or adjoining shorelines in Texas, Louisiana, Oklahoma, and Kansas,

44.     Defendant itself recently acknowledged in a disclosure report to the U.S. Securities and Exchange Commission that it has "experienced (*and likely will experience future*) releases of hydrocarbon products into the environment from our pipeline . . . operations" that "may reach surface water bodies." (Emphasis added).

45.     In short, Defendant has an ugly tradition of operating pipelines that fail. The communities through which it transports oil suffer the consequences.

46.     Defendant knew of the extremely high risk of catastrophic injury inherent in the transportation of oil through a pipeline. Notwithstanding, Defendant took no action to prevent or protect Plaintiff and the Class. Indeed, Defendant actively avoided taking action to protect Plaintiff and the Class from apparent risks its Line 901 pipeline presented. Defendant demonstrated a callous and reckless

disregard for human life, health, and safety by operating Line 901 without proper safety equipment. This disregard for human life and safety at Line 901 is part of a pattern and practice that Defendant has demonstrated across the country. Defendant acted with such indifference to the consequences of its misconduct, with such recklessness, and as part of a well-established pattern, as to be willful, malicious, and oppressive, and in disregard of the rights of the Plaintiff, thereby meriting an award of punitive or exemplary damages against Defendant.

47.    This lawsuit therefore seeks to compensate the victims of the spill and to ensure that Defendant is prevented from causing additional damage to Santa Barbara County's economy and environment in the future.

## VI.    PLAINTIFF'S FACTS

### A.    Plaintiff Cheverez

48.    Plaintiff Cheverez, a resident of Santa Barbara, is an urchin diver and nearshore fisherman. He grew up on the beaches of Santa Barbara County, recreationally diving for the urchin, lobster, and other species that live just offshore.

49.    After high school, he worked at a charter diving business at the Santa Barbara marina, rising from deckhand to a captain. After that, he decided to be a commercial fisherman. In 1989, he bought a permit to commercially harvest sea urchin in California, for which he pays an annual fee. He bought his first nearshore permit five years later. Today, he owns and maintains two boats: the 34-foot Florentia Marie M/V, which he uses for urchins and nearshore fishing, and a 16-foot outboard he uses to fish in the eelgrass beds close in to the surf.

50.    Defendant's oil spill has damaged and will continue to damage the fisheries on which Plaintiff Cheverez's livelihood depends.  For example, species like Grass Rockfish spawn during the winter and spring in the eelgrass and kelp beds close to shore. At the time of Defendant's spill, those juvenile fish were

returning to those areas to feed and grow. Those are the same areas where Defendant has spilled tens of thousands of gallons of crude oil.

51.     Sea urchins—prickly, fist-sized invertebrate that cling to rocks and are prized for their roe—cannot avoid oiled areas, so urchins close to shore have likely also been impacted.

52.     But for Defendant's oil spill, Plaintiff Cheverez would have been or would presently be fishing the nearshore areas that are currently closed due to the spill.

53.     Defendant's acts and omissions have caused present injury to Plaintiff Cheverez as well as the concrete risk of imminent, additional injury.

## VII.   CLASS ACTION ALLEGATIONS

54.     Plaintiff brings claims pursuant to Federal Rule of Civil Procedure 23 on behalf of classes of similarly situated persons. Plaintiff proposes two classes: a Commercial Fishery Class and a Natural Resources-Based Businesses Class.

55.     The Commercial Fishery Class is defined as follows:

> All persons who derive a significant portion of their income through the direct harvest of fish, shellfish, or other sea life in the marine waters adjacent to Santa Barbara County.

56.     The Natural Resources-Based Businesses Class is defined as follows:

> All persons who derive a significant portion of their income from the operation of a business or businesses in Santa Barbara County, where such businesses are dependent upon the coastal and marine natural resources of that county, and that have lost profits as a result of Defendant's oil spill.

57.     Both classes are ascertainable and have a well-defined community of interest among their members.

58.     **Ascertainability:** Although the Classes are large, the precise number of members can be ascertained in at least two ways. First, because the members of the proposed Classes live in a geographically confined area, providing notice to them via newspapers, trade publications, and other routine avenues of communication will be easily accomplished. Third, Defendant's records – such as logs of complaints from affected class members – will also serve to ascertain potential Class members.

59.     **Numerosity**: The members of the Classes are so numerous that joinder of all members would be impractical.  The proposed Classes likely contain hundreds of members.

