Robert L. Lieff (CSB No. 037568)
Elizabeth J. Cabraser (CSB No. 083151)
Robert J. Nelson (CSB No. 132797)
Wilson M. Dunlavey (CSB No. 307719)
**LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP**
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

Lynn Lincoln Sarko
*(Admitted Pro Hac Vice)*
Gretchen Freeman Cappio
*(Admitted Pro Hac Vice)*
Daniel Mensher
*(Admitted Pro Hac Vice)*
**KELLER ROHRBACK L.L.P.**
1201 Third Ave., Suite 3200
Seattle, WA 98101
Telephone: (206) 623-1900
Facsimile: (206) 623-3384

Juli Farris (CSB No. 141716)
Matthew J. Preusch (CSB No. 298144)
**KELLER ROHRBACK L.L.P.**
1129 State Street, Suite 8
Santa Barbara, CA 93101
Telephone: (805) 456-1496
Facsimile: (805) 456-1497

*Interim Co-Lead Class Counsel
for Plaintiffs*

A. Barry Cappello (CSB No. 037835)
Leila J. Noël (CSB No. 114307)
Lawrence J. Conlan (CSB No. 221350)
**CAPPELLO & NOËL LLP**
831 State Street
Santa Barbara, CA 93101-3227
Telephone: (805)564-2444
Facsimile: (805)965-5950

*Lead Trial Counsel for Plaintiffs*

*\*Additional Counsel for Plaintiffs on
Signature Page*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KEITH and TIFFANI ANDREWS, individuals, ALEXANDRA B. GEREMIA, as Trustee for the Alexandra Geremia Family Trust dated 8/5/1998, RICHARD LILYGREN, an individual, et al. individually and on behalf of others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>PLAINS ALL AMERICAN PIPELINE, L.P., a Delaware limited partnership, PLAINS PIPELINE, L.P., a Texas limited partnership, and JOHN DOES 1 through 10,<br><br>Defendants. | Case No.  2:15-cv-04113-PSG-JEM<br><br>[Consolidated with Case Nos. 2:15-CV-04573 PSG (JEMx), 2:15-CV-4759 PSG (JEMx), 2:15-CV-4989 PSG (JEMx), 2:15-CV-05118 PSG (JEMx), 2:15-CV- 07051-PSG (JEMx)]<br><br>**CLASS ACTION**<br><br>**PLAINTIFFS' CONSOLIDATED SECOND AMENDED COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

# **TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ...................................................................................... 1

II.     NATURE OF THE ACTION ...................................................................... 1

III.    PARTIES ................................................................................................... 3

IV.     JURISDICTION AND VENUE ................................................................. 6

V.      FACTS ...................................................................................................... 7

     A.      The Gaviota Coast ........................................................................... 7

     B.      The Failure of Defendants' Pipeline ................................................ 8

     C.      Plains Has a Long History of Recklessly Avoiding Installing
            Safety Equipment ........................................................................... 14

     D.      On September 11, 2015 PHMSA Issued a Formal Notice of
            Probable Violation and Compliance Order Against Defendants
            in Light of a Long-standing Investigation. ..................................... 18

VI.     PLAINTIFFS' FACTS ............................................................................ 22

     A.      Plaintiffs Keith and Tiffani Andrews ............................................ 22

     B.      Plaintiff Baciu Family LLC .......................................................... 24

     C.      Plaintiff Robert Boydston .............................................................. 25

     D.      Plaintiff  Captain Jack's Santa Barbara Tours, LLC ....................... 25

     E.      Plaintiff Morgan Castagnola .......................................................... 26

     F.      Plaintiff Crab Cowboys, LLC ....................................................... 27

     G.      Plaintiff The Eagle Fleet, LLC ...................................................... 28

     H.      Plaintiff Zachary Frazier ................................................................ 29

     I.       Plaintiff Mike Gandall .................................................................. 29

     J.       Plaintiff Alexandra B. Geremia ..................................................... 31

     K.      Plaintiff Jim Guelker ..................................................................... 32

     L.      Plaintiff Jacques Habra .................................................................. 32

     M.      Plaintiff iSurf, LLC ....................................................................... 33

     N.      Plaintiffs Mark and Mary Kirkhart ............................................... 34

     O.      Plaintiff Jamie Klein ...................................................................... 34

# TABLE OF CONTENTS
(continued)

**Page**

P.     Plaintiff Richard Lilygren ....................................................35

Q.    Plaintiff Hwa Hong Muh.....................................................35

R.     Plaintiff Ocean Angel IV, LLC ..........................................36

S.     Plaintiff Pacific Rim Fisheries, Inc.....................................37

T.     Plaintiff Sarah Rathbone, Community Seafood LLC ........38

U.    Plaintiff Santa Barbara Uni, Inc. .......................................39

W.    Plaintiff Southern Cal Seafood, Inc. ..................................40

X.     Plaintiff TracTide Marine Corp. ........................................41

Y.     Plaintiff Wei International Trading Inc. ..............................42

Z.     Plaintiff Stephen Wilson ....................................................43

VII.    CLASS ACTION ALLEGATIONS ............................................44

VIII.   CAUSES OF ACTION ...............................................................47

IX.    REQUEST FOR RELIEF............................................................61

X.     DEMAND FOR JURY TRIAL...................................................62

## I.     INTRODUCTION

Plaintiffs Keith Andrews, Tiffani Andrews, Baciu Family, LLC, Robert Boydston, Captain Jack's Santa Barbara Tours, LLC, Morgan Castagnola, Crab Cowboys, LLC, The Eagle Fleet LLC, Zachary Frazier, Mike Gandall, Alexandria Geremia, Jim Guelker, Jacques Habra, iSurf, LLC, Mark Kirkhart, Mary Kirkhart, Jamie Klein, Richard Lilygren, Hwa Hong Muh, Ocean Angel IV, LLC, Pacific Rim Fisheries, Inc., Sarah Rathbone, Santa Barbara Uni, Inc., Southern Cal Seafood, Inc., TracTide Marine Corp., Wei International Trading Inc., and Stephen Wilson (collectively "Plaintiffs"), individually and on behalf of all others similarly situated, allege the following against Plains All American Pipeline, L.P., Plains Pipeline, L.P., and John Does 1 through 10 ("Defendants" or "Plains"), based where applicable on personal knowledge, information and belief, and the investigation and research of counsel.

## II.     NATURE OF THE ACTION

1.     On the morning of May 19, 2015, a 10-mile long, 24-inch wide oil pipeline in Santa Barbara County, California known as Line 901, owned and operated by Defendants, ruptured. For Defendants, ruptured pipelines are nothing new; since 2006, federal agencies have cited them for over 175 safety and maintenance violations. What makes this failure different, however, is that this pipeline runs along the edge of the Pacific Ocean, and the rupture sent tens of thousands of gallons of toxic crude oil flowing over some of California's most beautiful beaches and into its pristine waters.

2.     Before Defendants shut off Line 901, it had discharged crude oil in an amount initially estimated by Plains to be over 100,000 gallons, and then recalculated to be more than 140,000 gallons. Oil coated the shoreline and clung to rocks, sand, wild animals, and marine life. Oil floated out to sea, creating a slick that stretched for miles, contaminating several State Marine Conservation Areas along the way.  The spill forced the closure of beaches and fertile fishing grounds,

CONSOLIDATED SECOND AMENDED
CLASS ACTION COMPLAINT
CASE NO. 2:15-CV-04113-PSG-JEM

1   including a variety of shellfish and fishing operations, and damaged coastal private

2   properties.

3       3.      These waters are home to hundreds of sensitive animal species, and

4   serve as the backbone of the local economy. Tourists come to these beaches to

5   enjoy the unspoiled sand and water. Additionally, people support themselves and

6   their families by harvesting fish, squid, and shellfish from these waters. The

7   beachfront properties along the Central Coast of California, like coastal properties

8   throughout the state, are highly valuable. The property owners enjoy the unspoiled

9   sand and water, direct access to fishing, surfing, kayaking, and other activities. The

10  oil fields below these waters also provide many local jobs for workers in offshore

11  and onshore oil and gas operations, and a lucrative market for small business that

12  support the oil companies.

13      4.      This depressingly familiar story could have been averted had

14  Defendants adequately maintained Line 901, making it less susceptible to corrosion

15  and rupture, installed an automatic shut-off valve on the pipeline, or properly

16  responded to the rupture of Line 901.

17      5.      Regular maintenance of pipelines is a crucial step that owners of

18  pipelines must take in order to avoid exactly the disaster that occurred with Line

19  901. Line 901 was severely corroded prior to the spill, and in fact had thinned to

20  just 1/16 of an inch in places. Additionally, Defendants had repaired three parts of

21  Line 901 adjacent to the rupture, indicating that they were aware of corrosion, knew

22  how to address it, but simply failed to do so.  Moreover, Defendants also failed to

23  maintain their pipeline known as Line 903 (a 30-inch diameter pipeline connecting

24  to Line 901 and extending approximately 128 miles to Kern County).  Defendants

25  control both Line 901 and Line 903 (together, the "Pipeline") from their control

26  room in Midland, Texas.

27      6.      Automatic shut-off valves, which the Pipeline lacked, are not new or

28  novel; they are ubiquitous on pipelines across the country. In fact, the Pipeline is

the only pipeline of its kind in Santa Barbara County without this key safety feature. The absence of an automatic shut-off system on the Pipeline is no accident. When Defendants, through their predecessor in interest, built the Pipeline in 1987, Santa Barbara County demanded that they install such a shut-off system and allow the County to inspect the welds on the pipeline. Rather than doing the responsible thing and installing safety systems and protocols, as all the other pipeline owners in the area did, Defendants sued, arguing that the County lacked the authority to force them to install an automatic shut-off system or inspect their pipeline. As a result, the Pipeline has no automatic shut-off system, and more than 140,000 gallons of crude oil polluted the waters and beaches on which the people and wildlife of this region depend. Even now, after the spill, Plains has publicly announced that it will not install automatic shutoff valves.

7.     Plaintiffs bring this action pursuant to Federal Rule of Civil Procedure 23 on their own behalves and as representatives of others similarly situated to recover significant economic losses they have incurred and will continue to incur because of Defendants' oil spill.

### III.   PARTIES

8.     Plaintiffs Keith and Tiffani Andrews are residents and citizens of Santa Margarita, San Luis Obispo County, California.

9.     Plaintiff Baciu Family, LLC is a California limited liability company that owns coastal property in Santa Barbara, Santa Barbara County, California.

10.     Plaintiff Robert Boydston is a resident and citizen of Santa Maria, Santa Barbara County, California.

11.     Plaintiff Captain Jack's Santa Barbara Tours, LLC is a California limited liability company doing business in Santa Barbara, Santa Barbara County, California.

12.     Plaintiff Morgan Castagnola is a resident and citizen of Santa Barbara, Santa Barbara County, California.

13.     Plaintiff Crab Cowboys, LLC is a California limited liability company doing business in Ventura, Ventura County, California.

14.     Plaintiff The Eagle Fleet LLC is a California limited liability company with its principal place of business in Salinas, Monterey County, California.

15.     Plaintiff Zachary Frazier is a resident and citizen of Bakersfield, Kern County, California.

16.     Plaintiff Mike Gandall is a resident and citizen of Goleta, Santa Barbara County, California.

17.     Plaintiff Alexandra B. Geremia is a resident and citizen of Santa Ynez, Santa Barbara County, California.

18.     Plaintiff Jim Guelker is a resident and citizen of Los Osos, San Luis Obispo County, California.

19.     Plaintiff Jacques Habra is a resident and citizen of Santa Barbara, Santa Barbara County, California.

20.     Plaintiff iSurf, LLC is a California limited liability company doing business in Santa Barbara, Santa Barbara County, California.

21.     Plaintiffs Mark and Mary Kirkhart are residents and citizens of Montecito, Santa Barbara County, California.

22.     Plaintiff Jamie Klein is a resident and citizen of San Clemente, Orange County, California.

23.     Plaintiff Richard Lilygren is a resident and citizen of Santa Maria, Santa Barbara County, California.

24.     Plaintiff Hwa Hong Muh is a resident and citizen of Santa Barbara, Santa Barbara County, California.

25.     Plaintiff Ocean Angel IV, LLC is a California limited liability company doing business in Watsonville, Santa Cruz Santa County, California.

///

26.    Plaintiff Pacific Rim Fisheries, Inc. is a California corporation doing business in Camarillo, Ventura County, California.

27.    Plaintiff Sarah Rathbone is a resident and citizen of Goleta, Santa Barbara County, California.

28.    Plaintiff Santa Barbara Uni, Inc. is a citizen of Oxnard, Ventura County, California.

29.    Plaintiff Southern Cal Seafood, Inc. is a California corporation doing business in Camarillo, Ventura County, California.

30.    Plaintiff TracTide Marine Corp. is a California corporation headquartered and with its principal place of business in Port Hueneme, Ventura County, California.

31.    Plaintiff Wei International Trading Inc. is a California corporation doing business in El Monte, Los Angeles County, California.

32.    Plaintiff Stephen Wilson is a resident and citizen of Atascadero, San Luis Obispo County, California.

33.    Defendant Plains All American Pipeline, L.P. is a limited partnership formed in Delaware with its headquarters and principal place of business in Houston, Texas. Under the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d)(10), Defendant Plains All American Pipeline, L.P., an unincorporated association, is therefore a citizen of Delaware and Texas.

