1  Robert L. Lieff (CSB No. 037568)
   Elizabeth J. Cabraser (CSB No. 083151)
2  Robert J. Nelson (CSB No. 132797)
   Sarah R. London (CSB No. 267083)
3  Wilson M. Dunlavey (CSB No. 307719)
   **LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
4  275 Battery Street, 29th Floor
   San Francisco, CA  94111-3339
5  Telephone:  (415) 956-1000
   Facsimile:   (415) 956-1008
6
7  Lynn Lincoln Sarko                    A. Barry Cappello (CSB No. 037835)
   (*Admitted Pro Hac Vice*)             Leila J. Noël (CSB No. 114307)
8  Gretchen Freeman Cappio               Lawrence J. Conlan (CSB No. 221350)
   (*Admitted Pro Hac Vice*)             David Cousineau (CSB No. 298801)
9  Daniel Mensher                        **CAPPELLO & NOËL LLP**
   (*Admitted Pro Hac Vice*)             831 State Street
10 **KELLER ROHRBACK L.L.P.**            Santa Barbara, CA 93101-3227
   1201 Third Ave., Suite 3200           Telephone:  (805) 564-2444
11 Seattle, WA 98101                     Facsimile:    (805) 965-5950
   Telephone:  (206) 623-1900
12 Facsimile:   (206) 623-3384           *Lead Trial Counsel for Plaintiffs*
13 Juli Farris (CSB No. 141716)          William M. Audet (CSB No. 117456)
   Matthew J. Preusch (CSB No. 298144)   **AUDET & PARTNERS, LLP**
14 **KELLER ROHRBACK L.L.P.**            711 Van Ness Avenue, Suite 500
   1129 State Street, Suite 8            San Francisco, CA 94102-3275
15 Santa Barbara, CA 93101               Telephone:  (415) 568-2555
   Telephone:  (805) 456-1496            Facsimile:   (415) 568-2556
16 Facsimile:   (805) 456-1497
17 *Attorneys for Interim Co-Lead Class
   Counsel for Plaintiffs*
18
                    **UNITED STATES DISTRICT COURT**
19                  **CENTRAL DISTRICT OF CALIFORNIA**
20 KEITH ANDREWS, an individual,         **Case No.  2:15-cv-04113-PSG-JEM**
   TIFFANI ANDREWS, an individual,
21 BACIU FAMILY LLC, a California        [Consolidated with Case Nos. 2:15-
   limited liability company, ROBERT     CV- 04573 PSG (JEMx), 2:15-CV-
22 BOYDSTON, an individual, CAPTAIN      4759 PSG (JEMx), 2:15-CV-4989
   JACK'S SANTA BARBARA TOURS,           PSG (JEMx), 2:15-CV-05118 PSG
23 LLC, a California limited liability   (JEMx), 2:15-CV- 07051- PSG
   company, MORGAN CASTAGNOLA, an        (JEMx)]
24 individual, THE EAGLE FLEET, LLC, a
   California limited liability company, **DECLARATION OF RANDALL**
25 ZACHARY FRAZIER, an individual,       **BELL, PH.D., MAI IN SUPPORT**
   MIKE GANDALL, an individual,          **OF PLAINTIFFS' MOTION FOR**
26 ALEXANDRA B. GEREMIA, as Trustee      **CLASS CERTIFICATION**
   for the Alexandra Geremia Family Trust Date:         November 7, 2016
27 dated 8/5/1998, JIM GUELKER, an       Time:         1:30 p.m.
   individual, JACQUES HABRA, an         Courtroom:  Hon. Philip S. Gutierrez
28 individual, ISURF, LLC, a California
   limited liability company, MARK

1   KIRKHART, an individual, MARY
    KIRKHART, an individual, RICHARD
2   LILYGREN, an individual, HWA HONG
    MUH, an individual, OCEAN ANGEL IV,
3   LLC, a California limited liability
    company, PACIFIC RIM FISHERIES,
4   INC., a California corporation, SARAH
    RATHBONE, an individual,
5   COMMUNITY SEAFOOD LLC, a
    California limited liability company,
6   SANTA BARBARA UNI, INC., a
    California corporation, SOUTHERN CAL
7   SEAFOOD, INC., a California
    corporation, TRACTIDE MARINE
8   CORP., a California corporation, WEI
    INTERNATIONAL TRADING INC., a
9   California corporation and STEPHEN
    WILSON, an individual, individually and
10  on behalf of others similarly situated,

11                  Plaintiffs,

12  v.

13  PLAINS ALL AMERICAN PIPELINE,
    L.P., a Delaware limited partnership,
14  PLAINS PIPELINE, L.P., a Texas limited
    partnership, and JOHN DOES 1 through
15  10,

16                  Defendants.

17

18

19

20

21

22

23

24

25

26

27

28

# DECLARATION OF RANDALL BELL, PHD, MAI.

I, Randall Bell, PhD, MAI, declare as follows:

1.      I was retained by Plaintiffs to quantify damages for property owners and lessees impacted by the Plains Oil Spill. In this declaration, I describe, from an appraisal perspective, how damages for such property owners and lessees can be calculated. Specifically, I describe how, based on my experience and research for this case, any harm to property owners and lessees can be quantified and why such losses can be quantified through mass appraisal techniques. I have investigated a number of factors in coming to my conclusions described below.

