Robert L. Lieff (CSB No. 037568)
Elizabeth J. Cabraser (CSB No. 083151)
Robert J. Nelson (CSB No. 132797)
Sarah R. London (CSB No. 267083)
Wilson M. Dunlavey (CSB No. 307719)
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

Lynn Lincoln Sarko
(*Admitted Pro Hac Vice*)
Gretchen Freeman Cappio
(*Admitted Pro Hac Vice*)
Daniel Mensher
(*Admitted Pro Hac Vice*)
**KELLER ROHRBACK L.L.P.**
1201 Third Ave., Suite 3200
Seattle, WA 98101
Telephone: (206) 623-1900
Facsimile: (206) 623-3384

Juli Farris (CSB No. 141716)
Matthew J. Preusch (CSB No. 298144)
**KELLER ROHRBACK L.L.P.**
1129 State Street, Suite 8
Santa Barbara, CA 93101
Telephone: (805) 456-1496
Facsimile: (805) 456-1497

A. Barry Cappello (CSB No. 037835)
Leila J. Noël (CSB No. 114307)
Lawrence J. Conlan (CSB No. 221350)
David Cousineau (CSB No. 298801)
**CAPPELLO & NOËL LLP**
831 State Street
Santa Barbara, CA 93101-3227
Telephone: (805) 564-2444
Facsimile: (805) 965-5950

*Lead Trial Counsel for Plaintiffs*

William M. Audet (CSB No. 117456)
**AUDET & PARTNERS, LLP**
711 Van Ness Avenue, Suite 500
San Francisco, CA 94102-3275
Telephone: (415) 568-2555
Facsimile: (415) 568-2556

*Attorneys for Interim Co-Lead Class Counsel for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| KEITH ANDREWS, an individual, TIFFANI ANDREWS, an individual, BACIU FAMILY LLC, a California limited liability company, ROBERT BOYDSTON, an individual, CAPTAIN JACK'S SANTA BARBARA TOURS, LLC, a California limited liability company, MORGAN CASTAGNOLA, an individual, THE EAGLE FLEET, LLC, a California limited liability company, ZACHARY FRAZIER, an individual, MIKE GANDALL, an individual, ALEXANDRA B. GEREMIA, as Trustee for the Alexandra Geremia Family Trust dated 8/5/1998, JIM GUELKER, an individual, JACQUES HABRA, an individual, ISURF, LLC, a California limited liability company, MARK | **Case No. 2:15-cv-04113-PSG-JEM**<br><br>[Consolidated with Case Nos. 2:15-CV- 04573 PSG (JEMx), 2:15-CV-4759 PSG (JEMx), 2:15-CV-4989 PSG (JEMx), 2:15-CV-05118 PSG (JEMx), 2:15-CV- 07051- PSG (JEMx)]<br><br>**DECLARATION OF STEVE ROBERTS IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**<br><br>Date: November 7, 2016<br>Time: 1:30 p.m.<br>Courtroom: Hon. Philip S. Gutierrez |

| | |
|---|---|
| 1 | KIRKHART, an individual, MARY KIRKHART, an individual, RICHARD LILYGREN, an individual, HWA HONG MUH, an individual, OCEAN ANGEL IV, LLC, a California limited liability company, PACIFIC RIM FISHERIES, INC., a California corporation, SARAH RATHBONE, an individual, COMMUNITY SEAFOOD LLC, a California limited liability company, SANTA BARBARA UNI, INC., a California corporation, SOUTHERN CAL SEAFOOD, INC., a California corporation, TRACTIDE MARINE CORP., a California corporation, WEI INTERNATIONAL TRADING INC., a California corporation and STEPHEN WILSON, an individual, individually and on behalf of others similarly situated, |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | Plaintiffs, |
| 12 | v. |
| 13 | PLAINS ALL AMERICAN PIPELINE, L.P., a Delaware limited partnership, PLAINS PIPELINE, L.P., a Texas limited partnership, and JOHN DOES 1 through 10, |
| 14 | |
| 15 | |
| 16 | Defendants. |

I, STEVE ROBERTS, hereby declare:

1. I am the founder of Veritas Forensic Accounting & Economics, hereafter, "Veritas." Attorneys for Plaintiffs retained Veritas to assess the economic impact of the Plains All-American Line 901 oil spill, and resulting shutdown of Lines 901 and 903, on fishermen, business owners and oil industry workers and businesses.

