1  Robert L. Lieff (CSB No. 037568)
   Elizabeth J. Cabraser (CSB No. 083151)
2  Robert J. Nelson (CSB No. 132797)
   Sarah R. London (CSB No. 267083)
3  Wilson M. Dunlavey (CSB No. 307719)
   **LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
4  275 Battery Street, 29th Floor
   San Francisco, CA  94111-3339
5  Telephone:  (415) 956-1000
   Facsimile:   (415) 956-1008
6
   Lynn Lincoln Sarko                          A. Barry Cappello (CSB No. 037835)
7  (*Admitted Pro Hac Vice*)                   Leila J. Noël (CSB No. 114307)
   Gretchen Freeman Cappio                     Lawrence J. Conlan (CSB No. 221350)
8  (*Admitted Pro Hac Vice*)                   David Cousineau (CSB No. 298801)
   Daniel Mensher                              **CAPPELLO & NOËL LLP**
9  (*Admitted Pro Hac Vice*)                   831 State Street
   **KELLER ROHRBACK L.L.P.**                  Santa Barbara, CA 93101-3227
10 1201 Third Ave., Suite 3200                 Telephone:  (805) 564-2444
   Seattle, WA 98101                           Facsimile:   (805) 965-5950
11 Telephone:  (206) 623-1900
   Facsimile:   (206) 623-3384                 *Lead Trial Counsel for Plaintiffs*
12
   Juli Farris (CSB No. 141716)                William M. Audet (CSB No. 117456)
13 Matthew J. Preusch (CSB No. 298144)         **AUDET & PARTNERS, LLP**
   **KELLER ROHRBACK L.L.P.**                  711 Van Ness Avenue, Suite 500
14 1129 State Street, Suite 8                  San Francisco, CA  94102-3275
   Santa Barbara, CA 93101                     Telephone:  (415) 568-2555
15 Telephone:  (805) 456-1496                  Facsimile:   (415) 568-2556
   Facsimile:   (805) 456-1497
16
   *Interim Co-Lead Class Counsel for*
17 *Plaintiffs*

18           **UNITED STATES DISTRICT COURT**
             **CENTRAL DISTRICT OF CALIFORNIA**
19

20 KEITH ANDREWS, an individual,              **Case No.  2:15-cv-04113-PSG-JEM**
   TIFFANI ANDREWS, an individual,
21 BACIU FAMILY LLC, a California             [Consolidated with Case Nos. 2:15-
   limited liability company, ROBERT          CV-04573-PSG (JEMx), 2:15-CV-
22 BOYDSTON, an individual, CAPTAIN            4759-PSG (JEMx), 2:15-CV-4989
   JACK'S SANTA BARBARA TOURS,                 PSG (JEMx), 2:15-CV-05118-PSG
23 LLC, a California limited liability         (JEMx), 2:15-CV-07051-PSG (JEMx)]
   company, MORGAN CASTAGNOLA, an
24 individual, THE EAGLE FLEET, LLC, a         **PLAINTIFFS' REPLY IN**
   California limited liability company,       **SUPPORT OF MOTION FOR**
25 ZACHARY FRAZIER, an individual,             **CLASS CERTIFICATION**
   MIKE GANDALL, an individual,
26 ALEXANDRA B. GEREMIA, as Trustee            Date:    February 27, 2017
   for the Alexandra Geremia Family Trust      Time:    1:30 p.m.
27                                             Judge:  Hon. Philip S. Gutierrez
                                               Courtroom: 6A
28 [*caption cont'd next page*]

CASE NO:  2:15-CV-04113-PSG-JEM
PLFS.' REP. ISO MOT. FOR CLASS CERT.

1323465.9

1    dated 8/5/1998, JIM GUELKER, an
individual, JACQUES HABRA, an

2    individual, ISURF, LLC, a California
limited liability company, MARK

3    KIRKHART, an individual, MARY
KIRKHART, an individual, RICHARD

4    LILYGREN, an individual, HWA HONG
MUH, an individual, OCEAN ANGEL IV,

5    LLC, a California limited liability
company, PACIFIC RIM FISHERIES,

6    INC., a California corporation, SARAH
RATHBONE, an individual,

7    COMMUNITY SEAFOOD LLC, a
California limited liability company,

8    SANTA BARBARA UNI, INC., a
California corporation, SOUTHERN CAL

9    SEAFOOD, INC., a California
corporation, TRACTIDE MARINE

10    CORP., a California corporation, WEI
INTERNATIONAL TRADING INC., a

11    California corporation and STEPHEN
WILSON, an individual, individually and

12    on behalf of others similarly situated,

13                Plaintiffs,

14    v.

15    PLAINS ALL AMERICAN PIPELINE,
L.P., a Delaware limited partnership,

16    PLAINS PIPELINE, L.P., a Texas limited
partnership, and JOHN DOES 1 through

17    10,

18                Defendants.

19

20

21

22

23

24

25

26

27

28

CASE NO:  2:15-CV-04113-PSG-JEM
PLFS.' REP. ISO MOT. FOR CLASS CERT.

1323465.9

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ............................................................................................ 1

II.    ARGUMENT .................................................................................................. 2

       A.     Plaintiffs Satisfy the Requirements of Rule 23(a) ................................ 2

       B.     Plaintiffs Satisfy the Requirements of Rule 23(b)(3) ......................... 3

              1.     Common questions predominate. ................................................ 3

                     a.     The most important questions are common. .................... 3

                     b.     Plains fails to distinguish *Deepwater Horizon* and
                            *Exxon Valdez*, despite their obvious similarities. ........... 12

                     c.     Plains' consumer cases do not defeat
                            predominance. ................................................................. 14

              2.     A class action is superior to OPA. ............................................ 16

       C.     Plaintiffs Meet the Requirements for a Rule 23(b)(2) Class .............. 18

       D.     The Proposed Class is Ascertainable ................................................ 19

       E.     The Court may Refine the Class as More Data Becomes
              Available ......................................................................................... 22

III.   CONCLUSION ............................................................................................ 22

1323465.9

**TABLE OF AUTHORITIES**

**Page**

**Cases**

*Ambrosio v. Cogent Commc'ns, Inc.*,
   No. 14-02182, 2016 WL 777775 (N.D. Cal. Feb. 29, 2016)................................15

*Amchem Prod., Inc. v. Windsor*,
   521 U.S. 591 (1997)..........................................................................13, 14

*Bazemore v. Friday*,
   478 U.S. 385 (1986).................................................................................7

*Blackie v. Barrack*,
   524 F. 2d 891 (9th Cir. 1975) ................................................................22

*Boggs v. Divested Atomic Corp.*,
   141 F.R.D. 58 (S.D. Ohio 1991).............................................................6

*Cal. v. Kinder Morgan Energy Partners, LP*,
   613 F. App'x 561 (9th Cir. 2015) ............................................................7

*Carrera v. Bayer Corp.*,
   727 F. 3d 300 (3d Cir. 2013) ................................................................22

*Cheverez v. Plains All Am. Pipeline, LP*,
   No. 15-4113, 2016 WL 4942328 (C.D. Cal. Feb. 25, 2016) .......................16

*De Anda v. City of Long Beach*,
   7 F. 3d 1418 (9th Cir. 1993) ................................................................22

*Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*,
   No. 13-5693, 2015 WL 4776932 (C.D. Cal. May 27, 2015).........................7

*Forcellati v. Hyland's, Inc.*,
   No. 12-1983, 2014 WL 1410264 (C.D. Cal. Apr. 9, 2014)........................22

*Frieman v. San Rafael Rock Quarry, Inc.*,
   116 Cal. App. 4th 29 (2004) ..................................................................7

*Geier v. M-Qube Inc.*,
   314 F.R.D. 692 (W.D. Wash. 2016) .......................................................15

*Gintis v. Bouchard Transp. Co.*,
   596 F. 3d 64 (1st Cir. 2010)....................................................................7

*Gonzales v. Comcast Corp.*,
   No. 10-01010, 2012 WL 10621 (E.D. Cal. 2012) ....................................15

*Gray v. Golden Gate Nat. Recreational Area*,
   279 F.R.D. 501 (N.D. Cal. 2011)...........................................................18

*In re ConAgra Foods, Inc.*,
   302 F.R.D. 537 (C.D. Cal. 2014)............................................................9

*In re ConAgra Foods, Inc.*,
   90 F. Supp. 3d 919 (C.D. Cal. 2015) ....................................................22

