Robert L. Lieff (CSB No. 037568)
Elizabeth J. Cabraser (CSB No. 083151)
Robert J. Nelson (CSB No. 132797)
Sarah R. London (CSB No. 267083)
Wilson M. Dunlavey (CSB No. 307719)
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Telephone:  (415)956-1000
Facsimile:  (415) 956-1008

Lynn Lincoln Sarko
(*Admitted Pro Hac Vice*)
Gretchen Freeman Cappio
(*Admitted Pro Hac Vice*)
Daniel Mensher
(*Admitted Pro Hac Vice*)
Lisa Faye Petak (CSB No. 300914)
**KELLER ROHRBACK L.L.P.**
1201 Third Ave., Suite 3200
Seattle, WA 98101
Telephone: (206) 623-1900
Facsimile:   (206) 623-3384

Juli Farris (CSB No. 141716)
Matthew J. Preusch (CSB No. 298144)
**KELLER ROHRBACK L.L.P.**
1129 State Street, Suite 8
Santa Barbara, CA 93101
Telephone:  (805) 456-1496
Facsimile:  (805) 456-1497

*Interim Co-Lead Class Counsel for Plaintiffs*

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

A. Barry Cappello (CSB No. 037835)
Leila J. Noël (CSB No. 114307)
Lawrence J. Conlan (CSB No. 221350)
David L. Cousineau (CSB No. 298801)
**CAPPELLO & NOËL LLP**
831 State Street
Santa Barbara, CA 93101-3227
Telephone:  (805)564-2444
Facsimile:  (805)965-5950

*Lead Trial Counsel for Plaintiffs*

William M. Audet (CSB No. 117456)
**AUDET & PARTNERS, LLP**
711 Van Ness Avenue, Suite 500
San Francisco, CA 94102
Telephone: (415) 568-2555
Facsimile: (415) 568-2556

*Additional Counsel for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| KEITH ANDREWS, an individual, TIFFANI ANDREWS, an individual, BACIU FAMILY LLC, a California limited liability company, ROBERT BOYDSTON, an individual, CAPTAIN JACK'S SANTA BARBARA TOURS, LLC, a California limited liability company, MORGAN CASTAGNOLA, an individual, THE EAGLE FLEET, LLC, a California limited liability company, ZACHARY FRAZIER, an individual, MIKE GANDALL, an individual, ALEXANDRA B. GEREMIA, as Trustee for the Alexandra Geremia Family Trust dated 8/5/1998, JIM GUELKER, an | **Case No. 2:15-cv-04113-PSG-JEM**<br><br>[Consolidated with Case Nos. 2:15-CV-04573 PSG (JEMx), 2:15-CV-4759 PSG (JEMx), 2:15-CV-4989 PSG (JEMx), 2:15-CV-05118 PSG (JEMx), 2:15-CV-07051- PSG (JEMx)]<br><br>**REBUTTAL DECLARATION OF DR. HUNTER S. LENIHAN, PH.D.**<br><br>Date:       February 27, 2017<br>Time:       1:30 p.m.<br>Location:  Courtroom 6A<br>Judge:      Hon. Philip S. Gutierrez |

individual, JACQUES HABRA, an individual, ISURF, LLC, a California limited liability company, MARK KIRKHART, an individual, MARY KIRKHART, an individual, RICHARD LILYGREN, an individual, HWA HONG MUH, an individual, OCEAN ANGEL IV, LLC, a California limited liability company, PACIFIC RIM FISHERIES, INC., a California corporation, SARAH RATHBONE, an individual, COMMUNITY SEAFOOD LLC, a California limited liability company, SANTA BARBARA UNI, INC., a California corporation, SOUTHERN CAL SEAFOOD, INC., a California corporation, TRACTIDE MARINE CORP., a California corporation, WEI INTERNATIONAL TRADING INC., a California corporation and STEPHEN WILSON, an individual, individually and on behalf of others similarly situated,

    Plaintiffs,

v.

PLAINS ALL AMERICAN PIPELINE, L.P., a Delaware limited partnership, PLAINS PIPELINE, L.P., a Texas limited partnership, and JOHN DOES 1 through 10,

    Defendants.

DECLARATION OF HUNTER S. LENIHAN

I, Hunter S. Lenihan, Ph.D., declare as follows:

1. I am a Professor of Applied Marine and Fisheries Ecology at the Bren School of Environmental and Science Management at the University of California, Santa Barbara ("UCSB"). The attorneys for the plaintiffs in this case retained me to provide my opinion regarding the likely effects on commercial fisheries from the May 19, 2015 oil spill from the Plains All American Pipeline on the Gaviota Coast. This declaration is in response to criticisms made by Plains and its experts in response to the opinions I have expressed in this case.

