#122/150/208

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-4113 PSG (JEMx) | Date | February 28, 2017 |
|---|---|---|---|
| Title | Andrews *et al.* v. Plains All American Pipeline, L.P. *et al.* | | |

Present: The Honorable | Philip S. Gutierrez, United States District Judge

| Wendy Hernandez | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |
| Attorneys Present for Plaintiff(s): | Attorneys Present for Defendant(s): |
| Not Present | Not Present |

**Proceedings (In Chambers):    Order GRANTING IN PART and DENYING IN PART
Plaintiffs' Motion for Class Certification, and DENYING
Motions to Strike**

Before the Court is Plaintiffs Keith Andrews, Tiffani Andrews, Baciu Family LLC, Robert Boydston, Captain Jack's Santa Barbara Tours LLC, Morgan Castagnola, the Eagle Fleet LLC, Zachary Frazier, Mike Gandall, Alexandra B. Geremia, Jim Guelker, Jacques Habra, iSurf LLC, Mark Kirkhart, Mary Kirkhart, Richard Lilygren, Hwa Hong Muh, Ocean Angel IV LLC, Pacific Rim Fisheries, Inc., Sarah Rathbone, Community Seafood LLC, Santa Barbara Uni, Inc., Southern Cal Seafood, Inc., Tractide Marine Corp., Wei International Trading Inc., and Stephen Wilson's ("Plaintiffs") motion for class certification.  Dkt. # 122.  After considering the arguments in the moving, opposing, reply, and sur-reply papers, as well as those made at the hearing on February 27, 2017, the Court GRANTS IN PART and DENIES IN PART Plaintiffs' motion.

I.    Background

This litigation arises from an oil spill that occurred at Refugio State Beach near Santa Barbara County on May 19, 2015.  In the aftermath of the oil spill, and as early as June 1, 2015, plaintiffs started to file class action complaints with the Court.  On November 9, 2015, the Court consolidated many of the cases into this lead case, *Andrews et al. v. Plains All American Pipeline, L.P. et al.*, and administratively closed all other related cases.  *See* Dkt. # 40.  The operative pleading in this lead case is now the Second Amended Complaint ("SAC"), filed on April 6, 2016.  Dkt. # 88.

This lead case now includes four subclasses of plaintiffs: (1) the fisher and fish industry subclass, which includes commercial fishers and fish sellers affected by the closure of fishing areas in the Pacific Ocean and damage to those fisheries; (2) the property owner subclass, which

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-4113 PSG (JEMx) | Date | February 28, 2017 |
|---|---|---|---|
| Title | Andrews *et al.* v. Plains All American Pipeline, L.P. *et al.* | | |

includes class members who owned or leased ocean-proximate property; (3) the oil industry subclass, which includes oil workers and oil supply businesses dependent on the pipeline; and (4) the business tourism subclass, which includes businesses in the area that were affected by reduced tourism. *See Plaintiffs' Motion for Class Certification* ("*Mot.*") 2:11–20.

Plaintiffs assert that the oil spill affected these groups in various ways. The fishermen, who fish a variety of fish species, including sea cucumbers, shrimp, halibut, black cod, halibut, rock crab, and California spiny lobster, report harm from the forced closure of parts of the coastline in the immediate aftermath of the spill, and many believe that they will continue to feel the spill's effects. The property owner plaintiffs, who own property along the coastline from Point Conception in Santa Barbara to the eastern border of Malibu, claim that their homes diminished in value after the spill. And, finally, the workers and business owners in the oil industry and tourism subclasses assert that they lost business after the spill impeded their ability to transport oil from offshore platforms to onshore vendors, and otherwise discouraged tourists from coming to the area. *See generally Mot.* 9:14–12:11.

Plaintiffs filed their motion for class certification on August 22, 2016. Dkt. # 122. Defendants Plains All American Pipeline, L.P. and Plains Pipeline, L.P. ("Defendants" or "Plains") oppose the motion. The parties also filed separate motions to strike the experts proposed by the other side.

II.     Discussion

A.     The Underlying Claims

Plaintiffs seek to certify the proposed subclasses for all nine causes of action in the SAC: (1) violation of the California Lempert-Keene-Seastrand Oil Spill Prevention and Response Act, Cal. Gov't Code §§ 8670 *et seq.*; (2) strict liability for ultrahazardous activities; (3) negligence; (4) violation of the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.*; (5) public nuisance; (6) negligent interference with prospective economic advantage; (7) trespass; (8) continuing private nuisance; and (9) nuisance per se. *See* Dkt. # 88.

B.     Class Action Standards

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes et al.*, 564 U.S. 338, 348–49 (2011) (citing *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979)). "In order to justify a departure from that rule, 'a class representative must be part of the class and "possess

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-4113 PSG (JEMx) | Date | February 28, 2017 |
|---|---|---|---|
| Title | Andrews *et al.* v. Plains All American Pipeline, L.P. *et al.* | | |

the same interest and suffer the same injury" as the class members.'" *Id.* (citing *East Tex. Motor Freight Sys., Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977)).

In a motion for class certification, the burden is on plaintiffs to make a prima facie showing that class certification is appropriate, *see In re Northern Dist. of Cal. Dalkon Shield IUD Liab. Litig.*, 693 F.2d 847, 854 (9th Cir. 1982), and the Court must conduct a "rigorous analysis" to determine the merit of plaintiffs' arguments, *see Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982). Plaintiffs must be prepared to "prove" that there are "*in fact*" sufficiently numerous parties or that common questions exist, and frequently this will require some "overlap with the merits of the plaintiff's underlying claim." *See Dukes*, 564 U.S. at 350. Rule 23 does not, however, grant the court license to "engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 133 S. Ct. 1184, 1194 (2013). "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *See id.* (citing *Dukes*, 564 U.S. at 351 n.6).

Federal Rule of Civil Procedure 23 governs the maintenance of class actions in federal court. Rule 23(a) ensures that the named plaintiffs are "appropriate representatives of the class whose claims they wish to litigate." *See Dukes*, 564 U.S. at 349. Plaintiffs must satisfy all of Rule 23(a)'s four requirements—numerosity, commonality, typicality, and adequacy—and at least one of the requirements of Rule 23(b). *See Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 979–80 (9th Cir. 2011).

In this motion, Plaintiffs move for class certification under Rule 23(b)(2) and Rule 23(b)(3). Rule 23(b)(2) permits class actions for declaratory or injunctive relief where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." *See* Fed. R. Civ. P. 23(b)(2). Rule 23(b)(3) requires the Court to find that (1) "questions of law or fact common to class members predominate over any questions affecting only individual class members" and (2) "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *See* Fed. R. Civ. P. 23(b)(3) (referring to the dual requirements as "predominance" and "superiority"). Rule 23(b)(3) specifically mandates that the Court consider "the likely difficulties in managing a class action." *See Briseno v. ConAgra Foods*, 844 F.3d 1121, 1126 (9th Cir. 2017).[1]

---

[1]   In addition to the Rule 23(a) and (b) requirements, Defendants urge the Court to separately assess whether the proposed subclasses are ascertainable. *See Opp.* 19–21. In *Briseno v. ConAgra Foods*, the Ninth Circuit concluded that Rule 23 does not impose a separate

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-4113 PSG (JEMx) | Date | February 28, 2017 |
|---|---|---|---|
| Title | Andrews *et al.* v. Plains All American Pipeline, L.P. *et al.* | | |

Defendants' opposition to class certification largely skips over the prerequisite requirements of Rule 23(a) and focuses directly on why the proposed class and subclasses fail under Rules 23(b)(2) and 23(b)(3). Although the Court recognizes that it must nonetheless independently assess the Rule 23(a) requirements, *see* Newberg on Class Actions § 7:19, the Court welcomes the opportunity to begin with the most contested analyses first. Thus, rather than start with Rule 23(a), the Court begins with Rule 23(b). The Court first resolves the disputes related to Rules 23(b)(2) and 23(b)(3), and then turns to Rule 23(a). Ultimately, the Court finds that only the fisher and fisheries industry subclass satisfies both the requirements of Rule 23(a) and (b)(3).

    C.    <u>Rule 23(b)(2)</u>

Rule 23(b)(2) covers cases in which "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." *See* Fed. R. Civ. P. 23(b)(2). A Rule 23(b)(2) class is proper only if "a single injunction" would provide relief to the subclasses. *See Dukes*, 564 U.S. at 260. "[I]t does not authorize class certification when each class member would be entitled to an individualized award of monetary damages." *See id.*

In the certification motion, Plaintiffs argue that they are entitled to proceed as a Rule 23(b)(2) class because they request a single injunction that would "order[] Plains to replace and/or repair, operate, and maintain the Pipeline using best available technologies, consistent with the requirements of the PSA and the Lempert-Keene-Seastrand Oil Spill Prevention and Response Act." *Mot.* 23. This argument fails for two reasons.

First, the Court is not convinced that it can fashion one injunction to apply to Plaintiffs' entire class. The SAC, which requests multiple and diverse forms of relief, is evidence of how difficult it would be to craft such a remedy. *See, e.g.*, *Opp.* 24:1–8 (citing SAC where Plaintiffs demand that Defendants restore fisheries, repair reputational damage to the seafood industry and coastal properties, restore real property and beaches, and repair property damage). Unlike in *Shields v. Walt Disney Parks and Resorts*, where the court was convinced that enjoining Disney to provide Braille, large-print signage respected the wishes of the entire class of blind and partially sighted people, the Court is not so convinced that a single remedy would satisfy the

---

ascertainability requirement; rather, courts in the Ninth Circuit are to assess the administrative feasibility of the class action under Rule 23(b)(3)'s superiority analysis. *See* 844 F.3d 1121, 1125–26 (9th Cir. 2017). Accepting this guidance, the Court assesses administrative feasibility in its Rule 23(b)(3) discussion, and not as a separate section on "ascertainability."

