| | |
|---|---|
| 1 | Robert L. Lieff (CSB No. 037568) |
| | Elizabeth J. Cabraser (CSB No. 083151) |
| 2 | Robert J. Nelson (CSB No. 132797) |
| | Sarah R. London (CSB No. 267083) |
| 3 | Wilson M. Dunlavey (CSB No. 307719) |
| | **LIEFF CABRASER HEIMANN &** |
| 4 | **BERNSTEIN, LLP** |
| | 275 Battery Street, 29th Floor |
| 5 | San Francisco, CA 94111-3339 |
| | Telephone: (415) 956-1000 |
| 6 | Facsimile: (415) 956-1008 |

| | | |
|---|---|---|
| 7 | Lynn Lincoln Sarko | A. Barry Cappello (CSB No. 037835) |
| | (*Admitted Pro Hac Vice*) | Leila J. Noël (CSB No. 114307) |
| 8 | Gretchen Freeman Cappio | Lawrence J. Conlan (CSB No. 221350) |
| | (*Admitted Pro Hac Vice*) | David Cousineau (CSB No. 298801) |
| 9 | Daniel Mensher | **CAPPELLO & NOËL LLP** |
| | (*Admitted Pro Hac Vice*) | 831 State Street |
| 10 | **KELLER ROHRBACK L.L.P.** | Santa Barbara, CA 93101-3227 |
| | 1201 Third Ave., Suite 3200 | Telephone: (805) 564-2444 |
| 11 | Seattle, WA 98101 | Facsimile: (805) 965-5950 |
| | Telephone: (206) 623-1900 | |
| 12 | Facsimile: (206) 623-3384 | *Lead Trial Counsel* |
| 13 | Juli Farris (CSB No. 141716) | William M. Audet (CSB No. 117456) |
| | Matthew J. Preusch (CSB No. 298144) | **AUDET & PARTNERS, LLP** |
| 14 | Lisa Faye Petak (CSB No. 300914) | 711 Van Ness Avenue, Suite 500 |
| | **KELLER ROHRBACK L.L.P.** | San Francisco, CA 94102-3275 |
| 15 | 1129 State Street, Suite 8 | Telephone: (415) 568-2555 |
| | Santa Barbara, CA 93101 | Facsimile: (415) 568-2556 |
| 16 | Telephone: (805) 456-1496 | |
| | Facsimile: (805) 456-1497 | |

*Lead Counsel for Plaintiff Class*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| 20 | KEITH ANDREWS, an individual, TIFFANI ANDREWS, an individual, BACIU FAMILY LLC, a California limited liability company, ROBERT BOYDSTON, an individual, CAPTAIN JACK'S SANTA BARBARA TOURS, LLC, a California limited liability company, MORGAN CASTAGNOLA, an individual, THE EAGLE FLEET, LLC, a California limited liability company, ZACHARY FRAZIER, an individual, MIKE GANDALL, an individual, ALEXANDRA B. GEREMIA, as Trustee for the Alexandra Geremia Family Trust dated 8/5/1998, JIM GUELKER, an individual, JACQUES HABRA, an | **Case No. 2:15-cv-04113-PSG-JEM**<br><br>[Consolidated with Case Nos. 2:15-CV-04573 PSG (JEMx), 2:15-CV-4759 PSG (JEMx), 2:15-CV-4989 PSG (JEMx), 2:15-CV-05118 PSG (JEMx), 2:15-CV- 07051-PSG (JEMx)]<br><br>**REBUTTAL DECLARATION OF RANDALL BELL, PHD, MAI IN SUPPORT OF RENEWED MOTION FOR CLASS CERTIFICATION AND IN OPPOSITION TO PLAINS' MOTION TO STRIKE** |

| | | |
|---|---|---|
| 1 | individual, ISURF, LLC, a California limited liability company, MARK KIRKHART, an individual, MARY KIRKHART, an individual, RICHARD LILYGREN, an individual, HWA HONG MUH, an individual, OCEAN ANGEL IV, LLC, a California limited liability company, PACIFIC RIM FISHERIES, INC., a California corporation, SARAH RATHBONE, an individual, COMMUNITY SEAFOOD LLC, a California limited liability company, SANTA BARBARA UNI, INC., a California corporation, SOUTHERN CAL SEAFOOD, INC., a California corporation, TRACTIDE MARINE CORP., a California corporation, WEI INTERNATIONAL TRADING INC., a California corporation and STEPHEN WILSON, an individual, individually and on behalf of others similarly situated,<br><br>    Plaintiffs,<br><br>v.<br><br>PLAINS ALL AMERICAN PIPELINE, L.P., a Delaware limited partnership, PLAINS PIPELINE, L.P., a Texas limited partnership, and JOHN DOES 1 through 10,<br><br>    Defendants. | Date: February 5, 2018<br>Time: 1:30 p.m.<br>Location: Courtroom 6A<br>Judge: Hon. Philip S. Gutierrez | |

REBUTTAL DECL. OF RANDALL BELL IN SUPPORT OF RENEWED MOTION FOR CLASS CERTIFICATION AND IN OPPOSITION TO MOTION TO STRIKE

I, Randall Bell, Ph.D., MAI declare:

1. I submitted three prior declarations in this matter: Declaration of Randall Bell, Ph.D., MAI in Support of Plaintiffs' Motion for Class Certification [Dkt. #125], Rebuttal Declaration of Randall Bell, Ph.D., MAI [Dkt. #214], and Declaration of Randall Bell, Ph.D., MAI in Support of Plaintiffs' Renewed Motion for Class Certification [Dkt. # 300-3]. I submit this further Declaration to respond to certain statements made by Defendants and their consultants.

