1 | Robert L. Lieff (CSB No. 037568)
Elizabeth J. Cabraser (CSB No. 083151)
2 | Robert J. Nelson (CSB No. 132797)
Nimish R. Desai (State Bar No. 244953)
3 | Wilson M. Dunlavey (CSB No. 307719)
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
4 | 275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
5 | Telephone:  (415) 956-1000
Facsimile:   (415) 956-1008
6 |

| | |
|---|---|
| Lynn Lincoln Sarko | A. Barry Cappello (CSB No. 037835) |
| (*Admitted Pro Hac Vice*) | Leila J. Noël (CSB No. 114307) |
| Gretchen Freeman Cappio | Lawrence J. Conlan (CSB No. 221350) |
| (*Admitted Pro Hac Vice*) | **CAPPELLO & NOËL LLP** |
| Daniel Mensher | 831 State Street |
| (*Admitted Pro Hac Vice*) | Santa Barbara, CA 93101-3227 |
| Ray Farrow | Telephone:  (805) 564-2444 |
| (*Admitted Pro Hac Vice*) | Facsimile:  (805) 965-5950 |
| **KELLER ROHRBACK L.L.P.** | |
| 1201 Third Ave., Suite 3200 | *Lead Trial Counsel* |
| Seattle, WA 98101 | |
| Telephone:  (206) 623-1900 | |
| Facsimile:   (206) 623-3384 | William M. Audet (CSB No. 117456) |
| | Ling K. Kuang (CSB No. 296873) |
| Juli Farris (CSB No. 141716) | **AUDET & PARTNERS, LLP** |
| Matthew J. Preusch (CSB No. 298144) | 711 Van Ness Avenue, Suite 500 |
| **KELLER ROHRBACK L.L.P.** | San Francisco, CA  94102-3275 |
| 801 Garden Street, Suite 301 | Telephone:  (415) 568-2555 |
| Santa Barbara, CA 93101 | Facsimile:   (415) 568-2556 |
| Telephone:  (805) 456-1496 | |
| Facsimile:   (805) 456-1497 | |

*Class Counsel*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KEITH ANDREWS, an individual, TIFFANI ANDREWS, an individual, BACIU FAMILY LLC, a California limited liability company, ROBERT BOYDSTON, an individual, MORGAN CASTAGNOLA, an individual, THE EAGLE FLEET, LLC, a California limited liability company, ZACHARY FRAZIER, an individual, MIKE GANDALL, an individual, ALEXANDRA B. GEREMIA, as Trustee for the Alexandra Geremia Family Trust dated 8/5/1998, JIM GUELKER, an individual, JACQUES HABRA, an individual, MARK KIRKHART, an individual, MARY KIRKHART, an individual, RICHARD LILYGREN, an individual, HWA HONG | **Case No. 2:15-cv-04113-PSG-JEM** [Consolidated with Case Nos. 2:15-CV- 04573 PSG (JEMx), 2:15-CV-4759 PSG (JEMx), 2:15-CV-4989 PSG (JEMx), 2:15-CV-05118 PSG (JEMx), 2:15-CV- 07051- PSG (JEMx)] **PLAINTIFFS' NOTICE OF MOTION AND MOTION TO AMEND ORDER CERTIFYING FISHER CLASS PURSUANT TO RULE 23(c)(1)(C)** Date:        November 18, 2019 Time:        1:30 p.m. Judge:      Hon. Philip S. Gutierrez |

MUH, an individual, OCEAN ANGEL IV, LLC, a California limited liability company, PACIFIC RIM FISHERIES, INC., a California corporation, SARAH RATHBONE, an individual, COMMUNITY SEAFOOD LLC, a California limited liability company, SANTA BARBARA UNI, INC., a California corporation, SOUTHERN CAL SEAFOOD, INC., a California corporation, TRACTIDE MARINE CORP., a California corporation, WEI INTERNATIONAL TRADING INC., a California corporation and STEPHEN WILSON, an individual, individually and on behalf of others similarly situated,

               Plaintiffs,

v.

PLAINS ALL AMERICAN PIPELINE, L.P., a Delaware limited partnership, PLAINS PIPELINE, L.P., a Texas limited partnership, and JOHN DOES 1 through 10,

               Defendants.

Courtroom:  6A

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on November 18, 2019, at 1:30 p.m., or as soon thereafter as the matter may be heard, before the Honorable Philip S. Gutierrez, in Courtroom 6A of the United States District Court, Central District of California, located at 350 West 1st Street, Los Angeles, CA 90012-3332, Plaintiffs, by and through their attorneys of record herein, will move this Court for an order amending the definition of the Fisher Subclass.

Plaintiffs' motion is based on this Notice of Motion and Motion, the accompanying Memorandum in Support, all pleadings previously submitted, including all materials previously submitted in support of Plaintiffs' prior Motions for Class Certification, the oral argument of counsel, and any other matters the Court may consider. This motion is made following the conference of counsel pursuant to LR 7-3, which took place on August 1, 2019, following correspondence in July 2019.

Dated: August 30, 2019           Respectfully submitted,

**KELLER ROHRBACK L.L.P**

By:   _/s/ Juli E. Farris_
        Juli E. Farris

Juli E. Farris (CSB No. 141716)
Matthew J. Preusch (CSB No. 298144)
**KELLER ROHRBACK L.L.P.**
801 Garden Street, Suite 301
Santa Barbara, CA 93101
Telephone:  (805) 456-1496
Facsimile:   (805) 456-1497

1     Lynn Lincoln Sarko
      *(Admitted Pro Hac Vice)*
2     Gretchen Freeman Cappio
      *(Admitted Pro Hac Vice)*
3     Daniel Mensher
      *(Admitted Pro Hac Vice)*
4     Ray Farrow
      *(Admitted Pro Hac Vice)*
5     **KELLER ROHRBACK L.L.P.**
      1201 Third Ave, Suite 3200
6     Seattle, WA 98101
      Telephone:   (206) 623-1900
7     Facsimile:    (206) 623-3384

8     Robert L. Lieff (CSB No. 037568)
      Elizabeth J. Cabraser (CSB No. 083151)
9     Robert J. Nelson (CSB No. 132797)
      Nimish R. Desai (State Bar No. 244953)
10    Wilson Dunlavey (CSB No. 307719)
      **LIEFF CABRASER HEIMANN &**
11    **BERNSTEIN, LLP**
      275 Battery Street, 29th Floor
12    San Francisco, CA  94111-3339
      Telephone:   (415) 956-1000
13    Facsimile:    (415) 956-1008

14    *Class Counsel*

15    A. Barry Cappello (CSB No. 037835)
      Leila J. Noël (CSB No. 114307)
16    Lawrence J. Conlan (CSB No. 221350)
      **CAPPELLO & NOËL LLP**
17    831 State Street
      Santa Barbara, CA  93101-3227
18    Telephone:  (805)564-2444
      Facsimile:   (805)965-5950
19
      *Lead Trial Counsel*
20
      William M. Audet (CSB No. 117456)
21    Ling Y. Kuang (CSB No. 296873)
      **AUDET & PARTNERS, LLP**
22    711 Van Ness Avenue, Suite 500
      San Francisco, CA  94102-3275
23    Telephone:  (415) 568-2555
      Facsimile:   (415) 568-2556
24
      *Class Counsel*
25