60.     **Commonality:** There are common questions of law and fact that predominate over any questions affecting only individual members of the Classes.

61.     For Plaintiff and the Classes, the common legal and factual questions include, but are not limited to, the following:

a)     Whether Defendant acted negligently and/or fraudulently to cause the spill;

b)     Whether Defendant had installed and maintained adequate safety measures and systems on Line 901 and in its systems of command and control to prevent the spill;

c)     Whether Defendant conducted adequate supervision that could have prevented the spill could be prevented;

d)     Whether Defendant engaged in unconscionable, deceptive, and/or unreasonable business practices and conduct;

e)      Whether Defendant knowingly, intentionally, or negligently concealed, suppressed, or omitted material facts concerning the safety of its pipeline from the public;

f)      Whether Defendant knowingly, intentionally, or negligently concealed, suppressed, omitted, or delayed relaying material facts regarding the spill to local, state, and federal agencies, thereby slowing the response, and/or increasing the damages to Plaintiff and members of the Classes;

g)      Whether the Classes have suffered injury by virtue of Defendant's negligence, recklessness, carelessness, and/or unconscionable and/or deceptive business practices; and,

h)      Whether Defendant is strictly liable to Plaintiff and the Classes, by virtue of State and/or Federal Law.

62.    **Typicality**: The representative Plaintiff's claims are typical of the claims of the members of the Classes. Plaintiff and all the members of the Classes have been injured by the same wrongful acts and omissions of Defendant. Plaintiff's claims arise from the same practices and course of conduct that give rise to the claims of the members of the Classes and are based on the same legal theories.

63.    **Adequacy of Representation**: Plaintiff is a representative who will fully and adequately assert and protect the interests of the Classes, and has retained class counsel who are experienced and qualified in prosecuting class actions. Neither Plaintiff nor his attorneys have any interests contrary to or in conflict with the Classes.

64.    **Rule 23(b)(3)**: In addition to satisfying the prerequisites of Rule 23(a), Plaintiff satisfies the requirements for maintaining a class action under Rule 23(b)(3). Common questions of law and fact predominate over any questions affecting only individual class members and a class action is superior to individual

litigation. The amount of damages available to individual plaintiff is insufficient to make litigation addressing Defendant's conduct economically feasible in the absence of the class action procedure. Individualized litigation also presents a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system presented by the legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

65.     **Rule 23(b)(2)**. Plaintiff also satisfies the requirements for maintaining a class action under Rule 23(b)(2). Defendant has acted or refused to act on grounds that apply generally to the proposed classes, making final declaratory or injunctive relief appropriate with respect to the proposed classes as a whole.

66.     **Rule 23(c)(4)**. Plaintiff also satisfies the requirements for maintaining a class action under Rule 23(c)(4). The claims of class members are composed of particular issues that are common to all class members and capable of class wide resolution that will significantly advance the litigation.

## VIII.  CAUSES OF ACTION

### First Claim for Relief
### Strict Liability under Lempert-Keene-Seastrand Oil Spill Prevention and Response Act, Government Code Section 8670, *et seq*.

67.     Plaintiff incorporates by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

68.     The Lempert-Keene-Seastrand Oil Spill Prevention and Response Act provides that "[a]ny responsible party, as defined in Section 8670.3, shall be absolutely liable without regard to fault for any damages incurred by any injured

party which arise out of, or are caused by, the discharge or leaking of oil into or onto marine waters." Cal. Gov. Code Section 8670.56.5(a).

69.     The Pacific Ocean and the waters off the Gaviota Coast are "marine waters" as defined in Section 8670.03(i).

70.     Defendant is a "responsible party," which is includes "the owner or transporter of oil or a person or entity accepting responsibility for the oil."

71.     The oil transported through Line 901 is "oil" within the meaning of the Act, which defines "oil" as "any kind of petroleum, liquid hydrocarbon, or petroleum products or any fraction or residues therefrom," including "crude oil."

72.     As the responsible party for the oil transported through Line 901, Defendant is absolutely liable under the Lempert-Keene-Seastrand Act.

73.     On May 19, 2015, Defendant discharged or leaked crude oil into the Pacific Ocean, and is therefore absolutely liable without regard to fault for all damages that Plaintiff and Class sustained or will sustain. That discharge was not permitted by state or federal law.

74.     The Act entitles a plaintiff to recover a wide variety of damages, including, but not limited to, loss of subsistence use of natural resources; loss of taxes, royalties, rents, or net profit shares caused by the injury, destruction, loss, or impairment of use of real property, personal property, or natural resources; and loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources. *See generally* Cal. Gov. Code Section 8670.56.5(h).