34.    Defendant Plains All American operates through or on behalf of: PAA GP LLC, a limited liability company formed in Delaware with its headquarters and principal place of business in Houston, Texas; Plains AAP, L.P. ("AAP"), a limited partnership formed in Delaware with its headquarters and principal place of business in Houston, Texas, that is the sole member of PAA GP LLC; Plains All American GP LLC ("GP LLC"), a limited liability company formed in Delaware with its headquarters and principal place of business in Houston, Texas; Plains GP Holdings, L.P. ("PAGP"), a limited partnership formed in Delaware with its

1    headquarters and principal place of business in Houston, Texas, that is the sole

2    member of GP LLC; and PAA GP Holdings LLC, a limited liability company

3    formed in Delaware with its headquarters in Houston, Texas, that is the general

4    partner of PAGP. As each of these entities are unincorporated associations,

5    pursuant to CAFA, 28 U.S.C. § 1332(d)(10), they are each citizens of Delaware and

6    Texas.

7         35.    Defendant Plains Pipeline, L.P. is a limited partnership formed in

8    Texas with its headquarters and principal place of business in Houston, Texas.

9    Plains Pipeline, L.P. is a subsidiary of Plains All American Pipeline, L.P. Pursuant

10   to CAFA, 28 U.S.C. § 1332(d)(10), Defendant Plains Pipeline, L.P., an

11   unincorporated association, is therefore a citizen of Texas.

12        36.    On information and belief, Defendants John Does 1 through 10, are

13   corporations or partnerships, the names and addresses of which are currently

14   unknown.

15        37.    Defendants own and operate the Pipeline, a crude oil pipeline system

16   which, until shut down following the Line 901 rupture, had been approved to

17   transport crude oil from ExxonMobil's Santa Ynez field at Las Flores and crude oil

18   from the Freeport-McMoRan-operated Point Arguello field at Gaviota.  In addition,

19   and unknown until testing was performed after the spill, the Pipeline also carried –

20   and Line 901 spilled – toxic chemicals known to pose severe threats to human

21   health and marine life, including but not limited to, Ethylbenzene, Toluene, Xylene,

22   and Naphthalene, as further detailed below.

23                    **IV.   JURISDICTION AND VENUE**

24        38.    This Court has jurisdiction over this action pursuant to CAFA, 28

25   U.S.C. § 1332(d), because at least one class member is of diverse citizenship from

26   one defendant; there are more than 100 class members; and the aggregate amount in

27   controversy exceeds $5 million, exclusive of interest and costs.

28   ///

39.     This Court has personal jurisdiction over Defendants because they are registered to conduct business in California, and have sufficient minimum contacts with California.

40.     Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred and/or emanated from this District, and because Defendants have caused harm to Class members residing in this District.

## V.     FACTS

### A.     The Gaviota Coast

41.     The Gaviota Coast, north of Santa Barbara, is a special place. Its blue waters and beautiful coastline are home to an abundance of life, including critical populations of endangered Snowy Plovers, seals, migrating whales, and myriad of fish. For those reasons, the area is often called North America's Galapagos.

42.     Because of its natural bounty and beauty, as long as people have lived in North America, they have lived on the Gaviota Coast. Today, the economic life in this region revolves around its waters and beaches. Thousands of people in Santa Barbara County depend on the ocean and beaches for their jobs: fishing, tourism, and recreation in the region rely on them. Beachfront property owners enjoy direct access to blue waters and magnificent coastline, and residents walk the beaches, fish from the shores, swim, surf, kayak and use and enjoy their properties.

43.     Santa Barbara's port has the highest earnings in the state for red sea urchin, California spiny lobster, red rock crab, yellow rock crab, giant red sea cucumber, white seabass, and grass rockfish. The Santa Barbara area is also considered to be the backbone of California's squid fishing industry.  The annual ex-vessel value of the catch coming into Santa Barbara's harbor is approximately $10 million, and the commercial value of the area closed by Plains' oil spill alone was nearly $20 million, and over 35 million pounds, over the last decade.

///

44.     Now contamination by Defendants' oil spill has undermined the health of the environment, real property and local market for jobs and small businesses on which that economy depends.

45.     Threats to the Gaviota Coast and Santa Barbara's environment and economy from oil development are not new. In 1969, a blowout at Union Oil's off-shore drill rig sent millions of gallons of oil into the waters and onto the beaches of Santa Barbara County. The blowout killed thousands of birds, dolphins, fish, and other marine life. The litigation that followed effectively led to the birth of the environmental movement and legislation to protect the environment and the public from oil and gas operations on and off shore.

46.     Despite that disaster, the oil industry has only continued to grow in and around Santa Barbara County. Today, however, governments and some companies have taken significant steps to make the production and transportation of crude oil safer and more reliable. Defendants, on the other hand, are notable for their track record of doing otherwise.

**B.     The Failure of Defendants' Pipeline**

47.     Line 901 runs along the edge of the Pacific Ocean, transporting, when operational, up to 6,300,000 gallons of oil per day between Gaviota and Las Flores, California. The route takes the pipeline through many private properties and past several state parks and beaches, including Refugio State Beach, carrying crude from offshore Heritage, Harmony, and Hondo platforms inland, and from there to refineries in Southern California.  Line 901 delivers all of its crude oil to Line 903 at the Gaviota Pumping Station.

48.     Line 903 then picks up crude oil delivered from the Hidalgo, Harvest and Hermosa platforms which are located off Point Arguello, and continues on its 128-mile run north and inland to the east, to the Emidio Station.  Defendants' Pipeline is shown in the below map published by the Santa Barbara County Energy Division.

CONSOLIDATED SECOND AMENDED
CLASS ACTION COMPLAINT
CASE NO. 2:15-CV-04113-PSG-JEM



49.     On the morning of May 19, 2015, at approximately 10:55 a.m., Line 901 ruptured on private property near Refugio State Beach, spilling toxic oil onto the beach and into the Pacific Ocean.

50.     As oil poured out of the ruptured pipe, neighbors and beachgoers became overwhelmed by the smell of oil. At approximately 11:30 a.m. the Santa Barbara County Fire Department responded to reports of the odors, and arrived to find oil flowing freely from the pipeline, through a storm drain under Highway 101, across the beach, and into the Pacific Ocean. Oil continued to spill from the pipeline until approximately 3 p.m. Line 901 continued to operate for more than 30 minutes after its initial rupture.

51.     Initially, the oil covered the beach and rocks just below the failed pipe. But once it reached the water, the oil quickly spread, travelling for miles out to sea. The oil fouled beaches for miles in each direction, spreading along the

1    shoreline, and washed up on nearby properties. As of June 8, 2015, the spill had

2    impacted up to 50 miles of shoreline along the Central Coast. By June 22, 2015,

3    Defendants confirmed that their oil has washed up in identifiable tarballs on

4    Manhattan Beach, 130 miles south of Santa Barbara. Subsequently, tarballs

5    matching Plains oil washed up on Orange County beaches. It is presently unknown

6    how far north the oil spill has traveled.

7        52.    While the precise timeline of events is still unknown, it appears that

8    Defendants did not promptly act to respond to signs of the pipeline's failure or

9    notify relevant government agencies. As California's two United States senators

10   stated in a letter to Defendants, "we are concerned that Plains Pipeline may not

11   have detected this spill or reported it to federal officials as quickly as possible, and

12   that these delays could have exacerbated the extent of the damage to the

13   environment." The senators called Defendants' response "insufficient."

14       53.    Indeed, as reported by the *Los Angeles Times*, it appears that "chaos

15   and delay marked the initial hours after [the] pipeline burst." According to

16   Defendants' response to the senators' letter, Plains personnel were unable to timely

17   notify federal spill response officials or communicate with other Plains

18   representatives due to in part "distractions" at the spill site. Defendants' on-site

19   employee was reduced to using a shovel to try to build a berm to contain the spill.

20       54.    According to federal investigators, one of Plains' representatives told

21   officials who first responded to reports of an oil spill that he did not think it came

22   from Line 901, which is on the opposite side of the highway from the ocean. In fact,

23   it was several hours before Defendants officially notified local, state, or federal spill

24   response officials, even though Defendants' representatives were conducting a spill

25   response drill nearby *that very morning*.

26       55.    Witnesses who visited Refugio State Beach on the night of the spill

27   reported little or no response. Even the next day, as professional clean-up crews

28   began responding to the oil contaminating Refugio State Beach, the response efforts

at other nearby beaches were left to volunteers with little or no training or protective equipment, some using nothing but shovels and five-gallon buckets in attempts to remove thousands of gallons of crude oil from the sand and sea.

56.     That apparently delayed and inadequate response runs contrary to Defendants' oil spill response plan, which, as reported by the *New York Times*, had assured state regulators that a spill from Line 901 was "extremely unlikely" because of its state-of-the-art monitoring system.  Defendants also assured regulators that it would take no longer than 15 minutes to discover and shut off the source of any spill. In fact, Defendants continued to operate Line 901 for more than 30 minutes after it initially ruptured, and waited hours before officially notifying federal responders of the rupture.

57.     Despite the efforts of volunteers and professional responders, the spill affected numerous Marine Protected Areas that provide vital breeding and feeding grounds for marine species, as shown in this map prepared by the GreenInfo Network:



-11-

58.     As the oil spread, so did its terrible consequences. Hundreds of fish, birds, and marine mammals died after being covered in oil or exposed to the oil's toxic compounds. Tar balls and oil sheen from Defendants' oil spill fouled beaches far to the south and east of Refugio, including beaches in Santa Barbara, Ventura, Los Angeles, and Orange Counties. Frisbee-sized "oil pancakes" drifted into the waters of Channel Islands National Park.

59.     Those are just some of the visible harms, relatively easy to see and tally. Beneath the ocean's surface, however, a largely unseen catastrophe continues to unfold. As the oil spread through the tides and currents, it likely suffocated marine life, and otherwise seeped into the aquatic food chain through shellfish and plankton, thereby contaminating seafood that could reach, and potentially harm, the public. Numerous dead bass, lobsters, crabs, octopi and other species that live beneath the surface offshore washed up on area beaches through late June.  This carnage will affect generations of marine life, particularly for those species for whom the affected area was a breeding habitat.

60.     In Santa Barbara, these environmental impacts translate to profound economic impacts. In the short term, the oil from Defendants' ruptured pipeline closed fishing grounds and shellfish areas, and caused many cancelled reservations from tourists who otherwise would have spent their money on hotels, restaurants, kayaking or surf trips, fishing charters, and retail shopping. The spill polluted coastal private properties and impaired the ability of property owners to use and enjoy their land.

61.     For example, state officials closed key coastal fishing areas from Canada de Alegria to Coal Oil Point, including the shoreline and offshore areas between those points to 6 miles offshore. The spill's impacts on the region's fisheries will continue far into the future. Also, the negative publicity from the spill has and will continue to deter seafood buyers from seeking out Santa Barbara seafood.

62.     The spill has also discouraged tourists from visiting businesses in Santa Barbara County, where tourism (along with agriculture and wine) accounts for roughly 15 percent of the workforce, or over 36,000 jobs. For example, one local kayaking company reported 25 cancellations following the spill, resulting in a loss of approximately $3,000. Two popular state beaches—Refugio and El Capitan—were closed during busy holiday weekends, and remained closed until July 17, 2015 and June 26, 2015, respectively.  Notices like that pictured below were posted online, to explain the closures.

On May 19, 2015, a privately owned crude oil pipeline ruptured, causing an oil spill within and around Refugio State Beach. State beaches affected by this incident include Refugio and El Capitan near Goleta.

**Both beaches are closed until further notice.**

Camping reservations have been cancelled through July 9th, 2015 in an effort to expedite clean-up efforts. Campers with reservation during this time will be provided a full refund through Reserve America.

Visitors wanting to find alternative overnight camping opportunities should contact a Reserve America representative at 1-800-444-7275 to locate campgrounds nearby.

For current beach areas open for day use during the holiday weekend in Santa Barbara and Ventura counties, visitors should call (805) 585-1850. This site will be updated with information when made available. We apologize for any inconvenience.

http://www.parks.ca.gov/?page_id=603

63.     The spill also caused an immediate impact on the livelihood of local workers and small businesses that support the oil industry.  Following the spill, oil and gas workers across the region were laid off from their jobs offshore and onshore as platforms and processing facilities related to the Pipeline shut down. Likewise, small businesses that support the oil industry saw their revenues plummet.  These workers and entities depended on Plains' Pipeline, and Plains likewise depended on them to provide oil that was transported through the Pipeline. Now, workers and small business have lost lucrative jobs and had their economic relationships greatly impaired, and Plains has refused to pay their claims.

64.     Finally, the oil spill presented a serious risk to human life. The Santa Barbara County Health Department recommended that residents avoid all areas affected by the spill, but a major highway runs through and adjacent to the spill

CONSOLIDATED SECOND AMENDED
CLASS ACTION COMPLAINT
CASE NO. 2:15-CV-04113-PSG-JEM

area. The County called Refugio Beach a "Hazmat area." The County also warned that direct contact with oil, inhalation of fumes, or ingestion of contaminated fish or shellfish can cause skin irritation, nausea, vomiting, and other illnesses.

65.     Following the spill, the group Water Defense collected oil and water samples to test for chemicals that could be harmful to the public. Those tests confirmed several toxic chemicals known to pose severe threats to human health and marine life were present in Defendants' oil spill, including Ethylbenzene, Toluene, Xylene, and Naphthalene. Those test results also confirmed the presence of Glutaraldehyde, a biocide used in drilling, fracking, and acidizing injections. Defendants released those chemicals onto the beach and into the Pacific Ocean, contaminating ocean waters and threatening human and marine life.