## BACKGROUND

2.      I am a real estate economist and a licensed appraiser.  I also am a certified general appraiser and a licensed real estate broker. I hold the professional designation of MAI from the Appraisal Institute.  A copy of my resume is attached.

3.      I am a principal and the CEO of Landmark Research Group, LLC, a consulting and appraisal firm that specializes in real estate damage economics – located at: 496 Broadway, Laguna Beach, California 92651. Prior to this, I led the national real estate damages practice at Bell Anderson & Sanders LLC, Price Waterhouse and PricewaterhouseCoopers.

4.      I have a PhD degree from Fielding Graduate University focusing on socio-economics, an MBA degree with a real estate emphasis from UCLA and a BS degree in finance and accounting from BYU.

5.      I have over 25 years of experience in appraisal, consulting and research regarding residential, land, commercial, special purpose, retail, industrial, recreational and investment properties in several states, as well as internationally.

6.      Since approximately 1992, I have specialized in real estate damage economics, which includes valuation issues related to a variety of detrimental conditions, including environmental issues, geotechnical issues, distress conditions, construction defects, and natural disasters.

7.     I am the author of the Appraisal Institute's course titled "The Valuation of Detrimental Conditions in Real Estate" and I have taught the course on dozens of occasions throughout the United States, Canada, South America and Asia. This course specifically addresses the appropriate methodologies for valuing properties that have been impacted with detrimental conditions, such as environmental issues.

8.     I am the author of numerous published articles related to the effect that detrimental conditions have on real estate values.

9.     I am the author of the book, "Real Estate Damages – 3rd Edition" which is published by the Appraisal Institute. This book is widely regarded as the authoritative text on determining the impacts, if any, that a detrimental condition has on property values. Specifically, Chapter 1 addresses diminution in value methodologies and Chapter 8 addresses environmental issues.

10.     I have been retained in hundreds of diminution in value assignments, including the World Trade Center, Hurricane Katrina and the Bikini Atoll Nuclear Test Sites, respectively the largest terrorist, climate and environmental cases in modern history.

11.     Through my work, I also have become familiar with the beach-front neighborhoods stretching from Refugio through Orange County.

12.     This declaration discusses the investigations undertaken to date, methodologies available and preliminary analysis performed, and sets forth how damages to the property owners and lessees impacted by the Line 901 spill can be calculated and whether such damages can be calculated on a subclass-wide basis through, for example, mass appraisal techniques. This is based upon the characteristics of the subject developments and standard real estate appraisal methodologies. Further, this declaration addresses the ability of mass appraisal techniques to measure any diminution in value suffered by the members of the

1    subclass. Specific diminution in value calculations will be the subject of a future

2    report.

3        13.    The scope of work includes the following:

4    • Read various background and supporting documents.

5    • Research background data regarding the four class representative properties.

6    • Review various legal documents.

7    • Perform a literature review on water amenities and environmental conditions,

8      as well as mass appraisal.

9    • Discuss the availability of market data with local real estate professionals.

10   • Collect and review preliminary market data.

11   • Personally inspect the subclass representatives' developments, the

12     surrounding areas and comparable developments.

13   • Perform preliminary regression analyses in order to demonstrate such

14     techniques.

15   • Review the Uniform Standards of Professional Appraisal Practice and other

16     appraisal textbooks and articles related to mass appraisal techniques.

17   • Determine if mass appraisal techniques are appropriate given the relevant

18     facts.

19   • Prepare an expert declaration.

20   • Mr. Michael Tachovsky assisted with subject property and market research.

21     Mr. Tyler Baird assisted with subject property and market research. Mr.

22     Michael Bell assisted with background research.

23                          **SUMMARY**

24       14.    Plains Oil Spill – Case Background: The Plains Oil Spill resulted in a

25   spill of over 140,000 gallons of crude oil that was deposited on beaches from north

26   of Refugio State Park to Santa Barbara and as far south as Orange County. This oil

27   spill resulted in an effective loss of the amenities for which property owners and

28

DECLARATION OF RANDALL BELL, PHD IN
SUPPORT OF PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION

1  lessees pay a premium to live on or near the ocean.  This effective loss lasted while

2  those amenities were polluted with oil.

3      15.   Subject Properties: The properties harmed by the Plains Oil Spill will

4  be determined based on information developed by Dr. Igor Mezić regarding where

5  and when the oil flowed after entering the ocean, other reports of oil from Line 901

6  in the ocean and washing onto beaches and properties, and my professional

7  assessment of the geographic scope of properties impacted by the oil in the ocean

8  and washing onto beaches and properties.  The persons to be included in the real

9  property subclass are set forth in paragraph 30, below.

10     16.   Water Feature Premiums: A review of the literature and market data

11 confirmed what is commonly known and self-evident. Property owners and tenants

12 routinely pay significant premiums for water amenities, such as beach frontage or

13 beach and ocean access.