## PERSONAL AND BUSINESS BACKGROUND

2. I am an Economist, Certified Public Accountant, Certified Forensic Accountant, Certified Fraud Examiner, Forensic Certified Public Accountant, Certified Global Management Accountant, Certified Criminal Investigator, and am Certified in Financial Forensics by the American Institute of Certified Public Accountants ("AICPA"). I am also a member of the Academy of Court Appointed Masters.

3. Since my time at accounting firm, Deloitte & Touche, I have spent the last 29 years designing, implementing and managing more than two thousand engagements involving billions in economic damages. I have employed the damage measurement models and principles discussed in this Declaration on nearly a daily basis during these years. Additionally, I have conducted training and continuing education courses for a variety of organizations and professionals on these same economic loss models and principles for more than two decades. As part of my practice, I testify regularly in federal and state courts, and in alternative dispute resolution proceedings. I do so in relatively equal measure for both plaintiffs and defendants. I also serve as an umpire and mediator in cases involving disputed values and other forensic accounting issues.

4. Veritas engagements, under my direction, focus exclusively on economic research, economic loss measurement, valuation and forensic accounting issues. These assignments include economic loss modeling and calculation, expert report and exhibit preparation, and deposition and courtroom testimony. I have

evaluated economic losses in Alaska, Europe, across North America, in Mexico, and throughout the Gulf and Pacific Rim.

5. Several hundred of these engagements specifically have involved economic damages resulting directly from oil and other toxins entering the water. The majority of these assignments entailed assessing the economic impact of pollution, destruction of habitat and fishing closures on fishermen, offshore and shore-based businesses and individuals working for and/or connected with these businesses.

6. I have used the same economic damage models and principles discussed in this Declaration to evaluate losses on other past engagements including damage modeling and measurement of a large volume of businesses and individuals adversely impacted by Superfund site pollution, and pipeline leakage and subsequent catastrophic explosion. More recently, I have used these same models and principles in examining the impact of toxins in Galveston Bay and Gulf waters involving approximately 650 fishermen, shore-based businesses and individual workers. Currently, I am managing several fishing and other business interruption loss, and employee loss of earnings engagements, involving approximately $75 million, each employing the same damage measurement models and principles discussed in this Declaration.

7. Working closely with me on this engagement is Jeff DeBell. Mr. DeBell is a Veritas Associate, former seafood industry CFO and experienced evaluator of fishing and related business losses on both the Exxon Valdez and BP Oil spills. Mr. DeBell and I have several decades of loss evaluation in class action suits.

8. Other Veritas Associates working on this engagement are Wade Roberts, Luke Fischer, Tom Sill, and Andrea Holtan. Dr. Roberts is a Professor of Economics with a specialty in labor economics. He is assisting with the assessment of lost earnings for oil workers and businesses impacted by the Plains All-American

Pipeline spill and shutdown. Veritas will also use the skills of professors Tom Sill and Andrea Holtan, and Financial Analyst, Luke Fischer, MBA, in modeling and measuring losses from this pipeline rupture. Included among Mr. Sill's achievements are the design and implementation of Boeing's accounting system. Ms. Holtan is a business professor and former seafood industry professional. Mr. Fischer has approximately 6,000 hours modeling and calculating economic loss, much of which has been with the seafood industry.

9. My hourly rate and the rates for those assisting me on this case are as follows:

| | |
|---|---|
| Steve Roberts: | $365.00 |
| Jeff DeBell: | $350.00 |
| Wade Roberts: | $285.00 |
| Tom Sill: | $245.00 |
| Luke Fisher: | $195.00 |
| Andrea Holtan: | $245.00 |

10. My CV is attached as Exhibit 1.

## MEASURING THE ECONOMIC IMPACT OF THE SPILL AND SHUTDOWN

11. The economic impact of the Line 901 spill and resulting shutdown of Lines 901 and 903 on fishermen, business owners and oil industry workers and businesses can be captured and measured by applying normal and customary economic loss measurement principles and common modeling techniques. Based on my experience, these principles and techniques are well suited for calculating damages for each of these groups impacted by this event.