**TABLE OF AUTHORITIES**
**(continued)**

Page

*In Re Concert Antitrust Litig.*,
    247 F.R.D. 98 (C.D. Cal. 2007)....................................................22

*In re Deepwater Horizon*,
    739 F. 3d 790 (5th Cir.) ...............................................13, 14, 20

*In re Motor Fuel Temperature Sales Practices Litig.*,
    271 F.R.D. 221 (D. Kan. 2010)....................................................19

*In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico*,
    910 F. Supp. 2d 891 (E.D. La.)....................................................13

*Jarvis v. K2 Inc.*,
    486 F. 3d 526 (9th Cir. 2007) ........................................................7

*Jimenez v. Allstate Ins. Co.*,
    765 F. 3d 1161 (9th Cir. 2014) ....................................................14

*Johnson v. Colonial Pipeline Co.*,
    830 F. Supp. 309 (E.D. Va. 1993) ...............................................17

*Kosta v. Del Monte Foods, Inc.*,
    308 F.R.D. 217 (N.D. Cal. 2015)..................................................20

*Local Joint Exec. Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.*,
    244 F. 3d 1152 (9th Cir. 2001) ......................................................6

*Lou v. Ma Labs., Inc.*,
    No. 12-05409, 2014 WL 68605 (N.D. Cal. Jan. 8, 2014) ...................15

*McCrary v. Elations Co., LLC*,
    No. 13-00242, 2014 WL 1779243 (C.D. Cal. Jan. 13, 2014) .............22

*McVicar v. Goodman Global, Inc.*,
    No. 13-1223, 2015 WL 4945730 (C.D. Cal. Aug. 20, 2015)...............15

*Miller v. Fuhu Inc.*,
    No. 14-06119, 2015 WL 7776794 (C.D. Cal. Decl. 1, 2015) ...............9

*Morales v. Kraft Foods Grp., Inc.*,
    No. 14-04387, 2015 WL 10786035 (C.D. Cal. June 23, 2015) ............9

*Mullins v. Direct Digital, LLC*,
    795 F. 3d 654 (7th Cir. 2015) ......................................................21

*Norris-Wilson v. Delta-T Grp., Inc.*,
    270 F.R.D. 596 (S.D. Cal. 2010) ..................................................18

*O'Connor v. Boeing N. Am., Inc.*,
    184 F.R.D. 311 (C.D. Cal. 1998)........................................19, 20, 21

*Parko v. Shell Oil Co.*,
    739 F. 3d 1083 (7th Cir. 2014) .................................................9, 10

*Patillo v. Schlesinger*,
    625 F. 2d 262 (9th Cir. 1980) ......................................................17

- iii -

CASE NO:  2:15-CV-04113-PSG-JEM
PLFS.' REP. ISO MOT. FOR CLASS CERT.

1323465.9

**TABLE OF AUTHORITIES**
**(continued)**

Page

*Pedroza v. Petsmart, Inc.*,
   No. 11-298, 2013 WL 1490667 (C.D. Cal. Jan. 28, 2013).....................................9

*Petersen v. Costco Wholesale Co.*,
   312 F.R.D. 565 (C.D. Cal. 2016)........................................................................3

*Rowden v. Pac. Parking Sys., Inc.*,
   282 F.R.D. 581 (C.D. Cal. 2012).......................................................................17

*S. C. Anderson, Inc. v. Bank of America N.T. & S.A.*,
   24 Cal. App. 4th 529 (1994) ...............................................................................4

*Sherman v. Yahoo! Inc.*,
   No. 13-0041, 2015 WL 5604400 (S.D. Cal. Sept. 23, 2015) ............................21

*Shields v. Walt Disney Parks and Resorts US, Inc.*,
   279 F.R.D. 529 (C.D. Cal. 2011).......................................................................18

*Shook v. Bd. of Cnty. Comm'rs of Cnty. of El Paso*,
   543 F. 3d 597 (10th Cir. 2008) .........................................................................18

*Tidenberg v. Bidz.com*,
   No. 08-5553, 2010 WL 135580 (C.D. Cal. Jan. 7, 2010)..............................14, 21

*Torres v. Mercer Canyons Inc.*,
   835 F. 3d 1125 (9th Cir. 2016) ...........................................................3, 10, 15, 16

*Turner v. Murphy Oil USA, Inc.*,
   234 F.R.D. 597 (E.D. La. 2006) .......................................................................16

*Tyson Foods, Inc. v. Bouaphakeo*,
   136 S. Ct. 1036 (2016)..................................................................................4, 19

*U. S. v. M/V COSCO BUSAN*,
   557 F. Supp. 2d 1058 (N.D. Cal. 2008).............................................................18

*Vaquero, v. Ashley Furniture Indus., Inc.*,
   824 F. 3d 1150 (9th Cir. 2016) .....................................................................15, 16

*Williams v. Wraxall*,
   33 Cal. App. 4th 120 (1995) ...............................................................................8

*Zinser v. Accufix Research Inst., Inc.*,
   253 F. 3d 1180 (9th Cir. 2001) .........................................................................14

**Rules**

Rule 23(b)(3).....................................................................................................6

Rule 23(c)(4)...............................................................................................2, 22

Rule 42(b) .......................................................................................................22

**Other Authorities**

CACI § 3903G ...................................................................................................7

1323465.9

# I.      INTRODUCTION

Plains does not dispute that the answers to the most significant questions in this case—the ones that will drive its resolution—are common: Why did the Pipeline rupture? Was Plains' conduct negligent, wanton and/or reckless? How much oil was released into the environment? Where did it go? How did the oil spill affect fisheries? How did the oil spill and the resulting beach closures affect visitor spending? How has the oil spill and resulting Pipeline shutdown affected employment and business opportunities? How long will the effects last? What measures should be required so this disaster does not happen again?

Plains does not contest that the answers to these questions, and many more subsumed within them, are susceptible to common proof—the same evidence that each subclass member would have to offer, should he or she have to proceed on her own. Instead, Plains makes the unremarkable point that there are also some individualized questions regarding damages and causation. But that fact—true in so many class actions—ought not to defeat class certification.

Certification of the proposed subclasses is vastly superior to the private OPA claims process, in which Plains, the company that caused this mess, serves as both judge and jury, and is no substitute for this Court. OPA was not designed to fully compensate those harmed, nor can it provide the type of injunctive relief available through the class mechanism.

This is not the first oil spill to soil a coastal community. Multiple courts have considered how to achieve just and efficient resolutions in cases like this one. Yet Plains does not even try to distinguish *Deepwater Horizon* and *Exxon Valdez*, despite their obvious similarities. Instead, Plains strains to apply inapt consumer cases to suggest that class certification is not appropriate here. This is not the kind of case, however, where it will be hard to ascertain class members, as ample records exist and no memory test is required. Nor is this case mired with trial management issues, unlike the cases upon which Plains relies: every subclass member alleges harm due

1   to a single event, caused by Plains, and involving the law of a single state.

2          Nor do Plains' myriad experts undermine class certification. These experts

3   ignored obvious, useful information regarding past oil spills, selectively applied

4   methods to cherry-picked data, employed untested approaches when standard

5   methods were available, and failed to consider alternative explanations while leaping

6   to unsubstantiated conclusions.[1] Setting aside their dubious methods, Plains' experts'

7   inappropriate venture into the merits merely raises more common issues, including

8   the impact of other environmental factors, such as El Niño, or economic factors, such

9   as fluctuating oil prices. The ability to adjudicate these common issues in one action

10  to the benefit or detriment of the subclasses weighs heavily in favor of certification.

11         As in other oil spill cases, case management issues are within this Court's

12  power to address: trial could be phased, starting with common questions, such as

13  what caused the spill and where the oil went, and ending with the individualized

14  issues relating to damages. Further, as more data becomes available, the Court can

15  adjust the subclass definitions if, for example, the oil spill did not harm certain

16  fisheries, or the oil reached a smaller area than the one proposed; or the Court could

17  certify common issues pursuant to Rule 23(c)(4). Class certification would allow the

18  Court to manage this action strategically and effectively.

19                         **II.    ARGUMENT**

20  **A.    Plaintiffs Satisfy the Requirements of Rule 23(a)**

21         There is no dispute that Plaintiffs have established numerosity, commonality,

22  and typicality. Plains only challenges adequacy, claiming there is a conflict of

23  interest between the subclass representatives and absent class members because

24  certain claims, including OPA, have been "abandoned." Opposition to Motion for

25  Class Certification, Dkt. 152-1 ("Opp.") at 22-23.[2] Yet, to establish adequacy, "there

26  is no rule that requires class certification of every conceivable cause of action. In

---

[1] *See, e.g.*, Plaintiffs' Motion to Strike Defendants' Experts, filed concurrently.
[2] Plains does not challenge Plaintiffs' commitment to prosecute the case vigorously.