2. Plains' expert, Ann Michelle Morrison, makes a number of criticisms about my BACI/BACIPS analysis of the impact of the oil spill on one lobster fisherman, ▉▉▉▉▉. But as I said at paragraph 31 of my initial declaration, that analysis was merely "an example of the type of analysis I can conduct across fisheries….[u]sing data generated by the fishers themselves and collected by the [California] Department of Fish and Wildlife."

3. The kind of analysis that I described in my initial declaration is "designed to account for co-occurring environmental perturbations and conditions, such as ENSO-El Nino events, storms, and other natural anthropogenic disturbances that can influence organisms and fishery catches." *Id.*

4. The fishery-wide (classwide) BACI/BACIP analysis I intend to perform in this case will be based on comprehensive data from the California Department of Fish and Wildlife. I have requested and been granted permission by the California Department of Fish and Wildlife to access and use all available fisheries data from the entire southern and central California coast, extending back as far as the data were recorded. I will also receive data provided for fishing seasons after the spill, each year, as they become available. These data include landing receipts data from fisheries for spiny lobster, rock crab, kelletia, black cod, groundfish, rockfish, squid, sea cucumber and sea urchin fisheries. I also plan to survey fishers from these various fisheries and examine and analyze their financial records. My research group has done this

1            DECLARATION OF HUNTER S. LENIHAN

1 successfully with the spiny lobster fishery (e.g., Guenther 2012).

2     5.    The Refugio oil spill occurred roughly 18 months ago. In order to conduct a robust analysis I need post-spill fishery wide data from 2015 and 2016, so that I have a minimum of two years of post-spill data to compare to pre-spill data. For those species for which fishing season opens late in the year, only one complete cycle has occurred. For these reasons, I will continue to collect post-spill data as they become available and expect to be able to conduct a robust analysis as of May 2017, after two full years of post-event data becomes available.

    6.    Because Dr. Morrison appears to have misconstrued or misunderstood the point of my BACI analysis, which was merely to provide one example of the kind of analysis I can perform across fisheries once I have the necessary data, her criticisms of my BACI analysis are misplaced.

    7.    First, the transcription errors that I made when I did the analysis of ▬ ▬▬▬ catch have been corrected and did not change my opinions about the impact of the spill on ▬▬▬▬. I have reviewed Dr. Morrison's comments regarding additional transcription errors in my corrected analysis of ▬▬▬▬ records and confirmed that, as she acknowledges, those minor errors do not change my conclusion; if anything, they show an even greater impact than shown before. But, again, that is beside the point as I intend to conduct an analysis of the impacted fisheries across those fisheries.

    8.    Second, Dr. Morrison says that I identified the data that I used in my analysis of ▬▬▬▬ as "logbook data" when I actually used "fish ticket" data, but that is an issue of semantics. "Fish ticket" is a colloquial term that usually refers to landing receipts data, which I used in my analysis. There are only a few fisheries, including spiny lobster, squid, sea urchin, and groundfish, that use geographically very specific information of catch and effort recorded in daily logbooks. Lobster logbook data has one of the highest levels of geographic specificity, and thus provides the basis for geographically precise landing receipts data. Thus, information entered into the landing receipts data by lobster fishermen is usually spatially accurate because it is based on

logbook records. I equated the logbook-based information used in ▮▮▮▮ landing receipts as "Logbook data". This had no bearing on the outcome of my analysis. The information that I used for ▮▮▮▮ is the same kind of information I will use for all fisheries: fish ticket data, which is compiled in landing receipt reports and includes information showing the species caught, the amount, and the block from which it was caught.

9. Third, Dr. Morrison incorrectly claims that my BACI analysis is invalid because I did not consider potential effects of fishing effort across the impact and control fishing blocks. I did not consider effort because my analysis of one lobster fisherman's data addressed the question "Did average daily catch vary as a function of space and time space related to the oil spill?" Had the influence of effort been an issue, I would have examined the total number of days fished each season by ▮▮▮▮ in the control and impact areas. This issue can and will be accounted for in my analysis across fisheries once the data are available.