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-4113 PSG (JEMx) | Date | February 28, 2017 |
|---|---|---|---|
| Title | Andrews *et al.* v. Plains All American Pipeline, L.P. *et al.* | | |

wishes of all class members here.  *See* 279 F.R.D. 529, 558 (C.D. Cal. 2011).  Defendants point
out that some in the class might never want the pipeline to open, and others, including those in
the oil industries subclass, might want the pipeline to open even if it does not entirely comply
with federal or state guidelines.  Others in the class might not care about the ongoing operation
of the pipeline at all, but only seek monetary compensation for their damages.  The diversity of
positions within the class suggests that the class definition is simply too broad and too varying to
allow the Court to provide unitary relief.  *See also Shook v. Board of County Commissioners of
El Paso*, 543 F.3d 597, 604 (10th Cir. 2008) ("[I]f redressing the class members' injuries
requires time-consuming inquiry into individual circumstances or characteristics of class
members or groups of class members, 'the suit could become unmanageable and little value
would be gained in proceeding as a class action.'").

Second, the Court is also unconvinced that Plaintiffs' certification motion under Rule
23(b)(2) satisfies the requirements of Federal Rule of Civil Procedure 65, which governs
injunctions.  As the Tenth Circuit held in *Shook*, "injunctions simply requiring the defendant to
obey the law are too vague to satisfy Rule 65."  *See id.* at 604.  The injunction proposed here
would simply require Defendants to abide by existing pipeline safety regulations when the
pipeline reopens.  Such an injunction is superfluous and overly vague, and so does not meet the
Rule 65 requirements, even if the Court were to find that a single injunction could be fashioned.

In sum, Plaintiffs have not demonstrated that Rule 23(b)(2) certification is appropriate.
The Court therefore DENIES Plaintiffs' motion to certify a Rule 23(b)(2) class.

D.      Rule 23(b)(3)

Plaintiffs next move to certify the four subclasses under Rule 23(b)(3).  Although courts,
including the U.S. Supreme Court, have raised skepticism about certifying mass torts classes
under Rule 23(b)(3), courts have certified such classes where plaintiffs have shown that they will
achieve "economies of time, effort, and expense, and promote . . . uniformity," and especially
where the plaintiffs would be unable to recover otherwise.  *See Amchem Prods., Inc. v. Windsor*,
521 U.S. 591, 615 (1997) (citing Adv. Comm. Notes, 28 U.S.C. App., p. 697); *see also id.* at 625
(observing that "'mass accident' cases are 'ordinarily not appropriate' for class treatment").
Precedent suggests that this Court must rigorously scrutinize Plaintiffs' claims that the classes'
claims can be litigated together and achieve efficiencies.  The Court turns first to predominance
and then superiority.

i.      *Predominance*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-4113 PSG (JEMx) | Date | February 28, 2017 |
|----------|------------------------|------|-------------------|
| Title | Andrews *et al.* v. Plains All American Pipeline, L.P. *et al.* | | |

The Rule 23(b)(3) predominance inquiry "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Aschem* , 521 U.S. at 623.  "Predominance is a qualitative rather than a quantitative concept.  It is not determined simply by counting noses: that is, determining whether there are more common issues or more individual issues, regardless of relative importance."  *See Parko v. Shell Oil Co.*, 739 F.3d 1083, 1085 (7th Cir. 2014) (Posner, J.).  The predominance inquiry is "far more demanding" than the commonality requirement of Rule 23(a).  *See Aschem*, 521 U.S. at 623–24.  Although the court may compare the number of uncommon questions to the number of common ones as a proxy for predominance, the court must ultimately assess the significance of the uncommon questions in the overarching dispute and the ability to manage a trial of common claims.  *See id.*  "Implicit in the satisfaction of the predominance test is the notion that the adjudication of common issues will help achieve judicial economy."  *See Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996).

Defendants contest predominance vigorously.  They contend that both causation and injury are individualized inquiries that necessitate an alternative method for adjudicating claims.  *See Opp.* 4:4–17; 5:9–28.  In so arguing, Defendants rely on experts who declare that rental values, fish catch, hotel occupancy, and oil industry employment in the Santa Barbara region remained the same or increased slightly immediately after the oil spill.  They also point to depositions, which show that income increased for some named Plaintiffs, and environmental data that suggests that "natural oil seeps" in the area may have caused some of Plaintiffs' damages.  *See Opp.* 4:4–17.

Although Plaintiffs do not dispute that economic damages must be established individually, they point to Ninth Circuit cases that hold that an individualized inquiry on damages alone cannot defeat certification.  *See Mot.* 18:14–19:2 (citing *Leyva v. Medline Indus., Inc.*, 716 F.3d 510, 513–14 (9th Cir. 2013) ("In this circuit, however, damage calculations alone cannot defeat certification.")).  Relying on their own experts, Plaintiffs contend that both causation and injury can be established class wide through statistical modeling and regression analysis.  *See Mot.* 20:6–20.  Although the experts plan to integrate individual-level data into their analysis, they testify that both the dispersion of the oil and the overall effect of the oil spill on Santa Barbara's economy can be determined at a common trial.  *See, e.g.*, *Mezic Decl.*, *Lenihan Decl.*, *Roberts Decl.*

Plaintiffs' predominance arguments largely rise and fall with the scope of their experts' analysis.  If the Court finds the experts credible and their methods reliable, and that the proposed experts' models account for variation in the class, then Plaintiffs are likely to succeed in showing that causation and injury are capable of class-wide calculation and that predominance is

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-4113 PSG (JEMx) | Date | February 28, 2017 |
|---|---|---|---|
| Title | Andrews *et al.* v. Plains All American Pipeline, L.P. *et al.* | | |

satisfied.  However, if the experts fail, or if the class is defined too broadly so as to defeat a class-wide attempt at calculating causation or injury, Defendants are likely to prevail and show that predominance is lacking.  Defendants have mounted challenges under *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 591 (1993), to each of Plaintiffs' four key experts: Igor Mezić, Steve Roberts, Hunter Lenihan, and Randall Bell.[2]

To decide among the competing claims regarding predominance, the Court first takes up the *Daubert* challenges, given their centrality to Plaintiffs' claims that causation and injury are subject to common proof.  Informed by the expert declarations, the Court then assesses each subclass separately to determine whether the subclass is "sufficiently cohesive" for the Court to hold that common issues predominate over individual issues for the class.

### 1.  Daubert Challenges

The Court first considers Defendants' *Daubert* challenges.  *See In re ConAgra Foods, Inc.*, 302 F.R.D. 537, 548 (C.D. Cal. 2014) (Morrow, J.) (citing *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011)).  Defendants' motion to strike challenges the expert opinions of Igor Mezić, Steve Roberts, Hunter Lenihan, and Randall Bell.  *See generally Defendants' Motion to Strike* ("*Defendants' MTS*").

Federal Rule of Evidence 702 governs the admissibility of expert opinion.  *See* Fed. R. Evid. 702(b)–(d).  Expert opinion is admissible if it is based on sufficient facts or data, is the product of reliable principles and methods, and if the expert reasonably applies the principles and methods to the facts of the case.  *See id.*; *see also City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1043 (9th Cir. 2014).  The Rule 702 factors are broadly summarized as requiring "reliability, relevancy, and assistance to the trier of fact."  *See ConAgra Foods*, 302 F.R.D. at 549 (citing *Sementilli v. Trinidad Corp.*, 155 F.3d 1130, 1134 (9th Cir. 1998)).  The expert opinion must involve scientific or technical knowledge.  *See Daubert*, 509 U.S. at 590.

In conducting the preliminary assessment under *Daubert*, the trial court is vested with broad discretion.  *See United States v. Espinosa*, 827 F.2d 604, 611 (9th Cir. 1987) ("The

---

[2]    Plaintiffs filed their own *Daubert* challenges to Defendants' nine class certification experts: Hal Sider, Jerry Dent, Paul Boehm, Edward Buchak, Wade Bryant, Michelle Morrison, Kile Anderson, Avram Tucker, and Neilia La Valle.  *See* Dkt. # 209.  To the extent that the Court relies on any of Defendants' expert declarations, the Court denies Plaintiffs' motion to strike and overrules Plaintiffs' *Daubert* objections for purposes of this class certification motion only. Plaintiff may renew its challenges, if appropriate, later in the litigation.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-4113 PSG (JEMx) | Date | February 28, 2017 |
|---|---|---|---|
| Title | Andrews *et al.* v. Plains All American Pipeline, L.P. *et al.* | | |

decision to admit expert testimony is committed to the discretion of the district court and will not
be disturbed unless manifestly erroneous."). "The trial court must act as a 'gatekeeper' to
exclude junk science that does not meet Federal Rule of Evidence 702's reliability standards by
making a preliminary determination that the expert's testimony is reliable" and relevant. *See
Ellis*, 657 F.3d at 982. Moreover, at the class certification stage, "it is not enough for the district
court to determine the admissibility of the expert testimony at issue; rather, the Court must be
mindful to weigh the persuasiveness as well." *See P.P. v. Compton Unified Sch. Dist.*, CV 15-
3726 MWF (PLAx), 2015 WL 5752770, at *6–7 (C.D. Cal. Sept. 29, 2015). In the case of
Plaintiffs' experts, it is Plaintiffs' burden to prove by a preponderance of the evidence that the
expert's testimony meets these admissibility requirements. *See Lust By & Through Lust v.
Merrell Dow Pharm., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996).