2. In my original declarations, I described, from an appraisal perspective, how loss of use damages for impacted property owners and lessees can be calculated. Specifically, I described how, based on my experience and research for this case, any harm to property owners and lessees can be quantified and why such losses can be quantified through mass appraisal techniques.

3. I have read Plains' motion to strike and opposition to the renewed motion for class certification, as well as the declarations and depositions of Jerry Dent and Nancy Mathiowetz, and I disagree with their criticisms of my work. Relevant extracts of my deposition transcript cited in this declaration are attached as Exhibits to the concurrently filed Declaration of Juli Farris.

4. First of all, it is incorrect to say that my methodology in this case measures stigma damages or lost property value. I explained this repeatedly to Plains counsel at my deposition on August 16, 2017. See Deposition of Randall Bell, Aug. 16, 2017 ("Bell Dep.") at 19:13-17; 118:17-24; 275:7-276:3. To be clear, loss of use of a water or beach amenity falls within the "use" element of USPAP Advisory Opinion 9. And, as I explained in my prior declaration at ¶¶ 58-60, use effects reflect impacts on the utility of a site as a result of contamination, and rental rates provide an appropriate measure of loss of use. It is incorrect to characterize loss of use as "temporary decrease in property value." Loss of use is different from "risk" effects, or stigma, which concerns impacts on property value due to environmental risk. In sum, there is a distinct difference between "loss of

1 use" (which I am measuring) and "diminution in value" (which I am not
2 measuring).

3     5.    Second, Plains and its consultants appear to be missing the point of my
4 field surveys. Although the surveys conducted here were relatively informal, I am
5 qualified to design and conduct formal scientific surveys. While earning my
6 Ph.D., I completed coursework and trained in statistics and survey methodology. I
7 am also well-versed in performing less formal field surveys, or market
8 verifications, in connection with real estate appraisal work. I have published
9 written work that includes discussions about conducting formal and informal
10 surveys in the context of real estate appraisals.

11     6.    As a real estate economist and licensed appraiser, I routinely design
12 and conduct informal surveys to reconcile market data like I did in this case. All
13 surveys that I design and conduct, whether informal market verifications like those
14 used here, or formal scientific surveys, conform to professional standards
15 applicable to mass appraisals.

16     7.    As I testified at my deposition in August, the field surveys in this case
17 were used to generally verify the findings of Igor Mezic, the industry literature
18 regarding the effects of environmental contamination on property owners and
19 lessees, and media reports of Plains' oil spill. Bell Dep. 37:5-23; 40:24-42:14;
20 45:6-25; 248:22-249:3. These types of surveys are commonly used by licensed
21 appraisers in any assignment from as simple as appraising a house to something
22 more complex like this case. *Id*. The field surveys provide *additional* evidence of
23 the impact of the Plains oil spill. The point is to get out in the field and verify
24 data, and the surveys were not designed to be scientific. Bell Dep. 251:18-252:22.

25     8.    As I explained further at my deposition, the beach survey respondents
26 were selected because, in my professional experience, beachgoers have opinions
27 as to what level of oiling is acceptable to them. Beachgoers, in my opinion, are a
28 relevant source of data regarding beach oiling. Bell Dep. 42:15-43:11; 159:14-

160:5. Moreover, in my professional experience, it has always been my understanding that the tolerance for oiling on beaches does not vary materially from beach to beach or state to state.

9. As I further explained at my deposition, the 300-person plus neighborhood survey was intended to verify what I learned from Professor Mezic and media reports with people in the neighborhoods near the beaches. Bell Dep. 230:1-15; 231:7-15.

10. I did not intend either survey to identify specific properties that were impacted, and I did not rely on them for that purpose. Bell Dep. 230:24-231:6.

11. I understand that Plains' consultant Nancy Mathiowetz criticized me for not "pretesting" the field surveys, but pretesting is not necessary for this type of survey, and as I testified, no refinements were done when the surveys were taken (Bell Dep. 161:13-23) which tells me that there were no problems with the questions or how they were being asked.

12. In designing the beach survey, I worked with my colleague Valeo Shultz, who is also an MAI appraiser, and we discussed the materials received from NOAA and the levels of oiling that Professor Mezic determined at various beaches. Mr. Shultz has done surveys in appraisal work for many years. Bell Dep. 11:21-12:1; 168:12-25.

13. As I explained to Plains' counsel, I asked a graphic artist to put together the drawings to reflect the levels of oiling described in the NOAA manual and to superimpose a footprint on each of the graphics. Bell. Dep. 183:10-184:14. I asked Mr. Shultz to randomly sample beachgoers in Southern California and show them the graphics in the order showing least oiling to most. Bell Dep. 169:11-170:5. I am confident, based on my professional relationship with Mr. Schultz and his extensive experience designing and conducting surveys, that he did not vary from the questions written down in the surveys. *Id*.; 176:1-11.

1  14. As I explained to Plains' counsel at my deposition, I understand that a band of oil on a beach fluctuates in and out as the tide rises and falls. The beach survey graphics were not meant to suggest, and I do not believe they do, that the "entire beach" was covered with the amount of oil depicted in the graphics used in the surveys. Bell Dep. 191:5-192:6.

15. Finally, Plains misconstrues the loss of use analysis on another point even though I explained this at my deposition. Loss of use here is not limited to loss of use of public beaches, but also includes loss of use of private property. For example, where Plains' oil washed up above the mean high tide line, then beachfront and beach easement properties have lost use of a private beach as well as a public beach. Bell Dep. 76:9-78:10; 282:7-22.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed at Laguna Beach, California, this ___ day of December, 2017.

/s/ _____
RANDALL BELL, PHD, MAI