26

27

28

Robert L. Lieff (CSB No. 037568)
Elizabeth J. Cabraser (CSB No. 083151)
Robert J. Nelson (CSB No. 132797)
Nimish R. Desai (State Bar No. 244953)
Wilson M. Dunlavey (CSB No. 307719)
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Telephone:  (415) 956-1000
Facsimile:  (415) 956-1008

Lynn Lincoln Sarko
(*Admitted Pro Hac Vice*)
Gretchen Freeman Cappio
(*Admitted Pro Hac Vice*)
Daniel Mensher
(*Admitted Pro Hac Vice*)
Ray Farrow
(*Admitted Pro Hac Vice*)
**KELLER ROHRBACK L.L.P.**
1201 Third Ave., Suite 3200
Seattle, WA 98101
Telephone:   (206) 623-1900
Facsimile:    (206) 623-3384

Juli Farris (CSB No. 141716)
Matthew J. Preusch (CSB No. 298144)
**KELLER ROHRBACK L.L.P.**
801 Garden Street, Suite 301
Santa Barbara, CA 93101
Telephone:   (805) 456-1496
Facsimile:    (805) 456-1497

A. Barry Cappello (CSB No. 037835)
Leila J. Noël (CSB No. 114307)
Lawrence J. Conlan (CSB No. 221350)
**CAPPELLO & NOËL LLP**
831 State Street
Santa Barbara, CA 93101-3227
Telephone:  (805) 564-2444
Facsimile:  (805) 965-5950

*Lead Trial Counsel*

William M. Audet (CSB No. 117456)
Ling K. Kuang (CSB No. 296873)
**AUDET & PARTNERS, LLP**
711 Van Ness Avenue, Suite 500
San Francisco, CA  94102-3275
Telephone:  (415) 568-2555
Facsimile:   (415) 568-2556

*Class Counsel*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KEITH ANDREWS, an individual, TIFFANI ANDREWS, an individual, BACIU FAMILY LLC, a California limited liability company, ROBERT BOYDSTON, an individual, MORGAN CASTAGNOLA, an individual, THE EAGLE FLEET, LLC, a California limited liability company, ZACHARY FRAZIER, an individual, MIKE GANDALL, an individual, ALEXANDRA B. GEREMIA, as Trustee for the Alexandra Geremia Family Trust dated 8/5/1998, JIM GUELKER, an individual, JACQUES HABRA, an individual, MARK KIRKHART, an individual, MARY KIRKHART, an individual, RICHARD LILYGREN, an individual, HWA HONG | **Case No. 2:15-cv-04113-PSG-JEM**<br><br>[Consolidated with Case Nos. 2:15-CV- 04573 PSG (JEMx), 2:15-CV-4759 PSG (JEMx), 2:15-CV-4989 PSG (JEMx), 2:15-CV-05118 PSG (JEMx), 2:15-CV- 07051- PSG (JEMx)]<br><br>**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION TO AMEND ORDER CERTIFYING FISHER CLASS PURSUANT TO RULE 23(c)(1)(C)**<br><br>Date:        November 18, 2019<br>Time:        1:30 p.m. |

1  MUH, an individual, OCEAN ANGEL IV,  | Judge:      Hon. Philip S. Gutierrez
   LLC, a California limited liability      | Courtroom:  6A
2  company, PACIFIC RIM FISHERIES,
   INC., a California corporation, SARAH
3  RATHBONE, an individual,
   COMMUNITY SEAFOOD LLC, a
4  California limited liability company,
   SANTA BARBARA UNI, INC., a
5  California corporation, SOUTHERN CAL
   SEAFOOD, INC., a California
6  corporation, TRACTIDE MARINE
   CORP., a California corporation, WEI
7  INTERNATIONAL TRADING INC., a
   California corporation and STEPHEN
8  WILSON, an individual, individually and
   on behalf of others similarly situated,
9
                    Plaintiffs,
10
    v.
11
    PLAINS ALL AMERICAN PIPELINE,
12  L.P., a Delaware limited partnership,
    PLAINS PIPELINE, L.P., a Texas limited
13  partnership, and JOHN DOES 1 through
    10,
14
                    Defendants.
15

16

17

18

19

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................ 1

RELEVANT BACKGROUND .................................................................................... 1

I.     PLAINTIFFS' INITIAL MOTION WAS BASED ON
PRELIMINARY EVIDENCE. .......................................................................... 1

II.    PLAINTIFFS' INSTANT MOTION IS BASED ON FINAL
EVIDENCE. ....................................................................................................... 4

THE PROPOSED SUBCLASS ................................................................................... 6

ARGUMENT ............................................................................................................... 9

I.     PLAINTIFFS SEEK TO MODIFY THE DEFINITION TO
CORRESPOND TO THE EVIDENCE. ........................................................... 9

II.    THE PROPOSED SUBCLASS SATISFIES RULE 23. ................................ 12

     A.     The Proposed Subclass satisfies Rule 23(a). ...................................... 12

     B.     The Proposed Subclass satisfies Rule 23(b)(3). .................................. 14

          1.     Common issues predominate. ................................................... 15

          2.     A class action is vastly superior to the alternative of
multiple trials involving the same evidence. ........................... 17

                a.     Interest of Class Members ............................................... 17

          3.     Extent of Any Litigation Already Begun ................................. 18

          4.     Desirability of Concentration in this Forum ............................ 18

          5.     Likely Difficulties of Managing a Class Action ..................... 18

CONCLUSION .......................................................................................................... 19

1

2

3

# TABLE OF AUTHORITIES

4

**Page(s)**

5

**Cases**

6

7

*Barnes v. AT&T Pension Benefit Plan-Nonbargained Program*,
   273 F.R.D. 562 (N.D. Cal. 2011) ..............................................................9, 10, 11

8

9

*Bates v. United Parcel Service, Inc.*,
   511 F.3d 974 (9th Cir. 2007) ......................................................................... 9

10

11

*Briseno v. ConAgra Foods, Inc.*,
   844 F.3d 1121 (9th Cir. 2017) ...................................................................... 17

12

13

*Cook v. Rockwell Int'l Corp.*,
   151 F.R.D. 378 (D. Colo. 1993) ................................................................... 10

14

15

*In re Deepwater Horizon*,
   910 F.Supp. 2d 891 (E.D. La. 2012) ........................................................... 18

16

17

*Dukes v. Wal-Mart Stores, Inc.*,
   603 F.3d 571 (9th Cir. 2010) ........................................................................ 9

18

19

*Fonder v. Sheriff of Kankakee Cty.*,
   823 F.3d 1144 (7th Cir. 2016) ...................................................................... 9