75.     The contamination illegally caused by the discharge of crude oil from Line 901 into or upon area beaches and the Pacific Ocean injured, caused to be lost, and/or impaired the use of property or natural resources on which Plaintiff and the Classes depend for subsistence living or their livelihood, including, but not

limited to, local beaches and marine waters; populations of fish, and shellfish; and marine ecosystems.

76.     The injury, destruction, loss, and/or impairment of usability of these natural resources has caused Plaintiff and the Classes to lose profits, and will caused future losses or profits and/or impair their earning capacities.

77.     The long-lasting effects of the contamination of the discharge of toxic crude oil into the Pacific Ocean on marine life on which Plaintiff and the Classes rely, requires that Plaintiff and the Classes continue future monitoring and testing activities in order to ensure such marine life is not contaminated and is safe and fit for human consumption.

## Second Claim for Relief
### Strict Liability for Ultrahazardous Activities

78.     Plaintiff incorporates by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

79.     At all times herein, Defendant was the owner and operator of the oil pipeline known as Line 901.

80.     At all times relevant to this action, Defendant had supervision, custody, and control of Line 901.

81.     At all times herein, Defendant was under a continuing duty to protect the Plaintiff and the Coast from the harm caused by Line 901.

82.     Defendant was engaged in an ultrahazardous activity by transporting flammable, hazardous, and toxic oil through its pipeline.

83.     Plaintiff and the Classes have suffered harm from the discharge of toxic oil from Defendant's Line 901.

84.     The injuries sustained by Plaintiff as a result of the oil spill were the direct and proximate result of Defendant's activity.

85.     The harm to Plaintiff and the Classes, was of the kind of harm that would reasonably anticipated as a result of the risks created by transporting flammable, hazardous, and toxic oil in a pipeline in close proximity to the Pacific Ocean.

86.     Defendant's operation of Line 901 and its failure was a substantial factor in causing the harms suffered by Plaintiff and the Classes.

87.     Due to Defendant's strict liability, Plaintiff and Class members are entitled to recover actual damages.

88.     The acts and omissions of Defendant were done with malice, fraud, and/or oppression as set out in this Complaint.

### **Third Claim for Relief**
**Violation of the Oil Pollution Act of 1990, 33 U.S.C. § 2701 *et seq.***

89.     Plaintiff incorporates by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

90.     The Federal Oil Pollution Act provides that "each responsible party for…a facility from which oil is discharged…into or upon the navigable waters or adjoining shorelines…is liable for the removal costs and damages…that result from such incident." 33 U.S.C. § 2702(a).

91.     Recoverable damages include "injury to, or economic losses resulting from destruction of, real or personal property" and "the loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources." *Id.* at (b)(2)(B) & (C).

92.     The Act defines "facility" as including a "pipeline" used for transporting oil. 33 U.S.C. § 2701(7).

93.     In the case of a discharge of oil from a pipeline, the "responsible party" is "any person owning or operating the pipeline." *Id.* at (32)(E).

94.     Plains All American Pipeline is the owner and operator of Line 901, and is thus the "responsible party."

95.     Line 901 is a "facility" as it a pipeline that transports oil.

96.     Plaintiff and members of the Class have suffered and will continue to suffer injury, economic losses, loss of profits, and impairment of their earning capacity as a result of the discharge of oil from Defendant's pipeline.

97.     Defendant is responsible for compensating Plaintiff and members of the Class for their current and future injuries, remove the oil from the environment, and restore the natural resources harmed and/or destroyed as a result of Defendant's oil spill.

## Fourth Claim for Relief
### Negligence

98.     Plaintiff incorporates by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

99.     Defendant owed a duty to Plaintiff and the Classes to exercise reasonable and ordinary care. That duty arose from, among other things, federal, state, and local laws that require Defendant to operate a pipeline in a manner that does not damage public health and safety.

100.    Defendant breached that duty to Plaintiff and the Classes by, among other things, failing to install reasonable safety equipment to prevent a spill, and failing to promptly respond to and contain the spill.

101.    Defendant, in the exercise of reasonable care, should have known that Line 901 could rupture or otherwise fail, and spill significant amounts of oil. Defendant has acknowledged that spills such as this have occurred on its pipelines in the past and will occur again.

102.   As a direct and proximate result of Defendant's negligence, Plaintiff and the Classes have sustained damages.  Those damages take primarily two forms: short-term and long-term.