66.     Long term, the impacts may be as-yet-unknown, but they are no less certain. Even with the best spill response, toxic oil will remain in the environment for a long time, continuing to harm the environment. Recently, five years after the Deepwater Horizon oil spill in the Gulf of Mexico, officials assessing the damage to that ecosystem said "the environmental effects of this spill is likely to last for generations." This spill, too, may cause long-lasting environmental and economic impacts.

67.     The *Santa Barbara News-Press* reported that, as of late June, the "most tedious" portions of the clean-up area still remained uncleaned, and cleanup costs had exceeded $92 million. As of that time, only 14,000 gallons of oily water had been collected, and approximately 300 oiled and dead mammals and birds had been collected.  Hundreds more have been treated for various illnesses and/or injuries caused by Defendants' oil spill.

C.     **Plains Has a Long History of Recklessly Avoiding Installing Safety Equipment**

68.     While this spill is a disaster, it is not an accident. Defendants wantonly disregarded the health and safety of the public and environment by

1   operating the Pipeline when they knew it did not have proper safety systems in

2   place.

3         69.     In 1987, when Defendants constructed the Pipeline, Santa Barbara

4   County's Energy Division sought to ensure that it was constructed properly by,

5   among other things, inspecting the welds on the pipeline using x-rays. The Division

6   routinely inspects welds on new pipelines, as a way to ensure they are done

7   correctly to reduce the risk of failure. The Division ordered Defendants to install an

8   automatic shut-off valve system on the Pipeline to ensure it would shut down

9   swiftly, without waiting for human action, at the first sign of a potential problem in

10   the Pipeline.

11         70.     Rather than agreeing to these commonplace and common-sense safety

12   protocols, Defendants instead fought the County, suing it in U.S. District Court in

13   1987 and arguing it lacked jurisdiction to regulate their pipeline design and

14   installation.

15         71.     As a result, the Pipeline is the only one in Santa Barbara County

16   "whereby the county is preempted from monitoring and safety inspections," said

17   (recently retired) Kevin Drude, Director of the County's Energy Division. Drude

18   has publicly said that Defendants' employees rarely, if ever, attended monthly

19   meetings that he held to discuss safety concerns with all the pipeline operators

20   under his jurisdiction.

21         72.     This refusal by Defendants to follow standard safety protocols

22   directly contradicts their own pipeline safety protocol published on their website,

23   which provides that "Plains All American Pipeline is committed to designing,

24   constructing, operating, and maintaining its pipelines in a safe and reliable manner

25   that will *meet or exceed minimum safety standards*. . . ." (Emphasis added).

26         73.     Also as a consequence of its lawsuit against the County, Defendants

27   operate the only pipeline of its type in the County without an automatic shut-off

28

1    valve system. For those reasons, it is likely the only pipeline that is capable of

2    failing and discharging hundreds of thousands of gallons of oil.

3         74.    According to federal regulators, Line 901 was severely corroded prior

4    to the spill. Preliminary findings by the Pipeline and Hazardous Materials Safety

5    Administration (PHMSA) in February 2016 ("Preliminary Findings") show that an

6    early May 2015 inspection of Line 901 revealed "extensive external corrosion,"

7    noting that Line 901's walls had been reduced by 54 to 74 percent of their original

8    thickness. Additionally, Line 901 had been reduced to 1/16 of an inch at the area of

9    the pipeline failure, the agency said. Defendants apparently repaired corrosion at

10   three adjacent parts of Line 901 in recent years, suggesting they were aware of

11   extent of the corrosion on the line.  The agency found that continued operation of

12   the entire Pipeline "would be hazardous to life, property, or the environment."

13        75.    PHMSA's Preliminary Findings also show that data from Plains' "in-

14   line inspections" of Line 901 "show a growing number of corrosion anomalies on

15   Line 901," increasing from 12 areas of metal loss of 40 to 59 percent to 80 such

16   areas by the month of the spill in May 2015.  Based on that and other data, the

17   agency concluded that "Plains' existing corrosion system is not preventing external

18   corrosion of the pipe under insulation."  Line 903 was likewise found to have

19   corrosion characteristics consistent with the failure point of Line 901.

20        76.    While California residents and the environment bore the risk, and now

21   reality, of a catastrophic pipeline failure, Defendants have reaped rising profits,

22   reported at roughly $906 million on over $23 billion in earnings in 2015[1]. By

23   avoiding the cost of safety equipment and systems, Defendants boosted their profits

24   by transferring the cost of the Pipeline's failure to people who live and work in the

25   region.

26        77.    The lax safety standards on the Pipeline are not isolated incidents for

27   Defendants. Since 2006 Plains has been cited for over 175 violations of safety

28   _____

[1] http://www.sec.gov/Archives/edgar/data/1070423/000110465916100030/a15-24557_110k.htm

requirements, causing nearly $24 million in property damage. Eleven of those incidents were in California.  Plains is one of the top four most-cited pipeline operators in the country.

78.     Even more alarming is that, according to federal statistics analyzed by the website The Smart Pig Blog, the "number of incidents on crude oil pipelines operated by [Plains] . . . is increasing faster than the national average" by about 14%.  The rapidly rising increase in incidents for pipelines operated by Plains is shown in this chart:



79.     In 2014, for example, a pipeline owned and operated by Defendants ruptured in a Los Angeles neighborhood, covering streets, cars, houses, and businesses in oil. The cause: a poorly maintained pipeline. A few years ago, another poorly maintained Plains pipeline ruptured and sent oil into a drinking water reservoir for Los Angeles.

80.     In 2010, pursuant to a Consent Decree filed by the U.S. EPA following numerous alleged violations of the Clean Water Act by Defendants in several states, Defendants represented that they would update their procedures such that "[i]f there is an unexplained increase in delivery flow-rate with corresponding decrease in pressure – [Plains would] SHUTDOWN the affected line segment."

81.     As part of that settlement, Defendants paid a $3.25 million penalty for 10 spills between June 2004 and September 2007 that discharged a total of roughly

273,420 gallons of crude oil into navigable waters or adjoining shorelines in Texas, Louisiana, Oklahoma, and Kansas.

82.     Plains itself recently acknowledged in a disclosure report to the U.S. Securities and Exchange Commission that it has "experienced (*and likely will experience future*) releases of hydrocarbon products into the environment from our pipeline . . . operations" that "may reach surface water bodies." (Emphasis added).

83.     Indeed, less than two months after the rupture of Line 901, more than 4,000 gallons of oil spilled from a pump station on Defendants' Capwood Pipeline in Illinois, contaminating a nearby creek.

**D.     On September 11, 2015 PHMSA Issued a Formal Notice of Probable Violation and Compliance Order Against Defendants in Light of a Long-standing Investigation**

84.     On August 19-22, 2013, September 16-19, 2013, and September 30-October 4, 2013, a PHMSA representative inspected Lines 901 and Line 903. Following those field inspections, PHMSA requested additional documentation and information pertaining to the Pipeline. This information was provided through June 2014.

85.     On September 11, 2015 PHMSA issued a formal notice of probable violation and compliance order (the "Notice") against Defendants in light of its long-standing investigation.

86.     In its Notice to Defendants, PHMSA stated that "as a result of the inspection, it appears that you have committed probable violations of the Pipeline Safety Regulations, Title 49, Code of Federal Regulations . . . . These finding and probable violations were determined prior to the May 19, 2015 crude oil spill in Santa Barbara County, California."

87.     The Notice identifies six probable violations:

   i. Failure to maintain adequate documentation of pressure tests as part of its baseline assessment plan for its seven breakout tanks at Pentland Station in Kern County, California and failure to present any evidence

1   of past pressure tests performed on the breakout tanks to inspection

2   teams.  While some evidence of testing from 1995 was ultimately

3   presented, these did not confirm that the tests were performed in

4   compliance with regulations;

5      ii. Failure to maintain adequate documentation of its preventative and

6   mitigative evaluations prior to the 2013 calendar year for at least two

7   different pipeline segments, and later stating that these records could

8   not be found;

9      iii. Failure to adequately document consideration of preventive and

10   mitigative measures nor explain why implementation of said measures

11   were not executed in "High Consequence Areas";

12      iv. Failure to present adequate documentation its annual review of its

13   emergency response training program, resulting in an ability to

14   demonstrate an adequate review of training program objectives or the

15   decision-making process for changes made to emergency response

16   programs;

17      v. Failure to present adequate documentation that would demonstrate

18   that supervisors maintained a thorough knowledge of the portions of

19   the emergency response procedure for which they are responsible and

20   for which it is their job to ensure compliance; and

21      vi. Failure to maintain sufficient records to demonstrate that contractors

22   met the required qualifications.

23      88.   In addition to the above probable violations, PHMSA also cited three

24   additional areas of safety concern:

25      i. Failure to fully discuss or document how tool tolerance was addressed

26   or how measured anomalies that deviated significantly from the size

27   predicted by the tool were addressed;

28

-19-

ii. Incomplete documentation of Management of Change for pressure

reduction; and

iii. Failure to comply with its responsibility to educate emergency

response officials as part of its Public Awareness Program.

89. As a result of these findings, PHMSA issued a Proposed Compliance

Order demanding that Defendants take action to remediate the above probable

violations and safety concerns.[2]

90. Later that same day, the Associated Press reported on the Notice and

Proposed Compliance Order, quoting Robert Bea, a civil engineering professor at

University of California, Berkeley.   Professor Bea, a former oil executive who has

studied spills, stated that, "In all the documentation I have reviewed concerning the

pipeline, I have never seen evidence of any advanced risk assessment and

management processes being used by Plains."

91. The Associated Press further reported that Professor Bea said the

latest action by regulators speak to a weak culture of safety and inadequate efforts

to assess risk and prevent spills.

92. More recently, and as mentioned above, on February 17, 2016,

PHMSA issued "Preliminary Findings" on the pipeline failure.  In addition to the

findings mentioned above, the agency found that:

i. The Pipeline failed at an approximate pressure of 750 psig (pounds

per square inch gauge) which is only 56% of the Maximum Operating

Pressure;

ii. The May 6, 2015 In Line Inspection survey did not accurately size the

amount of external corrosion in the area of the release;

---

[2] On November 12, 2015, PHMSA issued an amendment to the corrective action order. *See* In the Matter of Plains Pipeline, LP, Respondent, CPF No. 5-2015-5011H, Amendment No. 2 to the Corrective Action Order, *available at* http://www.phmsa.dot.gov/pv_obj_cache/pv_obj_id_B5EF5CF4C40AED2ACB35EE030BDB5CFAD5B60400/filen ame/52015_5011H_Amendment_No2_Corrective_Action_Order.pdf. That order explains that, contrary to common practice in the pipeline industry, Plains did not provide data from its field surveys of Line 901 to its in-line inspection vendor, and that based on PHMSA's investigation of Line 903 "it does not appear that Plains has an effective corrosion control program[.]"

iii. The In Line Inspection survey did not size corrosion anomalies consistently compared to field measurements of all anomalies investigated after the May 19th spill;

iv. Plains' existing corrosion control system is not preventing external corrosion of the pipe under insulation.

93.     The PHMSA investigation is continuing, with particular focus on metallurgical report review; the third-party root cause failure analysis; third-party analysis of the In Line Investigation surveys; complete analysis of the Plains control room including Controller actions; complete review and analysis of Plains Integrity Management Program; review of the adequacy of the placement and closure requirements of valves; need for additional pressure/flow monitoring devices; and investigation of the Plains Facility Response Plan.

94.     Defendants have profited and continue to profit from their failure to comply with local, state, and federal safety requirements and guidelines, and their decision not to repair and/or replace the Pipeline demonstrates Defendants' willingness to prioritize profits of over public safety.

95.     Defendants knew of the extremely high risk of catastrophic injury inherent in the transportation of oil through a pipeline. Notwithstanding, Defendants took insufficient steps to prevent Line 901's rupture or protect Plaintiffs and the Class from injury. Indeed, Defendants actively avoided taking action to protect Plaintiffs and the Class from apparent risks the Pipeline presented. Defendants demonstrated a callous and reckless disregard for human life, health, and safety by operating the Pipeline without proper safety equipment.

96.     This disregard for human life and safety is part of a pattern and practice that Defendants have demonstrated across the country. Defendants acted with such indifference to the consequences of their misconduct, with such recklessness, and as part of a well-established pattern, as to be willful, malicious, and oppressive, and in disregard of the rights of the Plaintiffs and the Class, thereby

1    meriting an award of punitive and/or exemplary damages against Defendants.

2        97.    In short, Plains operates pipelines that fail. The communities through

3    which it transports oil suffer the consequences.

4        98.    This lawsuit therefore seeks to compensate the victims of the spill and

5    to ensure that Defendants are prevented from causing additional damage to the state

6    economy and environment in the future.

7                        **VI.    PLAINTIFFS' FACTS**

8    **A.    Plaintiffs Keith and Tiffani Andrews**

9        99.    Keith and Tiffani Andrews, husband and wife, are citizens of Santa

10   Margarita, California. They have been fishing together for more than a decade.

11       100.   Their boat, F/V Alamo, is a 1945 Monterey Trawler, built in

12   Monterey, California, that sails from the Santa Barbara Harbor, as pictured below.



26       101.   Although Keith and Tiffani Andrews fish for a variety of species in

27   the area, including shrimp, their primary source of income is trawling for sea

28   cucumbers in the waters off of Refugio State Beach.

102.    Sea cucumbers are echinoderms, which puts them in the same genus as starfish. The Andrews primarily catch the California sea cucumber, *Parastichopus californicus*, also known as the giant red sea cucumber. Sea cucumbers, particularly those from Santa Barbara, are highly sought after in many Asian fish markets. Nearly the entire catch of Santa Barbara sea cucumbers is processed in California and then shipped to China, where they are sold at handsome prices.