14     17.   Environmental Valuation: The Plains Oil Spill environmentally

15 damaged the beaches and oceans and effectively resulted in a loss of the amenities

16 for which numerous property owners and tenants pay a premium. A literature

17 review was conducted on the topic of environmental issues and their impact on real

18 estate values. Environmental valuation methodologies and the Uniform Standards

19 of Profession Appraisal Practice (USPAP) recognize that loss-of-use is an

20 appropriate method of calculating environmental damages.

21     18.   Oil Spills: Oil that comes onto or nearby properties as a result of oil

22 spills can have a significant impact on owners' and lessees' enjoyment of their

23 properties. This has been well recognized in the appraisal and real estate

24 professions for years and has been reflected in the literature on the topic. In

25 particular, the severity of the impact of the BP oil spill on properties, resulted in a

26 number of published articles on this subject.  These articles confirm what was

27 generally known – that oil on or around properties close to the beach significantly

28 impact the owners' and lessees' enjoyment of those properties, and the use and

DECLARATION OF RANDALL BELL, PHD IN
SUPPORT OF PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION

1  values of such properties are diminished.

2       19.   Mass Appraisal: USPAP recognizes that mass appraisal methodologies

3  are a proper method of valuing harm caused to large numbers of properties. Mass

4  appraisals are most often used for property tax computations and in cases, such as

5  this, where large numbers of properties incurred a damage that is relatively low, as

6  compared to their overall value.

7       20.   Plains Oil Spill - Valuation Methodologies: All of the proposed

8  plaintiffs' properties are located on or near the California coastline, all are

9  residential properties or land, and all lost the effective use of the amenities for

10  which they pay a premium as a result of the Plains Oil Spill.

11       21.   The method to determine damages for a proposed subclass in a case

12  like this is straight forward. The subject properties would enjoy valuable amenities,

13  but for the Plains Oil Spill. As a result of this spill, the subject properties effectively

14  lost those amenities for a period of time. The owners and lessees who paid a

15  premium for those amenities lost the value of that premium, and therefore were

16  damaged in the amount of the value of the premium.

17       22.   The value of the premium paid for water amenities can be calculated

18  as the unimpaired rental rate of the subject property, less the rental rate of an

19  otherwise similar property without the beach proximity (i.e., a property that lacks

20  those amenities) – over the period where this amenity was effectively lost. Both

21  property inspections and the MLS data indicate that there is ample market data for

22  this analysis using simple regressions, multiple regressions or a paired-data

23  analysis.

24       23.   I have conducted a preliminary analysis utilizing actual market data to

25  demonstrate the feasibility of this methodology. This type of paired-data analysis

26  can be performed in various neighborhoods and regions along the coast where oil

27  caused property owners and lessees to lose the value of the water premium. This

28

5

damage figure would then be applied to the other similar homes in that area for the period during which they were harmed by the oil spill.

24. As a result of my research, personal inspections, literature review and analysis, the damage to the subject properties resulting from the Plains Oils Spill can be accurately calculated on a mass appraisal basis for the proposed subclass participants utilizing standard paired-data techniques. Indeed, there is ample market data such that this case is ideally suited for such a mass appraisal technique.

## PLAINS OIL SPILL – CASE BACKGROUND

25. On May 19, 2015, a corroded section of a 10.6-mile oil pipeline, owned by Plains All American Pipeline, ruptured.[1]  The pipeline rupture reportedly resulted in a spill of as many as 143,000 gallons of crude oil into the ocean and on nearby beaches.[2]  The 24-inch oil line rupture, located on the mountain side of Highway 101 north of Refugio State Beach, sent oil through a culvert under the highway and railroad tracks, into the ocean, and onto beaches.[3]

26. Ultimately, the oil spill had far reaching impacts, including both economically and environmentally.  California Governor Jerry Brown declared a state of emergency for Santa Barbara County the day following the spill.[4]  Cleanup

[1] Joseph Serna, "Refugio Oil Spill May Have Been Costlier, Bigger than Projected," *Los Angeles Times*, August 5, 2015, http://www.latimes.com/local/lanow/la-me-ln-refugio-oil-spill-projected-company-says-20150805-story.html.
[2] Joseph Serna, "Refugio Oil Spill May Have Been Costlier, Bigger than Projected," *Los Angeles Times*, August 5, 2015, http://www.latimes.com/local/lanow/la-me-ln-refugio-oil-spill-projected-company-says-20150805-story.html.
[3] Lara Cooper and Giana Magnoli, "Cleanup Under Way for Large Oil Spill Near Refugio State Beach," *Noozhawk*, May 19, 2015, http://www.noozhawk.com/noozhawk/print/oil_spill_reported_on_coast_near_refugio.
[4] Sam Frizell, "California Governor Declares State of Emergency After Santa Barbara Oil Spill," *Time*, May 20,2015, http://time.com/3891739/california-oil-spill-jerry-brown-state-of-emergency/.

costs have totaled $150 million thus far, and Plains is estimating that the environmental disaster would cost about $269 million in its annual report.[5]  The spill led to the closure of fisheries and beaches, as well as the death of local wildlife.[6]  Cleanup crews have responded to reports of tar balls as far away as Orange County, and one tar ball recovered in Manhattan Beach had the same oil "DNA" as the oil spilled at Refugio.[7]  The Plains rupture was the largest coastal oil spill since BP's Deepwater Horizon explosion in the Gulf of Mexico six years ago.[8]

27.    Below are pictures from the spill.  Additional pictures are included in Exhibit 8.

///

///

///

///

///

///

///

///

---

[5] Alex Kacik, "Plains Arraignment, Motion to Seal Indictment Transcripts Continued to July 28," *Pacific Coast Business Times*, June 30, 2016, http://www.pacbiztimes.com/2016/06/30/plains-arraignment-motion-to-seal-indictment-transcripts-continued-to-july-28/.