12. Commonly used and accepted loss measurement models can be employed to calculate damages for the following impacted businesses and workers in the following manner:

a. **OIL INDUSTRY WORKERS AND RELATED BUSINESSES** who face adverse economic impacts from the shutdown of Lines 901 and 903 and resulting oil production interruption. This category includes businesses and individuals who supplied the shutdown oil platforms, and workers for those businesses and shutdown platforms. In this case, workers and businesses will have suffered losses connected with oil production interruption in much the same manner. These workers and businesses likely will continue experiencing loss of earnings and lost profits until such time that pre-spill oil production, transfer volumes, and operating conditions are restored. Losses in this category take on the form of past and future lost employment, loss of earnings and benefits for the workers, lost profits for the businesses and extra out-of-pocket recovery costs for both. These losses, as described in more detail below, can generally be calculated as expected net earnings/profits minus actual net earnings/profits plus extraordinary costs (e.g., training or searching for new business opportunities).

b. **FISHERMEN AND FISH PROCESSORS** who face adverse economic impacts from oil from Line 901 entering the ocean and the resulting impacts on fisheries, including closures, decreases in size of fisheries and fish, decrease in consumer demand, pricing issues, and/or extra costs associated with recovering from the spill. These businesses will have suffered losses connected with a loss of harvestable fish and fish size, fishing closures and the stigma associated with presence of oil in the fisheries. This category includes fisherman, fish processors, and fish retailers and wholesalers whose profits decreased as a direct result of the spill. Members of this category will continue experiencing adverse effects for a period of restoration until such time that fish population and habitat have been restored to pre-spill conditions. Losses in this category take on

the form of past and future lower revenue from lower catch and process volumes resulting in lost profits, and event related recovery costs, causing lower than expected profits to be realized. The general loss calculation model for these fishermen and other businesses, as described in more detail below, is expected catch and associated costs but-for the spill minus actual catch and costs. This model excludes decreases in catch unrelated to the spill and includes additional costs connected with loss mitigation, to the extent mitigation is determined to have occurred, and recovery.

c. **OTHER BUSINESSES** who suffered adverse economic impacts due to decreased tourism, reduced hotel/motel occupancy, and fewer patrons resulting from the spill. Businesses in this category include tour operators, rental companies, hotels/motels, and restaurants. Decreased tourism and patrons connected with the spill will result in lower revenue for these businesses in much the same way. These entities experienced adverse effects during the period of time that tourism decreased because of concerns regarding the oil spill. Losses in this category take on the form of lost profits and loss mitigating recovery costs. The general calculation, explained in more detail below, is expected revenue but-for the spill minus actual revenue with the spill (accounting for decreases in revenue not caused by the spill) multiplied by operating margin.[1]

13. All three of these models and damage analyses link all calculated damages with the oil spill and shutdown, and appropriately exclude losses caused by other events. They also assume liability, which I understand Plaintiffs will demonstrate through other evidence.

---

[1] Operating margin evaluation considers both normal and loss-affected actual costs in order to appropriately deduct those costs avoided in connection with lower business volume.

## APPLYING THE ECONOMIC MODELS TO THIS CASE

14. **OIL INDUSTRY WORKERS AND RELATED BUSINESSES** – Oil industry worker and related business economic loss claims connected with the May 19, 2015 Plains All-American Pipeline spill and shutdown can be reliably evaluated by applying the common economic loss modeling procedures described below. Economic damages resulting from oil production interruption, such as loss of employment and benefits, lost profits and/or extra out-of-pocket employee recovery costs, can be evaluated efficiently through normal and customary loss modeling and measurement techniques. Based on initial observations of the particulars of this case, my experience with other spills and employee wage loss evaluations, labor economics and loss scenarios, the workers and businesses in this category were impacted similarly to each other and similarly to how other workers and businesses were impacted by other oil spills/shutdowns. My initial conclusion, which I anticipate will be confirmed through detailed analyses, is that the workers and businesses impacted by the spill will have been impacted similarly by the common cause of loss. The effects of the event may vary but the cause of loss will not. Oil workers and related businesses will have the same cause of loss, for relatively the same time period, with similar loss mitigating opportunities and damage measurement variables, combining to enable application of a common loss measurement model.