CASE NO:  2:15-CV-04113-PSG-JEM
PLFS.' REP. ISO MOT. FOR CLASS CERT.

1323465.9

1  some instances, opting not to assert certain claims may be an essential part of

2  adequate representation." *Petersen v. Costco Wholesale Co.*, 312 F.R.D. 565, 578

3  (C.D. Cal. 2016) (internal citation omitted).

4       Plains is simply incorrect that class certification would preclude recovery

5  under OPA; indeed, this Court, in denying Defendants' Motion to Stay, has already

6  determined that putative class members may also make OPA claims, so long as there

7  is no double recovery. Dkt. 73 at 7. Nor does Plains offer any basis for its speculative

8  claim that OPA, personal injury, or property damage claims are "likely to exceed by

9  many times the damages they are seeking," and therefore destroy adequacy.

10  *Petersen*, 312 F.R.D. at 578 (internal citation omitted). Any subclass member can

11  make an OPA claim, and any class member who has suffered unique personal issues

12  can pursue those claims separately, or may ultimately decide to opt out.

13  **B.   Plaintiffs Satisfy the Requirements of Rule 23(b)(3)**

14       **1.   Common questions predominate.**

15            **a.   The most important questions are common.**

16       Plains does not dispute that the most complex and important questions in this

17  case have common answers: Why did the Pipeline rupture? Was Plains' conduct

18  negligent, wanton and/or reckless? What measures should be required so this

19  disaster does not happen again? Instead, Plains attempts to defeat predominance by

20  simply itemizing individualized issues. "Predominance is not, however, a matter of

21  nose-counting." *Torres v. Mercer Canyons Inc.*, 835 F. 3d 1125, 1134 (9th Cir.

22  2016). Rather, the predominance inquiry is a "global determination" of the common

23  and individual questions. *Id.* "More important questions apt to drive the resolution

24  of the litigation are given more weight in the predominance analysis over

25  individualized questions which are of considerably less significance to the claims of

26  the class." *Id.* Here, as in numerous other environmental cases, the answers to the

27  common questions are more significant to the claims of the class than the

28  individualized issues, and readily predominate.

Plains claims that *all* causation and damages questions are individualized, because "the release had no impact on the vast majority of class members." Opp. at 4. This circular argument fails for multiple reasons. First, whether the oil spill harmed class members is a merits issue not to be decided at this stage. *See Tyson Foods, Inc. v. Bouaphakeo,* 136 S. Ct. 1036, 1047 (2016) ("When, as here, the concern about the proposed class is not that it exhibits some fatal dissimilarity but, rather, a fatal similarity—an alleged failure of proof as to an element of the plaintiffs' cause of action—courts should engage that question as a matter of summary judgment, not class certification."). Second, Plains' experts do not say that the release had no impact on class members.[3] *See* Ex. EE, Avram Tucker Dep.: 162:25-163:7 (refusing to offer any opinions as to whether class members were harmed by the spill); Ex. DD, Dr. Hal Sider Dep.: 60:21-61:7 (admitting he did not conclude that the spill had no common impact).[4] Third, even if Sider were correct that regional "rental values, fish catch, hotel occupancy, and oil industry employment levels were the same or higher than the prior year" (Opp. at 4), that does not mean there was no classwide impact from the spill; the relevant question is whether these levels would have been *higher*, or required greater cost to achieve, but for the spill. *See S. C. Anderson, Inc. v. Bank of America N.T. & S.A.*, 24 Cal.App.4th 529, 536 (1994); Ex. EE, at 148:19-151:12 (admitting that increased costs could be considered economic loss).

Fourth, Sider's conclusion that "available data provide no evidence of systematic or class-wide injury" (Sider Decl. ¶ 5 (Dkt. 152-18)) is based on unreliable methods that border on deceptive. As set forth in the accompanying Motion to Strike, Sider ignored all academic literature regarding the common

---

[3] Deposition excerpts ("Dep.") and Exhibit citations ("Ex.") are exhibits to the Declaration of Juli Farris, filed concurrently.
[4] Sider could not offer a coherent definition of "common impact." Ex. DD, at 59:16-60:7; 125:5-16 ("a preponderance, a large number, a large share," or "something more than a majority," but "not exactly sure where you'd draw the line").

1323465.9

economic impact of oil spills, was not familiar with government reports concerning this spill (he was not even aware of PHMSA, the agency that regulates the Pipeline), and, remarkably, did not consider any of the 450 OPA claims processed by Plains or class representative testimony, even though he acknowledged that it is important to put data in context. Ex. DD, at 45:25-46:20; 49:3-12; 68:12-69:3; 83:5-14; 155:8-11; Sider Decl. App'x B (materials reviewed) (Dkt. 159-2). Instead, he cherry-picked among data sets; for example, while Sider considered only yearly fish landing data from Santa Barbara for nine species, available data actually shows that the *total* 2015 seafood landings in Santa Barbara were the lowest this century—a 37% decrease from 2014, and a 41% decrease in May to December landings over the previous year. Ex. DD, at 239:15-21. *See also id.* at 157:13-160:8 (choosing monthly rather than daily or weekly hotel occupancy data, obscuring impact on tourism during the busy Memorial Day weekend); *id.* at 213:8-15; 218:4-221:10 (analyzing oil and gas employment data, but not payroll data showing a steep decline in wages after the spill); *id.* at 133:16-134:12 (using untested Airbnb data, rather than standard real estate industry data (MLS), which he has used in prior cases). From that cherry-picked data, he selectively ran regression analyses, and of those regressions he ran, he failed to control for obvious independent variables, such as seasonality. *Id.* at 246:18-247:10; 117:21-22. Fifth, Plains' experts Paul Boehm and Wade Bryant's premature conclusions that the bulk of the oil stayed within four miles and washed up on only two beaches contradicts preliminary findings by the U.S. Geological Survey ("USGS") that "the oil travelled a quarter mile to the ocean, and then about 21,000 gallons spread approximately 150 miles along the California coast, reaching as far south as Crystal Cove State Park in Newport Beach."[5] Thus, Plains has no reliable basis for its claim that the vast majority of class members were not impacted.

_____

[5] Ex. A at 1, The USGS Draft Response to the May 19, 2015 Plains All American Pipeline 901 Oil Spill near Refugio State Beach, California ("USGS Rep."). Plaintiffs have submitted a Request for Judicial Notice of this document, filed concurrently.

CASE NO: 2:15-CV-04113-PSG-JEM
PLFS.' REP. ISO MOT. FOR CLASS CERT.

Plains is also wrong that some "differences in the nature of the businesses and property" and the "variation in quality of their records" sink class certification. *See Boggs v. Divested Atomic Corp.*, 141 F.R.D. 58, 65 (S.D. Ohio 1991) ("clearly, people and parcels of real property, like snowflakes, necessarily have different and unique characteristics...notwithstanding the differences, class treatment is clearly a better way to proceed"); *Local Joint Exec. Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.*, 244 F. 3d 1152, 1163 (9th Cir. 2001) (variations among individuals and difficulty in proof do not defeat predominance under Rule 23(b)(3)).

Contrary to Plains' argument, common proof will answer the most important questions regarding impact, causation and damages in each subclass. The remaining individualized issues can be resolved through basic accounting principles.

### i.   Real property subclass

The most important questions driving the resolution of the real property subclass are common: How much oil and toxic chemicals were released? Where did the oil go? What efforts were made to mitigate the spread of oil to properties along the coast? Did Plains' conduct constitute a nuisance? If so, when was it abated? What was the loss of use and enjoyment suffered by the subclass? Answers to these questions are susceptible to common proof via Dr. Igor Mezić's modeling and Dr. Randy Bell's mass appraisal method.

Plains argues that Plaintiffs must test the oil at each beach to see whether the oil's "fingerprint" matches oil from its Pipeline. Opp. at 10. As in other exposure cases, however, the subclass can establish causation through direct *and* circumstantial evidence, such as models showing where the oil went, photographs, clean-up reports, eyewitness testimony, government research, and Plains' internal business records. To the extent Mezić's model, based on updated data, shows that the oil reached only a subset of the properties currently in the proposed subclass, the Court may alter the subclass definition to reflect that evidence. Regardless, Plains' claim that oil transport records are insufficiently precise is yet another common

1   issue. *See Gintis v. Bouchard Transp. Co.*, 596 F. 3d 64, 67 (1st Cir. 2010) (finding

2   sufficiency of evidence, or lack thereof, a common question).