10. Fourth, Dr. Morrison says that my BACI analysis of one lobster fisherman's catch violated the statistical assumptions of additivity and independence. But, again, these are issues that will be addressed when I have more data and am examining the impact of the oil spill across fisheries and over a longer time period. As I explained in paragraph 31 of my initial report, my analysis will examine the possible influence of weather, species biology, and fishing behavior. Alternative models accounting for co-varying factors, such as the model proposed by Dr. Morrison, can be specified and tested in a variety of regression-based models, but only with more fisheries data. (E.g., Stergiou et al. 1997, cited in paragraph 33 of my initial declaration).

11. I presented in my initial declaration a set of physical-biological mechanisms, reported in the published scientific literature, that describe how oil spilled into the marine environment impact fishery organisms through space and time. Of major importance are models that show how spilled oil can leak from sediments and biogenic habitat and kill organisms over periods as long as decades (Peterson et al. 2003

regarding the Exxon Valdez oil spill), and other models that show how oil, of different chemical compositions, can cause toxicity to marine larvae at incredibly low concentrations, leading to the probable reduction of their population abundance because the larvae do not develop and grow into adults (Incardona et al. 2012, 2015; Raimondi and Schmitt 1992). This work represents the state of the art in marine oil pollution eco-toxicology, and thus provides important models that explain how oil, at very low concentrations, for even long periods after a spill, can harm fishery organisms.

12. A draft U.S. Geological Survey study (Lorenson, *in prep.*) of the May 19, 2015 oil spill reinforces the problem of ongoing impacts, concluding that it is "likely that areas will be susceptible to periodic recontamination due to dispersion processes, chemical breakdown reactions, and physical processes such as remobilization and resuspension of sedimentary tar[,]" and that "there are many areas that will not be cleaned and may become persistent sources of hydrocarbons in the marine environment." Thus, results of the USGS study support models, which I cited in my declaration from the best scientific literature, that reveal how oil spilled into the marine intertidal environment can have long-term, widely-dispersed negative impacts on marine organisms, including those that support fisheries.

13. The fact that oil can have dramatic acute negative impacts on organisms from the sizes of larval to adults is accepted without question in the scientific and regulatory communities. That the Plains oil spill killed organisms in the vicinity of the spill is proven and not debated. Whether hydrocarbons released from the Plains pipeline spill also has long-term negative impacts on the set of fisheries in question within the region of the Santa Barbara Channel is highly probable and something that I will continue to analyze. Research of spills of chemically-similar oil, in a wide variety of environments, some not very different from Refugio Beach, have been conducted and have shown to negatively impact fisheries, as I explained in my initial declaration.

14. The hypothesis that some southern and south-central California fisheries were negatively impacted by the Plain's oil spill because of the acute death of organisms

in the vicinity of the spill is testable and well-supported by recent published literature. Many oil spills have occurred and been studied since the 1969 Santa Barbara oil spill, when scientists limited their impact assessment to short term negative impacts. More recent research has shown the longer term, chronic effects of oil spills on a host of marine populations.

15. Based on my professional experience, I am well aware of the step-by-step, logical, and rigorous approach required to identify the negative impacts of environmental perturbations on marine fish and other organisms. Descriptions of the weight of evidence needed to accurately assess a negative environmental impact are laid out in detail in the book written by my colleagues R. Schmitt and C. Osenberg (1996), which I cited in my declaration as well as use each winter in my Applied Marine Ecology course at UCSB. I have also published dozens of papers on the subject of marine ecological field assessments in peer-reviewed scientific literature.

16. Dr. Morrison also has experience assessing the impact of oil and other perturbations in aquatic ecosystems, but she has far less experience in publishing rigorous, peer-reviewed science in general, having only three papers in peer-reviewed scientific journals. The bulk the publications listed in her CV are non-peer reviewed abstracts (9 of 14 total publications). The remainder of her body of work is grey literature reports that are non-peer reviewed. Of the three peer-reviewed journal articles, one is a review article of marine pollution that does not include original empirical or quantitative science (Mearns et al. 2016); one reports on laboratory toxicity tests and modeling of freshwater zebrafish (a widely used model lab organism) (Morrison et al. 2014); and the last (Morrison et al. 2003) reports on the performance of curve analysis of beach water quality data that was collected in the study.

17. The body of Dr. Morrison's scholarship concerning field impact assessment is minimal, the result of which is an incomplete understanding of oil spill impact on marine species and my proposed damage assessment.

18. A list of additional materials considered is attached as Exhibit A.

I declare under penalty of perjury that the foregoing is true and correct. Executed on December 20, 2016 at Santa Barbara, California.

_____
Hunter S. Lenihan, Ph.D.