       *a.    Igor Mezić*

      Igor Mezić is a principal at AIMdyn, Inc., a firm that forecasts fluid flows in engineered
and natural systems, and a professor at the University of California, Santa Barbara. *See Mezić
Decl.*, ¶¶ 1, 11. In his declaration, Mezić explains how he will model how the oil from Line 901
dispersed once it left the pipeline. *See id.* ¶¶ 29–32. Using the methodology described in his
declaration, Mezić believes that he will be able to provide an "hour-by-hour analysis" of "where
(and when) the oil travelled, became submerged, including in kelp beds and crevices, and
washed ashore, and the extent to which submerged oil has reappeared on the shoreline." *See id.*
¶ 31. Mezić will use ocean currents, temperature, and fly over data from the National Oceanic
and Atmospheric Administration, as well as "fingerprinting"[3] data collected after the spill to
supplement and verify his methodological results. *Id.* ¶ 32. Mezić's declaration is the
foundation for Plaintiffs' other experts, who use statistical modeling to show, based on where the
oil ended up, the impact of the spill on fisheries, property, tourism, and the oil industry.

      Defendants move to strike Mezić's declaration as unreliable, incomplete, and unqualified.
Specifically, Defendants claim that Mezić can only model "where the oil from Line 901 *could
have* traveled" and "has not determined where Line 901 oil *actually did* travel." *See Defendants'
MTS* 6:15–19. They fault Mezić's model for failing to account for oil that was cleaned up or
removed from the shoreline before it reached the ocean, and assert that he is not qualified to
implement the complex analysis needed to determine exactly where the oil traveled. *See id.*
8:6–17; 9:15–26.

---

[3]   The process of determining where a sample of oil originated is called "fingerprinting" by
experts in the field. The fingerprinting yields information about the oil's chemical composition
that allows the expert to trace it back to its source.

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-4113 PSG (JEMx) | Date | February 28, 2017 |
|---|---|---|---|
| Title | Andrews *et al.* v. Plains All American Pipeline, L.P. *et al.* | | |

    Plaintiffs have the better of the argument in their defense of Mezić, and the Court is convinced that Mezić's methodology meets the *Daubert* standard. In his rebuttal declaration, Mezić confirms that the model integrates the "fate and transport" elements that concerned the experts that Defendants solicited to challenge Mezić's conclusions. *See Mezić Rebuttal Decl.*, ¶¶ 15–18. His proposed method also integrates a sensitivity analysis that can be used to verify the accuracy of his methodology and calibrate his predictions about where the oil landed. *See id.* ¶ 12; *see also Mezić Decl.*, ¶ 30.

    Mezić and his methodology have also proven acceptable to the scientific community. Mezić is a past recipient of the Alfred P. Sloan Fellowship and a National Science Foundation career award, and his work on oceanic transport of different substances has been published in peer-reviewed journals, including *Science* and *Proceedings of the National Academy of Sciences*. *See Mezić Decl.*, ¶¶ 17–18. In sum, given the information before the Court about Mezić's methodology and his qualifications and past experiences, the Court cannot say that Mezić's declaration is unreliable or that his methodology proposes an unreasonable application of the facts available in this case.

    Convincingly, Plaintiffs also point out that Defendants' experts do not challenge Mezić's methods as much as they offer their own means for assessing where the oil from the spill ended up. Defendants' experts, Paul D. Boehm, Edward M. Buchak, and Wade Bryant, offer competing techniques for measuring the dispersion of oil, but even these experts do not assert that such a measurement is impossible. *See Opposition to Defendants' Motion to Strike* ("*Plaintiffs' MTS Opp.*"), 4:19–25. Assuming that Mezić's method is reliable at baseline, the relative reliability of Mezić's model versus Boehm's or Buchak's is a question more appropriate for the trier of fact. *See City of Pomona*, 750 F.3d at 1049 (citing *United States v. Sandoval-Mendoza*, 472 F.3d 645, 654 (9th Cir. 2006) ("Where two credible experts disagree, it is the job of the fact finder, not the trial court, to determine which source is more credible and reliable.")).

    The Court will therefore consider Mezić's declaration in deciding Plaintiffs' motion for class certification and DENY Defendants' motion to strike Mezić's declaration.

        *b.*    *Steve Roberts*

    Steve Roberts is a principal at Veritas Forensic Accounting and Economics, and is certified as a public accountant and a financial forensics expert by the American Institute of Certified Public Accountants. *See Roberts Decl.*, ¶¶ 1–2. Roberts proposes to use regression analysis to assess the economic impact of the oil spill on fishermen, offshore and shore-based

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-4113 PSG (JEMx) | Date | February 28, 2017 |
|---|---|---|---|
| Title | Andrews *et al.* v. Plains All American Pipeline, L.P. *et al.* | | |

businesses, and people working for those businesses. *See id.* ¶ 5. Roberts provides damage models for the fisherman and fish processors subclass, the oil industry workers, and the tourism subclass. *See id.* ¶¶ 11–33. He does not opine on damages for the property owner subclass. (This task is reserved for Randall Bell.) Roberts's model estimates how much each subclass would have earned "but for" the oil spill, and then compares the "but for" world to what actually occurred after the spill. *See id.* ¶¶ 15, 20.

Defendants fault Roberts for failing to identify the information that he would need to construct a "but for" world for the fisheries, tourism, and oil industry subclasses. *See Defendants' MTS* 17:24–19:28. They also fault him for failing to consider contributing factors, such as the global decline in oil prices or El Niño's changes to water temperatures, or factors specific to Santa Barbara that might independently vary the revenues for the targeted industries. *See id.* To make their point, Defendants rely heavily on *In re ConAgra Foods, Inc.*, 302 F.R.D. 537, 550 (C.D. Cal. 2014), *aff'd Briseno v. ConAgra Foods, Inc.*, No. 15-55727 (9th Cir. Jan. 3, 2017). In that case, the court excluded the testimony of economic expert, Colin Weir, who plaintiffs had retained to show that consumers paid a price premium for the "100 percent natural" claim on Wesson Oils. *See id.* Although Judge Morrow found Weir qualified to make his opinion, the Judge ultimately found his model unreliable, given that Weir failed to "identify any variables he intends to build into the models, nor does he identify any data presently in his possession to which the models can be applied." *See id.* 552–53. The court concluded: "Although the methodologies he describes may very well be capable of calculating damages in this action, Weir has made no showing that this is the case. . . . Stated differently, his declaration is '"so incomplete as to be inadmissible as irrelevant."' *See id.*

The *ConAgra* analysis does not apply to Roberts's declaration because Roberts identifies relevant variables and accessible data that he would use in calculating damages for each subclass. For the oil industry subclass, for example, Roberts predicts that the harms will come from past and future lost employment, loss of earnings and benefits, lost profits, and out-of-pocket recovery costs. *See Roberts Decl.* 4:10–13. He identifies variables such as worker and business historic income, reasonable anticipated future income, the length of the affected period, and the time value of money, and he credibly asserts that employees in the oil industry would have had access to "similar loss mitigating opportunities" to enable a class-wide calculation of damages. *See id.* 6:2–7:11, 8:1–15.

Similarly, for the fisheries subclass, Roberts predicts that the harms will result from "loss of harvestable fish and fish size, fishing closures and the stigma associated with the presence of oil in the fisheries." *See id.* 4:22–24. For fisheries too Roberts identifies a number of variables: fishing area closures, consumer demand and pricing issues, the oil's impact on the size of the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-4113 PSG (JEMx) | Date | February 28, 2017 |
|---|---|---|---|
| Title | Andrews *et al.* v. Plains All American Pipeline, L.P. *et al.* | | |

fishery, historic income, anticipated future income, and natural events, such as El Niño. Roberts identifies four sources of information for calculating damages related to the fisheries subclass, including the State of California's fishing quotas, actual landings, and the annual processors' report, as well as the Lenihan expert report, which provides key information about different fish populations and commercial fishermen practices.

Roberts's analysis for the tourism subclass, or in Roberts's words—the "other businesses" subclass—is also sufficiently reliable to meet *Daubert*. Roberts asserts that the oil spill resulted in lower revenue, lower than normal occupancy, and fewer customers for businesses, including tour operators, rental companies, hotels/motels, and restaurants. *See Roberts Decl.*, 5:9–20. He intends to use data on hotel/motel occupancy, tourism, and restaurant industry revenue to account for injuries to the tourism subclass. Although the variables that Roberts intends to use do not account for the class's significant variation—a matter that the Court takes up in its predominance discussion—this does not necessarily mean that Roberts's model is inaccurate for calculating damages for some members of this subclass.