20

*Gates v. Rohm and Haas Co.*,
   655 F3d 255 (3rd Cir. 2011) ......................................................................... 16

21

22

*Gintis v. Bouchard Transp. Co.*,
   596 F.3d 64 (1st Cir. 2010) .......................................................................... 18

23

24

*Good v. Am. Water Works Co., Inc.*,
   No. 14-1374 (S.D.W. Va. Jul. 6, 2017), ECF 1146 ..................................... 19

25

26

*Minter v. Wells Fargo Bank, N.A.*,
   280 F.R.D. 244 (D. Md. 2012) ..............................................................10, 11, 12

27

28

*Moore v. Walter Coke, Inc.*,
   294 F.R.D. 620 (N.D. Ala. 2013) ................................................................. 10

*Ms. L. v. U.S Immigration & Customs Enf't,*
    330 F.R.D. 284 (S.D. Cal. 2019) ............................................................ 10, 11, 12

*O'Connor v. Boeing N. Am., Inc.,*
    184 F.R.D. 311 (C.D. Cal. 1998) ........................................................ 16

*Pulaski & Middleman, LLC v. Google, Inc.,*
    802 F.3d 979 (9th Cir. 2015) ................................................................ 17

*Rodriguez v. It's Just Lunch, Int'l,*
    300 F.R.D. 125 (S.D.N.Y. 2014) ........................................................ 19

*Tyson Foods, Inc. v. Bouaphakeo,*
    136 S.Ct. 1036 (2016) ........................................................................ 15

*Wehner v. Syntex Corp.,*
    117 F.R.D. 641 (N.D. Cal. 1987) ........................................................ 18

*In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig.,*
    302 F.R.D. 448 (N.D. Ohio 2014) .................................................... 9, 11

**Other Authorities**

Commercial Fisheries Economic Impact Report 10 (April 2015) .......................... 14

Fed. R. Civ. P. 23 ................................................................................................ 17

Fed. R. Civ. P. 26 .................................................................................................. 5

PHMSA's May 2016 *Failure Investigation Report* ...................................... 2

1 William B. Rubenstein, *Newberg on Class Actions*, §7.37 (5th ed. 2014) ....................................................................................................... 6

MEMO ISO MTN TO AMEND ORDER
CERTIFYING FISHER CLASS
CASE NO. 2:15-CV-04113-PSG-JEM

**INTRODUCTION**

Two years ago, this Court certified a subclass of fishers and seafood processors who lost income as a result of Defendants' ("Plains") failure to maintain their oil pipeline along the Gaviota Coast, causing an oil spill. *See* Dkt. 257 ("Fisher Order"). At that time, Plaintiffs' experts submitted preliminary results of where the oil went and how it impacted the regional fishing industry. Now, after additional fact and expert discovery, Plaintiffs have refined their preliminary estimates of the spill's scope and impact. The affected area and species differ from Plaintiffs' initial definition, which was based on a list of fishing blocks that discovery has shown were both over- and under-inclusive. Plaintiffs move to amend the subclass definition to conform the Fisher Subclass to this new evidence.

**RELEVANT BACKGROUND**

In May 2015, Plains' pipeline Line 901 (the "Pipeline") ruptured onshore near Santa Barbara causing an oil spill into the Pacific Ocean (the "Spill"). Plaintiffs have long claimed that Plains knew the entire Pipeline was severely corroded and at risk of rupture. Second Amended Complaint ("Complaint"), Dkt. 88 ¶¶ 5, 74, 75. These allegations have now been confirmed. Plains was indicted for its conduct leading up to the Spill, and after vigorously defending itself in a months-long trial, was found guilty by a California jury of nine separate counts, including a felony count for knowingly discharging oil into the ocean.[1]

**I.      PLAINTIFFS' INITIAL MOTION WAS BASED ON PRELIMINARY EVIDENCE.**

Among the victims of Plains' misconduct were fishers and the persons and businesses that purchase and re-sell the seafood those fishers catch. The operative Second Amended Complaint alleges claims on behalf of a nationwide class "[a]ll persons or businesses in the United States that claim economic losses, or damages

---

[1] Declaration of Juli Farris in Support of Motion to Amend Order Certifying Fisher Class Pursuant to Rule 23(c)(1)(C) ("Farris Decl."), Ex. 1.

to their occupations, businesses, and/or property as a result of Defendants' May 19, 2015 oil spill from Line 901." Complaint, Dkt. 88 ¶ 249.

Based on preliminary evidence of oiling from the Spill, as reported by Plains to the federal government, Plaintiffs moved for certification of the following Subclass (Fisher Order, Dkt. 257 at 14):

> Persons or entities who owned or worked on a vessel that landed seafood within the California Department of Fish & Wildlife fishing blocks 651 to 657, 664 to 671, 681 to 683, as well as persons or entities who owned or worked on a vessel that landed groundfish, including but not limited to sablefish, halibut and rockfish, in fishing blocks 631 to 633, 637 to 639, 643 to 645, 658 to 659, and 684 to 690, between May 19, 2010 and May 19, 2015 and were in operation as of May 19, 2015, as well as those persons and businesses who purchased and re-sold commercial seafood so landed, at the retail or wholesale level, that were in operation as of May 19, 2015.

Plaintiffs based this definition on the information available to them at the time regarding the amount of oil released and the areas impacted: Plains' own estimates, as reported to government agencies and published by the U.S. Department of Transportation Pipeline and Hazardous Materials Safety Administration ("PHMSA"),[2] and the areas closed to fishing after the Spill. According to the PHMSA's May 2016 *Failure Investigation Report*, which is based on figures reported by an expert Plains retained, 2,934 barrels of oil were released from the Pipeline, of which 500 reached the ocean, and 1,100 barrels were recovered. Farris Decl., Ex. 2, at 3-14.

---

[2] Plains consistently attempts to cast its estimate of the number of barrels of crude oil that reached the ocean as the government's estimate. The PHMSA did not determine the amount of oil spilled, it simply reported the estimate Plains supplied. *See* Farris Decl., Ex. 2, at 3-14.

1    To propose their initial class definition, Plaintiffs' experts used that initial

2    information to conduct their preliminary analysis of where the oil traveled and the

3    likely impact on fisheries. *See* Lenihan Decl., Dkt. 183 ¶ 23. Plaintiffs supplied a

4    report from Dr. Igor Mezić, the preeminent expert in the field of fate and transport

5    modeling, who explained that he would be able to predict where the spill oil went

6    on an hour-by-hour basis to a reasonable degree of scientific certainty, by

7    identifying and computing the impact of phenomena that affect oil flow in the

8    ocean. Mezić Decl., Dkt. 128 ¶ 31. Dr. Mezić's analysis was preliminary at that

9    time, as he waited for the Unified Command to complete its analysis and for

10   additional data to be released by the government, through the National Oceanic and

11   Atmospheric Administration ("NOAA"). Plaintiffs also submitted a report from Dr.

12   Hunter Lenihan, a professor of applied marine and fisheries ecology at UCSB's

13   Bren School of Environmental Science and Management, and an expert on local

14   fisheries and the impacts of oil spills on fisheries, regarding the effects of oil on

15   commercial fishing. Lenihan Decl., Dkt. 183.  Plaintiffs' initial subclass definition

16   identified geographic boundaries that were conservatively based on these initial

17   reports. *See* Plaintiffs' Reply ISO Class Certification ("Reply"), Dkt. 207 at 8-9.