103.   The short-term damages include loss of profits due to fishing closures caused by the spill, and increased costs associated with traveling to different fisheries.  The closures have excluded fishers from near shore fishing grounds for lobster, crab, shrimp, and other species.  The short-short term damages also include lost profits due to cancellations from tourists who, but for the spill, would have visited Santa Barbara County and businesses here who derive their profits from the area's natural resources.

104.   The long-term damages include future lost profits due to the harm caused to the fisheries themselves. For example, the oil is likely to depress or even eradicate in some areas populations of sea urchins, crab, lobster, and other crustaceans by directly killing numbers of those species or hindering their breeding and feeding. Similarly, oil that sinks below the surface will poison fish and potentially smother their eggs, limiting their future numbers.

105.   Finally, the taboo associated with an oil spill has and will continue to drive down the price of local fish and shellfish, and consumers and fish processors become wary of producing locally-caught species.

### Fifth Claim for Relief
**Violations of California's Unfair Competition Law Cal. Bus. & Prof. Code §§ 17200, *et seq.***

106.   Plaintiff incorporates by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

107.   Defendant has engaged and continues to engage in unfair competition in violation of the Act.

108.   Defendant's conduct constitutes "fraudulent" business practices within the meaning of the Act in that members of the public have been harmed.

109.   Defendant's conduct amounts to "unfair" business practices as the Act forbids all wrongful business activities in any context in which they appear. Moreover, as described above, Defendant's practices offend established public policies, are immoral, unethical, oppressive, and unscrupulous. The impact of Defendant's practices is in no way mitigated by any justifications, reason, or motives. Defendant's conduct has no utility when compared to the harm done to Plaintiff and members of the Class.

110.   Defendant's conduct was "unlawful" because it violated laws including but not limited to the Lempert-Keene Act, Government Code Section 8670, *et seq.*, and the Porter-Cologne Act, Water Code Sections 13000, *et seq.*, and Cal. Fish & Game Code Section 5650, *et seq. inter alia*, the Oil Pollution Act, and the oil spill response plans required by federal, state, and local laws. Federal, state, and local officials have announced civil and criminal investigations into Defendant's conduct related to the spill, so it is reasonable to infer that Defendant may have violated other laws.

111.   As a direct and proximate result of Defendant's unfair, fraudulent, and unlawful methods of competition and unfair and deceptive acts or practices, Plaintiff and the Classes have sustained damages.

112.   As a proximate result of Defendant's unfair methods of competition and unfair and deceptive acts or practices, Defendant has been unjustly enriched and should be required to make restitution payments to Plaintiff and the Classes pursuant to Bus. & Prof. Code §§ 17203 and 17204.

113.   The acts and omissions of Defendant were done with malice, fraud, and/or oppression as described in this Complaint.

### Sixth Claim for Relief
### Negligence Per Se

114.   Plaintiff incorporates by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

115.   At all times herein mentioned, Defendant negligently, wantonly, carelessly and/or recklessly maintained and operated Line 901.

116.   Defendants violated several statutes, ordinances, or regulations including but not limited to the Lempert-Keene Act, Government Code Section 8670, *et seq.*, and the Porter-Cologne Act, Water Code Sections 13000, *et seq.*, and Cal. Fish & Game Code Section 5650, *et seq.*

117.   As a direct and legal cause of the Defendant's wrongful acts and omissions herein above set forth, Plaintiff and the Classes have suffered and will suffer economic harm, injury, and losses.

118.   Plaintiff's harm resulted from the occurrence of the nature that the laws listed above were designed to prevent, and Plaintiff is a member of the class of persons for whose protection those laws were adopted.

119.   The acts and omissions of Defendant, and each of them, were done with malice, fraud, and/or oppression as described in this Complaint.

### Seventh Claim for Relief
### Public Nuisance

120.   Plaintiff incorporates by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

121.   Defendant has created a condition that is harmful to health and interferes with the comfortable enjoyment of life and property by discharging up to 101,000 gallons of crude oil onto the beaches of Santa Barbara County and the Pacific Ocean.

122.   That nuisance affects a substantial number of individuals similarly situated to the Plaintiff, such as residents and visitors to Santa Barbara County,

commercial fishers, and businesses that rely on the safe and healthy environment in the county.

123.   The oil spill is a condition which would reasonably annoy and disturb an ordinary person, as shown by, for example, the health impacts warned of by the county, the community outrage in response to the spill, and the nationwide interest in the spill's impact's on the Gaviota Coast.