103.    Although sea cucumbers grow in waters around the world, people pay a premium for Santa Barbara sea cucumbers. Indeed, sea cucumbers from Santa Barbara County are among the top three most expensive varieties, and often individually packaged in wooden boxes for sale in specialty stores in China.

104.    Defendants' oil spill could not have happened at a worse location for the Andrews.

105.    The Andrews fish for sea cucumbers almost exclusively in the waters that were closed because of Defendants' oil spill. That now tainted area is the best habitat for sea cucumbers. Other than a small strip of sea just east of the formerly closed area, there are virtually no other places where the Andrews can fish for Santa Barbara sea cucumbers.

106.    And, Defendants' oil spill could not have come at a worse time for the Andrews.

107.    Sea cucumber season opened on June 16, 2015. During the season, the couple customarily trawls for sea cucumbers in the area closed by Plains' oil spill. Because of the spill, the Andrews were forced to confine their trawls to a narrow strip of water just east of the closed area.

108.    Defendants' oil spill is already having a profound effect on the Andrews and their ability to do generate income. Not only were critical fishing grounds closed, the Andrews are worried that the spill has done long-lasting damage to key sea cucumber fishing areas, and that the market for Santa Barbara

1   sea cucumbers may forever be harmed. Foreign and domestic consumers are willing

2   to pay top dollar for Santa Barbara sea cucumbers because of Santa Barbara's

3   reputation of having pristine waters. As the image of clean blue waters in California

4   is tarnished by images of oil coating beaches, dolphins, and birds, there is a

5   significant, concrete risk that buyers may shy away from purchasing sea cucumbers

6   caught there. In fact, potential buyers have asked the Andrews about the quality and

7   safety of sea cucumbers caught in Santa Barbara.

8          109.    As a result, even though the fishing grounds are finally open and the

9   visible oil may be cleaned up, the Andrews face serious and potentially long-lasting

10  harms because of Defendants' oil spill.

11         110.    Defendants' acts and omissions have therefore caused present injury

12  to the Andrews, as well as the concrete risk of imminent, serious, and additional

13  injury.

14  **B.**    **Plaintiff Baciu Family LLC**

15         111.    Plaintiff Baciu Family LLC is a family operated LLC that owns

16  beachfront real property near Refugio State Beach.

17         112.    The property has immediate beachfront access to the ocean, including

18  areas to swim, surf, fish, and kayak directly accessible from the property.  Before

19  Defendants' oil spill, family members were able to enjoy the pristine natural

20  environment in the area, and the value of the property reflected its shoreline

21  location, direct access to the ocean, and natural beauty and quietude.

22         113.    The oil spill caused by Defendants caused crude oil to spill onto

23  beaches and into the ocean, including Baciu Family LLC's beachfront property.

24  The property was bombarded with a steady influx of oil tarballs and oil sheen from

25  the spill, and family members were not able to use it.  The clean-up efforts near the

26  property were unsatisfactory, and long-term, permanent contamination of the

27  property is likely. The family members' ability to use and enjoy it has been

28  impaired.

114.   Baciu Family LLC not only suffers present injury, but also suffers the concrete risk of imminent, additional injury.

**C.   Plaintiff Robert Boydston**

115.   Plaintiff Robert Boydston is a resident of Santa Barbara County, California, citizen of California, and an offshore oil platform crane operator by trade who has worked in the oil and gas industry his entire career.

116.   At the time of the spill, Mr. Boydston had been working for almost six years at the offshore oil platform Harmony, operated by Exxon Mobil.

117.   On June 4, 2015, shortly after the spill and subsequent closure of Line 901, Mr. Boydston lost his job because Exxon Mobil's oil and gas facilities were shut down.

118.   He has been out of permanent work since then.  For a time, he was able to find spot work, filling in for other workers on a temporary basis, but that work has now completely dried up.  The consequences of Plains' conduct and oil spill have had and will continue to have a devastating effect on the ability of oil and gas workers like Mr. Boydston to earn a living.

119.   After Mr. Boydston lost his job, he contacted Plains in an attempt to seek compensation for lost wages.  When Mr. Boydston presented his documentation of lost wages to Plains, his claim was summarily denied.

120.   Mr. Boydston believes the negative consequences of Defendants' oil spill will continue to impair his ability to earn a living as an oil platform operator indefinitely.  Defendants' acts and omissions have therefore caused present injury to Mr. Boydston, as well as the concrete risk of imminent, additional injury.

**D.   Plaintiff  Captain Jack's Santa Barbara Tours, LLC**

121.   Plaintiff Captain Jack's Santa Barbara Tours, LLC ("Captain Jack's") is a Santa Barbara-based tour business that offers kayaking, sailing, beach, wine tasting, and horseback tours, including tours at Refugio State Beach.  Captain Jack's is a 10-year old company owned and operated by Mark Hicks, a Santa

1   Barbara resident and the company's tour and event guide.

2       122.   Before Defendants' oil spill, Captain Jack's had been having one of its

3   best years yet. Profits for the first four months of the year were approximately 20

4   percent higher than in previous years. For the first part of May, Captain Jack's was

5   booking roughly $1,800 worth of trips each day, with one of the busiest holiday

6   weekends of the season, Memorial Day weekend, yet to come.

7       123.   Then Defendants spilled more than 140,000 gallons of crude oil in

8   Santa Barbara County, and the phones in Captain Jack's office became

9   unseasonably quiet. After Defendants' oil spill, Captain Jack's bookings dropped

10  off to an average of $800 per day for the remainder of May. For the same period

11  last year, Captain Jack's averaged roughly $1,500 to $2,000 per day in bookings.

12      124.   For example, four customers who had booked kayaking trips to

13  Refugio State Beach cancelled their reservations, with two of those customers

14  rescheduling less profitable tours in the Santa Barbara harbor. On information and

15  belief, Defendants' oil spill has decreased tourism to the Santa Barbara area, which

16  in turn has further exacerbated the decrease in bookings experienced by Captain

17  Jack's.

18      125.   Captain Jack's believes the negative consequences of Defendants' oil

19  spill will continue to depress his business for the remainder of the year and possibly

20  for years to come. Defendants' acts and omissions have therefore caused present

21  injury to Captain Jack's, as well as the concrete risk of imminent, additional injury.

22  **E.    Plaintiff Morgan Castagnola**

23      126.   Plaintiff Morgan Castagnola, a resident of Santa Barbara County,

24  California, and a citizen of California, is part of a family that has been fishing on

25  the Gaviota Coast since the 1800s.

26      127.   He primarily fishes for shrimp and halibut out of the Santa Barbara

27  marina in his boat, Cecelia. When halibut season opened last year, the area he

28  would have normally been fishing for halibut was closed due to Plains' oil spill. He

CONSOLIDATED SECOND AMENDED
CLASS ACTION COMPLAINT
CASE NO. 2:15-CV-04113-PSG-JEM

1   also fishes for shrimp in that area.

2       128.   Since Plains' oil spill, interest from buyers of the live halibut Mr.

3   Castagnola fishes for has largely disappeared, with buyers looking instead to fish

4   farms in Asia for their products because of concern about the spill's impacts on the

5   Santa Barbara-based fishery.

6       129.   Mr. Castagnola applied for and received a payment from Plains for

7   short-term, interim damages, but that payment does not cover all his past and

8   potential future losses resulting from Plains' oil spill.

9       130.   Defendants' acts and omissions have therefore caused present injury

10   to Mr. Castagnola as well as the concrete risk of imminent, additional injury.

11   **F.**      **Plaintiff Crab Cowboys, LLC**

12       131.   Plaintiff Crab Cowboys, LLC is a Ventura County-based business

13   operated by Devin Grace, a resident and citizen of Santa Barbara County,

14   California. Crab Cowboys, LLC sells locally-caught crab and other seafood to local

15   businesses, and it also derives income from fishing Mr. Grace does for crab and

16   other fish from his boat, the E&T, along the coast of Santa Barbara County.

17       132.   Crab Cowboys, LLC derives a significant portion of its annual income

18   fishing in the areas that Defendants' oil spill closed.

19       133.   Defendants' oil spill could not have happened at a worse location.

20       134.   Crab Cowboys, LLC and Mr. Grace do a significant amount of fishing

21   in the waters that were closed because of Defendants' oil spill. That now-tainted

22   area has provided some of the best habitat for these sea creatures in the region.

23       135.   Because these key waters were closed to fishing, Crab Cowboys, LLC

24   and Mr. Grace lost a significant opportunity to fish and so earn his livelihood.

25       136.   Not only did Crab Cowboys, LLC and Mr. Grace lose the chance to

26   fish while the waters were closed, because of the long lasting and multi-

27   generational impacts Defendants' oil spill will have on the crab population in the

28   area, he and the LLC are likely to suffer long-term impacts to their ability to earn a

living fishing these waters.

137. Finally, the market for Santa Barbara crab is seriously threatened by Defendants' oil spill. As the image of clean blue waters in California is tarnished by images of oil coating beaches, dolphins, and birds, there is a significant, concrete risk that buyers may shy away from purchasing seafood, including crab, caught there, products that Crab Cowboys, LLC sells.

138. In fact, orders for seafood from Crab Cowboys, LLC fell by at least half from the year 2014. He routinely receives phone calls from people inquiring whether it is safe to eat seafood caught in this region. The stigma Defendants' oil spill has created regarding Santa Barbara seafood directly affects his bottom line now, and will continue to do so into the future.

139. Defendants' acts and omissions therefore caused present injury to Crab Cowboys, LLC and Mr. Grace, as well as the concrete risk of imminent, additional injury.

## G.     Plaintiff The Eagle Fleet, LLC

140. Plaintiff The Eagle Fleet LLC, a Salinas, California-based limited liability company formed under the laws of California ("Eagle Fleet"), is owned or operated by members of the Nguyen family, including Hoa Nguyen, a first-generation Vietnamese immigrant and lifelong fisherman, and Thuy Nguyen, Hoa's daughter and the sole member of Eagle Fleet LLC.

141. For three decades, the Nguyen family has operated commercial fishing vessels along the Central Coast, and currently Eagle Fleet fishes two boats—the Golden Eagle and the Eagle Junior—out of Morro Bay. The Nguyens are part of the Central Coast's large and successful Vietnamese fishing community, which has been harmed by Plains' oil spill.

142. Eagle Fleet's boats are used for trawling and long-line fishing, primarily for black cod but also halibut and crab. Since Plains' oil spill, Eagle Fleet estimates that its landings for black cod—and all other species—have dropped by

1    roughly half, resulting in thousands of dollars in losses each month. Up until the

2    spill, Eagle Fleet and other Morro Bay fishers had been easily catching their limits.

3        143.    Though Eagle Fleet does not fish in the area that was closed following

4    Plains' spill, its boats fish in areas just to the north and west of there, where, on

5    information and belief, oil from Plains' pipeline travelled, causing present and long-

6    term harm to fisheries Eagle Fleet depends on for its business.

7        144.    Defendants' acts and omissions have therefore caused present injury

8    to Eagle Fleet as well as the concrete risk of imminent, additional injury.

9    **H.    Plaintiff Zachary Frazier**

10       145.    Plaintiff Zachary Frazier, a resident of Kern County, California, was

11   employed as a Roustabout by Irwin Industries on offshore oil platform Harvest

12   operated by Freeport McMoRan at the time of the spill.

13       146.     In early July 2015, as a result of the spill and related shutdown, Mr.

14   Frazier was informed that he was no longer required to work on the platform and

15   his position was being terminated.

16       147.    Mr. Frazier has been out of permanent work since then. The

17   consequences of Plains' conduct and oil spill have had and will continue to have a

18   devastating effect on the ability of Mr. Frazier and oil and gas workers like him to

19   earn a living.  Mr. Frazier believes the negative consequences of Defendants' oil

20   spill will continue to impair his ability to earn a living as a Roustabout indefinitely.

21       148.    Defendants' acts and omissions have therefore caused present injury

22   to Mr. Frazier, as well as the concrete risk of imminent, additional injury.

23   **I.    Plaintiff Mike Gandall**

24       149.    Plaintiff Mike Gandall, a resident and citizen of Santa Barbara,

25   California, has been fishing the waters off Santa Barbara for decades.

26       150.    Mr. Gandall makes his living by fishing for a variety of species,

27   including rock crab and California spiny lobster.

28

4853-2491-2687, v.  8                    -29-                CONSOLIDATED SECOND AMENDED
                                                            CLASS ACTION COMPLAINT
                                                            CASE NO. 2:15-CV-04113-PSG-JEM

151.    Santa Barbara lobsters are prized for the taste and appearance, and as such command a premium price on the seafood market.

152.    Mr. Gandall derives a significant portion of his annual income fishing for lobster in the areas that Defendants' oil spill closed.

153.    Defendants' oil spill could not have happened at a worse location.

154.    Mr. Gandall fishes for crab and lobster almost exclusively in the waters that were closed because of Defendants' oil spill. That now-tainted area has provided some of the best habitat for these sea creatures in the region.

155.    Pictures like this one taken after Plains' oil spill show some of the damage to lobsters in the area:



156.    Defendants' oil spill could not have happened at a worse time.

157.    The Spill occurred just before lobster spawning season. As a result, thousands of lobsters, laden with eggs that should become the next generation of lobsters, were moving into the shallow waters off of Refugio. Where oil settles to the sea floor, it will smother the adult lobsters and their eggs, killing them. And, as lobsters take nearly 10 years to reach reproductive age, Defendants' oil spill may

1  not have wiped out just this years' spawning population; it may have ruined lobster

2  populations for decades.