[6] Samantha Page, "Oil Company to Face Felony Charges Over Massive California Spill," *Think Progress*, May 18, 2016, http://thinkprogress.org/climate/2016/05/18/3779335/santa-barbara-oil-spill-indictment/.

[7] Javier Panzar, Joseph Serna, and Matt Hamilton, "Big Oil Slick off Santa Barbara County Coast Sparks New Concerns," *Los Angeles Times*, July 29, 2015, http://www.latimes.com/local/lanow/la-me-ln-oil-slick-santa-barbara-county-20150729-story.html.

[8] Brian Melley, "Company Charged in Oil Spill that Fouled California Beaches," *Phys.org*, May 17, 2016, http://phys.org/news/2016-05-pipeline-firm-california-oil.html.

1
2
3
4
5
6
7
8
9
10
11
12
13



Workers Conducting Clean-Up[9]

14
15
16
17
18
19
20
21
22
23
24
25



Arial View of Oil Stained Beaches and Clean-Up[10]

26
27
28

[9] Ibid
[10] Ibid

DECLARATION OF RANDALL BELL, PHD IN
SUPPORT OF PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION

1
2
3
4
5
6
7
8
9
10
11



Beaches Damaged by Plains Oil Spill[11]

12
13
14
15
16
17
18
19
20
21
22
23

Park Closure Due to Plains Oil Spill[12]

24   [11] Lara Cooper and Giana Magnoli, "Cleanup Under Way for Large Oil Spill Near
25   Refugio State Beach," *Noozhawk*, May 19, 2015,
      http://www.noozhawk.com/noozhawk/print/oil_spill_reported_on_coast_near_refu
26   gio.
27   [12] Alejandro Lazo and Erin Ailworth, "Pipeline in California Oil Spill Ordered Shut
      Down, Tested," *Wall Street Journal*, May 22, 2015,

28

DECLARATION OF RANDALL BELL, PHD IN
SUPPORT OF PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION

## **SUBJECT PROPERTIES**

28.     The property owner and lessee subclass representatives and their respective subject properties are:

- Mark & Mary Kirkhart, 1520 Miramar Beach, Santa Barbara, California 93108 (APN 009-345-013)
- Jacques Habra, 3425 Sea Ledge Lane, Santa Barbara, California 93109 (APN 047-082-012)
- Alexandra Geremia, 9 Arroyo Quemada Lane, Goleta, California 93117 (APN: 081-190-003)
- Baciu Family LLC, vacant land at Arroyo Hondo, Goleta (APN 081-160-001-2; 081-170-001,3; 081-180-001-3, 6)

29.     For purposes of preparing this declaration, I personally inspected the oil spill site, the exteriors of the above-listed properties, and the surrounding areas. I also am generally familiar with the beach-front neighborhoods stretching from Refugio through Orange County.

30.     The persons to be included in the real property subclass are owners or lessees of: (1) beachfront properties on a beach which oil from the Line 901 spill washed up onto or nearby the shoreline; (2) properties with a private easement to a beach which oil from the Line 901 spill washed up onto or nearby the shoreline; (3) properties in ocean-oriented communities that are within one-half (½) mile of a beach which oil from the Line 901 spill washed up onto or nearby the shoreline; and (4) such properties whose associated beach, based on media reports and broker feedback, was threatened with having oil from the Line 901 spill wash up onto or nearby the shoreline.

---

http://www.wsj.com/articles/pipeline-in-california-oil-spill-ordered-shut-down-tested-1432319020.

31.     The specific property owners/lessees harmed by the Line 901 spill will be determined by applying the above parameters to the final analysis developed by Dr. Igor Mezić regarding where and when the oil flowed after entering the ocean, along with other relevant reports relating to the Line 901 spill, and interviews of brokers or other relevant people.  Based on current information, including Dr. Mezić's preliminary analysis, the properties that the above parameters will be applied to are located from West Longitude 120.4 on the West, to West Longitude 118.6 on the East (i.e., approximately from Point Conception to the eastern border of Malibu).  These geographic boundaries may change based on Dr. Mezić's final analysis and any additional pertinent information I rely on in my final report.

32.     Pictures of the spill site and the subclass representatives' properties follow.

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

DECLARATION OF RANDALL BELL, PHD IN
SUPPORT OF PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28





View of the spill location site

DECLARATION OF RANDALL BELL, PHD IN
SUPPORT OF PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION

1
2
3
4
5
6
7
8
9
10
11
12
13



14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



View of the subject property located at 1520 Miramar Beach, Santa Barbara

DECLARATION OF RANDALL BELL, PHD IN
SUPPORT OF PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28





View of the subject property located at 3425 Sea Ledge Lane, Santa Barbara

DECLARATION OF RANDALL BELL, PHD IN
SUPPORT OF PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28





View of the subject property located at 9 Arroyo Quemada Lane, Goleta

15

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28





View of subject property land located at Arroyo Hondo, Goleta

DECLARATION OF RANDALL BELL, PHD IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

**WATER FEATURE PREMIUMS**

34.    It is commonly known in the real estate and appraisal professions that proximity to water features (ocean, lake and river) increase property values and rental rates. The published literature that speaks directly to water proximity concludes that property values increase as access to water amenities increases.