15. Reasonably certain economic damage measurements for oil industry workers and related businesses can be produced through a model that considers both past and prospective future damages. Appropriate consideration is given to both earnings and profits that would have resulted "*but for*" the oil spill, and earnings and profits that will now occur given the oil spill. The difference between these two measures calculates what was lost as a direct result of the spill. This process, and the formulas presented, will provide for systematic measurement of economic loss for these workers and businesses. The model presented below is

theoretically and empirically sound and considered mainstream by economists and individuals practicing in the forensic accounting and economics fields. This model is reliable and comprehensive, facilitating the measurement of economic loss for those experiencing employment reduction and/or separation, and business interruption as a direct result of the oil spill.[2]

16. Developing this model involves collecting information on worker and business historic income, reasonable anticipated future income, the length of the affected period, and the time value of money. Losses to these workers and businesses are tied to oil production and transfer and will generally have in common, among other characteristics, a similar loss measurement period, industry activity, and employment or business profile.

17. The formulas for calculating past and future damages are as follows:

    i. Past damages will be modeled according to Equation 1:

> Equation 1: $PD = BFE1 - AE1 + PI + \text{Extraordinary Costs}$
>
> *Where, PD = Past Damages (before trial)*
> *BFE1 = But for Earnings OR Profits, (before trial)*
> *AE1 = Actual Earnings OR Profits (before trial)*
> *PI = Prejudgment Interest (where applicable)*

    ii. Prospective future or forward-looking damages will be modeled according to Equation 2:

> Equation 2: $FD = BFE2 - AE2 + D + \text{Extraordinary Costs}$
>
> *Where, FD = Forward Damages (after trial)*
> *BFE2 = But for Earnings OR Profits (after trial)*
> *AE2 = Actual Earnings OR Profits (Projected) (after trial)*
> *D = Discounting (where applicable)*

---

[2] *See, e.g.*, A. Martin, Gerald D. 2016. Determining Economic Damages. Costa Mesa, CA: James Publishing, Inc. ISBN-13: 978-0938065418; B. Hall, Robert E, and Victoria A. Lazear. 2000. Reference Guide on Estimation of Economic Losses in Damages Awards; C. Gustafson, M. A.

a. **STEPS – Initial Step** – "But for Earnings ("BFE")" - The normal and customary initial step in the process of economic damage measurement involves the estimation of "*but for the event earnings or income*."[3] Relevant information including wage, wage growth, employment duration, profit and other industry-specific and demographic variables will be used to project probable compensation and profits for periods in the past and future for workers and oil-related businesses impacted by the spill and shutdown.

BFE is measured for both past damages and forward-looking damages. For past damages (BFE1), the loss measurement considers the period between initial employment or business interruption (following the spill and shutdown) through date of trial. Forward damages (BFE2) consider the period of time beyond the date of trial through the date at which oil operations will be returned to their pre-loss condition and volume.[4]

b. **Second Step – "Actual Earnings Or Income"** - The actual employment and results of business are then measured with due consideration of loss mitigating employment, business activity and other income earning activities. Actual earnings and income realized between the event and trial (AE1) are deducted from the gross value of (BFE1), what would have been realized under normal or "*without the*

---

[3] This well-established principal is described in, for example, "Measuring Business Interruption Losses and Other Commercial Damages," Patrick Gaughan.," "Recovery of Damages for Lost Profits," Robert L, Dunn, "A Quantitative Approach to Commercial Damages," Filler and DiGabrielle, "Litigation Services Handbook – The Role of the Financial Expert," Roman Weil.

[4] The date at which oil operations return to their pre-loss condition and volume will be based on the facts as they exist at the time of our report, input from Don Deaver, and other relevant information and reports related to the shutdown and restart of the pipelines.

*incident*" conditions. Actual earnings beyond the date of trial (AE2) are projected along an earning or profits profile curve, as appropriate. Earning and profit forecasts beyond trial are projected using best indicator models that determine the likely employment and profit outcomes had the event not occurred.

   c. **Third Step – Past & Future Damages** – Calculations of "*But for Earnings or Profits*" and "*Actual Earnings or Profits*" are then considered together for each relevant period of observation in accordance with stated formulas. Subtracting "*Actual Earnings and Profits*" from "*But for Earnings or Profits*" figures results in the measure of economic damage suffered. Consideration will also then be given to any extraordinary event-related costs incurred.

   d. **Fourth Step – Prejudgment Interest (PI) and Discounting (D) Adjustments** – Where appropriate, prejudgment interest and time value of money discounting practices will be implemented in accordance with Past and Forward Damages, respectively.