3       Plains nitpicks Dr. Bell's methodology.[6] For example, Plains claims that Bell

4   did not consider whether there are many other advantages to beachfront property

5   "unaffected by oil," such as the sound of the waves, the view, or the salt air. Opp. at

6   11 (citing Sider). Sider retracted this critique during his deposition. Ex. DD, at

7   151:24-152:12. Plains also claims that Dr. Bell failed to account for every possible

8   variable that could influence rental prices, even though he has accounted for all

9   variables deemed relevant enough to be included in the MLS, the real estate standard

10  database. Opp. at 12. This is sufficient. *Bazemore v. Friday*, 478 U.S. 385 (1986). To

11  the extent Bell's model overstates damages, adjustments can be made during expert

12  discovery before trial. *See Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*, No. 13-5693,

13  2015 WL 4776932, at *15 (C.D. Cal. May 27, 2015).

14      Plains is also mistaken that subclass members have to show they actually

15  intended to use the beachfront property. Opp. at 12. Property owners' states of mind

16  are irrelevant to claims for loss of the use and enjoyment of property, as damages are

17  based on the objective fair market value. *Jarvis v. K2 Inc.*, 486 F. 3d 526, 534 (9th

18  Cir. 2007); CACI § 3903G. The "right to use" real property has value, regardless of

19  whether or how the property is actually used. *Jarvis*, 486 F. 3d at 533.[7]

20      Plains fails to distinguish any cases in which real property classes were

21  certified under similar circumstances. Instead, Plains cites several inapposite noise

22  pollution cases where "[no] one factor, not even noise level, will be determinative as

23  to all parcels." *Frieman v. San Rafael Rock Quarry, Inc.*, 116 Cal.App.4th 29, 41

24  (2004) (internal citation omitted). Here, the common question of where the oil spread

25

26  ---

    [6] Plains' attacks on Bell merely raise more common issues, i.e., how to appropriately isolate beach amenity value and calculate loss of use and enjoyment damages.

27  [7] *See also Cal. v. Kinder Morgan Energy Partners, LP*, 613 F. App'x 561, 564-65 (9th Cir. 2015) (damages "can be proved through estimates of a property's rental

28  value based on hypothetical assumptions rather than its actual use.").

1   will be determinative for all subclass members and is the basis for liability.

2                 ii.    **Fisher and fish industry subclass**

3         Answers to the causation and damages questions that will drive the resolution

4   of the fisher subclass claims are also subject to common proof: How much oil and

5   toxic chemicals were released? Where did the oil go? Did the oil harm fisheries, and

6   if so, which ones, in what areas, and for how long? Did the Santa Barbara fish

7   industry suffer a stigma? What would the catch have been, but for the spill?

8   Plaintiffs' experts are qualified, and as their Declarations make clear, they are ready

9   to answer these questions, and many others subsumed within them, to establish

10  liability and damages for this subclass without any fisher-specific records. Dr. Mezić

11  will show where the oil went. Mezić Decl. ¶¶ 16, 29-32 (Dkt. 128). Dr. Lenihan will

12  show how and where the oil harmed fisheries. Lenihan Decl. ¶ 31 (Dkt. 184). Using

13  public records, Dr. Roberts will show what the catch would have been for the

14  harmed fisheries in the affected areas, but for the spill, versus the actual catch.

15  Roberts Decl. ¶¶ 12b, 18-24 (Dkt. 129). Even Plains' expert, Dr. Michelle Morrison,

16  concedes that the key question of whether and how toxic chemicals affect fisheries is

17  common. Ex. CC, Dr. Michelle Morrison Dep.: 227:22-230:13

18        Many of Plains' arguments to defeat predominance in this subclass go to the

19  merits, not class certification. *See* Opp. at 7 (claiming the oil did not sink, and "was

20  promptly and thoroughly cleaned up with only minimal harm to fish"). Others simply

21  raise more common questions: whether environmental and macroeconomic factors

22  affect fish catch and sales (Opp. at 5) are evidentiary issues affecting *all* fisher

23  subclass members.[8] *See* Ex. EE, at 80:14-23; 192:7-193:16; 196:5-197:18; 221:11-

24  14; Ex. BB, at 93:9-95:10; Roberts Decl. ¶ 23; Lenihan Decl. ¶ 31.

25        Plaintiffs' experts do not offer mere "intentions" or "promises" to develop

26  _____

27  [8] Contrary to Plains' argument, Plaintiffs do not need to prove that other factors *did
not* contribute to their losses; instead, they simply need to prove that the spill was a
contributing cause, even if one of many. *See, e.g., Williams v. Wraxall*, 33 Cal. App.

28  4th 120, 132 (1995), *as modified on denial of reh'g* (Apr. 12, 1995).

1323465.9

1  models consistent with Plaintiffs' theories.[9] Rather, they have actually developed and

2  used these same models before to show the same kinds of damages, based on the

3  same theories of liability advanced here.[10] Plains criticizes Mezić for not completing

4  his analysis, but a finished product is not required for class certification. *See, e.g.,*

5  *Morales v. Kraft Foods Grp., Inc.*, No. 14-04387, 2015 WL 10786035, at *8 (C.D.

6  Cal. June 23, 2015) (internal citation omitted). It is undisputed that the flow of oil

7  can be modeled (Opp. at 7), and that Dr. Mezić has the expertise necessary to do it.

8  Mezić Decl. ¶ 1; Ex. N, Boehm Dep. 74:14-21; 246:24-25. Indeed, Mezić's

9  preliminary analysis showing the fate and transport of the oil is consistent with the

10  preliminary findings released by the USGS. Ex. A at 1. The formulas Mezić will use

11  to complete his work are well accepted in the scientific community and routinely

12  applied in this type of analysis. Mezić Rebuttal Decl. ¶ 17.[11] Ample data is available,

13  and more is forthcoming. *Id.* at 18.

14       Plains' critiques of Dr. Lenihan are also unfounded. Dr. Lenihan offers the

15  analysis of a single fisher to demonstrate that his model effectively shows impact,

16  and explains how this analysis can be utilized on a classwide basis, using identified

17  data from reliable sources that will soon be available. *See* Lenihan Decl. ¶¶ 30–31.

18  Morrison, Plains' expert, concedes that BACI/BACIPS "are definitely standard

19  statistical tools that are often used in the environmental field." Ex. CC, at 106:7-15.

20  These tools can and will be applied to the relevant data on a species-by-species,

---

21  [9] Plaintiffs address the challenges to their experts in their Opposition to Defendants' Motion to Strike Plaintiffs' Experts, filed concurrently with this Reply.

22  [10] Plains' cited cases are therefore inapposite. *See, e.g., Parko v. Shell Oil Co.*, 739 F.

23  3d 1083, 1087 (7th Cir. 2014), *reh'g denied* (Mar. 10, 2014) (plaintiffs did not put forward a plausible damages model consistent with their theory of liability); *In re*

24  *ConAgra Foods, Inc.*, 302 F.R.D. 537, 552-53 (C.D. Cal. 2014) (striking an expert declaration that "provide[d] no damages model at all," contrasting it with

25  circumstances, as here, where the Court was presented with a damages model with "a structure or framework that could be used to analyze the [relevant] data");

26  *Pedroza v. Petsmart, Inc.*, No. 11-298, 2013 WL 1490667, at *3 (C.D. Cal. Jan. 28, 2013) (expert failed to provide any specific information about the methodology of

27  his proposed survey); *Miller v. Fuhu Inc.*, No. 14-06119, 2015 WL 7776794, at *22 (C.D. Cal. Decl. 1, 2015) (same).

28  [11] Filed concurrently herewith.

1  block-by-block basis to show how the oil harmed the fisher subclass.