In short, Roberts's declaration is sufficient to demonstrate that his methodology is reliable and reasonably capable of predicting how the oil spill affected members in the applicable subclasses. Although the Court is more skeptical about whether Roberts's declaration and his proposed methodology can assess damages for all members of the proposed subclasses, this is a matter that the Court raises in its predominance analysis, not in *Daubert* challenges where the Court merely assesses whether the expert is credible and the methodology reliable. Moreover, to the extent that Defendants challenge the "probativeness" or accuracy of Roberts's calculations, such arguments go to the weight of the analysis and are more appropriate for the trier of fact. *See ConAgra Foods, Inc.*, 302 F.R.D. at 552 (quoting *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1188 (9th Cir. 2002)); *see also See City of Pomona*, 750 F.3d at 1044 ("Challenges that go to the weight of the evidence are within the province of a fact finder, not a trial court judge."). The Court therefore DENIES Defendants' motion to strike the Roberts declaration.

*c.      Hunter Lenihan*

Hunter Lenihan is a professor of applied marine and fisheries ecology at the University of California, Santa Barbara, and is the director of the school's Sustainable Aquaculture Research Center. *See Lenihan Decl.*, ¶ 1. Lenihan's expert opinion speaks to the likely effect on commercial fisheries from the May 19, 2015 oil spill. *See id.* ¶ 3. In the past, Lenihan examined the impact of no-take marine reserves/marine protected areas ("MPAs") in Santa Barbara, and documented how commercial fishermen responded to certain closures in the area. *See id.* ¶ 13. Based on accounts from the lead Plaintiffs in this case, Lenihan posits that commercial

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-4113 PSG (JEMx) | Date | February 28, 2017 |
|---|---|---|---|
| Title | Andrews *et al.* v. Plains All American Pipeline, L.P. *et al.* | | |

fishermen responded to the oil spill in largely the same way as they responded to the implementation of the MPAs.  *See id.* ¶ 17 (predicting that commercial fisherman experienced an average 10 percent decline in total revenue from the MPAs).  Lenihan identified specific "blocks" of the Santa Barbara channel where the spill likely impacted fish organisms, and conducted a Before-After-Control-Impact ("BACI") analysis of spiny lobster catches to demonstrate how he would perform the same analysis for other fish species.  *See id.* ¶¶ 26–30.

Defendants' motion to strike asks the Court to find that Lenihan's BACI modeling is based on unreliable data and methodologies.  *See Defendants' MTS* 12–13.  Given the strength and detail in Lenihan's declaration, however, the Court is unconvinced by Defendants' arguments.  Lenihan proposes to use data collected by the California Department of Fish and Wildlife ("CDFW") to compare the harvest before the spill for each of the targeted species in each of the identified fishing blocks.  *See Lenihan Decl.*, ¶¶ 5, 30–31.  Lenihan attests that fishing is a heavily regulated industry with extensive record-keeping requirements, and that CDFW records, based partly on the mandatory "fish tickets" or "landing receipts" that fishermen must complete after each trip, are a robust source of data.  *See id.* ¶ 29.  Lenihan confirms that his model tests for natural disturbances and variation among fish species, and that it can distinguish between the "dispersed, intermittent seeps" generally present throughout the area and the "acute, concentrated, high-volume release of crude oil" generally present in the aftermath of an oil spill.  *See id.* ¶¶ 29, 30–31, 37.  Given the number of control variables in Lenihan's model, the Court is convinced that it can serve as common proof of both causation and injury for the proposed class.  Lenihan also appears to have intimate knowledge of the practicalities of commercial fishing on the Santa Barbara coastline.  His declaration recognizes that, when fishermen are forced to move to a new fishing area, they may incur additional gasoline expenses and lost time "testing" the waters, even though they may ultimately end up with a substantially similar catch.  *See id.* ¶¶ 16–17.

In light of the above, the Court cannot conclude that Lenihan's declaration is unreliable, irrelevant, or that it would not assist the trier of fact in understanding the potential damage to Santa Barbara fisheries from the oil spill.  Defendants' motion to strike the Lenihan deposition is thus DENIED.

### d.     Randall Bell

Randall Bell is a principal at Landmark Research Group, LLC, a consulting and appraisal firm that specializes in real estate damage estimates.  *See Bell Decl.*, ¶ 3.  Bell contends that property owners and tenants pay "significant premiums" for "water amenities" like "beach frontage" and "ocean access," and that these premiums were completely lost for all home owners

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-4113 PSG (JEMx) | Date | February 28, 2017 |
|---|---|---|---|
| Title | Andrews *et al.* v. Plains All American Pipeline, L.P. *et al.* | | |

and tenants after the spill. *See id.*, ¶¶ 18–22, 36, 40, 58 ("The Plains Oil Spill environmentally damaged the beaches and oceans and effectively resulted in a loss of the ocean amenities for which numerous property owners and tenants pay a premium."), ("[T]he reasonable use of the valuable ocean amenity has been eliminated for a period of time due to the oil spill."). Bell assumes that all of the properties in the property owner class, which spans from Point Conception in Santa Barbara County to the eastern border of Malibu, "lost the reasonable use of the beach as a result of the Plains Oil Spill." *See id.* ¶ 64.

Although the Court is doubtful of Bell's broad-sweeping statement that all property owners in the target class suffered losses, the Court finds Bell's proposed methodology reasonably reliable to qualify Bell as an expert in this case. Bell proposes to use "mass appraisal technologies" to estimate the loss rental value of the properties in the subclass geographic area. *Bell Decl.*, ¶ 47. Bell does not use transactional data from home sales to show actual property damage to these properties. Rather, he proposes to use price as an independent variable in his statistical analysis, and square footage, lot size, age, room counts, pools, views, and other amenities as his independent variables. *Id.* ¶¶ 48, 54. Bell proposes to code the properties in terms of "ocean-front," "ocean private easement," "ocean close," and "ocean community (but not in close proximity)." *Id.* ¶¶ 68, 71.

Because Bell contends that the properties on the coastline have "similar use, market areas, environmental damages, and clean up timeframe," his model does not appear to account for differences between home owners who had significant amounts of oil deposited on their property and those without any oil at all, or properties that were occupied and those that were not. *See id.* ¶ 60. Instead, Bell conclusively states that all property owners on the 130-mile stretch "lost the reasonable use of the beach as a result of the Plains Oil Spill." *See id.* ¶ 64.

Although the Court ultimately finds that Bell's model cannot account for the significant variation in the property owner subclass in the Predominance discussion, the Court declines, at the *Daubert* phase, to exclude Bell as an expert given his qualifications and the wide acceptance of his mass appraisal methodology. The Court will thus DENY Defendants' motion to strike the Bell declaration and will consider Bell's testimony as part of its analysis.

e.    *Conclusion on Defendants' Motion to Strike*

Defendants moved to strike the declarations of Igor Mezić, Steve Roberts, Hunter Lenihan, and Randall Bell. Having considered all the papers and the arguments made at the hearing, the Court DENIES Defendants' motion.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-4113 PSG (JEMx) | Date | February 28, 2017 |
|---|---|---|---|
| Title | Andrews *et al.* v. Plains All American Pipeline, L.P. *et al.* | | |

2. *Proposed Subclasses*

Informed by the expert discussion in the previous section, the Court now turns to the core predominance inquiry to determine whether common questions predominate over uncommon questions for the four subclasses: fisheries and fish industry, property owners, the oil industry, and business tourism.

a.     *Fisheries and Fish Industry Subclass*

The first subclass contains fishers and those that purchased fish from the commercial fisherman who worked in designated areas of the Santa Barbara coastline.  Specifically, Plaintiffs define the class as:

> Persons or entities who owned or worked on a vessel that landed seafood within the California Department of Fish & Wildlife fishing blocks 651 to 657, 664 to 671, 681 to 683, as well as persons or entities who owned or worked on a vessel that landed groundfish, including but not limited to sablefish, halibut and rockfish, in fishing blocks 631 to 633, 637 to 639, 643 to 645, 658 to 659, and 684 to 690, between May 19, 2010 and May 19, 2015 and were in operation as of May 19, 2015, as well as those persons and businesses who purchased and re-sold commercial seafood so landed, at the retail or wholesale level, that were in operation as of May 19, 2015.

*Mot.* 5:27–6:7 ("Fisher Subclass").

To succeed at trial on each of the remaining claims, Plaintiffs in the fisheries subclass must show that the oil spill caused each member of the subclass to earn less profit relative to what they could have earned had the spill not occurred.  Plaintiffs rely on the expert testimony of Mezić, Lenihan, and Roberts to show that this inquiry is subject to common proof.  Earlier, the Court admitted these experts' declarations and found them reliable for showing that fishermen in the identified blocks expended more and earned less in the aftermath of the oil spill and may continue to earn less, given that fish quantities and size and the reputation of Santa Barbara fishers continues to rebound after the spill.  Because these experts control for other variables, including natural weather patterns, that may impact fisheries' profits, the Court is convinced that causation and injury for this subclass can be established with common proof.