18   The Court certified Plaintiffs' proposed subclass, finding that each of Rule

19   23's prerequisites for certification had been met based on the evidence presented,

20   including reports from Plaintiffs' experts. *See* Fisher Order, Dkt. 257 at 7-17, 22-

21   27. The Court rejected Plains' attempts to exclude the experts and accepted each of

22   their declarations, finding "them reliable for showing that fishermen in the

23   identified blocks expended more and earned less in the aftermath of the oil spill and

24   may continue to earn less, given that fish quantities and size and the reputation of

25   Santa Barbara fishers continues to rebound after the spill," after noting that the

26   experts were able to isolate impact on fishers by controlling for other variables that

27   may impact fisheries' profits. Fisher Order, Dkt. 257 at 14.

28   The Court also concluded that the 36 fishing blocks that defined the

MEMO ISO MOTION TO
MODIFY THE CLASS DEFINITION
CASE NO. 2:15-CV-04113-PSG-JEM

geographic boundaries of the subclass "appear to reasonably reflect the potential zone of the oil spill." *Id*. at 16-17. It noted, however, that it could "whittle" the class definition as the case progressed to include "only those fisherm[e]n that worked in the areas affected by the spill." *Id*. at 17.

## II.   PLAINTIFFS' INSTANT MOTION IS BASED ON FINAL EVIDENCE.

After two more years of discovery, including recently completed expert discovery, Plaintiffs have significantly improved their understanding of the areas affected by the Spill. The work that Dr. Mezić has been engaged in for the last three years, determining where Plains' oil went, is now completed. Dr. Mezić has determined to a reasonable degree of scientific certainty the geographic area the Spill's oil covered, where it submerged and re-emerged onto the surface, and the duration and volume of Spill oil in each fishing block. *See* Farris Decl., Ex. 3, Expert Report of Igor Mezić, PhD, ¶¶ 3, 6, 40-41, 57.

Dr. Mezić concludes, based on extensive physical evidence and well-understood transport phenomena, that the actual volume of the oil spilled into the Pacific Ocean was between 8,000 and 11,500 barrels. Under the "most probable" scenario, at least 10,750 barrels of oil actually reached the Pacific Ocean as a result of the Spill. *Id*. ¶ 5. Using a Lagrangian oil transport model, Dr. Mezić has also determined that the oil released during the spill extended beyond the boundaries of the original certified class blocks directly along the coastline, and continued south and west of the anticipated area beyond the Channel Islands and as far as Los Angeles County, covering a total of 165 "oiled" fishing blocks. Farris Decl., Ex. 4, Rupert Decl. at 4.

Dr. Mezić's analysis was only the first step to determine the impact of the Spill on the commercial fishing industry. Dr. Peter Rupert, Professor of Economics at UCSB and former Chair of UCSB's Department of Economics explains that, by applying standard regression techniques to commercial fish landings data, he can

"determine to a reasonable degree of scientific certainty the extent to which the oil spill reduced the amount of fish caught in those blocks where [Plains'] oil was present." Farris Decl., Ex. 4, Amended and Supplemental Report of Peter Rupert, Ph.D. at 2. Dr. Rupert determined that the fishing blocks oiled by Plains' spill experienced lower levels of catch through the end of 2017. *Id.* At 11, Table 5. Dr. Rupert's Rule 26(a)(2) report then uses reliable government and industry data to compute damages for the original certified blocks.165 oiled blocks identified by Dr. Mezić, and the blocks in the proposed amended class definition. *Id.*

Dr. Mezić's analysis reveals that the original class boundaries were both over and under-inclusive. For example, some of the "groundfish only" fishing blocks included in the original class boundaries were not among those likely impacted. *See* Farris Decl., Ex. 7, Map of Fishing Blocks: Original and Amended Definitions (comparison of current and proposed subclass boundaries). These findings were confirmed by Dr. Rupert's analysis, which failed to discern any difference in groundfish catch attributable to the Spill in those thirteen blocks. Rupert Report Table 3.[3] With this evidence and expert analysis collected, Plaintiffs are now ready to address this Court's condition that the Fisher Subclass should correspond to the area impacted by the Spill.[4] While Plains argues that Plaintiffs could have made this request earlier (*see* Dkt. 523 at 3), in reality, the timing of this request, made before the close of expert discovery and just one month after completion of all expert reports, is appropriate. Indeed, Rule 23(c)(1)(C) expressly provides that the district

---

[3] The current class definition excludes groundfish, except in the "closed" blocks, because groundfish typically inhabit deep water far offshore and mature more slowly than most coastal species.

[4] Although not relevant to the Rule 23 analysis, given Plains' opposition to Dr. Mezić's estimates and the marked difference between Dr. Mezić's analysis and Plains' own estimates of the Spill volume, Plaintiffs took the additional step of completing their expert and rebuttal reports to be sure that there was a strong record and basis to bring this Motion, before presenting it to the Court. Substantial evidence, developed after painstaking evidentiary review and expert analysis, supports Dr. Mezić's conclusions.

MEMO ISO MOTION TO
MODIFY THE CLASS DEFINITION
CASE NO. 2:15-CV-04113-PSG-JEM

1    court may modify the class definition at any time "before final judgment." There

2    can be no doubt that Plaintiffs could raise these same arguments in opposition to

3    any motion to decertify the Fisher Subclass. Plaintiffs are entitled to address this

4    issue proactively, and the Court and all parties are better served by doing so. The

5    motion is neither time barred nor prejudicial.

6                              **THE PROPOSED SUBCLASS**

7            Rule 23 provides that "[a]n order that grants or denies class certification may

8    be altered or amended before final judgment." Fed. R. Civ. P. 23(c)(1)(C). Once a

9    class is certified, district courts retain jurisdiction to ensure that the class definition

10   is consistent with the evidence. *See, e.g.*, 1 William B. Rubenstein, *Newberg on*

11   *Class Actions*, §7.37, (5th ed. 2014) (citations omitted) (Once a class is certified,

12   district courts have an ongoing "'duty of monitoring class decisions in light of the

13   evidentiary development of the case.'"). Plaintiffs respectfully request that this

14   Court adjust the class definition to conform to the existing evidence.

15           As this Court has already determined, each of the elements of Rule 23 are

16   met with respect to the Fisher Subclass. Fisher Order, Dkt. 257 at 22-27. Plaintiffs'

17   proposal makes the necessary adjustments to "whittle" the class to those working in

18   the area impacted by the spill, while ensuring that those with legitimate claims are

19   not inadvertently excluded. Rule 23 requires no less.