124.   The seriousness and gravity of that harm outweighs the social utility of Defendant's conduct. There is little or no social utility associated with releasing tens of thousands of gallons of oil into the unique ecological setting of Santa Barbara County.

125.   Plaintiff and the Classes suffered harm and injury to their economic livelihood, which they did not consent to and which is different from the type of harm suffered by the general public.

126.   The above acts and omissions also created a public nuisance *vis-a-vis* the Plaintiff and the Classes, interfering with the property rights of Plaintiff and the Classes, and rights incidental to those property rights.

127.   The acts and omissions of Defendant described herein were also in violation of various California state laws including but not limited to the Lempert-Keene Act, Government Code Section 8670, *et seq.*, and the Porter-Cologne Act, Water Code Sections 13000, *et seq.*, and Cal. Fish & Game Code Section 5650, *et seq.*

128.   Defendant's violations of those statutes directly and proximately caused, and will cause, injury to the Plaintiff and the Classes of a type which the statutes are intended to prevent. Plaintiff and the Classes are of the class of persons for whose protection these statutes were enacted.

129.   As a direct and legal cause of Defendant's wrongful acts and/or omissions herein above set forth, Plaintiff and the Classes have suffered and will suffer economic harm, injury, and losses as herein above set forth.

130.   To remedy the harm caused by Defendant's nuisance, Plaintiff will seek public injunctive relief, including, but limited to, an order requiring Defendant to restore fisheries impacted by the spill and to repair reputational damage done to Santa Barbara's seafood industry.

131.   In maintaining the nuisance, which is ongoing, Defendant is acting with full knowledge of the consequences and damage being caused, and the acts and omissions of Defendant, were done with malice, fraud, and/or oppression as described in this Complaint.

## Request for Relief

Plaintiff, individually and on behalf of all others similarly situated, requests judgment against Defendant as follows:

A.   For an order certifying the Classes and appointing Plaintiff as a representative of the Classes and appointing the lawyers and law firms representing Plaintiff as counsel for the Classes;

C.   Permanently enjoining Defendant from operating a pipeline in Santa Barbara County without adequate safety and response measures;

D.    For all recoverable compensatory, statutory, and other damages sustained by Plaintiff and the Classes, including disgorgement, unjust enrichment, and all other relief allowed under applicable law;

E.   Granting Plaintiff and the Classes awards of restitution and/or disgorgement of Defendant's profits from its unfair and unlawful practices described above;

F.   For costs;

G.     For both pre-judgment and post-judgment interest on any amounts awarded;

H.     For appropriate injunctive relief, including public injunctive relief; *i.e.*, an order requiring Defendant to restore fisheries impacted by the spill and to repair reputational damage done to Santa Barbara's seafood industry;

I.     For treble damages insofar as they are allowed by applicable laws;

J.     For appropriate individual relief as request above;

K.     For payment of attorneys' fees and expert fees as may be allowable under applicable law, including the Private Attorneys General Act ("PAGA"), Cal. Code. Civ. P., § 1021.5;

L.     For exemplary or punitive damages under Cal. Civ. Code Section 3294 for the oppression, fraud, and malice alleged above; and

M.     For such other and further relief, including declaratory relief, as the Court may deem proper.

## IX.   DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable.

RESPECTFULLY SUBMITTED this 1st day of June, 2015.

KELLER ROHRBACK L.L.P.

By /s/Matthew J. Preusch

Juli Farris (Bar No. 141716)
jfarris@kellerrohrback.com
Matthew J. Preusch (Bar No. 298144)
mpreusch@kellerrohrback.com
Keller Rohrback L.L.P.
1129 State Street, Suite 8
Santa Barbara, CA 93101
(805) 456-1496, Fax (805) 456-1497

Gretchen Freeman Cappio*
gcappio@kellerrohrback.com
Daniel Mensher*
dmensher@kellerrohrback.com
Keller Rohrback L.L.P.
1201 Third Ave, Suite 3200
Seattle, WA 98102-3-25
(206) 623-1900, Fax (206) 623-3384

Robert Lawrence Lieff (No. 037568)
rlieff@lchb.com
Robert Nelson (No. 132797)
rnelson@lchb.com
Elizabeth J. Cabraser (No. 83151)
ecabraser@lchb.com
Lieff Cabraser Heimann & Bernstein, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111
(415) 956-1000, Fax (415) 956-1000

Attorneys for Plaintiff