3       158.    Defendants' oil spill has already had profound effects on Mr.

4  Gandall's ability to do his job by, for example, coating some of his gear in oil.

5       159.    Not only are future generations of lobsters now seriously threatened,

6  Mr. Gandall is concerned that the market for Santa Barbara lobster may never

7  recover. As the image of clean blue waters in California is tarnished by images of

8  oil coating beaches, dolphins, and birds, there is a significant, concrete risk that

9  buyers may shy away from purchasing lobsters caught there.

10      160.    Defendants' acts and omissions therefore caused present injury to Mr.

11  Gandall, as well as the concrete risk of imminent, additional injury.

12  **J.**    **Plaintiff Alexandra B. Geremia**

13      161.    Plaintiff Alexandra B. Geremia, as Trustee for the Alexandra Geremia

14  Family Trust dated August 5, 1998, is a resident of Santa Barbara County.  The

15  Alexandra Geremia Family Trust is the record owner of ocean and beachfront real

16  property just north of Refugio State Beach.

17      162.    Ms. Geremia's home has immediate beachfront access to the ocean,

18  including areas to swim, surf, fish, and kayak directly accessible from the property.

19  Before Defendants' oil spill, Ms. Geremia was able to enjoy the pristine natural

20  environment in the area of her home, and the value of her home reflected its

21  shoreline location, direct access to the ocean, and natural beauty and quietude.

22      163.    The more than 140,000 gallon oil spill caused by Defendants caused

23  crude oil to spill onto beaches and into the ocean, including Ms. Geremia's

24  beachfront property. Since then, her property has been bombarded with a steady

25  influx of oil tarballs and oil sheen from the spill, and she has been unable even to

26  walk on the beach.  The clean-up efforts near her home have been unsatisfactory,

27  and long-term, permanent contamination of her property is likely. Her ability to use

28  it has been severely impaired; and her ability to rent it has vanished.

164.    Ms. Geremia not only suffers present injury, but also suffers the concrete risk of imminent, additional injury.

**K.    Plaintiff Jim Guelker**

165.    At the time of the spill, Mr. Guelker was employed as Chief Engineer on the Admiral Tide, a supply vessel owned and operated by Tidewater Marine Western, Inc.  Tidewater provides large offshore service vessels to the energy industry.   Mr. Guelker had been employed by Tidewater since February 23, 1994.

166.    On January 12, 2016, Mr. Guelker was informed that, due to the pipeline rupture, shutdown and failure to reopen, the Admiral Tide had lost its contract to supply the ExxonMobil offshore platforms Harmony, Heritage and Hondo and therefore his employment was being terminated effective immediately.

167.    Mr. Guelker has been out of permanent work since then. The consequences of Plains' conduct and oil spill have had and will continue to have a devastating effect on the ability of Mr. Guelker and workers like him to earn a living.

168.    After Mr. Guelker lost his job, he contacted Plains in an attempt to seek compensation for lost wages. When Mr. Guelker presented his documentation of lost wages to Plains, his claim was denied.

169.    Mr. Guelker believes the negative consequences of Defendants' oil spill will continue to impair his ability to earn a living as a Chief Engineer indefinitely. Defendants' acts and omissions have therefore caused present injury to Mr. Guelker, as well as the concrete risk of imminent, additional injury.

**L.    Plaintiff Jacques Habra**

170.    Plaintiff Jacques Habra is a Santa Barbara County resident and owner of real property west of Hendry's Beach, Santa Barbara.

171.    The property has immediate beachfront access to the ocean, including areas to swim, surf, fish, and kayak directly accessible from the property.  Before Defendants' oil spill, Mr. Habra was able to enjoy the pristine natural environment

1    in the area, and the value of the property reflected its shoreline location, direct

2    access to the ocean, and natural beauty and quietude.

3        172.    The Spill caused crude oil to spill onto beaches and into the ocean,

4    right in front of Mr. Habra's property. This ocean frontage has suffered a steady

5    influx of oil tarballs and oil sheen from the spill, and he and his family were not

6    able to use and enjoy it.  The clean-up efforts near the property were unsatisfactory,

7    and long-term, permanent contamination of the property is likely. Mr. Habra's

8    ability to use and enjoy the property has been impaired.

9        173.    Mr. Habra not only suffers present injury, but also suffers the concrete

10   risk of imminent, additional injury.

11   **M.    <u>Plaintiff iSurf, LLC</u>**

12       174.    Plaintiff iSurf, LLC, is a Santa Barbara-based surf school owned by

13   Santa Barbara resident Alelia Parenteau that is dedicated to giving women and girls

14   the skills and confidence to become avid surfers. The company's website is

15   http://www. isurfschool.com.

16       175.    Plaintiff iSurf, LLC offers private and group lessons, annual

17   memberships, camps, after school programs, and extended surf trips in Santa

18   Barbara County and elsewhere.

19       176.    After Plains' pipeline ruptured, fouling the waves at Refugio and

20   other beaches, Plaintiff iSurf, LLC was forced to cancel lessons and experienced

21   diminished interest in its programs and services. Understandably, iSurf, LLC's

22   customers were not eager to surf in oil-coated waters or at beaches that had been

23   closed by county officials for health and safety reasons.

24       177.    Defendants' acts and omissions have therefore caused present injury

25   to Plaintiff iSurf, LLC as well as the concrete risk of imminent, additional injury.

26   ///

27   ///

28   ///

**N.** **Plaintiffs Mark and Mary Kirkhart**

178.    Plaintiffs Mark and Mary Kirkhart are residents of Montecito, California. They are long-term tenants, residing in an ocean and beachfront property in the Miramar Beach neighborhood of Montecito.

179.    Their leased property has immediate beachfront access to the ocean, including areas to swim, surf, fish and kayak directly accessible from the property. Before Defendants' oil spill, the Kirkharts and their family were able to enjoy the pristine natural environment in the area of their home, including walking and using the beachfront continually.  The rent paid to their landlord reflected the property's shoreline location, direct access to the ocean, and natural beauty and quietude.

180.    The Spill caused crude oil to spill onto beaches and into the ocean, including the Kirkharts' beachfront.   Their property was polluted and tainted by a steady influx of oil tarballs and oil sheen from the spill, and they were unable to walk on the beach. The clean-up efforts near their home were unsatisfactory, and long-term, permanent contamination at their residence is likely. Their ability to use their leased property was severely impaired, and its value diminished.

181.    The Kirkharts not only suffer present injury, but also suffer the concrete risk of imminent, additional injury.

**O.** **Plaintiff Jamie Klein**

182.    Jamie Klein is a resident of Orange County, the owner of a business that makes innovative surf paddles, and the record owner of ocean and beachfront real property in San Clemente, California.

183.    His property has direct beachfront access to the ocean, including areas to swim, surf, fish, and kayak directly accessible from the property.

184.    The more than 140,000 gallon oil spill caused by Defendants caused crude oil to spill onto beaches and into the ocean, which then traveled to Orange County where Mr. Klein's property is located.

///

185.    Mr. Klein not only suffers present injury, but also suffers the concrete risk of imminent, additional injury.

**P.    Plaintiff Richard Lilygren**

186.    Plaintiff Richard Lilygren is a resident of Santa Barbara County, California, citizen of California, and an offshore oil platform operator by trade who has worked in the oil and gas industry since 2002.

187.    At the time of the spill, Mr. Lilygren had been working for eleven years at the offshore oil platforms Hidalgo and Harvest, operated by Freeport-McMoRan near Point Arguello.

188.    On July 13, 2015, shortly after the spill and subsequent closure of the Pipeline, Mr. Lilygren lost his job because Freeport-McMoRan's oil and gas facilities were shut down.

189.    He has been out of work since then, and unable to find comparable employment.  The consequences of Plains' conduct and oil spill have had and will continue to have a devastating effect on the ability of oil and gas workers like Mr. Lilygren to earn a living.

190.    After Mr. Lilygren lost his job, he contacted Plains in an attempt to seek compensation for lost wages.  When Mr. Lilygren presented his documentation of lost wages to Plains, however, his claim was summarily denied.

191.    Mr. Lilygren believes the negative consequences of Defendants' oil spill will continue to impair his ability to earn a living as an oil platform operator indefinitely.  Defendants' acts and omissions have therefore caused present injury to Mr. Lilygren, as well as the concrete risk of imminent, additional injury.

**Q.    Plaintiff Hwa Hong Muh**

192.    Plaintiff Hwa Hong Muh is a resident and citizen of Alhambra, Los Angeles County, California, doing business in Santa Barbara County, California as Mu's Seafood Co.

///

193.    For many years Mr. Muh has run a business buying, processing, and exporting sea cucumbers from Santa Barbara.

194.    Mr. Muh purchases sea cucumbers every day from several different fishing boats during the sea cucumber season in Santa Barbara.

195.    As a result of Defendants' oil spill and the resulting fishing grounds closures, Mr. Muh has found there are fewer sea cucumbers for him to buy.

196.    Mr. Muh chose to start his business in Santa Barbara because sea cucumbers from the region are highly sought after, and command a premium price in the international market.

197.    The premium price buyers are willing to pay for Santa Barbara sea cucumbers comes, at least in part, from the fact that Santa Barbara and the waters in the region have the reputation of being clean, healthful, and free from pollution.

198.    As the image of clean blue waters in California is tarnished by pictures and videos of oil coating beaches, dolphins, and birds, there is a significant, concrete risk buyers may shy away from purchasing sea cucumber caught here. In fact, Mr. Muh's customers have asked how about Plains' spill and how it is affecting his business.

199.    As a result, even though the fishing grounds are opened, Mr. Muh faces serious and potentially long-lasting harms because of Defendants' oil spill.

200.    Mr. Muh believes the negative consequences of Defendants' oil spill will continue to impact the Santa Barbara fishery, and consequently his business, for years to come. Defendants' acts and omissions have therefore caused present injury to Mr. Muh, as well as the concrete risk of imminent, additional injury.

## R.    Plaintiff Ocean Angel IV, LLC

201.    Ocean Angel IV owns and operates a commercial fishing boat that fishes for squid and other species off the California coast, including at the squid fisheries off the coast of Santa Barbara.

///

202.   Ocean Angel generates significant revenues from squid fishing and can earn up to $30,000 per night.

203.   Defendants' oil spill, however, has seriously affected Ocean Angel's ability to fish for squid; following the spill, several commercial fisheries on which Ocean Angel relies for squid were closed.

204.   Ocean Angel is also gravely concerned that its business will be damaged long term.  Defendants' oil spill may have seriously and permanently harmed squid populations in the region, seriously impacting Ocean Angel's ability to earn income from squid.

205.   Ocean Angel believes the negative consequences of Defendants' oil spill will continue to impact the Santa Barbara fishery, and consequently its business, for years to come. Defendants' acts and omissions have therefore caused present injury to Ocean Angel, as well as the concrete risk of imminent, additional injury.

## S.      Plaintiff Pacific Rim Fisheries, Inc.

206.   Pacific Rim Fisheries is a seafood processing and wholesale business that sells and ships a wide variety of seafood products to destinations all over the world.  It specializes in squid caught off the California coast.

207.   Pacific Rim is a family-owned company that has been operating since 2011.  It generates significant revenues from squid fishing and selling squid around the world, particularly in Asia and Europe.  Squid fishing generates substantial income for the fisherman, the light boats that assist them, and the wholesalers like Pacific Rim which purchase and process the squid for re-sale in Asia, Europe and the United States.

208.   Defendants' oil spill, however, has seriously affected Pacific Rim's ability to fish. Following the spill, several commercial squid fisheries on which Pacific Rim relies for squid were closed.

///

209.    Pacific Rim is also gravely concerned that its business will be damaged long term.  Defendants' oil spill may have seriously and permanently harmed squid populations in the region, seriously impacting Pacific Rim's ability to earn income from squid.

210.    Pacific Rim believes the negative consequences of Defendants' oil spill will continue to impact the Santa Barbara fishery, and consequently its business, for years to come. Defendants' acts and omissions have therefore caused present injury to Pacific Rim, as well as the concrete risk of imminent, additional injury.

## T.    Plaintiff Sarah Rathbone, Community Seafood LLC

211.    Sarah Rathbone, a citizen of Goleta, is the owner and sole member of Community Seafood LLC. Community Seafood provides wholesales and direct sales of locally-caught seafood, and seasonally operates a "boat to table" business, buying fresh fish from local fishermen and delivers it directly to consumers, who purchase weekly or bi-weekly "shares." A half-pound share is $11 per week and $21 per week buys a pound share. Its website is http://www.communityseafood.com.

212.    Community Seafood's shares can include a wide variety of local species: black cod, ridgeback shrimp, yellowtail, yellowfin, albacore, squid, anchovies, oysters, mussels, rockfish, and so on. The three-year old business has nine part-time employees and one-full time employee besides Ms. Rathbone.

213.    Defendants' oil spill has damaged Ms. Rathbone's business. The week following that spill, Ms. Rathbone did not deliver any shares to her customers due to concerns over oil contamination. Those roughly 350 cancelled shares led to lost revenue of over $6,500 for Community Seafood and Ms. Rathbone.

214.    After the spill, as local fish have become scarcer, Ms. Rathbone had to spend time and money to drive to out-of-town to places like Morro Bay to purchase more expensive species, like salmon, to fulfill her orders. Those increased

costs have largely erased profits on her weekly shares, which have fixed prices.

215.    Ms. Rathbone believes the negative consequences of Defendants' oil spill will continue to impact the Santa Barbara fishery, and consequently her business, for years to come. Defendants' acts and omissions have therefore caused present injury to Ms. Rathbone, as well as the concrete risk of imminent, additional injury.