35.    A summary of published literature is included as Exhibit 9.

**VALUING ENVIRONMENTAL DAMAGES**

36.    The Plains Oil Spill environmentally damaged the beaches and oceans and effectively resulted in a loss of the ocean amenities for which numerous property owners and tenants pay a premium.

37.    A literature review of valuing environmental damages is found in Exhibit 10.  The fundamental framework for valuing such a loss-of-use, as well as nearly any other any real estate damage allegation, is set forth in the Detrimental Conditions Matrix.  This matrix was first published in 1998, and is the basis for fundamental changes of the Uniform Standards of Professional Appraisal Practice (USPAP) that were published in 2002 and made effective January 1, 2003.

///
///
///
///
///
///
///
///
///
///
///
///

DECLARATION OF RANDALL BELL, PHD IN
SUPPORT OF PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION

**Detrimental Conditions Matrix**

|  | Assessment | Repair | Ongoing |
|---|---|---|---|
| Cost | Cost & Responsibility To Assess Damage | Cost & Responsibility To Repair or Remediate | Ongoing Costs & Responsibility i.e., monitoring |
| Use | Impact on Use While Assessed | Impact on Use While Repaired or Remediated | Ongoing Impact on Use or Impact on Highest & Best Use |
| Risk | Uncertainty Factor | Project Incentive | Market Resistance |

38.   Advisory Opinion 9 of USPAP describes the "cost, use and risk" elements, with emphasis added, as follows:

Satisfying SR 1-4 Requirements:

When the appraiser addresses the diminution in value of a contaminated property and/or its unimpaired value, the appraiser must recognize that the value of an interest in impacted or contaminated real estate may not be measurable simply by deducting the remediation or compliance cost estimate from the opinion of the value as if unaffected (unimpaired value). Rather, cost, use and risk effects can potentially impact the value of contaminated property. Cost effects primarily represent deductions for costs to remediate a contaminated property. These costs are usually estimated by someone other than the appraiser, and should include consideration of any increased operating costs due to property remediation. The appraiser should also be aware that the market might not recognize all estimated costs as having an effect on value. **Use effects reflect impacts on the utility of the site as a result of the contamination. If the contamination and/or its cleanup rendered a portion of the site unusable, or limited the future highest and best use of the property, then there could be a use effect on value.** Risk effects are typically estimated by the appraiser and often represent the most challenging part of the appraisal assignment. These effects are derived

from the market's perception of increased environmental risk and uncertainty. The analysis of the effects of increased environmental risk and uncertainty on property value (environmental stigma) must be based on market data, rather than unsupported opinion or judgment.

In general, the unimpaired value of the property being appraised can be estimated using sales comparison approach (SR 1-4(a)), cost approach (SR 1-4(b)), and income approach (SR 1-4(c)). Estimating the effects of environmental contamination on real property value usually involves the application of one or more specialized valuation methods. These methods should be consistent with the requirements related to the valuation approaches in USPAP.

39.    While the nine quadrants within the matrix may not all be applicable, they should all be considered in the context of every assignment.  While cost, use and risk have all been considered, the use effects are central to this case.

40.    Sales prices and rental rates consider the entire value of the property including the use of associated amenities.  When environmental damages do not completely destroy the use of the property (e.g., owners and lessees still have the utility of the house itself), they still deprive the owners or lessees of part of what they paid for.  In this case, the reasonable use of the valuable ocean amenity has been eliminated for a period of time due to the oil spill.

41.    In the context of the DC Matrix and USPAP AO-9, rental rates are regularly utilized in determining loss of use calculations. Rental rates are appropriate for calculating the lost value of the water premium as they reflect the real estate markets perception of value for the use of a property over a specific period of time. Furthermore, USPAP makes clear that the "use" component should be considered in such an analysis, and the literature is clear the rental rates provide an appropriate measure of such use, or loss of use. Rental rates of properties with ocean frontage or proximity can be compared with the rental rates of otherwise similar properties that do not have ocean frontage or proximity. This is a standard

DECLARATION OF RANDALL BELL, PHD IN
SUPPORT OF PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION

1  paired-data analysis, and the differential reflects the damage caused to the subclass

2  properties.

3      42.    This differential in rental rates can be converted to a rental rate per

4  square foot, which can then be applied to the subclass member's properties.

5          **THE IMPACT OF OIL SPILLS ON PROPERTIES**

6      43.    Oil that comes onto or nearby properties as a result of oil spills can

7  have a significant impact on owners' and lessees' enjoyment of the property. This

8  has been well recognized in the appraisal and real estate professions for years and

9  has been reflected in the literature on the topic. In particular, the severity of the

10  impact of the BP oil spill on properties resulted in a number of published articles on

11  this subject.  These articles confirm what was generally known – that oil on or

12  around properties close to the beach significantly impacts the owners' and lessees'

13  enjoyment of those properties, and the use and values of such properties are

14  diminished.