18. **FISHERMEN AND FISH PROCESSORS –** Fishermen, fish processors, fish wholesaler and fish retailer economic loss claims connected with the May 19, 2015 Plains All-American Pipeline rupture and spill can be reliably evaluated by applying the common economic modeling procedures described below. Lost profits and other damages resulting from oil pollution, fishing area closures, consumer demand and pricing issues, the oil's impact on the size of the fishery, in both the time leading up to trial and in future years, and/or extra costs associated with recovering from the spill can typically be evaluated efficiently through a common model due to the similarities in loss factors shared by these fish volume and price-dependent businesses.

19. Based on my experience with other spills, loss scenarios and fishing industry businesses, the fishermen and fish processors, retailers and wholesalers in

this category will be impacted similarly to each other and similarly to how other fishermen and fish processors, retailers and wholesalers were impacted by other oil spills. More specifically, my initial conclusion, which I anticipate will be confirmed through detailed analyses, is that the fishermen and fish processors, retailers and wholesalers impacted by the spill will have been adversely impacted by lower volumes and prices both to date and in the future. The effects of the event may vary but the cause of loss will not. These fishermen and businesses will have the same cause of loss, for relatively the same time period, with similar impacts, common avoided costs, and typical loss mitigating opportunities, all combining for the application of the damage measurement model and process.

20. Reasonably certain economic damage measurements for fishermen and fish processors, retailers and wholesalers can be produced through a model that considers both past and prospective future damages. Appropriate consideration is given to profits that would have resulted "*but for*" the oil spill, and profits that will now occur given the oil spill. The difference between these two measures calculates what was lost as a direct result of the spill. This process, and the formulas presented, will provide for systematic measurement of economic loss for these fishermen and fish volume dependent businesses. The model presented below is theoretically and empirically sound and considered mainstream by economists and accountants practicing in the forensic accounting and economics fields. This model is reliable and comprehensive, facilitating the measurement of economic loss for those experiencing business interruption as a direct result of the oil spill.[5]

21. Developing this model involves collecting normal and customary information on business historic income, reasonable anticipated future income, the

---

[5] *See, e.g.*, A. Martin, Gerald D. 2016. Determining Economic Damages. Costa Mesa, CA: James Publishing, Inc. ISBN-13: 978-0938065418; B. Hall, Robert E, and Victoria A. Lazear. 2000. Reference Guide on Estimation of Economic Losses in Damages Awards; C. Gustafson, M. A.

length of the affected period, and the time value of money. Losses to these fishermen and businesses are tied to oil related fishery impacts and will generally have in common, as discussed above, among other characteristics, a similar loss measurement period, industry activity, and business profile.

22. Reasonably certain damage measurements can be produced for fishermen and fish processors, retailers and wholesalers by employing the following, generally accepted model:[6]



*Determine "But For" Normal Harvest*

*"But For" Normal Harvest - Actual Harvest = Lost Harvest*

*Lost Harvest \* Market Prices = Lost Gross Revenue*

*Lost Gross Revenue \* Operating Margin[7] = Lost Profits*

*Lost Profits + Extraordinary Costs =* **Economic Loss**

23. Each of these steps is described in more detail below:

    i. **Initial Step - "But For" Harvest** - The normal and customary initial step in the damage measurement process for this category of business involves forecasting "*but for the event*" catch by species and by season. I will rely on Dr. Hunter Lenihan and other applicable reports and information related to the oil spill

---

[6] *See, e.g.*, "Measuring Business Interruption Losses and other Commercial Damages," by Patrick Gaughan. "Recovery of Damages for Lost Profits," Robert L, Dunn, "A Quantitative Approach to Commercial Damages," Filler and DiGabrielle, "Litigation Services Handbook – The Role of the Financial Expert," Roman Weil.