2      Plains incorrectly argues that Dr. Roberts must show which subclass members

3  were harmed by the spill, before the class is even certified. Opp. at 8. *But see Torres,*

4  835 F. 3d at 1136–37; *see also Parko*, 739 F. 3d at 1085 ("How many (if any) of the

5  class members have a valid claim is the issue to be determined after the class is

6  certified."). Plains also accuses Roberts of "ignoring" trendlines in catch landings

7  that purportedly show no statistically significant change in catch before and after the

8  spill, and that deviations from previous trends are due to something other than the

9  spill. Opp. at 8 (citing Sider). But Sider retracted that conclusion at his deposition, as

10 he must, since he ran only "descriptive" regressions and did not control for any

11 independent variables. Ex. DD, at 246:18-247:18. In any event, Sider's flawed

12 analysis of the catch trendlines is something that would have to be litigated by every

13 subclass member in the absence of a class.

14     The individualized questions here, such as the amount of damages attributable

15 to the spill for any particular subclass member, require only application of

16 accounting principles to data kept in the ordinary course of business. Roberts Decl. ¶

17 24. Indeed, Plains admits that standard calculations can be applied to all fishers, with

18 consistent types of documentation. Ex. L, Kile Anderson Dep.: 61:24-62:6; 69:2-20;

19 70:5-25; 73:3-8; 74:8-75:2.

20                           iii.    **Oil Industry Subclass**

21     The key question that will drive the resolution of the oil industry subclass is

22 whether Plains' conduct, which shut down the Pipeline, proximately caused the loss

23 of wages, jobs, and business opportunities of workers and businesses at seven

24 offshore platforms. Third party discovery from platform operators can provide

25 common answers in the form of data showing hours or wages reduced, layoffs, and

26 contracts cancelled or renegotiated at lower prices. This data, coupled with

27 government data, will be sufficient to show that Plains' conduct causing a shutdown

28 of the Pipeline substantially contributed to the subclass' losses.

Likewise, Plains' defenses entail common proof: Was the shutdown a superseding, intervening cause that breaks the chain of causation? Can the seven offshore platforms linked to the Pipeline function without a pipeline to transport oil? What role did other market forces play in decreasing job and business opportunities? Plains' experts claim that there was no noticeable systematic decline in employment after the spill (Opp. at 13), and that declining world oil prices and proposed layoffs in Texas and Bakersfield caused Plaintiffs' losses, not the spill. Sider Decl. ¶ 56 n.65; Tucker Decl. ¶¶ 25(o), 67-8. Absent certification, these defenses would have to be litigated in virtually every subclass member's case.

Calculating damages for this subclass is straightforward. Accepted methods for calculating wage loss and lost profits can be applied to standard employment and profit/loss data, just as in *Deepwater Horizon* and the Worley claims process. Ex. L, at 64:3-25. To the extent Plains identifies any subclass member that was laid off due to a failed drug test and not the spill, or that lost income due to a bad reputation and not the spill, those members will not recover damages.

### iv.   **Business tourism subclass**

The answers to the most important causation and damages questions for the business tourism subclass are subject to common proof: Were there fewer tourists in the area as a result of the spill? If so, for how long? What was actual visitor spending? What would visitor spending have been, but for the spill? The parties agree there are several sources of available data that can be analyzed to determine the impact from the spill, if any, on tourism: hotel occupancy data, known as RevPar (revenue per room), and transient occupancy taxes (TOT) are generally accepted proxies for tourism levels. Sider Decl. ¶¶ 38, 43; Roberts Decl. ¶ 33.

Plains' comparison of Santa Barbara hotels to the Gulf Coast resorts in *Deepwater Horizon* is misleading. Sider did not run a regression to the Gulf Coast data that could fairly compare hotel occupancy between these two regions by controlling for other economic and seasonal factors affecting hotel occupancy, even

1   though he could have done so (and in fact did so for the monthly Santa Barbara

2   RevPar data (Sider Decl. ¶ 41)). Ex. DD, at 166:3-9. Yet, Sider's unreliable analysis

3   raises another common issue: whether hotel occupancy was "unaffected" by the spill.

4          Plains' reference to a "surge" of cleanup workers is a red herring, as data from

5   past spills indicate that these workers often stay at hotels with discounted rates, and

6   do not spend the same amount of money as tourists do on dining, shopping and

7   entertainment.[12] Nevertheless, the extent to which cleanup workers may have

8   mitigated any loss suffered by the subclass suggests additional common questions:

9   How many workers arrived? How long did they stay? How did cleanup workers'

10  spending compare to what visitor spending would have been, but for the spill? All

11  these questions entail common proof, and presumably would have to be answered in

12  every subclass member's case, absent a class.

13         Finally, the amount of loss that each particular business suffered attributable to

14  the spill can be determined by applying standard formulas to data kept in the regular

15  course of business, as in previous mass disasters. Roberts Decl. ¶¶ 6, 33. Indeed, that

16  is what Plains did to calculate damages under OPA through Worley. *See, e.g.*, Ex. B,

17  Plains-CL-00088812; Ex. L, at 64:3-25.

18         **b.     Plains fails to distinguish *Deepwater Horizon* and *Exxon***

19              ***Valdez*, despite their obvious similarities.**

20         Plains cannot distinguish *Deepwater Horizon. See, e.g.*, Ex. D, Transcript of

21  Nov. 9, 2015 Hr'g 12:19-21 (Plains' counsel stating that the legal theories in this

22  case are "the same" as those in *Deepwater Horizon*). Plains states that this spill is

23  unlike other spills (Opp. at 2), but contrary to Plains' claims, there is nothing unique

24  about this case with respect to proximity to natural oil seeps.[13] Nor does the size of

---

[12] *See, e.g.*, Ex. J at 63, Bureau of Ocean Energy Management, Assessing the Impacts of the Deepwater Horizon Oil Spill on Tourism in the Gulf of Mexico Region (September 2014). This document is submitted with Plaintiffs' Request for Judicial Notice, filed concurrently.

[13] *See* Ex. K at 2, BP, *Gulf of Mexico; Five years of environmental and economic progress* (April 2015), https://www.thestateofthegulf.com/media/1564/bp-gulf-environment-and-economic.pdf ("According to the National Research Council, every

*Footnote continued on next page*

CASE NO: 2:15-CV-04113-PSG-JEM
PLFS.' REP. ISO MOT. FOR CLASS CERT.

1  the spill matter; at most, the fact that Plains dumped less oil into the ocean is relevant

2  to numerosity, which Plains concedes is met here. This case involves the same types

3  of plaintiffs, alleging the same types of claims, for the same types of losses, arising

4  from an oil spill. The same common types of mathematical or formulaic models used

5  to calculate damages in *Deepwater Horizon* are also available here. *Compare, e.g.*, *In*

6  *re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico*, 910 F. Supp. 2d 891,

7  924-26 (E.D. La.) *aff'd* 739 F. 3d 970 (5th Cir. 2014), *with* Roberts Decl. ¶ 11. Any

8  "individualized" issues that Plains claims predominate here, such as whether a fisher

9  mitigated losses by moving to a different area, or whether a hotel had planned to be

10  closed anyway for six months after the spill, were also present in *Deepwater*

11  *Horizon*. However, these issues, i.e., "the extent to which the [spill] versus other

12  factors caused a decline in the income of an individual or business," do not

13  predominate over the common questions.   *In re Deepwater Horizon*, 739 F.3d 790,

14  816 (5th Cir.) (internal quotation marks and citation omitted)

15      Plains' primary argument to undermine the applicability of *Deepwater*

16  *Horizon*—that class certification was raised in a settlement context—is unpersuasive.

17  First, predominance was hotly contested on appeal. Despite having initially

18  supported settlement, BP later appealed the order granting class certification, raising

19  many of the same arguments Plains makes here regarding predominance. *Id.* at 815.

20  The Fifth Circuit specifically held that the settlement did not impact the Rule

21  23(b)(3) predominance analysis. *Id.* (noting that trial plan focusing on the important

22  common issues had been put in place before the settlement). Second, the *Deepwater*

23  *Horizon* district court did not simply bless class certification because of the

24  settlement—to the contrary, it conducted a rigorous Rule 23(b)(3) predominance

25  analysis, as required by the Supreme Court in *Amchem Prod., Inc. v. Windsor*, 521

26  U.S. 591, 620 (1997). *In re Deepwater Horizon*, 739 F. 3d at 817. As the Supreme

27  _____

*Footnote continued from previous page*

28  year natural seeps release 560,000 to 1.4 million barrels of oil into the Gulf.").

1323465.9

CASE NO: 2:15-CV-04113-PSG-JEM
PLFS.' REP. ISO MOT. FOR CLASS CERT.