To block certification, Defendants point to declarations from three of the lead fisheries Plaintiffs, Mike Gandall and Keith and Tiffani Andrews, in an attempt to show that some members of the class did not suffer injuries.  *See Tucker Decl.*, ¶¶ 46–47, 50, 52, 54–55;

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-4113 PSG (JEMx) | Date | February 28, 2017 |
|---|---|---|---|
| Title | Andrews *et al.* v. Plains All American Pipeline, L.P. *et al.* | | |

*Morrison Decl.*, ¶¶ 58–105.  The Court finds that Defendants' evidence is not conclusive on this point.  For example, Defendants argue that Mike Gandall, a commercial fisherman who fishes rock crab and California spiny lobster, earned more income in 2015 than 2013 and 2014 by moving to other fishing areas and focusing more on crab than lobster.  *See Gandall Decl.*, Ex. 7, ¶ 2.  An increase in income, however, does not necessarily mean an increase in profits, given that, as Lenihan points out, Gandall may have expended more gasoline traveling to areas away from the oil spill and may have spent more time on his boat testing fishing spots.  *See Lenihan Decl.*, ¶¶ 16–17; *see also Gandall Depo.* 253 (describing lobster fishing grounds that had been "destroyed"); *Andrews Depo.* 166, 247 (describing a sea cucumber fishery that "collapsed" in the area of oil spill).  As Gandall explains in his declaration:

> 9.   As a result of that decline [in lobster], I had to move my traps some 30 miles farther from the coastline, to locations near the Channel Islands.  This meant that I had to stay out at sea for several days at a time during the season, travel longer distances, and use more fuel.

> 10.   Probably because of limited availability, the price that I was able to get for spiny lobster during 2015 was as high as it has ever been in my years of fishing.  As a result, even though I caught fewer lobster than I typically do, my income in 2015 increased compared to the prior year.  However, I also worked more and longer days at sea, at a pace that was unsustainable for me.  And, it concerns me that the smaller population of lobster in this region may put the industry at risk in future years, if it cannot be fished and managed sustainably.

Gandall's declaration supports Plaintiffs' argument that one year's income does not necessarily establish that Gandall and similarly situated fisheries plaintiffs will not be harmed in the long-term by the spill.  If the fish in the new fishing spots do not replenish as quickly as the fish in the old spots, or if the remaining fish are less valuable on the market because of their size or species (replacing lobster with crab, for example), the long-term impact on fisheries may be significant.

Additionally, even if Defendants are correct that some members of the class cannot establish economic damages from the oil spill, recent Ninth Circuit cases counsel in favor of certifying the class.  *See Torres v. Mercer Canyons, Inc.*, 835 F.3d 1125, 1136 (9th Cir. 2016).  In *Torres*, for example, domestic farm workers brought a putative class action against a farm operator alleging that the operator failed to inform them of the availability of H-2A work at a higher pay rate.  *See id.* at 1134.  Defendant alleged that some members of the class were not harmed because they would not have taken up the offer to engage in H-2A labor even if they knew of the opportunity.  *Id.* at 1136–37.  The court admitted that "even a well-defined class

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-4113 PSG (JEMx) | Date | February 28, 2017 |
|---|---|---|---|
| Title | Andrews *et al.* v. Plains All American Pipeline, L.P. *et al.* | | |

may inevitably contain some individuals who have suffered no harm." *See id.* at 1136 (citing
*Messner v. Northshore Univ. Healthsystem*, 669 F.3d 802, 823 (7th Cir. 2012) ("[S]ome class
members' will fail on the merits if and when damages are decided, a fact generally irrelevant to
the district court's decision on class certification.")). It nonetheless affirmed the district court's
decision to certify the class keeping in mind that "the district court is well situated to winnow
out those non-injured members at the damages phase of the litigation, or to refine the class
definition." *See id.* at 1137 (citing Newberg on Class Actions § 2:3).

Similarly, in *Leyva v. Medline Industries Inc.*, the Ninth Circuit instructed that "damage
calculations alone cannot defeat certification." *See* 716 F.3d 510, 513 (9th Cir. 2013) (citing
*Yokoyama v. Midland Nat'l Life Ins. Co.*, 594 F.3d 1087, 1094 (9th Cir. 2010)). Other
California courts, and courts in this Circuit, have adopted similar reasoning. *See, e.g., Brinker
Rest. Corp. v. Superior Court*, 53 Cal. 4th 1004 (2012) ("In almost every class action, factual
determinations of damages to individual class members must be made. . . . Indeed, to decertify a
class on the issue of damages or restitution may well be effectively to sound the death-knell of
the class action device."); *Vaquero v. Ashley Furniture Indus., Inc.*, 824 F.3d 1150, 1155 (9th
Cir. 2016) ("[C]lass certification [may be] appropriate even though class members might have to
prove liability and damages individually." (citing *Tyson Foods*, 136 S. Ct. at 1046)); *Jiminez v.
Allstate Ins. Co.*, 765 F.3d 1161, 1167 (9th Cir. 2014) ("'[N]o matter how individualized the
issue of damages may be, determination of damages may be reserved for individual treatment
with the question of liability tried as a class action,' a position that it said held true even when
some consumers might have no harms at all." (citing *Butler v. Sears, Roebuck & Co.*, 727 F.3d
796, 801–02 (7th Cir. 2013)).

The Lenihan and Roberts declarations establish that causation and injury for the fisheries
subclass can be established class-wide. As in *Leyva*, where the court instructed the parties to
rely on "computerized payroll and time-keeping database" to establish damages by the class, fish
receipts and records from individual fisherman may be the substitute for such a mechanism here.
*See id.* at 514. Plaintiffs also attest to having retailer and wholesaler information for every
merchant that purchased fish at the dock. *See Reply* 20:11–16. Plaintiffs have also proposed a
method that would allow the Court to calculate individual economic damages at a separate phase
of the trial, where Defendants would also have an opportunity to challenge the damages claimed
by individual Plaintiffs.

In sum, the Court concludes that common questions predominate over uncommon
questions in the Fisher Subclass, and the subclass, as proposed, is sufficiently cohesive to merit
proceeding as a group. Plaintiffs should take note, however, that although the geographic
boundaries of the subclass as now defined appear to reasonably reflect the potential zone of the

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-4113 PSG (JEMx) | Date | February 28, 2017 |
|---|---|---|---|
| Title | Andrews *et al.* v. Plains All American Pipeline, L.P. *et al.* | | |

oil spill, the Court will not hesitate, as this case progresses, to winnow the class to only those fisherman that worked in the areas affected by the spill.

### b.    Property Owner Subclass

The second subclass contains people who owned or leased real property on the California coast within half a mile of the Pacific Ocean. Specifically, Plaintiffs define the class as:

> Persons or entities owning or leasing real property on the California coast within .50 miles of, or with deeded access to, the Pacific Ocean between Point Conception in Santa Barbara County and the eastern border of Malibu, California as of May 19, 2015.

*Mot.* 6:9–12.

This property owner subclass is too broadly defined for the Court to conclude that common questions predominate over uncommon questions. As defined, the subclass spans over more than 130-miles of coastline, including parts of the coastline where even Plaintiffs' expert admits oil never washed up. *See Opp.* 9:21–25; *see also Buchak Decl.*, ¶¶ 6–7. Moreover, Defendants point out that much of the oil that washed up on the coastline came not from Line 901, but from natural oil seeps in the area that regularly deposit some oil on beachfront properties. *See Boehm Decl.*, ¶¶ 25, 91 (predicting that natural seep oil seeps at an average of 100 to 600 barrels per day); *Bryant Decl.*, ¶¶ 36–43.

This subclass is expansive: it includes government and private-owned property, unoccupied and occupied homes, owners and tenants, undeveloped and developed land, and land where no oil spilled and land where it did. Although Plaintiff's expert, Randall Bell, believes that he can predict through statistical analysis the differences in rental use among the beachfront properties from assessing differences in the characteristics and location of the property, Bell's methodology does not purport to account for different types of damage to the property, including differences in the level of soiling and differences in the length of time the properties were affected by the spill. Because Bell's methodology sweeps broadly and concludes that all home owners along the shoreline lost the value of their beachfront property, the Court cannot conclude that this model will suffice as common proof of causation for the entire class.

The breadth of the subclass is even expansive when compared to the classes certified in other oil spill cases. *See, e.g., In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico on April 20, 2010*, 910 F. Supp. 2d 891, 919 (E.D. La. 2012); *Turner v. Murphy Oil*, 34 F.R.D. 597,

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-4113 PSG (JEMx) | Date | February 28, 2017 |
|---|---|---|---|
| Title | Andrews *et al.* v. Plains All American Pipeline, L.P. *et al.* | | |

615 (E.D. La. 2006); *see also Frieman v. San Rafael Rock Quarry*, 116 Cal. App. 4th 29, 41–42
(2004) (describing differences among homeowners that lead the court to decline to certify a class
of homeowners near a rock quarry).  Although the Deepwater Horizon oil spill covered more
geographic territory than the Santa Barbara spill, the Court in *Deepwater Horizon* was careful to
certify different subclasses of property owners; it did not lump all owners together as Plaintiffs
propose to do here.  For example, the *Deepwater Horizon* court certified three "property
damage" settlement subclasses that distinguished among coastal real property damage, wetlands
real property damage, and real property sales damage, and relied on a shoreline cleanup
assessment team to define boundaries.  *See* 910 F. Supp. 2d at 906–07.  The "coastal real
property damage" subclass, by way of example, included only those homes where oil was
actually observed and paid claimants differently based on whether the property included
"environmentally sensitive areas."  *See id.* at 907.

The *Deepwater Horizon* plaintiffs elected for a more narrowly defined class, and
developed an alternative claim procedure for parcels inadvertently excluded or misclassified.
*See id.*  The *Deepwater Horizon* court observed that "this carefully defined class facilitates the
satisfaction of predominance, as the class does not include remote claimants facing complicated
proof problems."  *See id.* at 923.  Plaintiffs here have elected to do the exact
opposite—deliberately defining the class too broadly and asking the Court to narrow it over
time.  Unlike the *Deepwater Horizon* court, the Court cannot conclude here that the class, as
proposed, will not face complicated proof problems.