20           The proposed amended Fisher Subclass definition is:

21           All persons and businesses (Fishers) who owned or worked on a

22           vessel that was in operation as of May 19, 2015 and that:

23           (1) landed any commercial seafood in California Department of Fish

24           and Wildlife ("CDFW") fishing blocks 654, 655, or 656; or

25           (2) landed any commercial seafood, except Groundfish or Highly

26           Migratory Species (as defined by the CDFW and the Pacific Fishery

27

28

Management Council),[5] in CDFW fishing blocks 651-656, 664-670, 678-686, 701-707, 718-726, 739-746, 760-764, or 806-809;

from May 19, 2010 to May 19, 2015, inclusive; and

all persons and businesses (Processors) in operation as of May 19, 2015 who purchased such commercial seafood directly from the Fishers and re-sold it at the retail or wholesale level.

Excluded from the proposed Subclass are: (1) Defendants, any entity or division in which Defendants have a controlling interest, and their legal representatives, officers, directors, employees, assigns and successors; (2) the judge to whom this case is assigned, the judge's staff, and any member of the judge's immediate family, and (3) businesses that contract directly with Plains for use of the Pipeline.

The proposed definition is limited to the 50 blocks that contained the highest volumes of oil identified by Dr. Rupert, using Dr. Mezić's model, plus five blocks that do not meet that criteria, but are surrounded by "top 50" blocks. The amended definition eliminates 17 blocks from the original definition that were not among the most contaminated, including all the groundfish-only blocks that were located north and west of Point Conception. The proposed definition instead includes those blocks south and east of the Channel Islands that, based on Dr. Mezić's model, were among the most contaminated. The original definition contained 36 blocks, the amended definition contains 55.

---

[5] *See* Farris Decl. Exs. 9 and 10 - (descriptions of Groundfish and Highly Migratory Species identified by CDFW and the Pacific Fishery Management Council)]

The map below, Exhibit 7 of the Farris Declaration, shows a comparison of both the currently certified class boundaries and boundaries proposed under the new class definition, with the overlap of the two shown in in dark gray:



**Map of Fishing Blocks: Original and Amended Definition**

*See also* Farris Decl., Exs. 5-6 (maps of current and proposed classes).

In addition, the proposed definition is limited to fishers who harvest species that primarily live and breed in shallow water, near the coast line, or in the top layer of the water column where Dr. Mezić's model indicates that Plains oil would be located. The amended definition excludes landings for species classified as Groundfish or Highly Migratory by the CDFW and Pacific Fishery Management Council that are found in deep-water or far off shore.  Farris Decl., Exs. 9-10.

These amendments are intended to closely conform both the causal proof and quantifiable damages. They are based on the science developed in this case and

scientific literature and are well supported by the causation and damage analysis performed by Dr. Peter Rupert. The result is a class definition that closely aligns with the area most impacted by the Spill and includes those for whom Plaintiffs can demonstrate and quantify loss on a class-wide basis.[6]

**ARGUMENT**

## I.   PLAINTIFFS SEEK TO MODIFY THE DEFINITION TO CORRESPOND TO THE EVIDENCE.

Under Rule 23(c)(1)(C), the district court has broad authority to alter or amend a class certification order at any time before final judgment. *See Bates v. United Parcel Service, Inc*., 511 F.3d 974 983 (9th Cir. 2007). "Rule 23 provides district courts with broad discretion to determine whether a class should be certified, and to revisit that certification throughout the legal proceedings before the court." *Dukes v. Wal-Mart Stores, Inc*., 603 F.3d 571, 579 (9th Cir. 2010) (internal quotation marks and citations omitted). This discretion specifically includes the ability of the court to modify the class definition. *See, e.g.*, *Barnes v. AT&T Pension Benefit Plan-Nonbargained Program*, 273 F.R.D. 562 (N.D. Cal. 2011) (granting a motion to modify the class definition).

Courts routinely modify class definitions after certification. Courts "re-defin[e] the class to better reflect new evidence." *In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig*., 302 F.R.D. 448, 460 (N.D. Ohio 2014) (modifying class to reflect new evidence regarding which washing machine models have the alleged design defect). "A class defined early in a suit cannot justify adjudicating hypothetical issues rather than determining the legality of what actually happens. The class definition must yield to the facts, rather than the other way 'round." *Fonder v. Sheriff of Kankakee Cty*., 823 F.3d 1144, 1147 (7th Cir.

---

[6] To the extent that individual fishers may have suffered losses, such as loss of equipment or changes in effort that are not reflected in the difference-in-differences model, these can be addressed through a second phase of trial proceedings, as this Court has previously acknowledged. Fisher Order, Dkt. 257 at 24; Real Property Order, Dkt. 454 at 12.

1    2016).

2         Courts also routinely enlarge classes to include new alleged victims,

3    particularly where the victims excluded from the class definition share common

4    factual circumstances and have the same legal claims. *Ms. L. v. U.S Immigration &*

5    *Customs Enf't* ("*ICE*"), 330 F.R.D. 284 (S.D. Cal. 2019); *Barnes v. AT&T Pension*

6    *Benefit Plan-NonBargained Program*, 273 F.R.D. 562, 569 (N.D. Cal. 2011);

7    *Minter v. Wells Fargo Bank, N.A.*, 280 F.R.D. 244 (D. Md. 2012).

8         The practicality of refining the class definition after substantial discovery is

9    evident in environmental cases like this one, because in such cases courts typically

10   require that a proposed class boundary be tethered to reliable scientific evidence.

11   *See., e.g.*, *Cook v. Rockwell Int'l Corp.*, 151 F.R.D. 378, 383 (D. Colo. 1993) (class

12   certification requires "examination of plaintiffs' evidence of the dispersion of

13   hazardous emissions."); *Moore v. Walter Coke, Inc.*, 294 F.R.D. 620, 628 (N.D.

14   Ala. 2013) (denying motion to dismiss class allegations in pollution case, because

15   "[a]fter reviewing expert testimony and other evidence, other courts have had a

16   better vantage point from which to decide why a definition fails or succeeds").

17        For example, in another context, the court in *Ms. L.*, granted the plaintiffs'

18   motion to enlarge the class. The plaintiffs' initial class certification motion sought

19   to certify a class of parents detained by ICE whose children were to be separated

20   from them after a preliminary injunction issued. 330 F.R.D. at 288. The court

21   certified the class. Subsequently, counsel for plaintiffs learned of parents detained

22   by ICE whose children were separated from them even before a preliminary

23   injunction issued. Plaintiffs then filed a motion to expand the class to include this

24   group. The trial court granted the motion, because those parents previously

25   excluded from the class had been subjected to the same common practice and

26   presented the identical legal question: whether the DOJ's practice of separating

27   parents from children violated the parents' due process rights. *Id.* at 289.