**U.    Plaintiff Santa Barbara Uni, Inc.**

216.    Plaintiff Santa Barbara Uni, Inc. is a California corporation and sea urchin processor doing business in Oxnard, Ventura County, California, and owned by Arnold Baez. Before starting Santa Barbara Uni in October 2014, Mr. Baez spent over two decades working for seafood buyers in the region.

217.    The success of Plaintiff Santa Barbara Uni, Inc. depends on the positive association its customers have between Santa Barbara and the quality of the sea urchin, or uni, that are caught in the waters offshore.

218.    Plaintiff Santa Barbara Uni, Inc. highlights that positive association on every package of uni roe it sells by using this label:



219.    After Plains' oil spill, Plaintiff Santa Barbara Uni, Inc. faced a shortage of uni. Because uni divers were prohibited from entering and fishing in prime urchin habitat, uni became more difficult to find and purchase.

220.    In addition, Plaintiff Santa Barbara Uni, Inc.'s customers began to question the quality and safety of uni from Santa Barbara, depressing demand for the processed uni roe Plaintiff sells to distributors around the nation. In response Plaintiff sold more of its product to Japan, where prices for uni are lower and the costs of shipping are higher, eroding Plaintiff's profits.

221.    Based on the foregoing and a significant decrease in transactions with its clients, Plaintiff Santa Barbara Uni, Inc. alleges that the oil spill has resulted in long-term damage to the Santa Barbara uni market.

222.    Defendants' acts and omissions therefore caused present injury to Plaintiff Santa Barbara Uni, Inc. as well as the concrete risk of imminent, additional injury.

## V.    **Plaintiff Southern Cal Seafood, Inc.**

223.    Southern Cal Seafood is a seafood processing and wholesale business that sells and ships a wide variety of seafood products, and specializes in squids and crab caught off the California coast.

224.    Southern Cal is a family-owned company that has been operating since 1994, run by experienced commercial fishermen who have been in the industry for generations.

225.    Southern Cal generates significant revenues from squid fishing and selling squid around the world, particularly in Asia and Europe.  Squid is ranked by volume as one of the state's largest commercial fish landed.  The abundance of squid in California marine areas is also critically important to the millions of fishes, birds, and mammals along the coast. The market squid is a principal forage item for a minimum of 19 species of fishes, 13 species of birds, and six species of mammals.

///

226.   The Santa Barbara and Ventura area makes up more than half the total value for all squids caught in California. The waters off the coast and near the islands are good for squids because there are many sandy bottoms in 200 feet or less, where massive congregations of squids flock to spawn.

227.   Fishing boats, with the assistance of lights boats that assist them to draw the squids to the surface at night, can net and return to the docks with up to 60 tons of squid per night, earning up to $30,000 in a single night.  Squid fishing generates substantial income for the fisherman, the light boats that assist them, and the wholesalers like Southern Cal who purchase and process the squid for re-sale in Asia, Europe and the United States.

228.   Defendants' oil spill, however, has seriously affected Southern Cal's ability to fish. Following the spill, several commercial squid fisheries on which Southern Cal relies for squid were closed.

229.   Southern Cal is also gravely concerned that its business will be damaged long term.  Defendants' oil spill may have seriously and permanently harmed squid populations in the region, seriously impacting Southern Cal's ability to earn income from squid.

230.   Southern Cal believes the negative consequences of Defendants' oil spill will continue to impact the Santa Barbara fishery, and consequently its business, for years to come. Defendants' acts and omissions have therefore caused present injury to Southern Cal, as well as the concrete risk of imminent, additional injury.

## W.   **Plaintiff TracTide Marine Corp.**

231.   For more than a decade, TracTide has provided marine fuels to oil drilling platform supply and crew vessels and other crafts in the Port of Hueneme. Some of TracTide's largest customers are the companies that operate offshore drilling platforms that have been unable to operate due to the closure of the Pipeline.

232.   Because of the loss of that business—a direct result of Plains' oil spill—TracTide has lost hundreds of thousands of dollars in revenue and has been forced to lay off multiple employees.

233.   In early December 2015, TracTide submitted a detailed claim for damages to Plains' claims administrator, but Plains has not paid that claim.

234.   TracTide's losses will continue to accrue unless and until the Pipeline can be safely restored to service.

## X.   Plaintiff Wei International Trading Inc.

235.   Wei International Trading Inc. is a California corporation conducting business in El Monte, Los Angeles County, California, and operated by Weihai Zhuang.

236.   Wei International Trading Inc. purchases, processes and exports sea cucumbers from Santa Barbara waters.

237.   Mr. Zhuang and Wei International Trading Inc. purchase sea cucumbers every day from several different fishing boats during the sea cucumber season in Santa Barbara.

238.   As a result of Defendants' oil spill and the resulting fishing grounds closures, Wei International Trading Inc.'s ability to purchase sea cucumbers from its regular suppliers was significantly diminished.

239.   Wei International Trading Inc.'s location in Santa Barbara is no accident–the location was thoughtfully selected because sea cucumbers from the region are highly sought after, and command a premium price in international markets.

240.   The premium price buyers are willing to pay for Santa Barbara sea cucumbers comes, at least in part, from the fact that Santa Barbara and the waters in the region have the reputation of being clean, healthful, and free from pollution.

241.   As the image of clean blue waters in California is tarnished by pictures and videos of oil coating beaches, dolphins, and birds, there is a

1   significant, concrete risk buyers may shy away from purchasing sea cucumber

2   caught in the region. In fact, Wei International Trading, Inc.'s past buyers and

3   potential buyers frequently inquire about the quality and safety of sea cucumbers

4   caught in Santa Barbara.

5       242.    As a result, even though the fishing grounds are open, Wei

6   International Trading, Inc. continues to face serious and potentially long-lasting

7   harms because of Defendants' oil spill.

8       243.    Based on the foregoing, diminished sales and the growing concerns of

9   its customers, Wei International Trading, Inc. is negatively impacted by

10  Defendants' oil spill and will continue to suffer from the oil spill's impact on the

11  Santa Barbara fishery for years to come. Defendants' acts and omissions have

12  therefore caused present injury to Wei International Trading, Inc., as well as the

13  concrete risk of imminent, additional injury.

14  **Y.**    **Plaintiff Stephen Wilson**

15      244.    At the time of the spill, Plaintiff Stephen Wilson was employed as a

16  Rig Manager by Parker Drilling Management Services, Inc. on offshore oil

17  Platform Harmony, operated by ExxonMobil.

18      245.    In or about September, 2015, Mr. Wilson was informed that, due to

19  the pipeline rupture and shutdown, platform Harmony was reducing and/or shutting

20  down production, and that his employment would be terminated as of November

21  24, 2015.

22      246.    Mr. Wilson has been out of permanent work since then. The

23  consequences of Plains' conduct and oil spill have had and will continue to have a

24  devastating effect on the ability of Mr. Wilson and oil and gas workers like him to

25  earn a living.

26      247.    Mr. Wilson believes the negative consequences of Defendants' oil

27  spill will continue to impair his ability to earn a living as a Rig Manager

28  indefinitely.

248.    Defendants' acts and omissions have therefore caused present injury to Mr. Wilson, as well as the concrete risk of imminent, additional injury.

## VII.   CLASS ACTION ALLEGATIONS

249.    Plaintiffs bring claims pursuant to Federal Rule of Civil Procedure 23 on behalf of classes of similarly situated persons, which they initially propose be defined as follows:

> All persons or businesses in the United States that claim
> economic losses, or damages to their occupations, businesses,
> and/or property as a result of Defendants' May 19, 2015 oil spill
> from Line 901.

250.    Plaintiffs reserve the right to propose subclasses of Plaintiffs in connection with their Motion for Class Certification, and as determined by the Court in its discretion.

251.    The Class members are ascertainable and have a well-defined community of interest among their members.

252.    **Ascertainability**: The number and identity of class members can be easily ascertained. Because the oil spill was a distinct catastrophic event, the class members—who consist of fishers and fish buyers, beachfront property owners and lessees, small businesses and oil workers who suffered economic harm—will not have difficulty discerning these injuries, or their cause. In May, 2015, as a result of the Refugio oil spill, oil from Plains' Pipeline washed up on their property, damaged their nets and equipment, affected their catch, forced their businesses or employers to shut down, and affected customer demand, and continues to do so. Those who can no longer work as a result of the spill are aware of that fact. Similarly those whose properties or business were affected by the spill and its lingering effects are aware of these facts and the resulting costs. Finally, those in the fishing industry are well aware of any current or continuing changes to the availability, quality or demand for their products.

253.   **Numerosity**: The members of the Class are so numerous that joinder of all members is impractical. The proposed Class likely contains hundreds if not thousands of members.

254.   **Commonality**: There are common questions of law and fact that predominate over any questions affecting only individual members of the Class.

255.   For Plaintiffs and the Class, the common legal and factual questions include, but are not limited to, the following:

(a) Whether Defendants acted negligently, recklessly, wantonly, and/or unlawfully to cause the spill;

(b) Whether Defendants installed and maintained adequate safety measures and systems on Line 901 and in its systems of command and control to prevent the spill;

(c) Whether Defendants conducted adequate supervision that could have prevented the spill or reduced its scale;

(d) Whether Defendants engaged in unconscionable, deceptive, and/or unreasonable business practices and conduct;

(e) Whether Defendants knowingly, intentionally, or negligently concealed, suppressed, or omitted material facts concerning the safety of the Pipeline from the public;

(f) Whether Defendants knowingly, intentionally, or negligently concealed, suppressed, omitted, or delayed relaying material facts regarding the spill to local, state, and federal agencies, thereby slowing the response, and/or increasing the damages to Plaintiffs and members of the Class;

(g) Whether Plaintiffs and the Class suffered injury by virtue of Defendants' negligence, recklessness, carelessness, and/or unconscionable and/or deceptive business practices; and

(h) Whether Defendants are strictly liable to Plaintiffs and the Class, by virtue of state and/or federal laws.

256.    **Typicality**: The representative Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs and all the members of the Class have been injured by the same wrongful acts and omissions of Defendants. Plaintiffs' claims arise from the same practices and course of conduct that give rise to the claims of the members of the Class and are based on the same legal theories.

257.    **Adequacy of Representation**: Plaintiffs are representatives who will fully and adequately assert and protect the interests of the Class, and have retained class counsel who are experienced and qualified in prosecuting class actions. Neither Plaintiffs nor their attorneys have any interests contrary to or in conflict with the Class.

258.    **Rule 23(b)(3)**: In addition to satisfying the prerequisites of Rule 23(a), Plaintiffs satisfy the requirements for maintaining a class action under Rule 23(b)(3). Common questions of law and fact predominate over any questions affecting only individual Class members and a class action is superior to individual litigation. The amount of damages available to individual plaintiffs is insufficient to make litigation addressing Defendants' conduct economically feasible in the absence of the class action procedure. Individualized litigation also presents a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system presented by the legal and factual issues of the case. By contrast, the class action device presents far fewer case management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

259.    **Rule 23(b)(2)**: Plaintiffs also satisfy the requirements for maintaining a class action under Rule 23(b)(2). Defendants have acted or refused to act on grounds that apply generally to the proposed Class, making final declaratory or injunctive relief appropriate with respect to the proposed Class as a whole.

260.    **Rule 23(c)(4)**: Plaintiffs also satisfy the requirements for maintaining a class action under Rule 23(c)(4). The claims of Class members are composed of particular issues that are common to all Class members and capable of class wide resolution that will significantly advance the litigation.

## VIII.  CAUSES OF ACTION

### First Claim for Relief
### Strict Liability under Lempert-Keene-Seastrand Oil Spill Prevention and Response Act, Government Code Section 8670, *et seq.*

261.    Plaintiffs incorporate by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

262.    The Lempert-Keene-Seastrand Oil Spill Prevention and Response Act ("the Act") provides that "[a]ny responsible party, as defined in Section 8670.3, shall be absolutely liable without regard to fault for any damages incurred by any injured party which arise out of, or are caused by, the discharge or leaking of oil into or onto marine waters." Cal. Gov't Code Section 8670.56.5(a).

263.    The Pacific Ocean and the waters off the Gaviota Coast are "marine waters" as defined in Section 8670.03(i).

264.    Defendants are "responsible part[ies]," which includes "the owner or transporter of oil or a person or entity accepting responsibility for the oil."

265.    The oil transported through the Pipeline is "oil" within the meaning of the Act, which defines "oil" as "any kind of petroleum, liquid hydrocarbon, or petroleum products or any fraction or residues therefrom," including "crude oil."

266.    As the responsible party for the oil transported through Line 901, Defendants are absolutely liable under the Lempert-Keene-Seastrand Act.

267.    On May 19, 2015, Defendants discharged or leaked crude oil into the Pacific Ocean, and are therefore absolutely liable without regard to fault for all damages that Plaintiffs and the Class sustained or will sustain. That discharge was not permitted by state or federal law.

///

268.    The Act entitles a plaintiff to recover a wide variety of damages, including, but not limited to, loss of subsistence use of natural resources; injury to, or economic losses resulting from destruction of or injury to, real or personal property, which shall be recoverable by any claimant who has an ownership or leasehold interest in property; loss of taxes, royalties, rents, or net profit shares caused by the injury, destruction, loss, or impairment of use of real property, personal property, or natural resources; and loss of profits or impairment of earning capacity due to the injury, destruction, or loss of real property, personal property, or natural resources. *See generally* Cal. Gov't Code Section 8670.56.5(h).