15      44.    A summary of relevant literature from the BP oil spill is included as

16  Exhibit 11.

17          **USE OF MASS APPRAISAL**

18      45.    Mass valuations of real estate have been established in the mainstream

19  of the appraisal profession since at least the 1950's and 60's.[13]

20      46.    Mass appraisal is defined by the Dictionary of Real Estate (5th

21  Edition) as, "The process of valuing a universe of properties as of a given date

22  using standard methodology, employing common data, and allowing for statistical

23  testing (USPAP, 2010-11 ed.)."

24      47.    Mass appraisal methodologies rely on statistical tools to estimate

25  values of properties in an appropriate subclass geographic area. The valuation

26  methodologies employed in this approach should be in conformance with Appraisal

27  _____

[13] Robert A. Blettner, "Mass Appraisal via Multiple Regression," *The Appraisal Journal* (1969): 513-521.

28

1    Foundation, USPAP Standard 6, and the Standard on Mass Appraisal of Real

2    Property promulgated by the International Association of Assessing Officers.

3         48.    The mass appraisal methodologies often include regression models or

4    studies. There are two basic types of regression models, simple regressions (that use

5    one independent variable) and multiple regressions (that use multiple independent

6    variables), which are also called hedonic models. On the other hand, dependent

7    variables are typically price, (including price per square foot, price per acre, price

8    per unit). The dependent variable of price "depends" upon the independent

9    variables. Independent variable can include features such as square footage, lot size,

10   age, room counts, as well as pools, views or other amenities.

11        49.    In the context of real estate damage economics, regressions often

12   compare multiple neighborhoods. The subject neighborhood being studied is

13   conventionally called the "test" area, while the comparable neighborhoods are

14   called "control" areas.

15        50.    Simple linear regression models may be utilized as trend studies.

16   These are often "time-value" models where a single independent variable "time" is

17   graphed on the "x-axis" and the dependent variable "value" is graphed on the "y-

18   axis."

19        51.    Multiple regression techniques use multiple independent variables. As

20   they are multi-dimensional, they cannot be graphed. Instead they use statistical

21   tables; specifically, these are (1) summary input tables, (2) descriptive statistic

22   tables, (3) residual tables, and (4) descriptive ANOVA tables.

23        52.    The positive attributes of simple regressions is that they are

24   presentation friendly and can facilitate studying several test and control

25   neighborhoods. They can also facilitate time, price and square footage, which is

26   often the predominant independent variable as a dependent variable of price-per-

27   square-foot. They can also generate linear (straight line) and curvilinear or

28

DECLARATION OF RANDALL BELL, PHD IN
SUPPORT OF PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION

1  polynomial (curved line) outputs. As a drawback, simple regressions use only one
2  independent variable.

3      53.    Multiple regressions use multiple independent variables. In other
4  words, they specifically account for variables such as a property's size, room
5  counts, age, condition and amenities (pool, spa, view, etc.)

6      54.    Multiple regressions not only accommodate multiple independent
7  variables, but they can facilitate studying several test and control neighborhoods.
8  Furthermore, a significant advantage of mass appraisal techniques in that
9  regressions are premised upon the concept of central tendency, where the data
10 groups or clusters around a central trend line.

11     55.    The phrase 'central tendency' was first used in the late 1920s. The
12 tendency of quantitative data, for homogeneous market data such as ocean-oriented
13 housing, is to cluster around some central value. The central value is commonly
14 estimated by the mean, median, or mode, whereas the closeness with which the
15 values surround the central value is commonly quantified using the standard
16 deviation or variance.

17     56.    Measures of central tendency, or what are commonly called averages,
18 answer the question, "Is there a single number that best represents the variable in
19 question?" With ocean-oriented residential properties, a mass appraisal technique is
20 not only efficient, but also appropriate and advantageous. Independent variables, as
21 addressed, account for the independent variables and can be reliably calculated.
22 Thus, all subclass properties, including those in pockets with more limited market
23 data, can benefit from the large amounts of data and the study as a whole.

24     57.    Exhibit 12 contains a chart setting forth an illustration of simple and
25 multiple regressions.

26 ///
27 ///
28 ///

## APPLICATION TO THE PLAINS OIL SPILL

58.     When an oil spill fouls the ocean and beaches, the local residents lose the full use of their property for which they paid a significant premium. The well-established valuation models previously described allow me to reasonably calculate the value of that lost premium.

59.     As discussed, mass appraisal techniques are well suited to measure any diminution in value resulting from environmental issues. USPAP Standard 6 sets forth mass appraisal as an accepted methodology. The professional literature provides further support for the use of mass appraisal techniques. Indeed, mass appraisal and regression techniques are relatively common within the appraisal profession.

60.     A valid mass appraisal should encompass similar property types, the source(s) of contamination, and market conditions. With reasonable similarities in the properties, market and environmental characteristics, property interest defined in a class action can be meaningfully analyzed.[14] The real estate damages in this case are well suited for mass appraisal, as properties along the impacted coastline have similar uses, market areas, environmental damages, and cleanup timeframe. The subject properties are all ocean-oriented residential properties (or land). From all perspectives, the subject properties and potential subclass areas are well-suited for mass appraisal methodologies.