[7] With due consideration for spill related extra and avoided costs.

and its effects on fisheries to determine the future impact of the spill on each species.

    ii. **Second Step – Lost Harvest Volume** - This "*but for the event*" baseline of the species that would have been harvested had the spill not occurred is then compared, for both the year of the spill and future years, with the actual harvest realized to determine lost harvest volume. This lost harvest volume figure is then adjusted to allow for other economic factors (e.g., post-event operating performance, unrelated business changes), loss mitigation and intervening causes of loss in order to produce lost harvest volume connected with the event.

    iii. **Third Step – Lost Gross Revenue** - Lost harvest figures are then extended by time-frame specific and appropriate market prices to determine gross revenue loss attributable to the event.

    iv. **Fourth Step – Operating Margin –** The normal and customary next step in the process is then to forecast baseline normal catch and other operating costs for comparison with actual costs incurred.

    v. **Fifth Step – Lost Profits** - Next, operating margin, commonly referred to as gross margin or contribution margin, is then multiplied against the loss of gross revenue, or ex-vessel amount, as appropriate, and combined with extra and avoided costs to arrive at a figure reflecting lost profits.

    vi. **Sixth Step - Prejudgment Interest (PI) and Discounting (D) (Time value of money) Adjustments** – Where appropriate, adjustment for prejudgment interest and discounting is made.

24. Data considered in assessing the impact of the spill on fishermen and fish processors includes documents generated in the normal course of fishing

operations, accounting for operations, filed taxes, and calculating cost of pack, but also includes fish tickets, scientific examination of the fishery projected impact on harvest, plus other documentation accumulated and generated by the state including:

    i. **State of California Fishing Quotas** for each fishery and fisherman affected by year,

    ii. **State of California Actual Landings** for each affected fishery and fisherman by year, and

    iii. **State of California Annual Processors Report** of fish processed by species by year, including fish recovery rates.

25. **OTHER BUSINESSES** – Other business economic losses connected with the May 19, 2015 Plains All-American Pipeline spill can be reliably evaluated by applying the common economic modeling procedures described below. The geographic scope of businesses to be considered in this analysis can be determined based primarily on where the oil migrated and where tourism was impacted by the spill. The basis for this determination will include an analysis Dr. Igor Mezic will be preparing on where the oil migrated, news reports on areas where tourism was impacted by the spill, and other relevant information and reports related to the spill and its effects. Based on current information, including Dr. Mezic's preliminary analysis, the businesses affected (those that provided services such as attracting, transporting, accommodating, or catering to the needs or wants of persons traveling to, or staying in, places outside their home community) were located from the south coast of Santa Barbara County (from Gaviota to the eastern Santa Barbara County line) to the coastal zone of Ventura County (defined as the beach-harbor-seaport area from the western Ventura County line to Point Mugu). These geographic boundaries may change based on Dr. Mezic's final analysis and any additional pertinent information I rely on in my final report.

26. I expect, based on my experience, lost profits and other damages resulting from either decreased tourism, lower than normal occupancy, fewer customers, and/or extra costs associated with recovering from the event can be evaluated efficiently through a common loss measurement model. Appropriate consideration can be given to both earnings and profits that would have resulted "*but for*" the oil spill, and earnings that will now occur given the oil spill. The difference between these two measures calculates what was lost as a direct result of the spill. This process, and the formulas presented, will provide for systematic measurement of economic loss for these other businesses. Based on my experience with similar hospitality, restaurant and other tourist-related businesses, and loss scenarios, the plaintiffs in this case will be similarly impacted by the oil spill and will be impacted similarly to how other such businesses were impacted by other spills. These businesses share the key common loss measurement impact of fewer than normal guests and patrons than would have been realized had the spill not occurred.

27. My initial conclusion, which I anticipate will be confirmed through detailed analyses, is that these businesses will have been impacted similarly through lower than normal revenue from lower than normal visitors and/or customers. The effects of the event may vary but the cause of loss will not. These businesses will have the same cause of loss, for the same time period, with similar loss mitigating opportunities, common business focus and purpose, all combining for the reasonable application of the same model.

28. Reasonably certain economic damage measurement for these businesses can be produced through this model that considers both past and prospective future damages. Appropriate consideration will be given to profits that would have resulted "*but for*" the oil spill, and profits that will now occur given the oil spill. The difference between these two measures calculates what was lost as a direct result of the spill. This process, and the formulas presented, will provide for

systematic measurement of economic loss for these businesses impacted by the spill. The model presented below is theoretically and empirically sound and considered mainstream by economists and accountants practicing in the forensic accounting and economics fields. This model is reliable and comprehensive, facilitating the measurement of economic loss for those experiencing business interruption as a direct result of the oil spill.[8]

29. Developing this model involves collecting common-held information on business historic income, reasonable anticipated future income, on the length of the affected period, loss mitigation and the time value of money. Losses to the members of this category are tied to the spill's impact on the local economy. Generally, these businesses share, among other characteristics, a similar loss measurement period, industry activity, and business profile and purpose, and are subject to similar business risk and profitably factors.