1  Court has explained, while the question of trial management is not relevant in the

2  settlement context, the other Rule 23(b) specifications (such as predominance) are

3  *heightened*—to protect absentees from overbroad or unwarranted class definitions—

4  since the court cannot adjust the class definition as the proceedings unfold. *Amchem*,

5  521 U.S. at 620. Third, the Ninth Circuit has cited *Deepwater Horizon* favorably in

6  affirming class certification under Rule 23(b)(3), showing that its reasoning is not

7  limited to settlement classes. *Jimenez v. Allstate Ins. Co.*, 765 F. 3d 1161, 1168 (9th

8  Cir. 2014), *cert. denied*, 135 S. Ct. 2835 (2015), citing *In re Deepwater Horizon*, 739

9  F. 3d at 810–17 ("[P]laintiffs were harmed by the same conduct, [and] disparities in

10  how or by how much they were harmed did not defeat class certification.").

11       Plains also tries to sidestep *Exxon Valdez*—the most notorious coastal oil spill

12  in this nation's history prior to *Deepwater Horizon*. The trial court's order granting

13  class certification and the underlying papers confirm the obvious: the *Exxon Valdez*

14  trial court addressed the same issues and arguments made here, and nevertheless

15  certified an economic loss class under Alaska's comparable Rule 23(b)(3), including

16  commercial fishers and landowners. (Exs. E and F.)  Plains offers no basis to

17  conclude that the individualized issues presented here are somehow more complex or

18  significantly different from those at issue in *Exxon Valdez*.

19            **c.**    **Plains' consumer cases do not defeat predominance.**

20       Rather than attempt to distinguish *Deepwater Horizon* and *Exxon Valdez*, or,

21  remarkably, cite to a single disaster case, Plains instead strains to analogize to

22  inapposite consumer cases that involve multiple transactions and misrepresentations

23  occurring across varying time periods, under various state laws, and without

24  adequate records.[14] These cases offer no insight into the propriety of class

----

[14] *See, e.g.*, *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1189 (9th Cir.),

26  *opinion amended on denial of reh'g*, 273 F.3d 1266 (9th Cir. 2001) (product liability
case with no common cause of injury and claims arose under 48 different state laws);

27  *Tidenberg v. Bidz.com*, No. 08-5553, 2010 WL 135580 (C.D. Cal. Jan. 7, 2010) (no
data available for half of the class period, and every transaction would have to be

28  analyzed separately to determine whether any wrongful conduct occurred, and, if so,

*Footnote continued on next page*

1323465.9

CASE NO: 2:15-CV-04113-PSG-JEM
PLFS.' REP. ISO MOT. FOR CLASS CERT.

1   certification in this case involving a single disastrous event, one course of conduct,

2   one cause of injury, one state's law, and ample records.

3   Nor do these consumer cases say that certification is precluded whenever

4   causation or damages as to a particular class member may require some

5   individualized proof. Opp. at 3. As the Supreme Court and the Ninth Circuit recently

6   reaffirmed, "class certification [may be] appropriate even though class members

7   might have to prove liability and damages individually." *Vaquero, v. Ashley*

8   *Furniture Indus., Inc.*, 824 F. 3d 1150, 1155 (9th Cir. 2016) (citing *Tyson Foods*, 136

9   S. Ct. at 1046). Plains nonetheless argues that "the need for some individualized

10  proof (as opposed to formula or record-driven determinations) to establish damages

11  weighs against certification." Opp. at 4. Plains gets no support from its case citations

12  on this point.[15] Regardless, Plaintiffs have supplied formulas and a method for

13  record-driven determinations of damages for every subclass here. *E.g.*, Bell Decl. ¶

14  68; Roberts Decl. ¶¶ 12, 17, 22-23, 30-31.

15  Nor must Plaintiffs prove by common evidence that every class member was

16  injured by the spill. Opp. at 4. The Ninth Circuit recently rejected this argument

17  again in *Torres*, 835 F. 3d 1125, where the court of appeals affirmed class

18  certification over the same objections Plains advances here: (1) the class included

19  individuals who were not injured by the defendants' conduct; and (2) the class could

20

*Footnote continued from previous page*

21  whether that wrongdoing caused harm); *McVicar v. Goodman Global, Inc.*, No. 13-1223, 2015 WL 4945730 (C.D. Cal. Aug. 20, 2015) (denying class certification in a

22  consumer fraud case where plaintiffs did not offer a damages model consistent with their theory of liability, and the materiality of the misrepresentations differed among

23  consumers); *Gonzales v. Comcast Corp.*, No. 10-01010, 2012 WL 10621 (E.D. Cal. 2012) (finding no commonality under Rule 23(a) because there was not even one

24  question capable of generating a common answer).

25  [15] *See Ambrosio v. Cogent Commc'ns, Inc.*, No. 14-02182, 2016 WL 777775, at *5 (N.D. Cal. Feb. 29, 2016) (denying motion to stay proceedings pending appeal of

26  class certification pursuant to Rule 23(b)(3)); *Geier v. M-Qube Inc.*, 314 F.R.D. 692, 701 (W.D. Wash. 2016) (making no reference to formulas or record-driven

27  determinations); *Lou v. Ma Labs., Inc.*, No. 12-05409, 2014 WL 68605, at *4 (N.D. Cal. Jan. 8, 2014) (plaintiffs could not advance a reliable damages method consistent

28  with their theory of liability due to insufficient records).

- 15 -

1  not offer common proof of injury. *Id.* at 1136–37. The Ninth Circuit considered these

2  merits issues, not appropriate for resolution at the class certification stage, and

3  "conclude[d] that such fortuitous non-injury to a subset of class members does not

4  necessarily defeat certification of the entire class, particularly as the district court is

5  well situated to winnow out those non-injured members at the damages phase of the

6  litigation, or to refine the class definition." *Id.*

7  In sum, in this single disaster case in which the same course of conduct caused

8  oil to impact four subclasses, answers to the important common questions

9  predominate over any need to address relatively straightforward individualized

10  questions, and thus certification under Rule 23(b)(3) is appropriate. Plains may

11  nevertheless bring challenges to any individual claim regarding injury, causation or

12  damages through one of the many procedural tools at the Court's disposal, such as

13  appointment of a special master. *See, e.g.*, *Vaquero*, 824 F. 3d at 1156 ("the court

14  could choose an option such as the use of individual claim forms or the appointment

15  of a special master, which plainly would allow Defendants to raise any defenses they

16  may have to individual claims").

17  ## 2.      A class action is superior to OPA.

18  Plains apparently concedes that a class action is superior to individual

19  lawsuits, and rests its superiority argument on the OPA process. Yet courts have

20  considered OPA and found it inferior to Rule 23 class actions. *See, e.g.*, *In re Oil*

21  *Spill Deepwater Horizon*, 910 F. Supp. 2d at 920 (rejecting argument that OPA

22  process was superior); *Turner v. Murphy Oil USA, Inc.*, 234 F.R.D. 597 (E.D. La.

23  2006) (class action litigation is superior to OPA). The federally-mandated OPA

24  interim payment process *supplements* legal rights—it does not and has never been

25  directly held to *supplant* those rights.[16] Any process in which the party at fault is also

26  _____

[16] *See, e.g.*, *Cheverez v. Plains All Am. Pipeline, LP*, No. 15-4113, 2016 WL

27  4942328, at *2 (C.D. Cal. Feb. 25, 2016) ("OPA explicitly preserves state law remedies for violations of law relating to the discharge (or threat of discharge) of

28  oil."); Ex. G, Feb. 29, 2016 Hr'g Tr. at 4:2-6 ("[W]e all agree that OPA provides for

*Footnote continued on next page*

CASE NO: 2:15-CV-04113-PSG-JEM
PLFS.' REP. ISO MOT. FOR CLASS CERT.

1  judge and jury is no substitute for the due process guarantees afforded by this Court.

2  No case holds otherwise.[17]

3  Further, the OPA process offers neither "ready and complete" compensation,

4  nor fair adjudication of claims for those injured by Plains' conduct. First, Worley

5  apparently denied *any* claims for prospective damages. Ex. L, at 142:24-17. Indeed,

6  Worley did not conduct a study of the potential long term effects of the spill on

7  various groups of claimants. *Id.* at 143:23-145:4. Second, Plains denied claims from

8  oil industry subclass members; as a result, the OPA process would provide these

9  members no relief. *Id.* at 145:19-146:12. Third, the process itself is rife with arbitrary

10  decision-making. For example, Plains arbitrarily decided to compensate only those

11  fishers who fished in the blocks that were closed after the spill, without conducting

12  any systematic investigation into whether the spill affected fisheries in other blocks.