Similarly, in *Murphy Oil*, the court narrowly defined the property subclass to the
neighborhood immediately surrounding the oil refinery.  *See* 34 F.R.D. at 603, 606, 611–16.
The court considered testimony from five different experts who conducted oil fingerprinting in
the neighborhood around the refinery.  *See id.* 611–16.  It further noted that all potential class
members had alleged that oil spilled on their property, and, given Hurricane Katrina, few, if any,
of the residents had been present at the time of the spill.  *Id.* at 603, 606.

Plaintiffs urge the Court to ignore the breadth of this subclass and to later revisit the class
definition when a fact finder determines where oil actually landed.  *See Reply* 6:25–27 ("To the
extent Mezić's model, based on updated data, shows that the oil reached only a subset of the
property currently in the proposed subclass, the Court may alter the subclass definition to reflect
that evidence."), 7:10–12 ("[A]djustments can be made during expert discovery before trial.").
At the hearing, Plaintiffs' counsel affirmed, "Today it's a problem.  Tomorrow it may not be."
Plaintiffs' "we'll fix it later" strategy does little to assure the Court that class certification is
warranted now, particularly when this subclass, unlike the fisheries subclass, spans more than
130 miles of the coastline and includes properties that even Plaintiffs' expert admits are not

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-4113 PSG (JEMx) | Date | February 28, 2017 |
|---|---|---|---|
| Title | Andrews *et al.* v. Plains All American Pipeline, L.P. *et al.* | | |

soiled.  The time for proving that the class is sufficiently cohesive is now, at class certification, not later, after Defendants have expended resources in conducting class-wide discovery.

Courts have refused to certify classes—even settlement classes—where the proposed class is broadly defined and includes potential diverse causes for plaintiffs' injuries.  *See Amchem*, 521 U.S. at 611, 624 (refusing to certify a settlement class of plaintiffs with advanced asbestos-related disease and plaintiffs that had not manifested disease at all (exposure only plaintiffs)); *Parko*, 739 F.3d at 1086 (refusing to certify a class where each plaintiff had a different diminution in the value of their home); *see also Mays v. Tennessee Valley Auth.*, 274 F.R.D. 614, 626–27 (E.D. Tenn. 2011) ("[I]ndividualized inquiries, such as whether coal ash is or was present on specific property . . . how each plaintiff's property interest and use and enjoyment of property has been impacted by the coal ash, and the extent of each plaintiff's damages, will predominate.").  The *Parko* court further recognized that homeowner injuries, unlike the injuries in small-claim consumer class action suits, may be more amenable to individual (or joined) suits rather than class actions.  *See* 739 F.3d at 1086 ("The damages may not be huge, but may well be sizeable enough for individual (or joined) suits to be a feasible alternative to class action.").

In light of the relevant case law and the failure of Plaintiffs' class certification evidence, the Court DENIES Plaintiffs' motion to certify the subclass of property owners.

### c.    *Oil Industry Subclass*

Plaintiffs next urge the Court to certify a subclass of people whose jobs were dependent on Lines 901 and 903.  Specifically, the class is defined as:

> Persons or entities who worked on or supported the oil platforms off the Santa Barbara coast, and whose jobs or businesses were dependent, in whole or in part, upon the functionality of Plains' Pipeline as of May 19, 2015.

*Mot.* 6:14–16.

Defendants challenge this class as overbroad because it not only includes persons who worked on the oil platforms for the oil extraction companies or companies that contract with oil platform operators, but all people whose "jobs or businesses were dependent, in whole or in part, upon the functionality of Plains' pipeline."  *See Opp.* 13:1–3.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-4113 PSG (JEMx) | Date | February 28, 2017 |
|---|---|---|---|
| Title | Andrews *et al.* v. Plains All American Pipeline, L.P. *et al.* | | |

The Court agrees that this subclass is overbroad. It potentially includes any business within the vicinity of the oil platforms, and businesses in communities with high concentrations of oil platform workers where much of the income in the community comes from the oil platforms. Although the Court has found Plaintiffs' damages expert, Steve Roberts, and his model acceptable under *Daubert*, the model does not account for the breadth of the subclass. It proposes that Plaintiffs will collect wage and hour information, as well as information on lay-offs and contracts cancelled and renegotiated, from oil platform operators, but it says nothing about businesses that have no formal contracts with the oil platform operators. *See generally Roberts Decl.* The subclass, as proposed, spans beyond what the Roberts model is capable of measuring.

The diversity in the subclass is not immaterial to Plaintiffs' claims; it is essential to what a fact-finder would need to determine liability for the subclass. To determine negligence, for example, the fact finder would need to find that the defendant owed the plaintiff a duty of care. *See Resolution Tr. Corp. v. Rossmoor Corp.*, 34 Cal. App. 4th 93, 101 (1995). A jury may very well conclude that Defendants owed some duty to the workers actually employed on the platforms, but not to the restaurant owners in the workers' home communities or those whose damages may have been caused by other factors, including poor performance or other declines in oil prices. *See Tucker Decl.*, ¶¶ 66–67 ("People lose their jobs for many reasons, including poor performance, absenteeism, violation of company policies, and larger economic factors such as declines in the world price of oil."). Given the potential scope of the subclass, the Court cannot conclude that it is sufficiently cohesive or that common questions would predominate over uncommon ones. *See Probe v. State Teachers' Ret. Sys.*, 780 F.2d 776, 780 (9th Cir. 1986) (recognizing that a class must not be vaguely defined and must be "sufficiently definite to conform to Rule 23").

Accordingly, the Court DENIES Plaintiffs' motion to certify the oil industry subclass.

### d. Business Tourism Subclass

The final subclass that Plaintiffs ask the Court to certify is a subclass of those employed in the tourism industry in Santa Barbara. Specifically, the definition includes:

> Businesses in operation on May 19, 2015 that provided services such as attracting, transporting, accommodating, or catering to the needs or wants of persons traveling to, or staying in, places outside their home community, located from the south coast of Santa Barbara County (from Gaviota to the eastern Santa Barbara

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-4113 PSG (JEMx) | Date | February 28, 2017 |
|---|---|---|---|
| Title | Andrews *et al.* v. Plains All American Pipeline, L.P. *et al.* | | |

County line) to the coastal zone of Ventura County (defined as the beach-harbor-
seaport area from the western Ventura County line to Point Mugu).

*Mot.* 6:18–23.  This subclass fails for largely the same reasons as the oil industry subclass
proposed above—it is overbroad.  Even if Roberts's model accounts for some tourism industry
harms—namely, the harms to hotels and restaurants—Plaintiffs have not shown that his model
can isolate the variables that might affect causation and damages among such a broad subclass.
Plaintiffs have not shown, for example, that they can control for factors such as quality of
service, reputation, advertising, and longevity of the business, or even that they can account for
the clean-up workers who used the area's lodging and restaurants after the spill.  *See Roberts
Decl.*, ¶ 33.  Plaintiffs have not even bothered to name the specific types of businesses included
in this subclass; they merely assert that the class includes anyone who "caters to" visitors.  As
currently defined, the subclass is broad enough to include *every* retail business from Santa
Barbara to Ventura.  *See Opp.* 9:7–19.

Again, the comparison to the *Deepwater Horizon* spill is instructive.  There, the court
certified a class for "business economic loss" that provided the court with a method for
differentiating among "people who changed jobs, people with multiple jobs, people with
seasonal jobs, individual periodic vendors, festival vendors, and people who were offered and
accepted employment but had their employment revoked."  *See* 910 F. Supp. 2d at 905–06.
Although the parties in *Deepwater Horizon* agreed to "presume[] causation for certain
industries," Defendants point out that the breadth of the Deepwater Horizon oil spill (3.2 million
barrels released) exhibited a more systematic reduction in occupancy and tourism to the Gulf
Coast region than the Santa Barbara spill (2,924 barrels released), and made such a presumption
more appropriate.  *See Sider* ¶¶ 37–46 (collecting data that suggests that hotel occupancy in
Santa Barbara was unaffected by the release as a result of the clean-up workers coming to area).
Suffice it to say that Plaintiffs' proposed method for discerning economic damages in the
tourism industry is not as detailed or as cohesive as that proposed in *Deepwater Horizon*.

The Court is further concerned that the members of the class are not readily identifiable.
It is difficult for the Court to see, for example, how Plaintiffs would tailor a class notice to every
business that "caters to" persons traveling to Santa Barbara County outside of their home
community.  Newberg's guide on class actions raised this particular concern in the context of
23(b)(3) litigation:

[T]he class definition must be clear and precise.  Definitions that are difficult to follow or
understand will leave absent class members unsure of their standing in regard to the
litigation.  The Due Process Clause requires that (in (b)(3) class actions) absent class

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-4113 PSG (JEMx) | Date | February 28, 2017 |
|---|---|---|---|
| Title | Andrews *et al.* v. Plains All American Pipeline, L.P. *et al.* | | |

members receive notice of the litigation and an opportunity to participate and exclude
themselves. But if the class definition is murky and a potential class member cannot
ascertain whether she is or is not a member of the class, she will not know how to
proceed, a situation raising due process concerns.

*See* Newberg on Class Actions § 7:27. Again, the Court is at a loss as to how Plaintiffs would
provide notice to such a broadly defined class.