28        Similarly, in *Minter*, 280 F.R.D. 244 at 246, the court originally certified a

class of consumers who had obtained loans from Wells Fargo "on or after December 26, 2006," one year before the complaint was filed.  But the complaint was amended to include civil RICO claims for which the statute of limitations is four years. Plaintiffs moved to expand the class definition to include borrowers who had closed on a Well Fargo loan "on or after December 26, 2003," in order to avoid excluding timely RICO claims. *Id.* The court agreed. In so doing, it declined to conduct a new Rule 23 analysis because the enlargement of the class involved the same legal theories and sets of proof as the initial motion. *Id.*

A recent decision from the Northern District of California is similar. *Barnes*, 273 F.R.D. at 569. In that ERISA action, the court enlarged the class to include deferred annuitants, in addition to lump-sum benefit recipients, after the defendant clarified its position that deferred annuitants were treated the same as lump-sum benefit recipients under its pension plan. *Id.* The court held that the enlargement was appropriate because the factual predicates of both groups were common (though not identical) and the legal issue, regarding plan interpretation, applied to both groups. *Id.*

Here, Plaintiffs' motion is straightforward. Plaintiffs seek to modify their class definition to conform to the evidence by excluding those fishing blocks where the common evidence shows fisheries were likely not impacted by Plains' oil, and to include fishing blocks that were. *See* Relevant Background § II, *supra*. As in *Whirlpool*, the modified definition comports with evidence of impact. As in *Ms. L*, *Minter*, and *Barnes*, the modified definition seeks to ensure that victims of Plains' gross negligence are not excluded. This modification does not "open the door to new theories or sets of proof that were not already part of the case." *Minter*, 280 F.R.D. at 247. Plaintiffs simply seek to ensure that the class definition conforms to the evidence they intend to present at trial.

This case has always been about where Plains' oil went. The fisher industry's claims have always been about which blocks were fouled with oil and which fish

and seafood populations were impacted by that soiling. *See, e.g.*, Fisher Order, Dkt. 257 at 14 ("To succeed at trial on each of the remaining claims, Plaintiffs in the fisheries subclass must show that the oil spill caused each member of the subclass to earn less profit relative to what they could have earned had the spill not occurred."). This Motion changes none of that.

## II.   THE PROPOSED SUBCLASS SATISFIES RULE 23.

"'In considering the appropriateness of [modification or] decertification, the standard of review is the same as a motion for class certification: whether the Rule 23 requirements are met.'" *Ms. L.*, 330 F.R.D. at 287 (internal citations omitted). In making this decision however, courts are not required to revisit elements of Rule 23 analysis already established. *Minter*, 280 F.R.D. at 247 ("The enlargement of the [subclass] does not sufficiently change the landscape so that this Court need revise its prior decision regarding the superiority of class treatment for this case.").

Plaintiffs' revised definition satisfies all requirements of Rule 23(a) and (b)(3), for the same reasons that the original definition did, as this Court has already held. *See* Fisher Order, Dkt. 257 at 24-27.

### A.   The Proposed Subclass satisfies Rule 23(a).

To justify class certification, "Plaintiffs must satisfy all of Rule 23(a)'s four requirements –numerosity, commonality, typicality, and adequacy—and at least one of the requirements of Rule 23(b)." Fisher Order, Dkt. 257 at 3 (citing *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 979-80 (9th Cir. 2011). Plains did not contest that the first three of these requirements had already been met, and this Court rejected Plains' arguments with respect to the fourth. *Id.* at 23-28. The proposed changes to the class definition do not affect the Court's findings, so there is no reason to revisit them here.

***Numerosity***. Rule 23(a)(1) requires a proposed class be "so numerous that joinder of all members is impracticable." This Court previously held that Plaintiffs' initial definition satisfied the numerosity requirement, because the proposed

subclass contains more than 100 class members. *Fisher Order*, Dkt. 257 at 24-25.
The proposed definition, covering a larger geographic region, is expected to include
a greater number of class members than the original class, although there is
significant overlap. *Farris Decl.* ¶ 17.   The initial class notice list included
individuals or businesses connected to roughly 700 license holders, 215 fish buyer
IDs, and over 875 vessel IDs, for an estimated 1,500 unique class member entities.
*Id*. Based on CDFW records, the new boundaries would likely include roughly 300
to 500 additional fishers and processors, or an estimated 2,000 class members in
total. *Id*.  As before, numerosity is satisfied.

> **Commonality.** Rule 23(a)(2) requires that Plaintiffs show "there are
questions of law or fact common to the class." The landscape has not changed with
respect to key common liability questions for this Subclass, such as whether Plains
acted negligently, recklessly, and/or maliciously regarding the design, inspection,
repair, and/or maintenance of the Pipeline. *See* Complaint, Dkt. 88 at ¶ 255; *Fisher
Order*, Dkt. 257 at 25; Real Property Order, Dkt. 454 at 10. As this Court has
determined, because the litigation will result in "at least one common answer" to
the questions presented, commonality is met. *Id*. at 10.

> **Typicality.** Rule 23(a)(3) requires that the named Plaintiffs' claims be typical
of the claims of the class. "[R]epresentative claims are 'typical' if they are
reasonably co-extensive with those of absent class members, [but] they need not be
substantially identical." *See* Fisher Order, Dkt. 257 at 26 (*quoting Hanlon v.
Chrysler Corp*., 150 F.3d 1011, 1020 (9th Cir. 1998)).

> The fisheries subclass is represented by the existing, Court-appointed Fisher
Plaintiffs. Complaint, Dkt. 88 ¶¶ 99-243; *see also* Declaration of Robert J. Nelson
in Support of Plaintiffs' Motion for Class Certification, Dkt. 124 Exs.1 to 22. The
subclass also includes seven Plaintiffs who purchased seafood for processing and
retail that was caught in both the existing and expanded boundary areas. *Id*. These
subclass representatives are typical of other fishery businesses, under either

definition, that lost income as a result of the spill when the fisheries were closed or had diminished supply. *Id.*; *see also* Commercial Fishermen of Santa Barbara, 2014 Commercial Fisheries Economic Impact Report 10 (April 2015).[7]

As this Court previously determined, typicality is met because "the class representatives' claims and damages are fairly similar, if not identical, to the claims of the other class members, and that the theories of liability among the fisheries subclass are alike." Fisher Order, Dkt. 257 26-27.

*Adequacy.* Rule 23(a)(4) requires that the class representatives "will fairly and adequately protect the interests of the class." Representation is adequate when "class representatives do not have any conflicts of interest with other class members, and the Court is confident the representative plaintiffs will prosecute the action 'vigorously on behalf of the class.'" *See, e.g.*, Fisher Order, Dkt. 257 at 27 (*citing Evon v. Law Offices of Sidney Mickell*, 688 F.3d 1015, 1031 (9th Cir. 2012)).