269.    The contamination illegally caused by the discharge of crude oil into or upon area beaches and the Pacific Ocean injured, and the shutdown of local oil and gas operations, caused to be lost, and/or impaired the use of property or natural resources on which Plaintiffs and the Class depend for their livelihood, including, but not limited to, local beaches and marine waters; populations of fish, squid and shellfish; and marine ecosystems. It also caused injury to and destruction of real or personal property, as well as impairment of earning capacity of Plaintiffs and the Class.

270.    Because Plaintiffs rely on natural resources for subsistence use; Plaintiffs have ownership or leasehold interests in real or personal property damaged by Defendants' oil spill; Plaintiffs derive at least 25 percent of their annual or seasonal earnings from activities that utilize property or natural resources damaged by Defendants' oil spill; Plaintiffs' livelihoods and earning capacity depend directly on the ability to extract the natural resources of the oil fields and the integrity of the pipeline not rupturing and damaging real and personal property and the natural resources in and around the Pacific Ocean, and along the California coastline; and/or Defendants' damage to real property, personal property, and natural resources has caused Plaintiffs a loss of taxes, royalties, rents, or net profit; or all of the above, Defendants are liable to Plaintiffs and the Class under the Act.

271. The injury, destruction, loss, and/or impairment of usability of these natural resources has caused Plaintiffs and the Class to lose profits, and will cause future losses of profits and/or impair their earning capacities.

272. The long-lasting effects of contamination related to the discharge of toxic crude oil into the Pacific Ocean and coastal areas, which Plaintiffs and the Class rely on, requires that Plaintiffs and the Class continue future monitoring and testing activities in order to ensure that such marine life is not contaminated and is safe and fit for human consumption, that the toxic oil from the spill does not further contaminate and degrade Plaintiffs' property, and that their earning capacity is not impaired.

## Second Claim for Relief
### Strict Liability for Ultrahazardous Activities

273. Plaintiffs incorporate by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

274. At all times herein, Plains was the owner and operator of the Pipeline.

275. At all times relevant to this action, Defendants had supervision, custody, and control of the Pipeline.

276. At all times herein, Defendants were under a continuing duty to protect the Plaintiffs and the Class from the harm caused by the Pipeline.

277. Defendants were engaged in ultrahazardous activities by transporting flammable, hazardous, and toxic oil through the Pipeline.

278. Plaintiffs and the Class have suffered harm from the discharge of toxic oil from the Pipeline and immediate, direct and negative impact of the shutdown of local oil and gas facilities.

279. The injuries sustained by Plaintiffs and the Class as a result of the oil spill were the direct and proximate result of Defendants' activities.

280. The harm to Plaintiffs and the Class was and is the kind of harm that would be reasonably anticipated as a result of the risks created by transporting

1   flammable, hazardous, and toxic oil in a pipeline on which local oil and gas

2   facilities and their workers depend, and not properly maintaining the pipelines in

3   close proximity to the Pacific Ocean.

4        281.    Defendants' operation of the Pipeline and its failure was a substantial

5   factor in causing the harms suffered by Plaintiffs and the Class.

6        282.    Due to Defendants' strict liability, Plaintiffs and Class members are

7   entitled to recover actual damages.

8        283.    The acts and omissions of Defendants were conducted with malice,

9   fraud, and/or oppression as set out in this Complaint.

10  **Third Claim for Relief**
    **Negligence**

11

12       284.    Plaintiffs incorporate by reference each and every prior and

13  subsequent allegation of this Complaint as if fully restated here.

14       285.    Defendants owed a duty to Plaintiffs and the Class to exercise

15  reasonable and ordinary care. That duty arose generally as well as from, among

16  other things, federal, state, and local laws, ordinances and regulations that require

17  Defendants to operate a pipeline in a manner that does not damage public health

18  and safety.  These laws include, but are not limited to, the Lempert-Keene Act,

19  Government Code Section 8670, *et seq*., the Porter-Cologne Act, Water Code

20  Sections 13000, *et seq*., Cal. Fish & Game Code Section 5650, *et seq*., the Federal

21  Clean Water Act, 33 U.S.C. § 1251 *et seq*., Santa Barbara County Code, Chapter

22  25, §§ 25-7(g) and 25-37, and state and federal spill response and notification laws.

23       286.    Defendants breached their duty to Plaintiffs and the Class by, among

24  other things, failing to install reasonable safety equipment to prevent a spill, failing

25  to detect and repair corrosion, and failing to promptly respond to and contain the

26  spill.

27       287.    Defendants, in the exercise of reasonable care, should have known

28  that the Pipeline could rupture or otherwise fail, and spill significant amounts of oil,

1    and cause local oil and gas operations to be shut down. Defendants have

2    acknowledged that spills such as this have occurred on their pipelines in the past

3    and will occur, and have in fact occurred, again.

4         288.    In addition, Defendants' violations of the above-cited statutes,

5    ordinances, and/or regulations resulted in precisely the harm to Plaintiffs that the

6    laws listed above were designed to prevent, and Plaintiffs and the Class are

7    members of the class of persons for whose protection those laws were adopted.

8         289.    At all times herein mentioned, Defendants negligently, wantonly,

9    carelessly and/or recklessly maintained and operated the Pipeline.

10        290.    As a direct and proximate result of Defendants' negligence, Plaintiffs

11   and the Class have sustained damages. Those damages take primarily two forms:

12   short-term and long-term.  As a direct and legal cause of the Defendants' wrongful

13   acts and omissions herein above set forth, Plaintiffs and the Class have suffered and

14   will continue to suffer economic harm, injury to earning capacity, and losses.

15        291.    The short-term damages include loss of profits due to fishing closures

16   caused by the spill, and increased costs associated with traveling to different

17   fisheries. The closures have excluded fishers from near shore fishing grounds for

18   lobster, crab, shrimp, squid, and other species. The short-term damages also include

19   lost profits due to cancellations from customers who, but for Defendants' oil spill,

20   would have used services offered by businesses in Santa Barbara County, or simply

21   visited Santa Barbara County and the businesses there. The short-term damages

22   additionally include loss of use and enjoyment of beachfront and oceanfront real

23   property because of oil polluting the beaches and waters, as well as potential lost

24   rental income and profits from vacationers and tourists visiting Santa Barbara. The

25   short-term damages also include loss and/or impairment of earning capacity of

26   workers at oil and gas facilities that have shut down, as well as the loss of revenues

27   of the business that support the oil industry.

28   ///

292.    The long-term damages include future lost profits due to the harm caused to the fisheries themselves. For example, the oil is likely to depress (or even eradicate in some areas) populations of sea urchins, crab, lobster, and other crustaceans by directly killing numbers of those species or hindering their breeding and feeding. Similarly, oil that sinks below the surface will poison fish and potentially smother their eggs, limiting their future numbers.  The taboo associated with an oil spill has and will continue to drive down the price of local fish and shellfish, as consumers and fish processors become wary of producing locally-caught species. Defendants' oil spill caused physical injury to property in which Plaintiffs have a direct ownership interest or an interest by virtue of their right to harvest fish and shellfish.

293.    Workers in the oil and gas industry, and businesses that support the local oil and gas industry, may never find comparable, dependable employment and business if Defendants do not operate their pipelines in a safe and responsible manner.

294.    The oil spill's long term damages may also diminish the values of oceanfront and beachfront real properties along the coast that have been polluted by Defendants' oil.

295.    Similarly, the image of the Gaviota Coast as a pristine place and as a perfect place to vacation has been tarnished. Images of oil soaked birds, dead dolphins, and fouled beaches now show up prominently in internet searches for "Santa Barbara Beaches" and will dissuade people from visiting the region and the many businesses that depend on tourism and other visitors.

296.    The acts and omissions of Defendants, and each of them, were conducted with malice, fraud, and/or oppression as described in this Complaint.

///

///

///

**Fourth Claim for Relief**
**Violations of California's Unfair Competition Law**
**Cal. Bus. & Prof. Code §§ 17200, *et seq.***

297.    Plaintiffs incorporate by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

298.    Defendants have engaged in and continue to engage in unfair competition in violation of California's Unfair Competition Law ("UCL").

299.    Defendants' conduct constitutes "fraudulent" business practices within the meaning of UCL in that members of the public have been harmed.

300.    Defendants' conduct amounts to "unfair" business practices as UCL forbids all wrongful business activities in any context in which they appear. Moreover, as described above, Defendants' practices offend established public policies, are immoral, unethical, oppressive, and unscrupulous. The impact of Defendants' practices is in no way mitigated by any justifications, reason, or motives. Defendants' conduct has no utility when compared to the harm done to Plaintiffs and members of the Class.

301.    Defendants' conduct is "unlawful" because it violated laws including but not limited to the Lempert-Keene Act, Government Code Section 8670, *et seq.*, the Porter-Cologne Act, Water Code Sections 13000, *et seq.*, and Cal. Fish & Game Code Section 5650, *et seq.*, the Oil Pollution Act, Santa Barbara County Code, Chapter 25, §§ 25-7(g) and 25-37, and local, state, and federal spill notification laws, and the oil spill response plans required by federal, state, and local laws. Federal, state, and local officials have announced civil and criminal investigations into Defendants' conduct related to the spill, so it is reasonable to infer that Defendants may have violated other laws.

302.    As a direct and proximate result of Defendants' unfair, fraudulent, and unlawful methods of competition and unfair and deceptive acts or practices, Plaintiffs and the Class have sustained injury in fact and have lost money or property, including but not limited to a diminishment in assets and value of assets,

1   for which they seek injunctive relief.  The relief sought includes, but is not limited

2   to, an order requiring Defendants to  do the following:  restore fisheries impacted

3   by the spill; repair reputational damage done to Santa Barbara's seafood industry;

4   restore the area real properties and beaches impacted by the spill; repair short and

5   long term damages to coastal properties; repair reputational damage done to coastal

6   property values; and prevent Defendants from operating the Pipeline without

7   adequate safety mechanisms and ongoing monitoring, to ensure that no future spill

8   occurs.

9       303.    Plaintiffs and the Class have no adequate remedy at law for the

10  injuries that will result from failure of the Defendants to safely replace and/or

11  repair, operate, and maintain the Pipeline and it could be impossible for Plaintiffs

12  and the Class to determine the precise amount of damages they will suffer if

13  Defendants' conduct is not restrained and Plaintiffs are forced to institute a

14  multiplicity of suits to obtain adequate compensation for injuries and harm to the

15  Class.

16      304.    The acts and omissions of Defendants were done with malice, fraud,

17  and/or oppression as described in this Complaint.

### Fifth Claim for Relief
### Public Nuisance

20      305.    Plaintiffs incorporate by reference each and every prior and

21  subsequent allegation of this Complaint as if fully restated here.

22      306.    Defendants have created a condition that is harmful to health and

23  interferes with the comfortable enjoyment of life and property by discharging more

24  than 140,000 gallons of crude oil into the Pacific Ocean and onto the California

25  coastline.

26      307.    That nuisance affects a substantial number of individuals similarly

27  situated to the Plaintiffs, such as citizens of and visitors to Santa Barbara County,

28  commercial fishers and processors, real property owners, oil workers, and

1  businesses that rely on the safe and healthy environment in the County.

2      308.   Defendants' oil spill is a condition which would reasonably annoy and

3  disturb an ordinary person, as shown by, for example, the health impacts warned of

4  by the county, the community outrage in response to the spill, and the nationwide

5  interest in the spill's impacts on the Gaviota Coast.

6      309.   The seriousness and gravity of that harm outweighs the social utility

7  of Defendants' conduct. There is little or no social utility associated with releasing

8  tens of thousands of gallons of oil into the unique ecological setting of Santa

9  Barbara County.

10     310.   Plaintiffs and the Class suffered harm and injury to their economic

11 livelihood, which they did not consent to and which is different from the type of

12 harm suffered by the general public.

13     311.   The above acts and omissions also created a public nuisance *vis-à-vis*

14 the Plaintiffs and the Class, interfering with the property rights of Plaintiffs and the

15 Class, and rights incidental to those property rights.

16     312.   The acts and omissions of Defendants described herein were also in

17 violation of various California state laws including but not limited to the Lempert-

18 Keene Act, Government Code Section 8670, *et seq*., the Porter-Cologne Act, Water

19 Code Sections 13000, *et seq*., and Cal. Fish & Game Code Section 5650, *et seq*.,

20 and local laws including Santa Barbara County Code, Chapter 25, §§ 25-7(g) and

21 25-37.

22     313.   Defendants' violations of those statutes directly and proximately

23 caused, and will cause, injury to the Plaintiffs and the Class of a type which the

24 statutes are intended to prevent. Plaintiffs and the Class are of the class of persons

25 for whose protection these statutes were enacted.

26     314.   As a direct and legal cause of Defendants' wrongful acts and/or

27 omissions herein above set forth, Plaintiffs and the Class have suffered and will

28 suffer economic harm, injury, and losses.

315.     To remedy the harm caused by Defendants' nuisance, Plaintiffs will seek public injunctive relief, including, but not limited to, an order requiring Defendants to do the following:  restore fisheries impacted by the spill; repair reputational damage done to Santa Barbara's seafood industry; restore the area real properties and beaches impacted by the spill; repair short and long term damages to coastal properties; repair reputational damage done to coastal property values; and prevent Defendants from operating the Pipeline without adequate safety mechanisms and ongoing monitoring, to ensure that no future spill occurs.

316.     In maintaining the nuisance, which is ongoing, Defendants are acting with full knowledge of the consequences and damage being caused, and the acts and omissions of Defendants, were done with malice, fraud, and/or oppression as described in this Complaint.