61.     Based on the USPAP standards and literature described in the prior sections, I can reliably assess the damages suffered by those property owners and lessees through a rental analysis. The monthly market rental rates can be divided by the square footage of the home, which yields a rental rate per square foot. By subtracting this rental rate per square foot of the ocean-oriented properties from

---

[14] Thomas O. Jackson, "Real Property Valuation Issues in Environmental Class Actions," *The Appraisal Journal* (2010): 141-149.

otherwise similar non-ocean oriented properties, the incremental value attributed to the ocean proximity can be derived.

62.     The properties harmed by the Plains Oil Spill will be determined based on information developed by Dr. Igor Mezić regarding where and when the oil flowed after entering the ocean, other reports of oil from Line 901 in the ocean and washing onto beaches and properties, and my professional assessment of the geographic scope of properties impacted by the oil in the ocean and washing onto beaches and properties.

63.     Field inspections of the subclass representatives' developments and comparable developments confirmed that the potential subclass representatives' developments have uniform residential property characteristics and there is ample comparable market data.

64.     During the property inspections, it was noted that all of the properties are located on or near the California coastline, all of the properties are residential properties or land, and all lost the reasonable use of the beach as a result of the Plains Oil Spill. As owners of properties with ocean proximity routinely pay significant premiums for this amenity, an oil spill would obviously interfere with a reasonable use of these natural resources.

65.     As described above, rental rates are the proper basis for performing loss of use calculations. Further, because the oil spill was cleaned up over a period of time, it is further clear that the loss of use and applicable rental rates should utilized in computing any damages.[15]

66.     Both property inspections, along with MLS data and public records, indicate that there is ample market data for this analysis. The approach is essentially an income approach both in terms of a rental survey and the calculations for loss of

_____

[15] Scott B. Arens, "The Valuation of Defective Properties: A Common Sense Approach," *The Appraisal Journal* (1997): 143-148.

DECLARATION OF RANDALL BELL, PHD IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

use over time. Furthermore, it utilizes a paired-rental analysis (similar to a paired-sales analysis) to measure the incremental value of the ocean frontage or proximity.

67.    I have performed similar regression analyses numerous times.  For example I have conducted statistical regressions involving contaminated real estate in multiple markets including California, Nevada, Florida, Missouri, Michigan, Idaho, the Bahamas and the Marshall Islands.

68.    Based upon the foregoing, the method to determine damages for a proposed subclass in this case straight forward. The subject properties would enjoy valuable amenities, but for the Plains Oil Spill. As a result of this spill, the subject properties effectively lost those amenities for a period of time. The period of damage will be calculated during the period that the oil spill effectively caused property owners or lessees to lose the reasonable use of their water amenities. This analysis considers past damages and is therefore retrospective. The following demonstrates how the analysis can be completed once all the underlying facts are known:

**Step 1 - Determine the Specific Subclass Area:** As described previously, the properties harmed by the Plains Oil Spill will be determined based on information developed by Dr. Igor Mezić regarding where and when the oil flowed after entering the ocean, other reports of oil from Line 901 in the ocean and washing onto beaches and properties, and my professional assessment of the geographic scope of properties impacted by the oil in the ocean and on beaches.

**Step 2 – Identify Relevant Property Characteristics:** The relevant property characteristics (location, square footage, age, lot size, room counts, garage, amenities, etc.) will be noted for all properties in the mass appraisal. Additionally, each property will be coded in terms of, (1) ocean-front, (2) ocean private easement, (C) ocean close, or (D) ocean community (but not in

close proximity). All market data will be entered into an Excel spreadsheet. The following diagram sets for these parameters for the study:

|  | A<br>Ocean<br>Proximity<br>< 0.5 Mile | | B<br>Ocean<br>Proximity<br>> 0.75 Mile |
|---|---|---|---|
| 1 | Ocean Front | vs. | Ocean Community |
| 2 | Ocean Private Easement | vs. | Ocean Community |
| 3 | Ocean Close | vs. | Ocean Community |

**Step 3 - Rental Transactions within the Subclass or "Test" Area:** This step involves the research of rental data, which is obtained from the local MLS services and cross-referenced with public records. Each rental comparable will also be similarly coded.

**Step 4 - Rental Transactions in the Non-Subclass or "Control" Areas:** The control areas include properties not located near the beach (at least 0.75 miles away), but that are otherwise similar to the homes located within the subclass.

To illustrate this process, a paired-data analysis simply compares home rental rates with and without the beach proximity amenities that were effectively lost for a period of time:

///

///

DECLARATION OF RANDALL BELL, PHD IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Rental rate of house with beach proximity,

2,000 SqFt @ $7,000/Month                                   $3.50/SqFt/Month

Less:

Rental rate of house without beach proximity[16]

2,000 SqFt @ $4,000/Month                                   $2.00/SqFt/Month

Incremental Loss of Use                                     $1.50/SqFt/Month

**Step 5 - Simple Regression Analysis:** A simple regression provides a graph that generates a trend line based upon the rental rate per square foot, over time. This graph can then be utilized to examine the quality of the data and identify any outlying market data that requires additional verification or analysis.