30. The generally accepted model for reliably calculating these types of damages is as follows:[9]



*Determine "But For" Normal Revenue*

*"But For" Normal Revenue - Actual Revenue = Lost Revenue*

*Lost Revenue *% Allowance for Other Economic Factors = Lost Gross Revenue Attributable to the Event*

*Lost Gross Revenue Attributable to the Event * Operating Margin[10] = **Lost Profits***

---

[8] *See, e.g.*, A. Martin, Gerald D. 2016. Determining Economic Damages. Costa Mesa, CA: James Publishing, Inc. ISBN-13: 978-0938065418; B. Hall, Robert E, and Victoria A. Lazear. 2000. Reference Guide on Estimation of Economic Losses in Damages Awards; C. Gustafson, M. A.

[9] *See, e.g.*, "Measuring Business Interruption Losses and other Commercial Damages," by Patrick Gaughan; "Recovery of Damages for Lost Profits," Robert L, Dunn, "A Quantitative Approach to Commercial Damages," Filler and DiGabrielle, "Litigation Services Handbook – The Role of the Financial Expert," Roman Weil.

[10] With due consideration for spill related extra and avoided costs.

31. Each of these steps is more specifically described as follows:

  i. **Initial Step - "But For" Revenue** - The normal and customary initial step in the damage measurement process for this category of businesses involves forecasting "*but for the event*" revenue by day, week or month, as appropriate, since the event.

  ii. **Second Step – Lost Revenue** - This "*but for the event*" baseline revenue that would have been generated had the spill not occurred is then compared with actual earned revenue to determine lost revenue, if any. This step also takes into account increased revenue that would not have occurred but-for the event (such as increased hotel occupancy because of out-of-town responders).

  iii. **Third Step – Other Economic Factors** - Lost revenues are then adjusted to allow for other economic factors and intervening causes of loss in order to produce lost revenue suffered as a direct result of the oil spill.

  iv. **Fourth Step – Operating Margin -** The normal and customary next step in the process is then to forecast baseline normal and other operating costs for comparison with actual costs incurred.

  v. **Fifth Step – Lost Profits** - Next, operating margin (commonly referred to as gross margin or contribution margin) is then multiplied against the lost gross revenue attributable to the event, and combined with extra and avoided costs, to arrive at lost profits.

  vi. **Sixth Step - Prejudgment Interest (PI) and Discounting (D) Adjustments** – Where appropriate, adjustments for prejudgment interest and discounting are made.

DECLARATION OF STEVE ROBERTS IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

32. These revenue and expense considerations combine to provide relevant and reliable loss figures for these businesses.[11]

33. Data considered in assessing the impact on these businesses includes documents generated in the normal course of business such as general ledgers and filed tax returns, and also includes information on tourism, hotel occupancy and the local economy. This analytical model will reliably allow for and recognize differences in business type, location and other economic factors by reviewing and considering, among other information, the following predictive data:

  i. **Hotel/Motel Occupancy Statistics** – Monthly hotel/motel occupancy statistics for Santa Barbara and neighboring areas,
  ii. **Tourism Data** – Monthly tourism data for Santa Barbara and neighboring communities,
  iii. **Restaurant Industry Statistics** – Monthly revenue figures for the area, and
  iv. **Operating Margins** – Normal, affected and avoided costs.

I declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

Executed at Sammamish, Washington this 18th day of August, 2016.

_____
Steve Roberts, CPA/CFF, CFA, CFE, CGMA, FCPA, CCI
Veritas Forensic Accounting & Economics
704 228th Ave NE #725
Sammamish, WA 98074
868-3330

---

[11] Appropriate attention is given to connecting the impact of the event with the post-event operating performance of the business, including potential loss mitigation, segregation of other unrelated business changes that would have occurred apart from the event, and time value of money.

## CERTIFICATE OF SERVICE

I, Robert J. Nelson, hereby certify that on August 22, 2016, I electronically filed Plaintiffs' **DECLARATION OF STEVE ROBERTS IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION** with the Clerk of the United States District Court for the Central District of California using the CM/ECF system, which shall send electronic notification to all counsel of record.

*/s/ Robert J. Nelson*
Robert J. Nelson