13  Ex. L, at 68:14-69:22; 235:23-236:18. All other fishers and fish processors were

14  subject to the whim of Worley's discretion. *See id.* Fourth, any claimed "efficiency"

15  of the process is belied by the slow and inconsistent progress on resolving claims.[18]

16  Plains boasts that the "majority of claims have been settled for less than

17  $5,000," and some even "$100." Opp. at 16. Given Plains' self-serving statement

18  that the majority of claimants "have not needed attorney representation" (Opp. at 17)

19  and the opaque process used to calculate damages, there is no way to know whether

20  *Footnote continued from previous page*
the handling of claims after the oil spill and that OPA talks about claims being

21  processes for short-term damages").

[17] Plains' citations are distinguishable. *See Johnson v. Colonial Pipeline Co.*, 830 F.

22  Supp. 309, 311 (E.D. Va. 1993) (holding that parties must first meet claims
presentation requirements in lawsuits with OPA claims); *Hanlon v. Chrysler Corp.*,

23  150 F.3d 1011, 1023 (9th Cir. 1998) (finding class actions are superior to "individual
claims for a small amount of consequential damages"); *Patillo v. Schlesinger*, 625

24  F.2d 262 (9th Cir. 1980) (finding a government-run administrative program capable
of providing full relief in a case involving a governmental defendant); *Rowden v.*

25  *Pac. Parking Sys., Inc.*, 282 F.R.D. 581, 582–83 (C.D. Cal. 2012) (same).

26  [18] *Compare* Motion to Stay, Jacoby Decl. at 4 (Dkt. 51-2) (claiming that as of Dec.
15, 2015, Plains had resolved 175 claims, denied 61, and 175 claims would be

27  processed in "a couple of weeks to a couple of months") *with* Anderson Decl. ¶ 18
(Dkt. 154) (claiming that as of Aug. 2016, Plains has "settled" only 164 claims,

28  denied 159, and 148 claims are still processing).

- 17 -

1  these claimants were hoodwinked into accepting less than fair compensation. *See*

2  Dkt. 76 at 8 ("The Court finds that Defendants are engaged in misleading conduct by

3  using the OPA claims process – a process intended to compensate oil spill victims –

4  to steer those victims toward unwittingly waiving their full rights to recovery"); *see*

5  *also* Ex. G, Tr. of Feb. 29, 2016 Hr'g at 11:3-10. That a few claimants expressed

6  "satisfaction" after getting paid is irrelevant. *See Norris-Wilson v. Delta-T Grp., Inc.*,

7  270 F.R.D. 596, 606 (S.D. Cal. 2010) ("It will almost always be the case that some

8  putative class members are happy with things as they are.").

9      Plains contends that OPA's NRDA process provides "superior prospective

10  relief." Opp. at 18. In fact, NRDA provides no prospective relief. The purpose of

11  NRDA is entirely restorative. 15 C.F.R. § 990.10. The NRDA process offers only

12  partial and incomplete relief to some class members and zero relief to others.

13  Further, the NRDA process, lacking judicial oversight, does not have the same

14  efficiencies as a class action. *See U. S. v. M/V COSCO BUSAN*, 557 F. Supp. 2d

15  1058, 1066 (N.D. Cal. 2008) ("it would not be unusual for the NRDA process to take

16  up to 5 years.") (internal citation omitted). There is no question that the class action

17  mechanism, overseen by this Court, is superior to OPA.

18  **C.   Plaintiffs Meet the Requirements for a Rule 23(b)(2) Class**

19      Plains relies on *Shook v. Bd. of Cnty. Comm'rs of Cnty. of El Paso*, 543 F. 3d

20  597, 604 (10th Cir. 2008), to argue that no single injunction can redress the various

21  harms claimed by each class member, and that therefore a Rule 23(b)(2) class cannot

22  be certified. Opp. at 23. However, *Shook* is not controlling here. *See, e.g.*, *Gray v.*

23  *Golden Gate Nat. Recreational Area*, 279 F.R.D. 501, 521 (N.D. Cal. 2011)

24  (declining to follow *Shook* and noting that "cases within the Ninth Circuit have taken

25  a more liberal view of Rule 23(b)(2) requirements") (citing cases). Rather, *Shields v.*

26  *Walt Disney Parks and Resorts US, Inc.*, 279 F.R.D. 529 (C.D. Cal. 2011), is

27  instructive. There, the court certified a Rule 23(b)(2) class to enjoin Disney to

28  provide Braille, large-print signage and other remedies on behalf of a class of blind

- 18 -

1323465.9

CASE NO:  2:15-CV-04113-PSG-JEM
PLFS.' REP. ISO MOT. FOR CLASS CERT.

visitors to the park. While class members desired different forms of relief, the court held that an injunction could be crafted that respected the entire class, which could include multiple remedial measures. *Id.* at 558. Here, as in *Shields*, an injunction can be crafted to meet the needs of each subclass, including, most critically, requiring Plains to install a state-of-the-art Pipeline with automatic shut-off systems. This would not require any tailored individualized relief.[19]

Plains also claims there is a class conflict, based on its speculation that some class members might prefer the Pipeline remain shut down. *See* Opp. at 25. There is no conflict. Plaintiffs' operative Complaint is clear: Plaintiffs demand that Plains not be permitted to re-open the Pipeline unless and until adequate state-of-the-art safety measures are in place to prevent another spill. Dkt. 88 ¶ 359. These safety measures would provide relief to every class member. Differences of opinion as to whether class members would benefit from the injunction go to the merits of Plaintiffs' claim and do not demonstrate a lack of cohesiveness. *See In re Motor Fuel Temperature Sales Practices Litig.*, 271 F.R.D. 221, 235 (D. Kan. 2010) (certifying injunctive class even though some class members believed that the relief sought would not benefit the class). Similarly, whether the injunction is too "vague" to satisfy Rule 65 is a common question of law. These questions are for summary judgment, however, not class certification. *See Tyson Foods*, 136 S. Ct. at 1047.

### D.    The Proposed Class is Ascertainable

Lastly, Plains argues that Plaintiffs have not established ascertainability because they have failed to meet some arbitrarily heightened level of precision. The subclasses, however, need not be "so ascertainable that every potential member can be identified at the commencement of the action." *O'Connor v. Boeing N. Am., Inc.*, 184 F.R.D. 311, 319 (C.D. Cal. 1998). As long as the criteria are objective and clear, and "the general outlines of the membership of the class are determinable at the

---

[19] Plains is incorrect that Plaintiffs have "jettisoned" or abandoned the injunctive relief sought in the Complaint. Opp. at 24. Plaintiffs' Motion refers to certain measures as examples of the type of relief sought, not an exhaustive list.

- 19 -

1323465.9

CASE NO: 2:15-CV-04113-PSG-JEM
PLFS.' REP. ISO MOT. FOR CLASS CERT.

1  outset of the litigation, a class will be deemed to exist." *Id*.

2        Here, the objective criteria in Plaintiffs' Motion are sufficiently clear: subclass

3  members must have (a) fished or bought and resold fish within the five years

4  preceding the spill from certain specified fishing blocks; or (b) worked on or

5  supplied one of the seven oil platforms shut down by the spill; or (c) owned or

6  operated a tourism-oriented business within a defined geographic area; or (d) owned

7  or rented property in a specified geographic area; (e) as of May 19, 2015. Dkt. 123.

8  These criteria are based largely on the class definitions in *Deepwater Horizon*, and

9  the subclasses here are ascertainable for the same reasons. *See In re Deepwater*

10 *Horizon*, 739 F. 3d at 821.

11       Plains claims that determining members of the fisher subclass will require an

12 "individualized, fact-intensive inquiry." Opp. at 19-20. In fact, Plaintiffs' expert has

13 access to California Department of Fish and Wildlife data on every commercial

14 species caught and sold, by fishing block, throughout the class period, as well as the

15 fisher and the retailer or wholesaler who bought the fish at the dock. Cal. Fish &

16 Game Code § 8043. Every subclass member can be verified using this data.

17       Plains also claims that it would be "impossible" to ascertain members of the

18 oil industry subclass, because there is no way to discern what it means to "support"

19 an oil platform. Opp. at 20. Yet, this is the same term used to define the oil and gas

20 industry class in *Deepwater Horizon*,[20] which Plains concedes was "objective and

21 precise." Opp. at 22. Nor is there any comparison between this case and *Kosta v. Del*

22 *Monte Foods, Inc.*, 308 F.R.D. 217, 229 (N.D. Cal. 2015), as this case involves class

23 members' very *livelihoods*—where they worked and with whom they conducted

24 business as of a date certain—and is not about which fruits or vegetables they may

25 have purchased years in the past. *See id.* Plains' hyperbolic concerns about alfalfa

26 farmers are baseless (Opp. at 20), as the class definition makes clear that only those

27

28 [20] *See* Ex. H at 7, Deepwater Horizon Economic And Property Damages Settlement Agreement As Amended On May 2, 2012.

- 20 -

CASE NO:  2:15-CV-04113-PSG-JEM
PLFS.' REP. ISO MOT. FOR CLASS CERT.

1323465.9

1  who directly interface with the oil platform belong in the subclass.

2      Plains also feigns confusion over what it means to "cater" to tourists. Opp. at

3  21. Yet, on its website, Plains advises that "claims for reimbursement may include:

4  tourism-based businesses and those who receive wages from such businesses."[21] As

5  Anderson admits, Plains handled claims from dozens of businesses that meet this

6  definition through Worley (Anderson Decl. ¶¶ 18-20; Ex. L, at 64:3-25),

7  demonstrating that the class definition is sufficiently clear for those affected to come

8  forward and to determine whether such businesses deserve compensation.

9      As for the property subclass, Plains apparently can identify the specific parcels

10  in the class, but curiously claims it would take years and $9.5 million to identify who

11  owns or rents those parcels. Opp. at 21. The data actually needed to conduct a

12  reliable mass appraisal in this case is readily available within weeks, at minimal cost.

13  Bell Rebuttal Decl. ¶ 29.[22] In any event, for purposes of ascertainability, "courts have

14  found that a definable class may be established by geographic boundaries."

15  *O'Connor*, 184 F.R.D. at 319. Here, as in *O'Connor*, Plaintiffs have specified a

16  geographic area, consistent with their theory of liability, and supported with

17  evidence, maps and expert testimony showing where the oil may have spread.

18      Plains' cases are inapposite. *See Tidenberg*, 2010 WL 135580 (insufficient

19  records available to determine whether a shill bidder was present during a sale, a

20  condition of class membership); *Sherman v. Yahoo! Inc.*, No. 13-0041, 2015 WL

21  5604400 (S.D. Cal. Sept. 23, 2015) (plaintiffs proposed requiring putative class

22  members to recall whether they received an unsolicited non-personal text message

23  from two years prior). Records will verify class membership here. *See Mullins v.*

24  *Direct Digital, LLC*, 795 F. 3d 654, 670 (7th Cir. 2015), *cert. denied*, 136 S. Ct. 1161

25  (2016) ("The due process question is not whether the identity of class members can

26  be ascertained with perfect accuracy at the certification stage but whether the

27  ─────────────
[21] Ex. I, http://www.plainsline901response.com/go/survey/7266/24766/.
28  [22] Filed concurrently herewith.

- 21 -

CASE NO:  2:15-CV-04113-PSG-JEM
PLFS.' REP. ISO MOT. FOR CLASS CERT.

1323465.9

1  defendant will receive a fair opportunity to present its defenses when putative class

2  members actually come forward.").[23]

3  **E.      The Court may Refine the Class as More Data Becomes Available**

4          The Court has wide discretion to define, manage and structure the class

5  proceedings. *Blackie v. Barrack*, 524 F. 2d 891, 906 n.22 (9th Cir. 1975). Rule 42(b)

6  permits bifurcation. *De Anda v. City of Long Beach*, 7 F. 3d 1418, 1421 (9th Cir.

7  1993). Plaintiffs propose a phased trial plan, similar to those adopted in other oil spill

8  cases. Phase one would address questions concerning Plains' conduct and the scope

9  of the spill, such as what caused the spill, and the reprehensibility of Plains' conduct,

10  where the oil went, the degree to which the spill harmed fisheries in the affected

11  area, whether and to what extent the spill reduced tourism in the affected region,

12  whether and to what extent job and business opportunities were affected, what causes

13  of action Plains is liable for, and whether injunctive relief is warranted. Phase two

14  would resolve the amount of economic damages, if any, owed to the class.

15          As the proceedings develop and more data emerges, the Court can modify the

16  class definitions, or certify only the common questions under Rule 23(c)(4), or even

17  decertify. *See In Re Concert Antitrust Litig.*, 247 F.R.D. 98, 148-49 (C.D. Cal. 2007)

18  (discussing management tools). In short, the Court may structure the class as it

19  deems necessary to promote the just, speedy and inexpensive resolution of this case

20  and avoid the burdensome serial re-litigation of common issues.

21                                **III.    CONCLUSION**

22          For these reasons, class certification should be granted.

23

24

---

25  [23] Plains mistakenly relies on *Carrera v. Bayer Corp.*, 727 F.3d 300 (3d Cir. 2013). Courts within the Ninth Circuit routinely have declined to follow *Carrera* because

26  its reasoning would effectively upend "the policy at the very core of the class action mechanism." *In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 970-71 (C.D. Cal.

27  2015); *accord Forcellati v. Hyland's, Inc.*, No. 12-1983, 2014 WL 1410264, at *5 (C.D. Cal. Apr. 9, 2014); *see also McCrary v. Elations Co., LLC*, No. 13-00242,

28  2014 WL 1779243, at *8 (C.D. Cal. Jan. 13, 2014).

Dated: December 21, 2016  Respectfully submitted,

            LIEFF CABRASER HEIMANN & BERNSTEIN LLP

            By: _/s/ Robert J. Nelson_
                Robert J. Nelson

            Robert L. Lieff (CSB No. 037568)
            Elizabeth J. Cabraser (CSB No. 083151)
            Robert J. Nelson (CSB No. 132797)
            Sarah R. London (CSB No. 267083)
            Wilson M. Dunlavey (CSB No. 307719)
            LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
            275 Battery Street, 29th Floor
            San Francisco, CA  94111-3339
            Telephone:  (415) 956-1000
            Facsimile:   (415) 956-1008

            KELLER ROHRBACK L.L.P.

            By: _/s/ Juli Farris_
                Juli Farris

            Juli Farris (CSB No. 141716)
            Matthew J. Preusch (CSB No. 298144)
            KELLER ROHRBACK L.L.P.
            1129 State Street, Suite 8
            Santa Barbara, CA 93101
            Telephone:  (805) 456-1496
            Facsimile:   (805) 456-1497

            Lynn Lincoln Sarko
            (Admitted Pro Hac Vice)
            Gretchen Freeman Cappio
            (Admitted Pro Hac Vice)
            Daniel Mensher
            (Admitted Pro Hac Vice)
            KELLER ROHRBACK L.L.P.
            1201 Third Ave, Suite 3200
            Seattle, WA 98101
            Telephone:  (206) 623-1900
            Facsimile:   (206) 623-3384

1323465.9

1                                           CAPPELLO & NOEL LLP

2

3                                     By:   */s/ A. Barry Cappello*
                                            A. Barry Cappello

4                                     A. Barry Cappello (CSB No. 037835)
                                  Leila J. Noël (CSB No. 114307)

5                                     Lawrence J. Conlan (CSB No. 221350)
                                  CAPPELLO & NOEL LLP

6                                     831 State Street
                                  Santa Barbara, CA 93101-3227

7                                     Telephone:   (805) 564-2444
                                  Facsimile:   (805) 965-5950

8

9                                     William M. Audet (CSB No. 117456)
                                  AUDET & PARTNERS, LLP

10                                    711 Van Ness Avenue, Suite 500
                                  San Francisco, CA  94102-3275

11                                    Telephone:   (415) 568-2555
                                  Facsimile:   (415) 568-2556

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 24 -

CASE NO:  2:15-CV-04113-PSG-JEM
PLFS.' REP. ISO MOT. FOR CLASS CERT.

1323465.9

1

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## CERTIFICATE OF SERVICE

I, Robert J. Nelson, hereby certify that on December 21, 2016, I electronically filed **PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR CLASS CERTIFICATION** with the Clerk of the United States District Court for the Central District of California using the CM/ECF system, which shall send electronic notification to all counsel of record.

*/s/ Robert J. Nelson*
Robert J. Nelson

1323465.9

CASE NO: 2:15-CV-04113-PSG-JEM
PLFS.' REP. ISO MOT. FOR CLASS CERT.