Accordingly, the Court DENIES Plaintiffs' motion to certify a subclass of businesses that
attract, transport, accommodate, and cater to tourists in the Santa Barbara region.

> *e.*    *Conclusion: Predominance*

Plaintiffs have not shown that common questions predominate over uncommon questions
for the proposed property owner, oil industry, and tourism subclasses. The Court therefore
DENIES Defendants' motion to certify these classes.

However, the Court has found that common questions predominate over uncommon
questions for the proposed fisheries subclass. The Court therefore will continue to assess
whether the fisheries subclass meets superiority—the second requirement of Rule 23(b)(3)—and
whether it also satisfies the four requirements of Rule 23(a).

> *ii.*    *Superiority*

Having established that Plaintiffs have only proven predominance for one of the four
proposed subclasses (the fisheries subclass), the Court now assesses whether class action
litigation is a superior method for adjudicating the claims of this subclass. This "superiority"
requirement is the second requirement for certification under Rule 23(b)(3). To demonstrate
superiority, Plaintiffs must show that a class action is "superior to other available methods for
fairly and efficiently adjudicating the controversy." *See Briseno*, 844 F.3d at 1127. The
superiority analysis "specifically mandates that courts consider 'the likely difficulties in
managing a class action.'" *See id.* It requires the Court to consider four non-exhaustive factors.

The first factor is the interest of each member in "individually controlling the prosecution
or defense of separate actions." Fed. R. Civ. P. 23(b)(3)(A). Where damages suffered by each
putative class member are not large, this factor weighs in favor of certifying a class action. *See
Zinser v. Accuflix Research Institute, Inc.*, 253 F.3d 1180, 1190–91 (9th Cir. 2001). Although
the members of the fisheries subclass likely incurred greater damages than the typical plaintiff in

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-4113 PSG (JEMx) | Date | February 28, 2017 |
|---|---|---|---|
| Title | Andrews *et al.* v. Plains All American Pipeline, L.P. *et al.* | | |

a consumer class action who claims no more than a small premium for a consumer good, the damages in the class are still relatively small. For plaintiffs like Gandall and the Andrews, who were able to move to new fishing areas or fish different species, economic damages may be nonexistent or may be limited to the fuel costs of traveling to a different fishing location. In any event, the Court is convinced that the cost of pursuing the claims on an individual basis and the limited benefit, for at least the fisheries subclass, counsels in favor of proceeding as a group. *See id.*

The second factor is "the extent and nature of any litigation concerning the controversy already commenced by or against members of the class." Fed. R. Civ. P. 23(b)(3)(B). If the court finds that several other actions are already pending and there is a risk of inconsistent adjudications, "a class action may not be appropriate since, unless the other suits can be enjoined." *See id.* at 1191 (citing 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1780 at 568–70 (2d ed. 1986)). Although the Court is currently presiding over four other lawsuits related to the Santa Barbara oil spill, *see, e.g.*, *Blue Water Boating, Inc. v. Plains All American Pipeline, LP*, CV 16-3282 PSG (JEMx); *Grey Fox, LLC et al. v. Plains All American Pipeline LP et al.*, CV 16-3157 PSG (JEMx); *Venoco Inc. v. Plains Pipeline LP*, CV 16-2988 PSG (JEMx); *Staben v. Plains All American Pipeline, L.P. et al.*, CV 16-1521, none of these lawsuits appear to include members of the fisheries subclass. This factor too thus weighs in favor of superiority.

The third factor is "the desirability or undesirability of concentrating the litigation of the claims in the particular forum." Fed. R. Civ. P. 23(b)(3)(C). Defendants suggest that the Oil Pollution Act ("OPA") claims process and the OPA natural resources damage assessment ("NRDA") process provide superior methods for compensating the class. *See Opp.* 15:20–19:14. The Court disagrees. Courts have considered OPA and found it inferior to Rule 23 class actions because the party responsible for the oil spill is also the party that adjudicates the claims—at least on the first round of review. *See, e.g.*, *Deepwater Horizon*, 910 F. Supp. 2d at 920; *Murphy Oil*, 234 F.R.D. at 604. The OPA claims process also cannot account for the long-term effects of the oil spill.[4] *See Reply* 17:3–15. For its part, the NRDA requires the

---

[4]    Defendants argue that certification would deny class members the ability to bring OPA claims. *See United States ex rel. Barajas v. Northrup Corp.*, 147 F.3d 905, 909 (9th Cir. 1998) (*res judicata*). The Court sees no reason to believe that this would be the case, given that OPA allows states to supplement the legal rights provided through OPA. *See* 33 U.S.C. §§ 2718(a)(1)(A); 2718(c)(1) ("Nothing in this Act . . . shall in any way affect, or be construed to affect, the authority of the United States or any State or political subdivision thereof to impose additional liability or additional requirements related to the discharge, or substantial threat of a

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-4113 PSG (JEMx) | Date | February 28, 2017 |
|---|---|---|---|
| Title | Andrews *et al.* v. Plains All American Pipeline, L.P. *et al.* | | |

responsible party to work with experts to return injured natural resources and services to baseline and compensate the public.  *See* 15 C.F.R. § 990.14.  However, the NRDA does not require Defendants to make individual payments to effected fishermen.  *See id.* 18:9–17.  In discrediting the alternative methods forward, Plaintiffs have shown the propriety of proceeding with this litigation in this particular forum.

The fourth factor is "the difficulties likely to be encountered in the management of the class action." Fed. R. Civ. P. 23(b)(3)(D).  "[W]hen the complexities of class action treatment outweigh the benefits of considering common issues in one trial, class action treatment is not the 'superior' method of adjudication."  *Zinser*, 253 F.3d at 1193.  In the predominance inquiry, the Court already concluded that individual members of the fisheries subclass will not have to litigate numerous and substantial separate issues to recover individually.  *See id.*  Although the assessment of economic damages may deserve a separate phase of trial or other claims procedures, courts in the Ninth Circuit have recognized that the calculation of damages alone is not enough to defeat the class.  *See Leyva*, 716 F.3d at 513 (9th Cir. 2013) (citing *Yokoyama*, 594 F.3d at 1094)).

In sum, the Court concludes that the fisheries subclass meets both the predominance and superiority requirements of Rule 23(b)(3).  The other proposed subclasses fail at the predominance inquiry.

E.    Rule 23(a)

The Court now turns to assess whether the fisheries subclass—the only subclass that satisfies a Rule 23(b) inquiry—also meets the four requirements of Rule 23(a).  The Court takes the four requirements—numerosity, commonality, typicality, and adequacy—in turn.

        *i.    Numerosity*

Rule 23(a)(1) requires that "the class is so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  There is no fixed number which satisfies the numerosity requirement; it "requires an examination of the specific facts of each case and imposes no absolute limitations."  *Gen. Tel. Co. of the Nw., Inc. v. EEOC*, 446 U.S. 318, 330 (1980).  In general, however, "courts find the numerosity requirement satisfied when a class includes at least 40 members."  *Rannis v. Recchia*, 380 Fed. App'x 646, 651 (9th Cir. 2010)

discharge, of oil.").

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-4113 PSG (JEMx) | Date | February 28, 2017 |
|---|---|---|---|
| Title | Andrews *et al.* v. Plains All American Pipeline, L.P. *et al.* | | |

(citing *EEOC v. Kovacevich "5" Farms*, No. CV-5-06-165, 2007 WL 1174444, at *21 (E.D. Cal. Apr. 19, 2007)). Plaintiffs assert that the proposed fisheries subclass contains more than 100 class members, *see Mot.* 7:13–16 (citing *Lilygren Decl.*, Ex. 14, ¶ 5), and Defendants have given the Court no reason to question this assertion. The Court therefore finds that the numerosity element is satisfied for the fisheries subclass.

       *ii.*    *Commonality*

Under Rule 23(a)(2), Plaintiffs must show that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). This means that the class members' claims must "depend on a common contention." *Dukes*, 564 U.S. at 350. "What matters to class certification . . . is not the raising of common 'questions'—even in droves—but rather, the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Id.* (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 131–32 (2009)). "[E]ven a single [common] question will do." *Dukes*, 564 U.S. at 359 (internal citations omitted). Thus, Rule 23(a)(2) requires not just a common question, but one that is "capable of class-wide resolution." *Alcantar v. Hobart Service*, 800 F.3d 1047, 1053 (9th Cir. 2015) (quoting *Wal-Mart*, 564 U.S. at 350).

Plaintiffs contend that the commonality requirement is satisfied because the litigation will produce "common answers to the critical liability questions." *Mot.* 8:9–15. Plaintiffs list a number of common questions for the litigation, including:

    (1) whether Plains is a "responsible party" under the Lempert-Keene-Seastrand Oil Spill Prevention Act; (2) whether the mixture of toxic chemicals and liquid Plains' transported through its Pipeline constitutes oil under Lempert-Keene; (3) whether Plains' transportation of oil in its Pipeline constitutes an ultrahazardous activity; and most crucially, (4) whether Plains acted negligently, recklessly, and/or maliciously with regard to the design, inspection, repair, and/or maintenance of the pipeline.

*Mot.* 8:17–24. Because Defendants do not contest Plaintiffs' assertion that the litigation will result in at least one common answer to these questions and the Court is convinced that the litigation will produce at least one common answer, the Court finds that commonality is satisfied.

       *iii.*    *Typicality*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-4113 PSG (JEMx) | Date | February 28, 2017 |
|---|---|---|---|
| Title | Andrews *et al.* v. Plains All American Pipeline, L.P. *et al.* | | |

Rule 23(a)(3) requires the named Plaintiffs' claims to be typical of the claims of the class. Fed. R. Civ. P. 23(a)(3). "Under the rule's permissive standards, representative claims are 'typical' if they are reasonably co-extensive with those of absent class members, [but] they need not be substantially identical." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998). The danger that this requirement is meant to guard against is whether "absent class members will suffer if their representative is preoccupied with [claims or defenses] unique to it." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 984 (9th Cir. 2011) (internal quotations and citations omitted). To meet the typicality requirement, plaintiffs must therefore establish that other class members have the same or similar injury as them; the action is based on conduct that is not unique to them as the named Plaintiffs; and other class members have been injured by the same course of conduct. *See id.*; *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010).

The fisheries subclass is made up of six lead fisher Plaintiffs: Keith and Tiffani Andrews, who fish sea cucumbers; Morgan Castagnola, who fishes shrimp and halibut; the Eagle Fleet LLC, which fishes black cod and halibut; Mike Gandall, who fishes rock crab and California spiny lobster; and Ocean Angel IV, LLC, which fishes squid. *See Mot.* 9:14–18 (citing Plaintiffs' declarations). It also includes seven Plaintiffs that purchased seafood along the Central Coast for processing or retail: Ocean Angel IV, LLC; Pacific Rim Fisheries, Inc.; Community Seafood LLC; Hwa Hong Muh; Santa Barbara Uni, Inc.; Southern Cal Seafood, Inc.; and Wei International Trading, Inc. *See id.* 10:4–9. Plaintiffs assert that the class members are typical of the class because "these companies lost income as a result of the oil spill because the fisheries on which the fishers relied for their catch were closed or had diminished supply, and faced reputational impacts." *See id.* 10:9–12; *see also id.* 9:20–23. Defendants do not challenge the typicality of the lead Plaintiffs, although they point out, in their predominance discussion, that the Andrews and Gandall may have earned more income in 2015—the year of the oil spill—then in 2013 and 2014.

The Court is concerned that if the lead Plaintiffs did in fact earn more profits after the oil spill than they did before it, they may not be "typical" of the class and the parties may spend time at trial litigating the defenses of these Plaintiffs rather than the general claims of the class. Nonetheless, the Court cannot conclude now, based on the sparse information before it, whether, in fact, these Plaintiffs earned less income in 2016, or whether their net profits (income minus expenses) suffered as a result of the spill as they were forced to look for new places and species to fish, expended longer hours fishing, and perhaps, earned less through fishing sales because of either the size of the fish or the willingness of third-parties to purchase fish from Santa Barbara. For now, the Court is satisfied that the class representatives' claims and damages are fairly similar, if not identical, to the claims of the other class members, and that the theories of liability

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-4113 PSG (JEMx) | Date | February 28, 2017 |
|---|---|---|---|
| Title | Andrews *et al.* v. Plains All American Pipeline, L.P. *et al.* | | |

among the fisheries subclass are alike.  Accordingly, the Court finds that the typicality element
of Rule 23(a) is satisfied.

     *iv.*   *Adequacy*

    Rule 23(a)(4) requires Plaintiffs to show that "the representative parties will fairly and
adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  Representation is
adequate when the class representatives do not have any conflicts of interest with other class
members, and the Court is confident that the representative plaintiffs will prosecute the action
"vigorously on behalf of the class."  *See, e.g.*, *Evon v. Law Offices of Sidney Mickell*, 688 F.3d
1015, 1031 (9th Cir. 2012).  A district court should evaluate whether the class representatives
have a sufficient stake in the outcome of the litigation, and whether the class representatives
have interests antagonistic to the unnamed class members.  *See Brown v. Ticor Title Ins.*, 982
F.2d 386, 390 (9th Cir. 1992).  In addition, the district court should inquire into the zeal and
competence of class representatives' counsel.  *See id.*

    Defendants argue that the lead Plaintiffs are not adequate representatives of the class
because they abandoned claims that some absent class members would have pursued.  *See Opp.*
22:16–19 ("[T]he class representatives have discarded many claims that might be advanced by
absent class members because those claims cannot be certified."); *see also id.* 23:1–7 ("Plaintiffs
have tossed [the claims] overboard with no regard for whether discarding such claims is in the
best interests of class members they purport to represent.").  Because this argument ignores the
practicalities of class action litigation, the Court is unconvinced.  As Plaintiffs point out, "opting
not to assert certain claims may be an essential part of adequate representation."  *See Reply*
3:1–3 (citing *Petersen v. Costco Wholesale Co.*, 312 F.R.D. 565, 578 (C.D. Cal. 2016)).  The
Court is in agreement.  It will not here second-guess the lead Plaintiffs' strategic decisions,
particularly since Plaintiffs have pursued a number of theories of liability and have vigorously
asserted the interests of the class, both in a challenge to Defendants' claims process and in
opposition to Defendants' earlier motion to dismiss.

    None of the proposed class representatives appear to have interests that would be counter
to those of other plaintiffs in this matter.  Rather, apart from the concerns about the Andrews and
Gandall already raised by the Court, the representatives' claims appear to be fairly representative
of those raised by other plaintiffs and the lead Plaintiffs appear committed to pursuing this
action.  *See, e.g.*, *Gandall Decl.*, ¶¶ 12–13; *Andrews Decl.*, ¶¶ 16, 19; *Castagnola Decl.*, ¶¶
10–11.  Similarly, it appears that proposed class counsel also do not have conflicts with the
class.  The Court thus finds that the proposed class representatives and counsel can fairly and
adequately represent a proposed class of plaintiffs in this matter under Rule 23(a)(4).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-4113 PSG (JEMx) | Date | February 28, 2017 |
|---|---|---|---|
| Title | Andrews *et al.* v. Plains All American Pipeline, L.P. *et al.* | | |

v.    *Conclusion*

In summary, the Court finds that Plaintiffs have met the requirements of Rule 23(a) and Rule 23(b)(3) for the proposed fisheries subclass. As such, the Court certifies the following class to pursue this class action:

> Persons or entities who owned or worked on a vessel that landed seafood within the California Department of Fish & Wildlife fishing blocks 651 to 657, 664 to 671, 681 to 683, as well as persons or entities who owned or worked on a vessel that landed groundfish, including but not limited to sablefish, halibut and rockfish, in fishing blocks 631 to 633, 637 to 639, 643 to 645, 658 to 659, and 684 to 690, between May 19, 2010 and May 19, 2015 and were in operation as of May 19, 2015, as well as those persons and businesses who purchased and re-sold commercial seafood so landed, at the retail or wholesale level, that were in operation as of May 19, 2015.

> Excluded from the Class are: Defendants, any entity or division in which Defendants have a controlling interest, and their legal representatives, officers, directors, employees, assigns and successors; (2) the judge to whom this case is assigned, the judge's staff, and any member of the judge's immediate family; and (3) businesses that contract directly with Plains for use of the Pipeline.

F.    Appointment of Class Counsel

The only task remaining for the Court is the appointment of class counsel. Under Rule 23(g) of the Federal Rules of Civil Procedure, a district court must appoint class counsel at the time the class is certified, unless otherwise provided by statute. *See* Fed. R. Civ. P. 23(g). The class counsel must fairly and adequately represent the interests of the class, and the court must review the counsel's work in investigating claims, experience in handling class action litigation, and the resources counsel will commit to representing the class. *See* Rule 23(g)(1)(B–C).

The Court sees no reason not appoint the interim class counsel as lead counsel for the fisheries plaintiffs in this case. Thus far, these attorneys have applied their experience and resources to litigate their clients' claims and will serve well as class counsel. Lead counsel shall include: Robert J. Nelson of the firm Lieff, Cabraser, Heimann & Bernstein, LLP; Lynn Sarko and Juli Farris of Keller Rohrback L.L.P.; A. Barry Cappello of the firm Cappello & Noel; and William M. Audet of Audet & Partners.

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 15-4113 PSG (JEMx) | Date | February 28, 2017 |
|---|---|---|---|
| Title | Andrews *et al.* v. Plains All American Pipeline, L.P. *et al.* | | |

III.   Conclusion

Having reviewed the class certification papers and heard the arguments made at the hearing, the Court GRANTS IN PART and DENIES IN PART Plaintiffs' motion for class certification.  Specifically, the Court:

- CERTIFIES the fisher and fish industry subclass under Rule 23(b)(3), but DENIES Plaintiffs' certification under Rule 23(b)(3) for the property owner, oil industry, and tourism industry subclasses because Plaintiffs have not shown that those classes satisfy the Rule's predominance requirement.

- DENIES Plaintiffs' motion for class certification under Rule 23(b)(2), given that the Court has found that a single injunction cannot be crafted to meet the class's varying needs.

- APPOINTS, under Rule 23(g), counsel at Lieff, Cabraser, Heimann & Bernstein, LLP, Keller Rohrback, L.L.P., Cappello & Noel, and Audet & Partners as lead counsel for the fisheries subclass.

To reach this ruling, the Court DENIED Defendants' motion to strike Plaintiffs' experts declarations and DENIED Plaintiffs' motion to strike Defendants' experts.  To the extent the Court considered Defendants' expert declarations, the Court overruled Plaintiffs' objections for purposes of this motion only.  Plaintiffs may renew their objections in subsequent motions or at trial.

**IT IS SO ORDERED.**