This Court rejected Plains' argument that Plaintiffs' strategic decisions of what claims to pursue should defeat their adequacy as class representatives. Fisher Order, Dkt. 257 Order at 27. As this Court held previously, Plaintiffs' "claims appear to be fairly representative of those raised by other plaintiffs and the lead Plaintiffs appear committed to pursuing this action." *Id.* Additionally, Class Counsel (whom this Court has already deemed adequate) remain committed to vigorously prosecuting the litigation. *Id.* Adequacy is satisfied.

Plaintiffs therefore satisfy the requirements of Rule 23(a).

## B.     The Proposed Subclass satisfies Rule 23(b)(3).

The Fisher Subclass was certified under Rule 23(b)(3), which requires that "[q]uestions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to

---

[7] *Available at* cfsb.squarespace.com/s/EconomicImpactReport.pdf (identifying typical species in the region).

other available methods for fairly and efficiently adjudicating the controversy."
While predominance is satisfied when common issue "of fact *or* law" predominate,
both common questions of fact regarding the Spill and common questions of law
predominate for the Proposed Fisher Class. *See* Rule 23(b)(3) (emphasis added).
The Fisher Subclass already "meets both the predominance and superiority
elements of Rule 23(b)(3)," as this Court has held. Fisher Order, Dkt. 257 at 24.

### 1.    Common issues predominate.

"The Rule 23(b)(3) predominance inquiry 'tests whether proposed classes are
sufficiently cohesive to warrant adjudication by representation.'" *See id.* at 6
(quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 at 623 (1997)). "The
predominance inquiry 'asks whether the common, aggregation-enabling, issues in
the case are more prevalent or important than the non-common, aggregation-
defeating, individual issues.' When 'one or more of the central issues in the action
are common to the class and can be said to predominate, the action may be
considered proper under Rule 23(b)(3) even though other important matters will
have to be tried separately, such as damages or some affirmative defenses peculiar
to some individual class members.'" *Tyson Foods, Inc. v. Bouaphakeo*, 136 S.Ct.
1036, 1045 (2016) (citations omitted).

Common questions predominate for the proposed Subclass, just as before. If
anything, by more carefully tailoring the class definition to the evidence of common
impact and injury, the proposed revisions to the class definition ensures that
common issues are even more predominant now than under the original definition.
Under either definition, the overwhelming common questions of fact regarding
Plains' gross negligence remain common to this Subclass, including *all* factual
questions regarding Plains' gross negligence leading up to the spill, *all* factual
questions regarding where the oil went, to what degree, and how much, and *all*
factual questions regarding Plains' failure to identify that a spill had happened for
many hours. *See, e.g.*, Complaint, Dkt. 88 ¶¶ 254-255 (alleging common questions).

1    All core factual questions are questions common to the entire Subclass and can be

2    answered with common proof.

3         Questions regarding the Spill's impact on the Subclass remain predominantly

4    common inquiries. This Court previously held that impact could be determined on a

5    class-wide basis because Plaintiffs' experts could show that Plains' Spill caused

6    fishermen in the identified blocks to earn less profit that they would have earned

7    had the spill not occurred. Fisher Order, Dkt. 257 at 14. Now, Plaintiffs' experts

8    have completed that analysis. *See* Relevant Background, § II, *supra*.

9         Consistent with Ninth Circuit precedent, the Court noted that even if some

10   members of the class turned out not to have been injured by the spill, certification

11   was still appropriate. Fisher Order, Dkt. 257 at 15-16 (citing *Torres v. Mercer*

12   *Canyons, Inc*., 835 F.3d 1125, 1136 (9th Cir. 2016) ("even a well-defined class may

13   inevitably contain some individuals who have suffered no harm.")). Here,

14   Plaintiffs' proposed Subclass includes *only* those fishing blocks that were directly

15   impacted by Plains' oil and excludes blocks that were not among those that

16   contained the highest volumes of oil from Plains' spill. Farris Decl. ¶ 11. Similarly,

17   species whose habitats or lifespans suggest that they would not be impacted by oil

18   in the near term have also been eliminated from the class.

19        Plains may dispute the *degree* of harm that fisheries within the proposed

20   class boundary experienced, but that is a merits dispute that the fact-finder can

21   resolve at trial class-wide with common proof. It is not a dispute the Court must

22   resolve now. As the Third Circuit concluded in *Gates v. Rohm and Haas Co.*, a

23   dispute about the risks from a chemical at issue "presents a merits determination

24   that does not alter the analysis of the propriety of class certification." 655 F3d 255,

25   at 261, n. 9 (3rd Cir. 2011); *see also O'Connor v. Boeing N. Am., Inc*., 184 F.R.D.

26   311, 320-22 (C.D. Cal. 1998) (rejecting argument against use of modeling at class

27   certification because "the concentration levels are irrelevant at this stage of the

28   litigation as this concerns the merits of Plaintiffs' claims against Defendants rather

1   than whether Plaintiffs have met the requirements of Rule 23").

2       In addition, although Subclass members' damages may vary, "differences in

3   damage calculations is not sufficient to defeat class certification." *Pulaski &*

4   *Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 987 (9th Cir. 2015) (quoting

5   *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1026 (9th Cir. 2011)). And

6   Plaintiffs' expert Dr. Rupert's difference-in-differences regression analysis

7   establishes a common method to establish the aggregate lost profits of the Subclass,

8   using common sources of proof. Farris Decl., Ex. 4 at 12-15. Thus, while Plaintiffs'

9   initial definition was appropriate for class certification, Plaintiffs' modified

10  definition is even more carefully tailored to match what the evidence reveals and

11  ensure that common issues predominate. Fisher Order, Dkt. 257 at 5-7.

12
13          **2.    A class action is vastly superior to the alternative of multiple
            trials involving the same evidence.**

14      Rule 23(b)(3) also requires Plaintiffs to demonstrate that the class action is

15  "superior to other available methods for fairly and efficiently adjudicating the

16  controversy." *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1127 (9th Cir.

17  2017). Courts consider four non-exhaustive factors. Fed. R. Civ. P. 23(b)(3)(A-D).

18  This Court's ruling that class treatment is superior applies with equal, if not greater,

19  force to the new definition.

20          **a.    Interest of Class Members**

21      As before, the interest of the Fisher Subclass members is served by class

22  treatment because "[w]here damages suffered by each putative class member are

23  not large, this factor weighs in favor of certifying a class action." *See* Fisher Order,

24  Dkt. 257 at 22-23 (citing *Zinser v. Accuflix Research Inst. Inc.*, 253 F.3d 1180,

25  1190-91 (9th Cir. 2001)); Real Property Order, Dkt. 454 at 16. Individuals would

26  have to incur enormous expense to litigate their individual claims in this complex

27  disaster action against Plains, including hiring liability and damages experts. *See,*

28  *e.g.*, *In re Deepwater Horizon*, 910 F. Supp. 2d 891,929 (E.D. La. 2012)

("Litigation of this type is extraordinarily complex and expensive, and the class action device was designed to allow individuals with comparatively modest claims to band together to bring such claims."). Litigating this action as a class also spares the court system from the burden of years of docket-clogging litigation. *Wehner v. Syntex Corp.*, 117 F.R.D. 641, 645 (N.D. Cal. 1987) ("Significant judicial economies are served by trying the common issues [of contamination].").

### 3. Extent of Any Litigation Already Begun

At the time the Fisher Subclass was certified, this Court held that the relatively few claims already pending weighed in favor of superiority. Fisher Order, Dkt. 257 at 23; Real Property Order, Dkt. 454 at 16-17. With the passage of time and dismissal of related matters previously identified, *see, e.g.*, Notice of Pendency of Other Actions or Proceedings, Dkt. 38, this factor now weighs even more heavily in favor of superiority.

### 4. Desirability of Concentration in this Forum

This Court previously rejected Defendants' claim that the OPA claims program was a superior forum to adjudicate fisher claims.  *See* Fisher Order, Dkt. 257 at 23 ("Courts have considered OPA and found it inferior to Rule 23 class actions because the party responsible for the oil spill is also the party that adjudicates the claims – at least on the first round of review.").

### 5. Likely Difficulties of Managing a Class Action

As with other certified subclasses, this last factor also weighs in favor of a class action. Because the key factual and legal issues are common to this Subclass, individuals will not have to litigate these issues separately. *See Gintis v. Bouchard Transp. Co.*, 596 F.3d 64, 67 (1st Cir. 2010) (Souter, J.) (noting in oil spill case that defendant's objections to plaintiffs' proof "show that substantial and serious common issues would arise over and over in potential individual cases"). Any variations within the Subclass are easily handled through ordinary trial procedures. *See Rodriguez v. It's Just Lunch, Int'l*, 300 F.R.D. 125, 141 (S.D.N.Y. 2014)

(holding that common issues can be "litigated collectively" and "predictable patterns" among a class can be "handled by special interrogatories or special verdict forms"); Memorandum Opinion and Order 38, *Good v. Am. Water Works Co., Inc.*, No. 14-1374, (S.D.W. Va. Jul. 6, 2017), ECF 1146 at 38 (noting in pollution case that while defendants "may be liable under somewhat different theories, both residential and business class members allege breach of similar duties").

Further, as the Court has already noted, even if separate proceedings are warranted for damages, that does not defeat class certification. See Fisher Order, Dkt. 257 at 24 (citing *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 513 (9th Cir. 2013)). Finally, providing notice to these Subclasses is straightforward and manageable; Plaintiffs' initial Fisher notice plan can be modified to accommodate notice to any additional class members. *See* Farris Decl. ¶ 17.; Declaration of Shannon R. Wheatman, Ph.D., in Support of Plaintiffs' Motion for Class Certification, Dkt. 130. As before, class action is a superior forum to resolve the claims of the Fisher Subclass. Fisher Order, Dkt. 257 Order at 24.[8]

## CONCLUSION

Plaintiffs respectfully request that this Court modify its initial order certifying the Fisher Subclass to correspond to the evidence. Plaintiffs will promptly submit a proposed Notice Plan subsequent to an order amending the Fisher Subclass definition.[9]

---

[8] In its prior ruling, the Court rejected Plains' ascertainability argument, holding that "courts in the Ninth Circuit are to assess the administrative feasibility of the class action under Rule 23(b)(3)'s superiority analysis." Fisher Order, Dkt. 257 at 3-4, n. 1. Accordingly, Plaintiffs do not separately address ascertainability here, but note that the new proposed definition is sufficient to allow class members to identify themselves, particularly given the detailed catch records available from CDFW.

[9] If the Court does not certify this amended class per Rule 23(b)(3), Plaintiffs alternatively request that this Court consider Rule 23 (c)(4). An issues class would allow a determination of common issues, such as how much oil spilled, where it went, whether Plains was negligent, and whether its misconduct constituted malice, oppression, or fraud, justifying an award of punitive damages, leaving

*Footnote continued on next page*

1
2
Dated: August 30, 2019                  Respectfully submitted,

3                                        By:   _/s/ Juli E. Farris_____
4                                              Juli E. Farris

5                                        Juli E. Farris (CSB No. 141716)
                                         Matthew J. Preusch (CSB No. 298144)
6                                        **KELLER ROHRBACK L.L.P.**
7                                        801 Garden Suite, Suite 301
                                         Santa Barbara, CA 93101
8                                        Telephone:   (805) 456-1496
9                                        Facsimile:    (805) 456-1497

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24  _____
    *Footnote continued from previous page*
25  individualized issues to a secondary proceeding.  *See, e.g.*, *Martin v. Behr Dayton*
    *Thermal Prod. LLC*   896 F.3d 405, 410 (6th Cir. 2018), *cert. denied*, 139 S. Ct.
26  1319, 203 L. Ed. 2d 564 (2019) (affirming a district court's certification of seven
27  issues in a groundwater contamination case, and its decision to later "establish
    procedures by which the remaining individualized issues concerning fact- of-injury,
28  proximate causation, and extent of damages can be resolved").

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Lynn Lincoln Sarko
*(Admitted Pro Hac Vice)*
Gretchen Freeman Cappio
*(Admitted Pro Hac Vice)*
Daniel Mensher
*(Admitted Pro Hac Vice)*
Ray Farrow
*(Admitted Pro Hac Vice)*
**KELLER ROHRBACK L.L.P.**
1201 Third Ave, Suite 3200
Seattle, WA 98101
Telephone:   (206) 623-1900
Facsimile:    (206) 623-3384

Robert L. Lieff (CSB No. 037568)
Elizabeth J. Cabraser (CSB No. 083151)
Robert J. Nelson (CSB No. 132797)
Nimish R. Desai (State Bar No. 244953)
Wilson M. Dunlavey (CSB No. 307719)
**LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP**
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Telephone:   (415) 956-1000
Facsimile:    (415) 956-1008

*Class Counsel*

A. Barry Cappello (CSB No. 037835)
Leila J. Noël (CSB No. 114307)
Lawrence J. Conlan (CSB No. 221350)
**CAPPELLO & NOËL, LLP**
831 State Street
Santa Barbara, CA 93101-3227
Telephone:   (805) 564-2444
Facsimile:    (805) 965-5950

*Lead Counsel for Plaintiff Class*

- 21 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

William M. Audet (CSB No. 117456)
Ling Y. Kuang (CSB No. 296873)
**AUDET & PARTNERS, LLP**
711 Van Ness Avenue, Suite 500
San Francisco, CA  94102-3275
Telephone:  (415) 568-2555
Facsimile:   (415) 568-2556

*Class Counsel*

MEMO ISO MOTION TO
MODIFY THE CLASS DEFINITION
CASE NO. 2:15-CV-04113-PSG-JEM

**CERTIFICATE OF SERVICE**

I, Juli Farris, hereby certify that on August 30, 2019, I electronically filed the foregoing with the Clerk of the United States District Court for the Central District of California using the CM/ECF system, which shall send electronic notification to all counsel of record.

/s/ Juli E. Farris

4838-5176-7202, v. 3

- 1 -