### Sixth Claim for Relief
### Negligent Interference With Prospective Economic Advantage

317.     Plaintiffs incorporate by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

318.     Plaintiffs and the Class have existing or prospective economic relationships with citizens of Santa Barbara County, visitors to Santa Barbara County, and other individuals and organizations doing business in and related to Santa Barbara County.

319.     These relationships have a reasonably probable likelihood of resulting in future economic benefits or advantages to Plaintiffs and the Class.

320.     Defendants knew or should have known of these existing and prospective economic relationships.

321.     Defendants owed a duty to Plaintiffs and the Class to avoid negligent or reckless conduct that would interfere with and adversely affect the existing and prospective economic relationships of Plaintiffs and the Class.

322.     Defendants breached that duty to Plaintiffs and the Class by, among

other things, failing to install and/or maintain reasonable safety equipment to prevent such a spill, failing properly to maintain the pipeline in a safe condition, and failing to promptly respond to and contain the spill.

323.   Defendants knew or should have known that, if they failed to act with reasonable care, the existing and prospective economic relationships of Plaintiffs and the Class would be interfered with and disrupted.

324.   Defendants were negligent and failed to act with reasonable care as herein set forth above.

325.   Defendants engaged in wrongful acts and/or omissions as herein set forth above, including but not limited to their violations of federal, state, and local laws that require Defendants to operate the Pipeline in a manner that does not damage public health and safety.

326.   As a direct and proximate result of Defendants wrongful acts and/or omissions, Defendants negligently and recklessly interfered with and disrupted the existing and prospective economic relationships of Plaintiffs and the Class.

327.   As a direct and proximate result of Defendants' wrongful acts and/or omissions, Plaintiffs and the Class have suffered and will suffer economic harm, injury, and losses as herein set forth above.

## Seventh Claim for Relief
### Trespass

328.   Plaintiffs who have a real property interest in water front property bring this on behalf of themselves and all other similarly situated land owners or lessees.  They incorporate by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

329.   Defendants discharged a polluting matter beyond the boundary of Plaintiffs' and Class Members' real property in such a manner that, it was reasonably foreseeable that the pollutant would, in due course, invade Plaintiffs' and Class Members' real property and cause harm.

330.    By discharging polluting matter, Defendants entered, invaded, and intruded on the real properties of Plaintiffs and the Class Members without privilege, permission, invitation, or justification.

331.    Defendants had a duty to use reasonable care not to enter, intrude on, or invade Plaintiffs' and Class Members' real properties.  Defendants also owed a duty to Plaintiffs and members of the Class to exercise reasonable care in the manufacture, maintenance, and operation of the Pipeline.

332.    Defendants had a heightened duty of care to Plaintiffs and the Class because of the great danger associated with transporting oil so near to pristine coastal residential areas and nearby real properties along the Central Coast.

333.    Defendants breached the duty they owed to Plaintiffs and members of the Class when they failed to exercise reasonable care in the manufacture, maintenance, and operation of the Pipeline, which conduct resulted in entry, intrusion, or invasion on Plaintiffs' and Class Members' real properties.

334.    Defendants knew or should have known that their conduct would foreseeably result in a disastrous oil spill, causing damage to the real properties and economic interests of persons in the area affected by the spill.

335.    As a direct and proximate result of Defendants' trespass, Plaintiffs and Class Members have suffered legal injury and damages, in an amount to be proven at trial, including, but not limited to, property damage, diminution of value of real estate, loss of income and other economic loss.

336.    Defendants' wanton or reckless conduct, as described herein, entitles Plaintiffs and Class Members to punitive damages.

### Eighth Claim for Relief
### Continuing Private Nuisance

337.    Plaintiffs who have a real property interest in water front property bring this claim on behalf of themselves and all other similarly situated land owners or lessees.  They incorporate by reference each and every prior and subsequent

allegation of this Complaint as if fully restated here.

338.    Defendants' actions and inactions caused, maintained, and/or permitted the contamination alleged in this action by its negligence, intentional or otherwise, actionable acts, and/or omissions.

339.    Defendants created the contamination at issue, which is harmful to both human health and the environment and interferes with Plaintiff's comfortable use and enjoyment of the real property in which she has a possessory interest.

340.    Defendants were, at all relevant times, in sufficient control of the Pipeline to have known of the threatened release of oil and associated hydrocarbons and to have prevented the resulting contamination.  Defendants knew or should have known that their operation of the failed pipeline would have, and did, cause the contamination described herein.

341.    Despite knowledge and forewarning, Defendants failed to take reasonable steps to prevent the failure which resulted in the contamination at issue.

342.    Defendants failed to take reasonable steps to abate the contamination at issue, which continues to spread to previously uncontaminated areas.  The contamination is, however, abatable, and, therefore, it is continuing in nature.  This also confirms that Defendants have knowingly maintained the nuisance, i.e. the contamination at issue.

343.    Plaintiffs did not consent to the ongoing damage to the use and enjoyment of her property as a result of Defendants' actions and inactions.

344.    After having a reasonable opportunity to do so, Defendants failed to take reasonable measures to properly abate the contamination described herein.

345.    As a direct and proximate cause, Defendants' acts and omissions have caused substantial actual damage and immediate and ongoing diminution of the value of Plaintiffs' real property and the property of the Class.

346.    As a result, Plaintiffs have and will continue to suffer damages, both economic and otherwise.

347.   The contamination described herein constitutes a nuisance within the meaning of Section 3479 of California Civil Code.

348.   Plaintiffs are informed and believe, and on that basis allege, that the contamination is continuing and abatable.

349.   As a proximate result of the nuisance, Plaintiffs have and will continue to suffer damages.

**Ninth Claim for Relief**
**Nuisance Per Se**

350.   Plaintiffs who have a real property interest in water front property bring this claim on behalf of themselves and all other similarly situated land owners or lessees.  They incorporate by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

351.   The contamination constitutes a continuing nuisance within the meaning of Section 3479 of California Civil Code, and Santa Barbara County Code, Chapter 25, §§ 25-7(g) and 25-37.

352.   Plaintiffs are in the class of persons protected under these statutes from Defendants and their violations thereof due to the fact that Defendants have, at all times relevant, owned, operated, maintained, supervised and/or controlled the Pipeline.

353.   Defendants violated California Civil Code section 3479 and Santa Barbara County Code, Chapter 25, §§ 25-7(g) and 25-37 by their failure to properly abate the contamination, and by allowing contamination to continue to spread.

354.   As a proximate result of the nuisance per se, Plaintiffs have and will continue to suffer damages.

**Tenth Claim for Relief**
**Permanent Injunction**

355.   Plaintiffs incorporate by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

356.   Beginning on or about May 19, 2015, and continuing to the present time, Defendants, and each of them, wrongfully and unlawfully caused oil to spill onto surrounding areas, into the Pacific Ocean, and onto coastal real properties. Defendants' conduct also caused local workers and businesses to lose work and impaired their ability to earn a livelihood indefinitely.

357.   In the absence of an injunction, Defendants will continue to violate the rights of Plaintiff and the Class.  Defendants, and each of them, have refused and still refuse to refrain from their wrongful conduct.

358.   Defendants' wrongful conduct, unless and until enjoined and restrained by order of this court, will cause great and irreparable injury to Plaintiff and the Class.

359.   Plaintiff and the Class have no adequate remedy at law for the injuries that will result from failure of the Defendants to safely replace and/or repair, operate, and maintain their pipeline and it could be impossible for Plaintiff and the Class to determine the precise amount of damages they will suffer if Defendants' conduct is not restrained and Plaintiff is forced to institute a multiplicity of suits to obtain adequate compensation for injuries and harm to the Class.

## IX.   REQUEST FOR RELIEF

Plaintiffs, individually and on behalf of all others similarly situated, request judgment against Defendants as follows:

A.   For an order certifying the Class and appointing Plaintiffs as representatives of the Class and appointing the lawyers and law firms representing Plaintiffs as counsel for the Class;

B.   For an order permanently enjoining Defendants from operating a pipeline in Santa Barbara County without adequate safety and response measures and ongoing monitoring;

///

///

CONSOLIDATED SECOND AMENDED
CLASS ACTION COMPLAINT
CASE NO. 2:15-CV-04113-PSG-JEM

1    C.    For all recoverable compensatory, statutory, and other damages

2  sustained by Plaintiffs and the Class, including all relief allowed under applicable

3  laws;

4    D.    For costs;

5    E.    For both pre-judgment and post-judgment interest on any amounts

6  awarded;

7    F.    For appropriate injunctive relief, including public injunctive relief; *i.e.*,

8  an order requiring Defendants to do the following:  restore fisheries impacted by the

9  spill; repair reputational damage done to Santa Barbara's seafood industry; require

10  Defendants to restore property values impacted by the spill; repair reputational

11  damage done to oceanfront and beachfront real property along California's Central

12  Coast; and an order requiring Defendants to operate the Pipeline in such a way to

13  ensure no further spills and resulting losses of jobs;

14    G.    For treble damages insofar as they are allowed by applicable laws;

15    H.    For appropriate individual relief as requested above;

16    I.    For payment of attorneys' fees and expert fees as may be allowable

17  under applicable law, including Cal. Gov. Code section 8670.56.5(f) the Private

18  Attorneys General Act ("PAGA"), Cal. Lab. Code. § 2698, et seq.;

19    J.    For exemplary or punitive damages under Cal. Civ. Code Section 3294

20  for the oppression, fraud, and malice alleged above; and

21    K.    For such other and further relief, including declaratory relief, as the

22  Court may deem just and proper.

23  ## X.    DEMAND FOR JURY TRIAL

24    Plaintiffs hereby demand a trial by jury on all issues so triable.

25  ///

26  ///

27  ///

28  ///

CONSOLIDATED SECOND AMENDED
CLASS ACTION COMPLAINT
CASE NO. 2:15-CV-04113-PSG-JEM

1

2   Dated: April 1, 2016                Respectfully submitted,

3                                       CAPPELLO & NOËL LLP

4
                                        By:  _/s/ A. Barry Cappello_____
5                                            A. Barry Cappello

6                                       A. Barry Cappello (CSB No. 037835)
                                        Leila J. Noël (CSB No. 114307)
7                                       Lawrence J. Conlan (CSB No. 221350)
                                        CAPPELLO & NOËL LLP
8                                       831 State Street
                                        Santa Barbara, CA 93101-3227
9                                       Telephone:  (805)564-2444
                                        Facsimile:   (805)965-5950
10

11                                      LIEFF CABRASER HEIMANN &
                                        BERNSTEIN LLP
12

13                                      By:  _/s/_____
                                             Robert J. Nelson
14
                                        Robert L. Lieff (CSB No. 037568)
15                                      Elizabeth J. Cabraser (CSB No. 083151)
                                        Robert J. Nelson (CSB No. 132797)
16                                      Wilson M. Dunlavey (CSB No. 307719)
                                        LIEFF CABRASER HEIMANN &
17                                      BERNSTEIN, LLP
                                        275 Battery Street, 29th Floor
18                                      San Francisco, CA  94111-3339
                                        Telephone:  (415) 956-1000
19                                      Facsimile:  (415) 956-1008

20                                      KELLER ROHRBACK L.L.P.

21
                                        By:  _/s/_____
22                                            Juli Farris

23                                      Juli Farris (CSB No. 141716)
                                        Matthew J. Preusch (CSB No. 298144)
24                                      KELLER ROHRBACK L.L.P.
                                        1129 State Street, Suite 8
25                                      Santa Barbara, CA 93101
                                        Telephone:  (805) 456-1496
26                                      Facsimile:  (805) 456-1497

27

28

1

2 Lynn Lincoln Sarko
  *(Admitted Pro Hac Vice)*
3 Gretchen Freeman Cappio
  *(Admitted Pro Hac Vice)*
4 Daniel Mensher
  *(Admitted Pro Hac Vice)*
5 KELLER ROHRBACK L.L.P.
  1201 Third Ave, Suite 3200
  Seattle, WA 98101
6 Telephone:  (206) 623-1900
  Facsimile:   (206) 623-3384

7

8 William M. Audet (CSB No. 117456)
  Jonas P. Mann (CSB No. 263314)
9 Theodore H. Chase (CSB No. 295823)
  AUDET & PARTNERS, LLP
10 221 Main Street, Suite 1460
  San Francisco, CA  94105
  Telephone:  (415) 568-2555
11 Facsimile:   (415) 568-2556

12 Abbas Kazerounian (CSB No. 249203)
  Matthew M. Loker (CSB No. 279939)
13 KAZEROUNI LAW GROUP APC
  245 Fischer Ave, Suite D1
14 Costa Mesa, CA 92626
  Telephone:  (800) 400-6808
15 Facsimile:   (800) 520-5523

16 Brett A. Boon (CSB No. 283225)
  BENNER & BOON, LLP
17 1516 Front Street
  San Diego, CA
18 Telephone:  (619) 358-9779
  Facsimile:  (619) 810-2459

19

20 *Attorneys for Plaintiffs*

21

22

23

24

25

26

27

28

1

**CERTIFICATE OF SERVICE**

2

   I, A. Barry Cappello, hereby certify that on April 1, 2016, I electronically

3

filed Plaintiffs' **CONSOLIDATED SECOND AMENDED COMPLAINT** with

4

the Clerk of the United States District Court for the Central District of California

5

using the CM/ECF system, which shall send electronic notification to all counsel of

6

record.

7

8

                         */s/ A. Barry Cappello*
                         A. Barry Cappello

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CONSOLIDATED SECOND AMENDED
CLASS ACTION COMPLAINT
CASE NO. 2:15-CV-04113-PSG-JEM