**Step 6 - Multiple Regression Analysis:** As discussed, a multiple regression is a mass appraisal technique that mathematically accounts and adjusts for multiple independent variables within the data set, such as location, square footage, age, lot size, room counts, garage, amenities, etc. Ultimately, the multiple regression will produce the incremental rental rate which reflects the loss of use for ocean proximity for each subclass property. Essentially a multiple regression is making a calculation similar to this for each subclass property, in order to determine the damages applicable for each property:

---

[16] Note that the paired data is of an otherwise similar home in terms of size and age, and located in the same general location greater than 0.75 mile from the ocean.

Subclass Property SqFt  X  Incremental Use Loss/Month  X  Months of Lost
Use  =  Damage

For example,

2,500 SqFt  X  $1.50/Month Loss of Use  X  2.5 Months of Lost Use  =
$9,375 Damage

69.    I conducted a preliminary analysis utilizing Santa Barbara market data.
This preliminary analysis demonstrates the fundamental calculations and the
availability of market data. In each of these calculations, rental properties located
within half a mile from the beach (beachfront or accessible) are compared with
otherwise similar properties located over three-quarters of a mile away from the
beach (ocean community). All of the analyses were completed on a "rental rate per
square foot basis" with a final "damage per month" being calculated, also on a "per
square foot basis."

70.    This type of paired-data analysis can be completed in various
neighborhoods and regions along the coast where oil soiled the beaches. This
damage figure would then be applied to the other similar homes in that area using
both simple and multiple regressions. There is abundant and reliable market data. In
a full analysis, this data could be utilized to determine damages for those residences
in the subclass area, by multiplying the damage per month, with the square footage
of the subclass member, by the period of time the damage occurred.

71.    Four sets of data were researched; (1) beach-front homes that had
rented, (2) homes with private easements to the beach that had rented, (3) homes in
close proximity (less than half a mile) to the beach that had rented, and (4) homes
that are otherwise similar to the prior homes, but are not located in proximity to the
beach. All data was derived from the Santa Barbara Multiple Listing Service

DECLARATION OF RANDALL BELL, PHD IN
SUPPORT OF PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION

(MLS). The results of the three preliminary comparisons, and brief descriptions, are as follows:

**Ocean Front v. Ocean Community**

| No | Item | Rental Rate | SqFt | Rental Rate/SqFt | Source |
|----|------|-------------|------|------------------|--------|
| 1 | Beach-Front House Rental Rate Per Month | $15,000 | 2,800 | $5.36 | Multiple Listing Service (MLS) |
| 2 | Local Inland House Rental Rate Per Month | $3,200 | 2,273 | $1.41 | Multiple Listing Service (MLS) |
| 3 | Damage Per Month | | | $3.95 | Calculation |

**Ocean Private Easement v. Ocean Community**

| No | Item | Rental Rate | SqFt | Rental Rate/SqFt | Source |
|----|------|-------------|------|------------------|--------|
| 1 | Ocean Private Easement House Rental Rate Per Month | $7,500 | 2,567 | $2.92 | Multiple Listing Service (MLS) |
| 2 | Local Inland House Rental Rate Per Month | $3,200 | 2,273 | $1.41 | Multiple Listing Service (MLS) |
| 3 | Damage Per Month | | | $1.51 | Calculation |

**Ocean Close v. Ocean Community**

| No | Item | Rental Rate | SqFt | Rental Rate/SqFt | Source |
|----|------|-------------|------|------------------|--------|
| 1 | Ocean Close House Rental Rate Per Month | $5,800 | 2,155 | $2.69 | Multiple Listing Service (MLS) |
| 2 | Local Inland House Rental Rate Per Month | $4,500 | 2,521 | $1.79 | Multiple Listing Service (MLS) |
| 3 | Damage Per Month | | | $0.91 | Calculation |

DECLARATION OF RANDALL BELL, PHD IN
SUPPORT OF PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION

72.   This data can then be applied to measure the damage incurred by each subclass member. For example, if a subclass member has a residence containing 2,200 square feet with a private easement to the beach, and the time of ocean impairment is two months, the total damages can be determined as follows:

2,200 SqFt  X  $1.51 Incrimental Use Loss/Month  X  2 Month of Lost Use  =
$6,644

73.   This research and example demonstrates the application of an analysis using market rental data. Similar calculations, refined through regression analysis, can then be applied to properties within the subclass to determine the damages for each property. The full quantification of real estate damages will be the subject of a future report.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on August 18, 2016, at ___LAGUNA BEACH, CA___.

_____
Randall Bell, PhD, MAI

DECLARATION OF RANDALL BELL, PHD IN
SUPPORT OF PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I, Robert J. Nelson, hereby certify that on August 22, 2016, I electronically filed Plaintiffs' **DECLARATION OF RANDALL BELL, PHD MAI IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** with the Clerk of the United States District Court for the Central District of California using the CM/ECF system, which shall send electronic notification to all counsel of record.

*/s/ Robert J. Nelson*
Robert J. Nelson

DECLARATION OF RANDALL BELL, PHD, MAI, IN
SUPPORT OF PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION